UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA

                          1:20cr-00142

v.

MELVIN PALMA FLORES,
    Defendant.

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Pursuant to Section 6A1.2 of the *Federal Sentencing Guidelines* the defendant, MELVIN PALMA FLORES, comes now and submits the following:

**I.     Objections to Presentence Report**

The defendant does not object to any fact or factor which would impact the calculation of the appropriate advisory federal sentencing guideline.

**II.    Background**

On October 26, 2019, Xyqwavius Brown was shot and killed in Fairfax County Virginia. During the course of the criminal investigation into the matter law enforcement were unable to identify any eyewitnesses to the slaying. Mr. Brown suffered two gun shot wounds. The shooting occurred in the late night hours. Police recovered bullet casings and one bullet from the scene.

At trial, government witnesses testified that prior to the shooting the victim and the defendant were involved in a drug disputed. According to these witnesses, the defendant had discovered that the victim planned, coordinated, and caused to be executed a plan to rob the defendant of one ounce of marijuana. The government's case theory was that the robbery served as the motive for the killing.

The key government witness at trial was the former girlfriend of the defendant, Laila Sheehy. Ms. Sheehy testified that she and Kollin Worlds accompanied the defendant to the

apartment complex where the shooting occurred. Ms. Sheehy, the defendant and Mr. Worlds travelled to the scene via car. According to Ms. Sheehy once they arrived to the apartment complex the defendant exited the car and walked out of her line of sight. Shortly thereafter she reported hearing multiple gun shots. Sometime after hearing the gun shots Ms. Sheehy testified that the defendant returned to the vehicle. The three then departed.

Ms. Sheehy further testified that after the defendant's arrest and detention she maintained communications with him. Significantly, she testified that she received a letter from the defendant. The letter was introduced at trial. Ms. Sheehy claimed that the letter encouraged her to falsely blame Kollin Worlds for the murder.

Mr. Kollin Worlds also served as a key government witness. He testified consistent with the testimony of Ms. Sheehy. However, during his testimony he admitted to having a secret romantic relationship with Ms. Sheehy. He testified that as far as he knew the defendant was unaware of his relationship with Ms. Sheehy. Further, Mr. Worlds confirmed that a social media account belonging to him communicated with the victim minutes before the shooting. These communications were introduced at trial.

The defendant testified at trial. During his testimony he denied killing Mr. Brown. He admitted traveling to the apartment complex with Ms. Sheehy and Mr. Worlds. Once they arrived at the complex he testified that it was Mr. Worlds, and not him, who exited the vehicle. After Mr. Worlds exited the vehicle the defendant testified he heard several shots. When the shooting occurred the defendant remained in the vehicle with Ms. Sheehy. Contrary to Ms. Sheehy's testimony the defendant maintained that his letter to her was not any attempt to falsely accuse Mr. Worlds. Instead, the defendant testified that the contents of the letter were largely true. On cross-

examination the defendant acknowledged that he did attempt to recruit witnesses to support his testimony.

### III. Sentencing Factors

A sentencing court is required to consider the guidelines ranges, *see* 18 U.S.C.A 3553(a)(4)(Supp. 2004), but is permitted to tailor the sentence in light of other statutory concerns as well. Specifically, 18 USC 3553(a) notes:

> The court shall impose a sentence **sufficient, but not greater than necessary,** to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for—
>   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, and that are in effect on the date the defendant is sentenced; or
>   (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code;
> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

The Supreme Court has described the process for imposing a sentence under the advisory sentencing guidelines as follows:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable [United States Sentencing] Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.  The Guidelines are not the only consideration, however.  Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the [18 U.S.C.] §3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented.  If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance…[A] major departure should be supported by a more significant justification than a minor one.  After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

*Gall v. United States,* 128 S.Ct. 586, 596-97 (2007)(citations and footnote omitted; *see also Kimbrough v. United States*, 128 S.Ct. 558, 569-70 (2007).

### A. Advisory Sentencing Guidelines

This Honorable Court must consider the advisory sentencing guidelines.  The Supreme Court has held that when sentencing, a court must demonstrate that it "considered the parties' arguments and ha[d] a reasoned basis for exercising [its] own legal decision making authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). " "[A] perfunctory recitation of the defendant's arguments or the § 3553(a) factors without application to the defendant being sentenced does not demonstrate reasoned decision making or provide an adequate basis for appellate review." *United States v. Blue*, 877 F.3d 513, 518 (4th Cir. 2017) (internal quotation marks omitted).Further, the district court must provide some individualized assessment "justifying the sentence imposed and rejection of arguments for a higher or lower sentence based on § 3553."

*United States v. Lynn*, 592 F.3d 572, 584 (4th Cir. 2010). A district court must address or consider all non-frivolous reasons presented for imposing a different sentence and explain why he has rejected those arguments. *United States v. Blue*, 877 F.3d 513, 518 (4th Cir. 2017); *Slappy*, 872 F.3d 202, 207 (4th Cir. 2017) (internal citation and quotation marks omitted).

An individualized assessment requires "that district courts consider the defendant's non-frivolous arguments for a downward departure, impose an individualized sentence based on the characteristics of the defendant and the facts of the case, and explain the sentence chosen." *Id.* A "'sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority'" by articulating how the sentencing factors apply to the case before it. *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) (quoting *Rita*, 551 U.S. at 356).

### B. § 3553(a) Sentencing Factors

In addition to considering the advisory sentencing range recommended under the federal sentencing guidelines, and statutory restrictions this Honorable Court must also consider the sentencing factors set forth in § 3553(a). The defendant submits an application of these factors to the case at bar leads to the conclusion that a sentence life as suggested by the advisory guideline range would be greater than necessary. We urge the Court to exercise its discretion to impose a sentence more consistent with the legitimate goal of the federal sentencing scheme to impose a sentence *sufficient but not greater than necessary.* We submit that in light of the relevant § 3553(a) factors discussed in detail below a total sentence of 25 years is appropriate.

1. **History and Characteristics of The Defendant**

The presentence investigative report fairly details Melvin's background. The instant offense represents his first arrest and conviction as an adult. The instant matter represents his first felony convictions. While it is true that this is not his first contact with the criminal justice system his prior incidents were adjudicated while he was a juvenile. As the government points out in its sentencing memorandum these contact generally resulted in misdemeanor delinquency findings. None resulted in any significant period of incarceration.

Melvin was nearly 18 years old at the time of these offenses. At the time he resided with his family in Northern Virginia. Although his mother and sister attempted to provide much needed structure Melvin found himself engaged in illegal drug use at a early age. As is far too often the case, he began to associate himself with negative influencers. As a teenager he began being arrested for misdemeanor delinquency matters. Although he has benefited from some court ordered rehabilitation programs, at the time of the offenses Melvin remained in need of services. The services include both educational, substance abuse, and vocational training.

The offenses and his subsequent incarceration coincided with Melvin becoming a father. He has a minor son from a previous relationship. As the Court learned during the presentation of evidence at trial the relationship between Melvin and the child's mother was also unhealthy. It was characterized by more drug abuse and a generally non-productive lifestyle. Melvin never benefited from the positive influence of a father-like figure during his most formative years. Now, facing a lengthy period of incarceration his only child faces the same troubling prospects.

While the United States Sentencing Commission has determined that age is not an appropriate ground to depart from the advisory guideline range, it remains a factor this Honorable

Court should consider. Research by the American Academy of Child and Adolescence Psychiatry and numerous other scholarly studies have concluded that the teenage mind remains "incomplete." As a consequence, youthful offenders are subject to "impulsive decision" making. Many demonstrate an impaired ability to appreciate risk or the gravity of their actions. *See* [https://www.aacap.org/AACAP/Families_and_Youth/Facts_for_Families/FFF-Guide/The-Teen-Brain-Behavior-Problem-Solving-and-Decision-Making-095.aspx](https://www.aacap.org/AACAP/Families_and_Youth/Facts_for_Families/FFF-Guide/The-Teen-Brain-Behavior-Problem-Solving-and-Decision-Making-095.aspx).

The weight of the evidence presented at trial support the conclusion that Melvin fits squarely within the parameters of the "impulsive decision" making teenager. According to the government, Melvin retaliated against Mr. Brown after being victimized at the hands of Mr. Brown of a robbery of $200 of marijuana. If believed, the act was clearly disproportionate to the harm Melvin suffered. While his age does not excuse or absolve his criminal responsibility it does provide some context.

Any sentence imposed by this Honorable Court should address Melvin's needs beyond punishment. The sentence should be fashioned to address his lengthy history of substance abuse, and need for both vocational and educational development.

### 2. Need to Deter

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421,

447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995); *see also* Gabbay, supra, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011).

As noted before, Melvin was only 18 years old at the time of these offenses. As a consequence of his convictions he has undoubtedly sacrificed the majority of his early adult years. He will be denied the ability too play a meaningful role in the raring of his young son. Even a

sentence as recommended by the government, 50 years, would likely result in Melvin spending the remainder of his natural life in prison. A sentence as recommended by the defense would give him the prospects of re-entering society as a middle aged man, far from the teenager convicted of the instant offenses.

### 4. Need to Protect the Public

The Court is also guided by the need to protect the public. In doing so, the court is duty bound to consider the likelihood that a particular defendant is likely to re-offend. In that regard, the defense urges this Honorable Court to consider the likelihood that Melvin will reoffend. We submit a sentence of 25 years in prison would more than adequately protect the public in light of Melvin's age and the clear evidence that older offenders are less likely to re-offend.

Studies by the Federal Bureau of Prisons, hereinafter BOP, as well as the United States Sentencing Commission, hereinafter Sentencing Commission, support the conclusion that as inmates age they become less prone to violence. *See* *https://www.bop.gov/about/statistics/statistics_inmate_age.jsp*. As the Sentencing Commission concluded, "[o]lder offenders are **substantially** less likely to re-offend." *See* https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

A sentence as recommended by the defense would place Melvin in an age category which has been found by the Sentencing Commission to represent a low risk of recidivism. 25 years would incapacitate Melvin during the period the same studies conclude would represent the highest risk category to engage in violence or re-offending post-release. It would be sufficient but not greater than necessary.

**IV.     Recommended Sentence**

The defense submits a sentencing totaling 25 years would be sufficient but not greater than necessary. We further submit the maximum period of supervised release should be impose. As the presentence report concludes, Melvin is without sufficient funds to pay any fines in this matter. In light of his lengthy history of substance abuse, we ask that the Court recommend to the Bureau of Prisons that he be permitted to participate in the 500 hours intensive drug treatment program. Finally, we ask that the Court include in its recommendation that he be housed in a facility as close to the Washington, DC metropolitan area as possible.

I ASK FOR THIS:

_____/s/_____
Robert L. Jenkins, Jr., Esq.
Virginia State Bar No: 39161
Bynum & Jenkins Law
1010 Cameron Street
Alexandria, Virginia 22314
(703) 309 0899 Telephone
(703) 549 7701 Fax
RJenkins@BynumAndJenkinsLaw.com
Counsel for Defendant MELVIN PALMA FLORES

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and accurate copy of the foregoing to be served upon all counsel of record via ECF on September 1, 2022.

_____/s/_____
Robert L. Jenkins, Jr., Esq.
Virginia State Bar No: 39161
Bynum & Jenkins Law
1010 Cameron Street
Alexandria, Virginia 22314
(703) 309 0899 Telephone
(703) 549 7701 Fax

RJenkins@BynumAndJenkinsLaw.com
Counsel for Defendant MELVIN PALMA FLORES