1

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF VIRGINIA
2               ALEXANDRIA DIVISION

3   -----------------------------x
                                 :
4   UNITED STATES OF AMERICA,     : Criminal Action No.
                                 :
5            versus              : 1:20-cr-142
                                 :
6   MELVIN PALMA FLORES,          : December 13, 2021
                                 :
7                   Defendant. : Volume I of IV
    -----------------------------x

8

          The above-entitled Jury Trial was heard before the
9   Honorable Rossie D. Alston, Jr., United States District Judge.

10                A P P E A R A N C E S

11   FOR THE GOVERNMENT:    MICHAEL BEN'ARY, AUSA
                            KATHERINE RUMBAUGH, AUSA
12                          United States Attorney's Office
                            2100 Jamieson Avenue
13                          Alexandria, VA 22314

14   FOR THE DEFENDANT:     ROBERT L. JENKINS, Jr. ESQ.
                            1010 Cameron Street
15                          Alexandria, VA 22314

16

17   OFFICIAL U.S. COURT REPORTER:   MS. TONIA M. HARRIS, RPR
                                     United States District Court
18                                   401 Courthouse Square
                                     Tenth Floor
19                                   Alexandria, VA 22314

20

21

22

23

24

25

2

```
 1                      TABLE OF CONTENTS
                         TRIAL WITNESSES
 2
     On behalf of the Government:
 3
     David Duffet
 4
             Direct examination by Mr. Ben'Ary............. 27
 5           Cross-examination by Mr. Jenkins.............. 34
             Redirect examination by Mr. Ben'Ary.......... 36
 6
     Kyle Wilson
 7
             Direct examination by Mr. Ben'Ary............. 37
 8           Cross-examination by Mr. Jenkins.............. 42

 9   Joyce Brown

10           Direct examination by Ms. Rumbaugh........... 45

11   Elijah Kyle-Canady

12           Direct examination by Mr. Ben'Ary............. 51
             Cross-examination by Mr. Jenkins.............. 61
13           Redirect examination by Mr. Ben'Ary.......... 72

14   Dr. Jocelyn Posthumus

15           Direct examination by Mr. Ben'Ary............. 78

16   Detective Michael Roberts

17           Direct examination by Mr. Ben'Ary............. 89
             Cross-examination by Mr. Jenkins.............. 119
18           Redirect examination by Mr. Ben'Ary.......... 128

19   Kara White

20           Direct examination by Mr. Ben'Ary............. 134
             Cross-examination by Mr. Jenkins.............. 148
21           Redirect examination by Mr. Ben'Ary.......... 156

22                         EXHIBITS

23   On behalf of the Government:
                                                      Admitted
24
     Number 1A - 1VV.................................... 92
25   Number 1B......................................... 30
     Number 2.......................................... 90
```

3

1   Number 3A......................................... 108
    Number 3B......................................... 108
2   Number 3C......................................... 108
    Number 3D......................................... 108
3   Number 3E......................................... 108
    Number 3F......................................... 108
4   Number 4.......................................... 109
    Number 5.......................................... 109
5   Number 9.......................................... 80
    Number 10......................................... 79
6   Number 11A........................................ 83
    Number 11B........................................ 82
7   Number 12A - 12AA................................. 113
    Number 13......................................... 28
8   Number 37......................................... 134
    Number 38 - 42.................................... 139
9   Number 43AB, 44AB, 45AB........................... 129
    Number 50......................................... 46
10

11                          MISCELLANY

12   Preliminary matters.................................. 03
     Opening statement of Ms. Rumbaugh.................... 19
     Opening statement of Mr. Jenkins..................... 24
13   Certificate of Court Reporter........................ 164

14

15

16

17

18

19

20

21

22

23

24

25

─────────────────── United States v. Flores ───────────────────

4

1    (Voir dire was held but not included herein.  Include voir

2    dire on page 2, line 1.)

3    (Jury trial commenced at 10:38 a.m.)

4             THE DEPUTY CLERK:  Would the defendant please stand

5    and face the jury?  And ladies and gentlemen of the jury,

6    would you please stand, raise your right hand, and respond

7    after the oath.

8             (Jury panel sworn.)

9             THE DEPUTY CLERK:  Please be seated.

10            THE COURT:  All counsel satisfied with the

11   composition of the jury?

12            MR. BEN'ARY:  Yes, Your Honor.

13            MR. JENKINS:  Yes, Your Honor.

14            THE COURT:  Very good.

15            Ladies and gentlemen who are remaining in the

16   gallery, I want to thank you for your willingness to come in

17   today and participate in the process.  As you have observed,

18   this is a very important process because we want to make sure

19   that we can have the ability for the jury to represent a

20   compliment of our community and, obviously, this venire, which

21   is the group that you all serve in, indeed represents the

22   complement of our community.  You have no responsibility for

23   the remainder of this case because you were not selected for

24   this particular jury.  It doesn't mean that you might not be

25   called on to sit on other juries because we need good

─────United States v. Flores─────

5

1   citizens, like you, who are willing to come forward, answer

2   the questions, and do the things that you need to do to make

3   sure that the government and Mr. Flores get a fair and

4   impartial trial in this matter.

5        Obviously, a couple of things that I'm going to

6   encourage you to do and not to do.  I'm going to encourage you

7   to have a happy holiday season.  I'm going to encourage you

8   not to contact any of these fine people who are serving on

9   this jury while this case is pending.

10       So if you have established a relationship with

11  someone who is sitting on this jury, please do not contact

12  them, or have any connection to them, during the course of

13  this litigation.  I'm going to be advising these good people

14  through the course of this trial not to talk about this case,

15  or any aspect of the case, until the case is fully presented

16  to them for their full and final deliberation.

17       Finally, on behalf of the court and the Eastern

18  District of Virginia, we appreciate you showing up here today

19  and living up to your public and civic duty and I wish you a

20  happy holiday season.  Thank you.  You're free to go.

21       (Jury panel members not selected excused.)

22       THE COURT:  Reading for the record now:  The public

23  was able to observe voir dire in courtroom 401 via the remote

24  broadcast system.  The jury is now selected, and the public

25  will be able to observe the trial from the gallery.  Markings

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────────────── United States v. Flores ───────────────

6

1    on seats in the gallery have been placed there to assist

2    individuals who enter the courtroom so that they can ensure

3    and maintain a safe distance from one another.

4              As you all have observed, some jurors will be seated

5    just outside the jury box to accomplish the Court's special

6    social distancing objectives, but all jurors will have an

7    unobstructed view of counsel, the witness box, and the

8    defendant throughout the trial.

9              Again, there's no significance of where you sit.

10   You're not wedded to any particular seat.  Most people, like

11   they are when they go to church, once they sit on a pew that's

12   where they sit all the time.  But you can sit anywhere you

13   want to as the trial goes on --

14             Your liaison or the person that's between you and

15   the Court is Ms. Tinsley.  She is my courtroom security

16   officer.  She's an excellent individual and an excellent

17   courtroom security officer.  If you have any concerns or

18   issues, please address them to her, and, if appropriate, she

19   will contact the Court to address any circumstances or

20   situations that you may confront.  But again, she's your

21   liaison.

22             I'm thinking at the end of the day she's probably

23   going to ask for your cell phone numbers, because, as I will

24   instruct you throughout the case, we cannot do anything unless

25   we have all 14 of you here.  So if there are any circumstances

────── United States v. Flores ──────

7

1    or something that comes up, please get in contact with her.

2            Just for your planning purposes, we will start

3    tomorrow at 10 a.m.  And as I indicated to one of the young

4    ladies I spoke with, we will try to get as close to 4 o'clock

5    at the end of the day to excuse you.  I will instruct you on

6    this formally every time:  Do not discuss the case or any

7    aspect of the case with anyone while the case is pending.  In

8    other words, a discussion of what's going on and what the

9    evidence is, what lawyers you think are good, none of that.

10   In other words, don't talk about the case at all.  That is a

11   specific instruction that you must adhere to and it's

12   important that you adhere to that instruction.

13           What I'm going to do now, ladies and gentlemen, is

14   give you a break, a comfort break.  So you can take care of

15   any of your personal needs.  As a special treat for you,

16   because I'm such a great guy, we'll have a menu for you to

17   select your lunch tomorrow.  You're paying for it through the

18   taxes that you pay.  But in any event, we're going to have a

19   menu for you so you can select your meal.  That will be done

20   at the beginning of the day.

21           We'll probably take our breaks somewhere between

22   12:30 and 1:15 every day.  I like to avoid people going out at

23   12:00.  Why?  Because that's when everybody goes out for

24   lunch, and I'd like for you to be able to have a nice lunch

25   where you can have it in a relaxed setting and not have to

─────────────── United States v. Flores ───────────────

8

1   worry.

2          Okay.  Let me go ahead and let you take your break.

3   We'll come back in.  I think we probably need to do a little

4   administrative stuff, so about 11 o'clock.

5          Okay.  Ms. Tinsley.

6          (Discussion off the record.)

7          THE COURT:  And if you need to bring back a bottle

8   of water or anything like that, that's fine too.  I'm not

9   persnickety on that.  I'm drinking water.

10          (Jury excused.)

11          THE COURT:  Very good.  Counsel, is there anything

12   we need to do before we get into the opening statements?

13          MR. BEN'ARY:  I don't believe so, Your Honor.

14          MR. JENKINS:  Not on behalf of the defense, Your

15   Honor.

16          THE COURT:  Very good.  As you all were able to

17   observe, the process that we all engaged in to get this done

18   is effective.  And so, I compliment you all on your

19   willingness to handle the case expeditiously and efficiently.

20   That is something that is a tribute to each of you as officers

21   of the court.

22          Mr. Flores, what's going to happen next now is we're

23   going to have opening statements and some of the witnesses are

24   going to testify.  We've gotten the jury seated.  You'll be in

25   a position to observe everyone who testifies during the course

─────────────── United States v. Flores ───────────────

9

1    of the case -- by the way the courtroom was configured.

2            Are you satisfied with the configuration of the

3    courtroom, sir?

4            THE DEFENDANT:  Yes, Your Honor.

5            THE COURT:  Mr. Jenkins.

6            MR. JENKINS:  Yes, Your Honor.

7            THE COURT:  Very good.  All right.  Do we need to do

8    any technical stuff to set up?

9            MR. BEN'ARY:  Your Honor, once we get into

10   witnesses, as long as we can have the exhibits up so that

11   counsel can see them, that's the only thing that we need.

12           THE COURT:  Okay.  Very good.

13           And I think the way we have the courtroom

14   configured, all of the witnesses can actually see a screen too

15   because we have one over here for the people who are down in

16   that section there.

17           Is the government satisfied with the configuration

18   of the courtroom?

19           MR. BEN'ARY:  Yes, Your Honor.

20           THE COURT:  We'll see everybody back in the

21   courtroom about 11 o'clock and we'll get the case rolling.

22           (Recess.)

23           (Court proceedings resumed at 11:10 a.m.)

24           THE COURT:  Let the record reflect, United States of

25   America versus Flores.

─────────────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────────────

EASTERN DISTRICT OF VIRGINIA

───────United States v. Flores───────

1      Counsel, are we ready to bring the jury back in?

2      MR. JENKINS:  Yes, Your Honor.

3      MS. RUMBAUGH:  Your Honor, we have two brief

4   housekeeping matters.  First, the government would request a

5   rule on witnesses.  Such that anyone who is slated to testify

6   or -- including anyone the defense might think of calling to

7   testify, would be instructed to wait outside the courtroom

8   until they are called.

9      THE COURT:  Mr. Jenkins.

10      MR. JENKINS:  I have no objection to the rule, Your

11   Honor.

12      THE COURT:  What I'm going to do is impose the rule.

13   I'm going to ask that counsel help me enforce the rule because

14   I don't know who witnesses are.  So maybe what you want to do

15   is take a look in the courtroom now and see if there's anyone

16   that you think might be a witness.

17      MS. RUMBAUGH:  None of the government's witnesses

18   are present.

19      MR. JENKINS:  And the same is true for the defense,

20   Your Honor.  I don't believe that there's any witnesses that

21   we intend to call who are present in the courtroom at this

22   time.

23      MS. RUMBAUGH:  Yes, Your Honor.  I should caveat.

24   Our case agent is present.

25      THE COURT:  And pursuant to the rule, you're

─────United States v. Flores─────

11

1   identifying that individual as your case agent?

2          MS. RUMBAUGH:  Yes, Your Honor.  This is Fairfax

3   County Police Detective Melissa Wallace.

4          THE COURT:  Okay.  Any objection, Mr. Jenkins?

5          MR. JENKINS:  No objection, Your Honor.

6          THE COURT:  Again, I'm going to depend on you all to

7   help me enforce the rule because I can't monitor who comes in

8   and out of the courtroom.  If you see someone come in, just

9   stop the proceeding and say we had a witness that didn't know

10  about the rule who slipped in and asked them to leave so we

11  won't have a problem.

12         MS. RUMBAUGH:  Yes, Your Honor.  The one other thing

13  is something very minor, but I noticed that many of the jurors

14  were out in the entranceway when we took a break.  And this

15  came up in another trial I had earlier this year where Judge

16  O'Grady just simply instructed the jury to take no offense if

17  the attorneys averted their eyes, made a point not to interact

18  with them.  We ask the Court to do the same here.

19         THE COURT:  I'll try to clean up as best I can.  And

20  I appreciate you saying that because that is a real difficult

21  thing when you're counsel -- and this is a small town -- even

22  though Alexandria is where we sit, and you run into people,

23  and I've seen situations where, as a lawyer, I would cross the

24  street just so I wouldn't get myself in a situation.  So I

25  will do what I can to make sure that the jurors understand

─────United States v. Flores─────

12

1    that.

2           MS. RUMBAUGH:  Thank you, Your Honor.

3           THE COURT:  I'm going to give them some preliminary

4    instructions about the case when they come back in and then

5    we'll look forward to opening statement.  You're free to move

6    about the well, to the extent that you can.  I'd say that the

7    closest that I would like you to get to the jury is maybe no

8    closer than the end of your desk.  So if you want to move

9    about the courtroom, that's fine.

10          Ms. Tinsley.

11          (Jury present.)

12          THE COURT:  Thank you.  You may be seated.

13          Ladies and gentlemen of the jury, now that you have

14   been sworn, I'm going to give you some preliminary

15   instructions to guide you in your participation in the trial.

16          First of all, I would like to kind of make a point

17   of saying something that is important to note in every

18   situation.  We have some fine professionals who are presenting

19   this matter, Mr. Ben'Ary, Ms. Rumbaugh, and Mr. Jenkins, and

20   we lawyers are very, very adherent to rules and we get afraid

21   of when we get in situations that make us uncomfortable, and

22   one of the things that makes us uncomfortable sometimes is

23   when we run into a juror in the hallway or out walking around

24   going back and forth to lunch.  And most lawyers are a little

25   bit OCD, and what a lot of them do, particularly the ones that

─────────────────────United States v. Flores─────────────────────

13

1    are particularly OCD like I was, they'll cross the street or

2    avert their eyes and make sure that they have no contact with

3    the jury because they don't want anyone to think that they're

4    trying to influence the jury in any way.

5            And so, if you see any of the lawyers in the case,

6    and they go the other way when they see you, or don't

7    acknowledge you with a good afternoon or good morning, please

8    don't hold it against them.  These are all fine people, good

9    people who always are willing to accord individuals with

10   pleasantries.  So please don't connote any bad situations or

11   the like because they do not respond or say good afternoon or

12   good morning.  I'm telling them that you say good morning,

13   they can say it back.  So, again, if they feel uncomfortable,

14   it's because they're trying to do their jobs.  And as I said

15   they are all good people.  I just want to make sure that the

16   thing is handled the way it is.

17           It will be your duty to find from the evidence what

18   the facts are.  You and you alone will be the judges of the

19   facts.  You will then have to apply the law to those facts as

20   the Court will give it to you.  You must follow that law

21   whether you agree with it or not.  Nothing the Court may say

22   or do during the course of the trial is intended to indicate,

23   or should be taken by you as indicating, what your verdict

24   should be.

25           The evidence from which you will find the facts will

—————————— United States v. Flores ——————————

1   consist of the testimony of witnesses, documents, and other

2   things received into the record as exhibits, and any facts

3   that the lawyers agree to, or stipulate to, or that the Court

4   may instruct you to find.  Certain things are not evidence and

5   must not be considered by you.  I will list them for you now:

6   Statements, arguments, and questions by lawyers are not

7   evidence.  Objections to questions are not evidence.  Lawyers

8   have an obligation to their clients to make objections when

9   they believe the evidence being offered is improper under the

10  rules of evidence.  You should not be influenced by the

11  objection or by the Court's ruling on it.  If the objection is

12  sustained, ignore the question.  If it is overruled, treat the

13  answer like any other.  If you are instructed that some item

14  of evidence is received for a limited purpose only, you must

15  follow that instruction.  Testimony that the Court has

16  excluded or told you to disregard is not evidence and must not

17  be considered.

18          In other words, you should not consult dictionaries

19  or reference materials, search the internet, websites, or

20  blogs, or any other electronic tools to obtain information

21  about this case or to help you decide the case.  Please do not

22  try to find out information from any source outside the

23  confines of this courtroom.

24          Until you retire to deliberate, you may not discuss

25  this case with anyone, even your fellow jurors.  After you

─────────────United States v. Flores─────────────

15

1  retire to deliberate, you may begin discussing the case with

2  your fellow jurors, but you cannot discuss the case with

3  anyone else until you have returned a verdict and the case is

4  at an end.

5          I know that many of you use cellphones, BlackBerrys,

6  Internet, and other tools of technology.  You must also not

7  talk to anyone at any time about this case or use these tools

8  to communicate electronically with anyone about the case.

9  This includes your family and friends.  You may not

10 communicate with anyone about this case from your cell phones,

11 through e-mails, BlackBerrys, text messaging, or on Twitter,

12 or any blog website, including Facebook, Google, Myspace,

13 LinkedIn, or YouTube.  I tried to list all of them that I

14 could think of.

15         But the bottom line is you may not use any similar

16 technology or social media even if you have not -- even if I

17 have not specifically mentioned it here.  I expect you will

18 inform me as soon as you become aware if any other jurors are

19 in violation of these instructions.  A juror who violates

20 these instructions jeopardizes the fairness of these

21 proceedings, and a mistrial could result, which would require

22 the entire trial to start all over.

23         Finally, do not form an opinion until all the

24 evidence is in.  Keep an open mind until you start your

25 deliberations in this case.  I hope that you will find the

─────────United States v. Flores─────────

16

1   case interesting and noteworthy.  Again, anything you may have

2   seen or heard outside this courtroom is not evidence and must

3   be disregarded.  You're to decide the case solely on the

4   evidence presented to you in this courtroom.

5           There are two kinds of evidence:  Direct and

6   circumstantial.  Direct evidence is direct proof of a fact,

7   such as testimony of an eyewitness.  Circumstantial evidence

8   is proof of facts from which you may infer or conclude the

9   other fact exists.  I will give you further instructions on

10  these as well as other matters at the end of the trial, but

11  keep in mind that you may consider both kinds of evidence.

12          It will be up to you to decide which witnesses to

13  believe, which witnesses not to believe, and how much of any

14  witness's testimony to accept or reject.  I will give you some

15  guidelines for determining the credibility of witnesses at the

16  end of the case.

17          As you know, this is a criminal trial.  There are

18  three basic rules about a criminal trial that you must keep in

19  mind.  First, the defendant is presumed innocent until proven

20  guilty.  The indictment brought by the government against the

21  defendant is only an accusation.  Nothing more.  It is not

22  proof of guilt or anything else.  The defendant, therefore,

23  starts out with a clean slate.

24          Second, the burden of proof is on the government

25  until the very end of the case.  The defendant has no burden

───────────────────United States v. Flores───────────────────

17

1    to prove his innocence or to present any evidence or even to

2    testify.

3            Since the defendant has a right to remain silent,

4    the law prohibits you from arriving at your verdict by

5    concerting that the defendant may not have testified.

6            Third, the government must prove the defendant's

7    guilt beyond a reasonable doubt.  I will give you further

8    instructions on this point of law, but bear in mind that this

9    is in respect to a criminal case, which is different from a

10   civil case.

11           Now, a few words about your conduct as jurors.  You,

12   as jurors, must decide this case based solely on the evidence

13   presented here within the four walls of this courtroom.  This

14   means that during the trial you must not conduct any

15   independent research about the case, matters in the case, and

16   the individuals involved in the case.

17           The trial will now begin.  First, the government

18   will make an opening statement, which is simply an outline to

19   help you understand the evidence as it comes in.  Next, the

20   defendant's attorney may, but does not have to, make an

21   opening statement.  Opening statements are neither evidence

22   nor arguments.  The government will present its witnesses and

23   the counsel for the defendant may cross-examine them.

24   Following the government's case, the defendant may, if he

25   chooses, to present witnesses from the government, and may

─────────────────── United States v. Flores ───────────────────

18

1   then cross-examine.

2          After all the evidence is in, the attorneys will

3   present their closing arguments and summarize and interpret

4   the evidence for you.  And the Court will instruct you on the

5   law.  After that, you will retire to deliberate and reach your

6   verdict.

7          Ladies and gentlemen, I'm going to also allow you to

8   take notes during the course of the trial.  But remember your

9   notes are not evidence.  It's basically an opportunity for you

10  to put down things that you think are important to consider

11  during your deliberations.

12         And once again on behalf of the Court, the Eastern

13  District of Virginia, and the judges of the Eastern District

14  of Virginia, and the parties involved, I thank you for your

15  participation in this trial.

16         Opening statement.

17         MS. RUMBAUGH:  Thank you, Your Honor.

18                    **OPENING STATEMENT**

19         MS. RUMBAUGH:  Ladies and gentlemen of the jury, one

20  night, in late October of 2019, Melvin Palma Flores, the

21  defendant that you see before you here today, took a gun to

22  the Meadow Woods apartment complex in Hybla Valley in

23  Alexandria, just a few miles south from here.

24         He took a gun, he took someone else's car to get

25  there, and he used someone else's social media account to

─────────────────────United States v. Flores─────────────────────

19

1  communicate with his intended victim, Xyqwavius Brown, who

2  sometimes went by Qwa.  What prompted that late night covert

3  trip to the Meadow Woods apartments?  Well, Mr. Palma Flores

4  is a weed dealer.  He sells marijuana.  He took pictures and

5  videos on his phone of the marijuana that he sold.  He also

6  took pictures and video of the large sums of cash that he made

7  selling weed.  He carried guns for protection because drug

8  dealing is a dangerous business and because he had been robbed

9  before.

10         And earlier in the day, before that late-night trip

11 to the Meadow Woods apartment complex, where Qwa Brown lived

12 with his grandmother, Melvin Palma Flores had been robbed.

13 Someone had robbed Mr. Palma Flores of a small amount of

14 marijuana, snatched it right out of his hand, and the person

15 who set up Mr. Palma Flores to be robbed was Qwa Brown.  And

16 for that, ladies and gentlemen, Mr. Palma Flores killed him.

17         Now, there are three counts of the indictment.  The

18 first count is possession with intent to distribute marijuana,

19 and that count pertains to the marijuana that Mr. Palma Flores

20 had that was stolen from him.  He intended to sell that to one

21 of Mr. Brown's associates before it was stolen from him.

22 You're going to hear from Elijah Kyle-Canady, who is expected

23 to testify about what happened that afternoon, that he

24 witnessed the robbery, and that it was Qwa Brown who set it

25 up.

─────United States v. Flores─────

20

1          Now, Count 2 of the indictment charges the defendant

2    with murder by firearm in furtherance of drug trafficking.

3    You're going to hear a lot of evidence about this particular

4    count.  You're going to hear about the crime scene that night.

5    You're going to see photos of the scene where Mr. Brown was

6    found on the exterior steps of his apartment building.  You're

7    going to see bullets and cartridge casings that were found on

8    the scene.  You're going to hear from Fairfax County Police

9    Detective Mike Roberts, who was in charge of the crime scene

10   that night.

11         Detective Roberts also was able to calculate the

12   trajectory of the bullets based on bullet holes found at the

13   scene, and he will explain all of that to you.  You're going

14   to hear from the medical examiner who conducted the autopsy of

15   Mr. Brown, who found that he died because of a bullet wound

16   directly to the top of his head.  She actually recovered that

17   bullet during the autopsy.

18         You're also going to hear from Forensic Analyst Cara

19   McCarthy, from the Virginia Forensic Science's Firearms and

20   Toolmarks Section.  Ms. McCarthy analyzed the bullets and the

21   cartridge cases found at the scene, and she concluded that

22   they were all fired from the same gun and that gun is

23   consistent with a GLOCK 9-millimeter pistol.

24         And you'll hear from the two people who went with

25   Mr. Palma Flores to the Meadow Woods apartment complex that

─────────────── United States v. Flores ───────────────

21

1   night.  Laila Sheehy, who is Mr. Palma Flores's on-again and

2   off-again girlfriend, and Kollin Worlds.  It was Ms. Sheehy's

3   car that the three of them took to the Meadow Woods apartment,

4   rather than Mr. Palma Flores' mother's car, which he had been

5   driving earlier that day.  And it was Kollin Worlds' Snapchat

6   account that Mr. Palma Flores was using to communicate with

7   Qwa Brown to lure him out of his apartment.

8            In fact, the last communication between Qwa Brown

9   and Mr. Worlds' Snapchat account came just five minutes before

10  the first 911 call came in regarding the shooting.

11           Now, Ms. Sheehy and Mr. Worlds are both expected to

12  testify that they didn't know why they were going there that

13  night, but when they arrived at the apartment complex, they

14  parked a ways away from the building where Mr. Brown lived.

15  The defendant got out of his car, walked down a hill, and out

16  of their line of sight.  Moments later they heard multiple

17  gunshots.  Mr. Palma Flores came running back to the car

18  carrying a gun.

19           Ms. Sheehy is also expected to testify that in the

20  aftermath of the shooting, Mr. Palma Flores dismantled his

21  gun, his small black handgun, and disposed of the different

22  parts of the gun in two different bodies of water, including

23  the Potomac River.  The gun, to this day, has never been

24  recovered.

25           Now, you'll also hear from Detective Melissa

─────United States v. Flores─────

22

1    Wallace, also with Fairfax County Police Department.

2    Detective Wallace is the lead detective assigned to this case,

3    and she's going to explain to you, step-by-step, her

4    investigation.  And how the evidence that she obtained all

5    points to Mr. Palma Flores.  And that evidence includes

6    evidence from his Instagram account and his cell phone showing

7    that he, in fact, owned a small black handgun consistent with

8    the GLOCK 9-millimeter.

9         Now, the final count in the indictment is witness

10   tampering.  And there's mentioning that in the aftermath of

11   the shooting, Mr. Palma Flores took several steps to conceal

12   what he had done.

13        First, as I mentioned, he dismantled his gun and

14   threw it away.  Second, he took the clothes that he had been

15   wearing that night, he drove them over to his cousin Hector's

16   apartment in Arlington, and he burned them in the middle of

17   the night.

18        And third, as it pertains to the third count of the

19   indictment, he wrote a letter, two letters actually, to

20   Ms. Sheehy.  And in one of those letters he instructed her to

21   lie, to blame what had happened on Kollin Worlds.  He

22   explained the plan.  He told her to get everyone, his sister,

23   Jasmine; his cousin, Hector; his friend, Jason; and

24   Ms. Sheehy, herself, on the same page so that their false

25   stories would align.  And for that Mr. Palma Flores is charged

─────────────────── United States v. Flores ───────────────────

23

1   with witness tampering.

2          Now, AUSA Ben'Ary and I represent the government,

3   and it is our burden to prove every element of the three

4   counts in the indictment beyond a reasonable doubt.  And I

5   submit to you that at the end of the evidence, at the end of

6   our case, once you've had a chance to hear and see all the

7   evidence and apply your common sense, it will be clear to you

8   beyond a reasonable doubt that Melvin Palma Flores, this

9   defendant, murdered Xyqwavius Brown in a premeditated fashion

10  over an ounce of marijuana and instructed Laila Sheehy to lie

11  for him to cover it up.

12         And at the end of the case, we will stand before you

13  again and we will ask you to hold Mr. Palma Flores accountable

14  and find him guilty of all three counts in the indictment.

15  Thank you.

16         THE COURT:  Thank you, Counsel.

17         Mr. Jenkins.

18                    OPENING STATEMENT

19         MR. JENKINS:  Thank you, Your Honor.  May it please

20  the Court --

21         THE COURT:  Yes, sir.

22         MR. JENKINS:  -- government counsel, Mr. Flores.

23         Ladies and gentlemen of the jury, again, my name is

24  Robert Jenkins and today I have the pleasure of representing

25  Mr. Melvin Palma Flores.  She-said-he-said isn't enough.  This

─────────United States v. Flores─────────

1   case is not about marijuana.  It's not about selling

2   marijuana.  This case is about the unfortunate taking of

3   Mr. Brown's life.  Mr. Brown, like Mr. Flores, engaged in the

4   possession and sale of marijuana.  At the end of this case, I

5   have no doubt that you will conclude that Mr. Flores was

6   involved in the sale of marijuana.  You're also going to hear

7   a lot about the drug trade, tools of the drug trade, firearms,

8   scales, baggies, you're even going to get to see what the

9   marijuana looks like that both Mr. Brown as well as Mr. Flores

10  dealt in.

11          You're going to hear a lot of evidence also about

12  the very inherent dangerous nature of drug trafficking.  That

13  drug traffickers often use and possess firearms, that drug

14  traffickers themselves are often targets for robberies, and

15  you all also hear that there are some involved in the drug

16  trade who specifically target other drug dealers for robbery.

17          Unfortunately, Mr. Brown was one of those

18  individuals.  And you will hear evidence that those who are

19  engaged in such activity themselves are often subject to

20  retaliation and violence themselves.  And it's a very, very,

21  very dangerous world.  A world in which you encounter other

22  dangerous individuals, and you make a lot of enemies.  The

23  government has explained to you what their theory is in terms

24  of how Mr. Flores was involved in Mr. Brown's death.  But what

25  you did not hear, and you will not hear in this entire trial,

─────── United States v. Flores ───────

25

1    no witness will take that stand and testify to having seen

2    Mr. Flores shoot and kill Mr. Brown.

3            You will hear that the murder was accomplished at an

4    apartment complex.  There are going to be no videos presented

5    to you on the night in which Mr. Brown was shot and killed.

6    You will not -- no one will take the stand and testify as to

7    having recovered the firearm that was used in order to kill

8    Mr. Brown.  You certainly will hear no evidence, no physical

9    evidence, that ties Mr. Flores to this unfortunate taking of

10   Mr. Brown's life.

11           At the end, ladies and gentlemen, you'll be left

12   with "she said," and what "he said."  And ladies and

13   gentlemen, in a criminal trial, as the judge has already

14   explained to you, the government has a burden to prove beyond

15   a reasonable doubt that Mr. Flores committed the acts he is

16   charged with.  And I submit to you, again, ladies and

17   gentlemen, "she said" and "he said" is not enough.

18           And for that reason, ladies and gentlemen, after you

19   have heard all of the testimony in this case, had the

20   opportunity to review all the evidence, I have no doubt you

21   will reach the only true verdict that applies to these charges

22   with respect to my client, Mr. Flores, and that is, simply,

23   not guilty.  Thank you.

24           THE COURT:  Thank you, Mr. Jenkins.

25           First witness for the government.

────────United States v. Flores────────

26

1      MR. BEN'ARY:  Thank you, Your Honor.  United States

2  calls Fairfax Police Lieutenant David Duffett.

3  (Government's witness, Lieutenant David Duffett, was sworn.)

4      THE COURT:  Sir, if you're fully vaccinated and

5  you're comfortable doing so, you may remove your mask while

6  testifying.

7      THE WITNESS:  Thank you, Your Honor.

8      MR. BEN'ARY:  May I proceed, Your Honor?

9      THE COURT:  Yes, sir.

10                  DIRECT EXAMINATION

11  BY MR. BEN'ARY:

12  Q.   Good morning.

13  A.   Good morning.

14  Q.   Would you tell the members of the jury your full name,

15  please, and let me have you spell your first and last name for

16  the benefit of our court reporter.

17  A.   Sure.  I'm Second Lieutenant David, D-a-v-I-d, Duffett,

18  D-u-f-f-e-t-t.

19  Q.   And how are you employed, sir?

20  A.   I work for the Fairfax County Police Department.

21  Q.   How long have you been a law enforcement officer with the

22  Fairfax County Police Department?

23  A.   20 years.

24  Q.   And are you working today, sir?

25  A.   Yes, I am.

United States v. Flores

27

1   Q.   Is there a particular area of the county that you're

2   assigned to?

3   A.   I'm assigned to the Mount Vernon District Station.

4   Q.   And how long have you had that assignment?

5   A.   I've been assigned the majority of my career,

6   approximately 15 years.

7   Q.   And are you familiar with the area of Fairfax County that

8   the Mount Vernon District Station covers?

9   A.   Yes, I am.  I also grew up there.  I was born there.

10  Q.   I want to draw your attention to early morning hours of

11  October 26, 2019.

12  A.   Yes.

13  Q.   Were you working at the Mount Vernon District Station as

14  a police officer on that early morning hours of that date?

15  A.   Yes, I was.

16  Q.   And did you have occasion to respond to a call at 7112

17  Fairchild Drive?

18  A.   Yes, I did.

19  Q.   And about what time was it?

20  A.   That would have been in those evening hours.  I

21  apologize.  I can't remember if it was before or after

22  midnight.

23  Q.   Is it fair to say it was around midnight?

24  A.   It was in that area, yes.

25  Q.   I want to have you take a look, please, at what has been

──────United States v. Flores──────

28

 1   marked for identification as Government 13.  It's an overhead

 2   map.  I'd ask you if you recognize that area, 13.

 3   A.   13?

 4   Q.   Yes, please.

 5   A.   Yes, I found No. 13.

 6   Q.   And is that a map that encompasses the area of 7112

 7   Fairchild Drive?

 8   A.   Yes, it does.  It shows the apartment community there.

 9   Q.   And do you recognize that to be an accurate

10   representation of that area of the county?

11   A.   Yes, it is.

12            MR. BEN'ARY:  I'd offer 13 into evidence.

13            THE COURT:  Without objection.

14            MR. JENKINS:  No objection.

15            THE COURT:  Without objection.

16   (Government's Exhibit No. 13 was admitted into evidence.)

17            MR. BEN'ARY:  May we publish it for the jury, Your

18   Honor?

19            THE COURT:  You may.

20   BY MR. BEN'ARY:

21   Q.   Just to start out.  There's a dot on one of the buildings

22   depicted, sort of, in the middle-right of the map.  What is

23   that?

24   A.   That's the location where 7112 Fairchild Drive is.

25   Q.   Sir, can you explain to the members of the jury what

—————United States v. Flores—————

29

1    information you had responding there and what you did to try

2    and locate the incident?

3    A.    I was dispatched to a report of a person shot outside one

4    of the apartment buildings there.  I believe it was 7106 was

5    the original dispatch location.  I responded to that area

6    going up Holly Hill Road as you can see on Exhibit 13.  I

7    stopped at the approximate area on Holly Hill Road instead of

8    -- in front of the 7106 building, started looking for -- a

9    report of a person having been shot in front of that building.

10   Q.    And did you locate anyone in that area in front of 7106?

11   A.    7106, I did not.  I searched the building as well as the

12   attached buildings in that block, as well as the staircase.  I

13   was there with other officers.  I was not there by myself, and

14   we did not locate anything suspicious.

15   Q.    And so, what did you do to try and figure out what this

16   call was all about?

17   A.    I received an update stating that the actual location was

18   behind the building I was at.  And so, I went around the

19   building -- using this map I went around the building towards

20   the mid-place side of the building.  As soon as I came around

21   the corner of the dispatch -- originally dispatched location,

22   I was able to see a person at the 7112 building in front of

23   the building laying down.

24   Q.    And where exactly do you recall this person laying down?

25   A.    It would have been at the very bottom of the staircase at

───────United States v. Flores───────

30

1   7112, at the very bottom.

2   Q.   Still on the staircase or off of the staircase?

3   A.   I apologize.  I don't recall exactly whether they were

4   still partially on the stairs or not.  They were definitely at

5   the bottom of the staircase.

6   Q.   I'm going to ask you to take a look at another photo in

7   that binder, please.  It's 1B.  It's behind the one tab.  It

8   should be the second.

9   A.   Yes, I'm looking at 1B.

10  Q.   And do you recognize what that is a photo of?

11  A.   Yes.  So this shows the front of the apartment building.

12  It's marked 7112.

13  Q.   And is it a fair and accurate representation of what that

14  building looked like as you responded to it on that early

15  morning?

16  A.   Yes, it does.

17              MR. BEN'ARY:  Can I offer 1B into evidence?

18              THE COURT:  Any objection?

19              MR. JENKINS:  No objection, Your Honor.

20              THE COURT:  Without objection.

21              MR. BEN'ARY:  I'd like to ask that it be published,

22  please.

23              THE COURT:  You may.

24  (Government's Exhibit No. 1B was admitted into evidence.)

25  BY MR. BEN'ARY:

———————United States v. Flores———————

31

1   Q.   Is this the area where you responded to where you found

2   the individual lying, sort of, somewhere near the bottom

3   portion of the stairs?

4   A.   Yes.  It would have been in, kind of -- in that area

5   right at the bottom of the staircase.  As you can see there,

6   right where it says 7112.

7   Q.   And once you and your colleagues located this individual

8   at the bottom of the stairs, what happened next?

9   A.   Right at that point it was a matter of determining what

10  we had, what kind of injuries we had on this person.  If there

11  were injuries, there were -- injuries were very apparent.

12  Trauma had happened to this person and at that point I wanted

13  to seek medical attention for this person.  And I had units

14  respond with the proper medical equipment to render care.

15  Q.   And understanding you're not a medical professional, can

16  you give a description of the injuries that were apparent to

17  you as a law enforcement officer?

18  A.   Well, it was apparent to me there was a wound to the

19  person's head, as well as to an arm area.

20  Q.   And so, was emergency medical assistance requested?

21  A.   It was immediately requested on that scene.

22  Q.   All right.  And did you and your colleagues take steps

23  either then or shortly thereafter to secure the crime scene?

24  A.   Yes.  As my officers started giving care, it was at that

25  point trying to determine what kind of crime we had here as

─────────United States v. Flores─────────

32

1  well as starting to start putting up crime scene tape to

2  secure that area to make sure that whatever evidence is

3  preserved there.

4  Q.   And just can you run the jury through briefly what are

5  some of the steps that were taken here in order to preserve

6  evidence, placement of evidence, the integrity of the crime

7  scene?

8  A.   The primary thing was we stopped any movement at that

9  location, no persons coming and going.  There was evidence on

10  the stairs that you can see in this 1B exhibit.  We wanted to

11  make sure that those -- that evidence was not tampered with in

12  any way, not moved in any way.  I asked my officers not to go

13  up that staircase.  In addition to having -- officers were

14  ordered to start putting up that crime tape to -- again, to

15  further limit people being allowed access into that area.

16  Q.   And at this time, and probably presently as well, are

17  there detectives who are trained in crime scene preservation,

18  analysis that would come in and help after the scene is

19  secured?

20  A.   Absolutely.  I contacted what's called our "duty officer"

21  who is the primary person in charge of operations for the

22  department who then calls out our detectives from our major

23  crimes bureau to come out, as well as our crime scene

24  technicians to come out, and to start doing their processing.

25  Q.   And did members of that crime scene unit analyze this

—————United States v. Flores—————

33

1   scene and collect evidence?

2   A.   Absolutely.

3   Q.   What happened with the individual who you testified you

4   observed with those injuries?

5   A.   Again, my officers started giving immediate care to that

6   person until our rescue squad showed up and were able to take

7   him to the hospital.

8   Q.   And I take it that when you arrived and people were

9   working on saving the life of this individual, his care was

10  paramount over taking pictures and documenting evidence at the

11  scene?

12  A.   Absolutely.  That was the primary concern at that time

13  because we didn't even know exactly what we were dealing with

14  at that point.

15           MR. BEN'ARY:  Those are my questions, lieutenant.

16  Mr. Jenkins will have some questions for you.  Thank you.

17           THE WITNESS:  Thank you.

18           THE COURT:  Cross.

19           MR. JENKINS:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21  BY MR. JENKINS:

22  Q.   Lieutenant Duffett, can you describe for the jury some of

23  your current duties and responsibilities?

24  A.   I'm still a squad supervisor at the Mount Vernon District

25  Station.

—————Tonia M. Harris OCR-USDC/EDVA 703-646-1438—————

EASTERN DISTRICT OF VIRGINIA

─────────────── United States v. Flores ───────────────

34

1   Q.   Exactly what does that mean?

2   A.   I have people -- officers that work underneath me.  Their

3   primary responsibility is responding to calls for service.

4   Q.   Are you involved in the investigations of crimes?

5   A.   For my officers, yes.

6   Q.   Are you involved with making arrests?

7   A.   Yes.

8   Q.   If I could have Government's Exhibit 13 displayed for the

9   jury, again.

10          Now, lieutenant, I believe you testified that you're

11  familiar with this area that's depicted in Government's

12  Exhibit 13.

13  A.   Yes.

14  Q.   Where is it located?

15  A.   This was located in what's called in our area 201, our

16  service area.  It's right off of Lockheed Boulevard and

17  Richmond Highway.

18  Q.   Would I be correct in assuming that on the evening of

19  October 26, 2019, when you arrived at this location, this

20  wasn't your first occasion to being at this apartment complex,

21  correct?

22  A.   I've been to this apartment complex many times.

23  Q.   And that's because this apartment complex is an area in

24  which officers from the Mount Vernon Station often have to

25  respond to, correct?

—United States v. Flores—

35

1   A.   It's one of many areas that we respond to, sir.

2   Q.   Because there's a fair amount of crime that goes on in

3   this -- or reported crimes that go on in this area, correct?

4   A.   It's heavily populated so there's going to be more calls

5   for service simply based on the population.

6   Q.   What type of crimes?

7   A.   Anything.  A common call in this area is just

8   trespassing.

9   Q.   What about vandalism?

10  A.   Vandalism as well.

11  Q.   Drug dealing?

12  A.   Occasionally.

13  Q.   Firearms?

14  A.   Occasionally.

15  Q.   Assaults?

16  A.   Yes.

17          MR. JENKINS:  I have no further questions, Your

18  Honor.

19          THE COURT:  Redirect.

20                  REDIRECT EXAMINATION

21  BY MR. BEN'ARY:

22  Q.   Lieutenant, how many reports of somebody being shot in

23  the head did the police receive on the early morning of

24  October 26, 2019?

25  A.   Only one.

──────United States v. Flores──────

36

1          MR. BEN'ARY:  Thank you.

2          THE COURT:  Is this witness subject to recall?

3          MR. BEN'ARY:  Not by the government, Your Honor.

4          THE COURT:  Mr. Jenkins?

5          MR. JENKINS:  No, Your Honor.

6          THE COURT:  All right.  Lieutenant, you're free to

7  leave.  Please do not discuss the case or any aspect of the

8  case with anyone while the case is pending.

9          THE WITNESS:  Thank you, sir.

10          THE COURT:  Yes, sir.

11          (Witness excused.)

12          MR. BEN'ARY:  Your Honor, the next witness would be

13  Fairfax Police Officer, Kyle Wilson.

14          THE COURT:  Kyle Wilson.

15  (Government's witness, Kyle Wilson, was sworn.)

16          THE COURT:  Sir, if you're fully vaccinated and

17  you're comfortable doing so, you may remove your mask while

18  testifying.

19          THE WITNESS:  Thank you, Your Honor.

20                    DIRECT EXAMINATION

21  BY MR. BEN'ARY:

22  Q.   Good afternoon, sir.

23  A.   Good morning, sir.

24  Q.   Would you tell the members of the jury your full name,

25  please, and I'm going to have you spell your first and last

──────Tonia M. Harris OCR-USDC/EDVA 703-646-1438──────

─────────────────United States v. Flores─────────────────
                                                              37

1   name.

2   A.   Kyle Wilson.  First name, K-y-l-e, last name,

3   W-I-l-s-o-n.

4   Q.   And how are you employed, sir?

5   A.   I'm a police officer with the Fairfax County Police

6   Department.

7   Q.   How long have you been employed as a police officer with

8   the Fairfax County Police Department?

9   A.   Approximately over five years.

10  Q.   And what is your current assignment with the police

11  department?

12  A.   Patrol officer at Mount Vernon Station.

13  Q.   How long have you been assigned to Mount Vernon Station?

14  A.   Full time with the department.

15  Q.   And were you working on or about the early morning hours

16  of October 26, 2019, in that capacity?

17  A.   Yes, sir.

18  Q.   Part of beginning as an officer with the Fairfax County

19  Police Department, do you have military service in your

20  background?

21  A.   I do, sir.

22  Q.   Can you describe for the members of the jury your

23  military service?

24  A.   Yes, sir.  I was honorably -- worked with the United

25  States Marine Corps active duty as an infantry.

─────────────── United States v. Flores ───────────────

38

1   Q.   And as a member of our military, did you receive training

2   as a combat medic?

3   A.   Yes, sir.

4   Q.   And were you deployed?

5   A.   I did two deployments overseas, yes, sir.

6   Q.   Thank you, sir.

7            I'm going to draw your attention, again, back to the

8   early morning hours of October 26, 2019.  Were you on duty in

9   that timeframe?

10  A.   Yes, sir.

11  Q.   And did you have occasion to respond to a call related to

12  7112 Fairchild Drive?

13  A.   Yes, sir.

14  Q.   And is that within Fairfax County in your area that you

15  were covering that day?

16  A.   Yes, it is.

17  Q.   Can you tell the members of the jury what was the call

18  about when you pulled up, what did you understand it to be,

19  and what did you do?

20  A.   Approximately at 12:32 a.m. in the morning we responded

21  to a call for weapons and a shooting.  Once we arrived on

22  scene, the given location was giving us a hard time to find

23  the location of the victim.  During the search we were able to

24  locate him at a different address.

25  Q.   And was someone in medical distress located at 7112

─────────United States v. Flores─────────

39

1    Fairchild Drive?

2    A.   Yes, sir.

3         MR. BEN'ARY:  And can I ask 1A to be published,

4    again, please.  I'm sorry, 1B.

5    BY MR. BEN'ARY:

6    Q.   Do you recognize what this is a photo of, Officer?

7    A.   I do.

8    Q.   Is this a photo of the address where you found the victim

9    on the early morning hours of October 26, 2019?

10   A.   It is.

11   Q.   Now, there's not any people pictured here.

12   Could you describe for the jury where you found this

13   individual in medical distress?

14   A.   Yes, sir.  So once I arrived on scene, I observed the

15   victim to be lying on the bottom of the stairwell.  He was

16   lying on his back, so he was able to look at me at the bottom

17   of the stairwell.  The way he was laying down his -- you can

18   imagine his bottom of his knees and his legs are underneath

19   his buttocks.  So it would be the stairwell, his feet, and

20   then his buttock.

21   Q.   Sir, in that position is it -- would the tops of his feet

22   been back under against the stairs?

23   A.   Correct.

24   Q.   And what did you do when you observed that?

25   A.   I immediately told the officer to take him off that --

─────────────────── United States v. Flores ───────────────────

40

1  off the incline to put him on flat ground and started to give

2  him medical aid.

3  Q.   Why did you move him from off the stairs onto level

4  ground?

5  A.   It's just standard procedure.  While I work on a patient

6  to get him on flat level ground and start taking off his

7  clothes and start working through the process.

8  Q.   And once that individual was moved off of his position on

9  the stairs onto level ground, can you describe for the members

10  of the jury what you and other colleagues did to try to save

11  his life?

12  A.   Yes.  I immediately observed -- well, based on my

13  training and experience, to be a possible gunshot wound to

14  his -- back of his head area.  That's, obviously, the most

15  immediate thing I needed to take care of.  I started to have

16  officers apply pressure with gauze to that area to stop the

17  bleeding.

18       During further analysis, we started taking off

19  clothing.  During that I observed a possible -- another

20  gunshot wound to his right shoulder area where we started

21  utilizing quick cloth to stop the bleeding there as well.

22  Q.   When you say -- I think you said you took off his

23  clothing, how did you do that?

24  A.   I can't remember exactly which officers, but trying to

25  take off his pants, his shirts, just immediately trying to see

─────────── United States v. Flores ───────────

41

1  any other wounds that we needed to take care of immediately.

2  Q.   And does that involve actually cutting the clothes off?

3  A.   If they need to be, yes.

4  Q.   All right.  Did you continue to render aid to this

5  individual until medical professionals arrived?

6  A.   Yes.

7  Q.   And then what happened once the medical professionals

8  arrived?

9  A.   Once the medical professional arrived, they put him in an

10  ambulance and began to transport him to Fairfax Hospital in

11  which I followed behind the ambulance until they got to the

12  hospital.

13  Q.   And what happened once you and the ambulance ahead of you

14  arrived at the hospital?

15  A.   Once at the hospital they immediately put him into the

16  emergency room and started to work on him and that's when they

17  advised me that the victim was deceased.

18  Q.   And did you remain there at the hospital until detectives

19  came?

20  A.   I did.

21          MR. BEN'ARY:  Those are my questions, sir.

22  Mr. Jenkins will have some questions, sir.  Thank you.

23          THE COURT:  Cross.

24          MR. JENKINS:  Thank you, Your Honor.

25                    CROSS-EXAMINATION

─────United States v. Flores─────

42

1    BY MR. JENKINS:

2    Q.   Officer Wilson, I understand you've been with the Fairfax

3    County Police Department for five years?

4    A.   Yes, sir.

5    Q.   At the time when you arrived on the scene on October the

6    26th, 2019, I take it you had been on the police force for

7    three years up until that point, correct?

8    A.   Yes, sir.

9    Q.   This location that you arrived to, can you describe for

10   the jury whether or not it was a gated community?

11   A.   Not a gated community.

12   Q.   Is it fair to say that it is a community without any

13   controlled access?

14   A.   Correct.

15   Q.   Anyone can come and go as they please, correct?

16   A.   Correct.

17   Q.   And is it a densely populated apartment complex?

18   A.   It is.

19   Q.   Had that been your first time being called to respond to

20   that location?

21   A.   I can't remember that specific address but that road, no,

22   sir.

23   Q.   You had been called to that area before?

24   A.   Yes.

25   Q.   I take it you investigate other crimes?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Flores─────

43

1   A.    Correct.

2   Q.    That had been reported to you, correct?

3   A.    Yes, sir.

4   Q.    What type of crimes?

5   A.    Any kind of -- you name it.  From domestic disputes,

6   disorderly, narcotic events, every crime you can --

7   Q.    Firearm offenses?

8   A.    Yes, sir.

9   Q.    Shootings?

10  A.    Yes, sir.

11          MR. JENKINS:  No further questions, Your Honor.

12          THE COURT:  Redirect.

13          MR. BEN'ARY:  No redirect.

14          THE COURT:  Thank you, sir.  Is this witness subject

15  to recall?

16          MR. BEN'ARY:  Not from the government, Your Honor.

17          MR. JENKINS:  No, Your Honor.

18          THE COURT:  Very good.

19          Sir, please do not discuss the case or any aspect of

20  the case with anyone.  You're free to leave.

21          THE WITNESS:  Thank you, Your Honor.

22          THE COURT:  Yes, sir.

23          (Witness excused.)

24          MS. RUMBAUGH:  The United States calls Joyce Brown.

25  (Government's witness, Joyce Brown, was sworn.)

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─United States v. Flores─

44

1          THE COURT:  Ma'am, if you're fully vaccinated and

2    you're comfortable doing so, you may remove your mask while

3    you're testifying.

4          (Witness seated.)

5                    DIRECT EXAMINATION

6    BY MS. RUMBAUGH:

7    Q.    Good morning, ma'am.

8    A.    Good morning.

9    Q.    Could you please state your full name for the benefit of

10   the jurors.

11   A.    Joyce Brown.

12   Q.    And ma'am, could you please spell your first and last

13   name for the court reporter?

14   A.    Joyce, capital J, o-y-c-e, capital B, r-o-w-n.

15   Q.    And, Ms. Brown, how old are you?

16   A.    I'm 69.

17   Q.    Where do you currently live?

18   A.    I live in Lorton, Virginia.

19   Q.    And previously, did you reside at 7112 Fairchild Drive in

20   Alexandria?

21   A.    Yes, I did.

22   Q.    Okay.  Now, Ms. Brown, just a reminder to please speak up

23   so everyone can hear you.  And if at any time you can't

24   understand my question or couldn't hear me, please just ask me

25   to repeat it, okay.

United States v. Flores

45

1   A.   Okay.

2   Q.   All right.  Now, Ms. Brown, are you familiar with

3   Xyqwavius Brown or Qwa?

4   A.   Yes, I am.

5   Q.   Who is Qwa?

6   A.   My first grandson.

7   Q.   Okay.  I'd like you to take a look at Government's

8   Exhibit 50 for me.  And if the court security officer could

9   give her a hand that would be great.

10         Ma'am, do you have Exhibit 50, that's 5-0, in front

11   of you.

12         THE COURT:  Do you have that in front of you, ma'am?

13         THE WITNESS:  Yes, I do.

14         THE COURT:  Thank you.

15   BY MS. RUMBAUGH:

16   Q.   Ms. Brown, do you recognize that?

17   A.   Yes, I do.

18   Q.   What is that exhibit?

19   A.   That's my grandson.

20   Q.   Okay.

21   A.   That was his high school dance.

22         MS. RUMBAUGH:  I'd offer Exhibit 50 into evidence.

23         THE COURT:  Without objection.

24         MR. JENKINS:  No objection, Your Honor.

25         THE COURT:  Without objection.

─────────────────────────United States v. Flores──────────────────────────

46

1    (Government's Exhibit No. 50 was admitted into evidence.)

2              MS. RUMBAUGH:  Your Honor, may we publish it?

3              THE COURT:  You may.

4              MS. RUMBAUGH:  Your Honor, I think we're having some

5    technical difficulties.  One moment, please.

6              THE COURT:  Sure.  In the meantime remove it from

7    the stack.  Ms. Tinsley, take it out of the folder.

8              Sometimes with the technological advances that we

9    enjoy, it doesn't come to fruition.  So what we're going to do

10   is, while the technical people from the government side are

11   trying to get it, we're going to pull out the photograph and

12   let you take a look at it individually.

13             MS. RUMBAUGH:  Your Honor, I think we have the Elmo

14   working at this point.

15             THE COURT:  Okay.  Very good.

16   BY MS. RUMBAUGH:

17   Q.   Ms. Brown, you said that Qwa Brown -- he was your

18   grandson, correct?

19   A.   Yes.

20   Q.   Was he the victim of a fatal shooting?

21   A.   Yes.

22   Q.   I'd like to direct your attention to late October of

23   2019.  Were you living at 7112 Fairchild Drive at the time?

24   A.   Yes, I was.

25   Q.   And did Qwa live with you?

──────United States v. Flores──────

47

1   A.   Yes, he did.

2   Q.   Was anyone else living with you at the time?

3   A.   I was just getting ready to get back my granddaughter,

4   but she was, you know, there off and on with me.

5   Q.   Your granddaughter lived there with you as well?

6   A.   Yes, also.

7   Q.   Do you remember the night that Qwa was killed?

8   A.   Yes, I do.

9   Q.   What were you doing that evening?

10  A.   I was watching TV.

11  Q.   And was Qwa with you?

12  A.   Yes, he was.

13  Q.   At some point did Qwa walk out of the apartment?

14  A.   Yes.  He -- I said, "Where you going?"  He said, "Me and

15  Nay," -- Nay, which is his sister -- "we're going to chill

16  tonight.  We're going to watch some movies.  I'll be right

17  back."

18  Q.   Do you know what prompted him to walk out of the

19  apartment?

20  A.   No, I don't.

21  Q.   Did he have his phone with him?

22  A.   I think he did.

23  Q.   Do you remember if he got a call or a text message or

24  anything like that?

25  A.   He could have.

United States v. Flores

48

1  Q.   After he walked out of the apartment, what happened next?

2  A.   After he walked out the apartment, I was watching

3  television and about -- I can't get the timing right on it

4  because of what I was watching.  I'm trying to remember what I

5  was watching but I can't no more.  So when he went out the

6  door, I don't know if it was 15 or 20 minutes or it could have

7  been five minutes, I just heard gunshots.

8  Q.   Do you remember approximately how many gunshots you

9  heard?

10 A.   I heard four.

11 Q.   And what were you thinking when you heard the gunshot?

12 A.   At the time I was thinking and hoping that I didn't want

13 it to be anyone.  I sure didn't want it to be Qwa.

14 Q.   At what point did you realize it was Qwa that had been

15 shot?

16 A.   As time went on, I don't know how long it was, but as

17 time went on I said, "I better go to the door," but then I

18 didn't go to the door.  Then I said, "No, I'm going to go to

19 the door," but by the time I went to the door I saw my

20 neighbor standing up in the hallway, and he said, "It's your

21 grandson."  So someone's voice said, "Close the door.  Do not

22 come out."  So I remember closing my door and I fell to my

23 knees, and I cried, and I cried, and I cried by my neighbor

24 telling me it's my grandson, and I cried.

25           So when I got up from the floor, you know, I paced

─────────── United States v. Flores ───────────

49

1    back and forth through the house because I had my other

2    grandson, which was 2 at the time, was on the couch sleep, and

3    the eight-year-old was laying across my bed sleep.  So I just

4    went to my closet and I fell on my knees again, and I cried,

5    and I cried, and I cried.  I just kept crying.  I didn't try

6    to get to the phone to call anyone or nothing like that, I

7    just kept crying.  And then when I did get to myself, I paced

8    back and forth again, and then I called -- I called my cousin,

9    Jackie, to tell her we have to go to the hospital.  You know,

10   I need to go to the hospital.  She said, "What's wrong?"  Then

11   I told her then on the phone it was Qwa.  So from there, I

12   guess she couldn't get through because of what had happened.

13   They wouldn't let anybody in or out.  And after that I --

14   Q.   Ms. Brown, let me ask you this:  Do you remember

15   approximately what time of night it was when Qwa exited the

16   apartment?

17   A.   That's why I was trying to remember what I was watching.

18   If I could just remember what I was watching at the time, I

19   would know the time, but I think as time went on -- I think it

20   was around about -- it could have been before 12:00 or a

21   little after 12:00.

22           MS. RUMBAUGH:  Nothing further from the government.

23           THE COURT:  Mr. Jenkins.

24           MR. JENKINS:  No questions, Your Honor.  Thank you.

25           THE COURT:  Is this witness subject to recall?

─────────United States v. Flores─────────

50

1          MS. RUMBAUGH:  No, Your Honor.

2          THE COURT:  Ma'am, you're free to leave.  Please do

3   not discuss the case or any aspect of the case with anyone.

4          (Witness excused.)

5          MR. BEN'ARY:  Your Honor, the government calls

6   Elijah Canady.

7   (Government's witness, Elijah Kyle-Canady, was sworn.)

8          THE COURT:  Sir, if you're fully vaccinated and

9   you're comfortable doing so, you're free to remove your mask.

10          THE WITNESS:  Excuse me?

11          THE COURT:  If you're fully vaccinated and you're

12   comfortable doing so, you may remove your mask.

13          THE WITNESS:  I'm not vaccinated.

14          THE COURT:  Yes, sir.

15          MR. BEN'ARY:  Thank you, Your Honor.

16                    DIRECT EXAMINATION

17   BY MR. BEN'ARY:

18   Q.   Sir, I just want to make sure everyone hears, and you

19   don't have to repeat everything.  There's a microphone in

20   front of you.  If you can pull your chair up a little bit so

21   that you're speaking into the microphone to try to get through

22   this one time.

23          Good afternoon.

24   A.   (Nods head.)

25   Q.   Would you tell the members of the jury your full name,

─────United States v. Flores─────
51

1   please, and let me have you spell your first and last name?

2   A.   Elijah Rashan Kyle-Canady.  E-l-I-j-a-h,

3   K-y-l-e-C-a-n-a-d-y.

4   Q.   And how old are you, sir?

5   A.   20.

6   Q.   You're here pursuant to a subpoena this afternoon; is

7   that correct?

8   A.   Yes.

9   Q.   And -- is it -- do you have any agreements, whether in

10  writing or not in writing, between the U.S. Attorney's Office,

11  or the Fairfax Police Department, or the DEA having anything

12  to do with this case?

13  A.   Can you, like, elaborate in what you're saying?  I don't

14  really understand.

15  Q.   Did you enter into any agreements about your testimony or

16  your coming to court today?

17  A.   Yeah.

18  Q.   What is that?

19  A.   I don't really understand what you're asking me.

20  Q.   You're here because you got subpoenaed as a witness,

21  right?

22  A.   Right.

23  Q.   Have you been given immunity or are there any written

24  agreements in place governing the terms of your testimony?

25  A.   Yeah.

─────────────── United States v. Flores ───────────────

52

```
 1   Q.   What are they?

 2   A.   Immunity.

 3   Q.   What immunity do you understand that you have?

 4   A.   That I can't incriminate myself when I testify.

 5   Q.   And who was it that gave you that understanding?

 6   A.   Detective Wallace.

 7   Q.   I'm sorry?

 8   A.   Detective Wallace.

 9   Q.   And she's a Fairfax police detective?

10   A.   Yes.

11   Q.   Do you have anything in writing with her?

12   A.   No.

13   Q.   All right.  Do you have any adult criminal convictions on

14   your record?  Have you been convicted of any crime involving

15   lying, cheating, or stealing as an adult?

16   A.   No, sir.

17   Q.   And have you been involved as a juvenile in some theft

18   offenses involving an iPhone from a store and going into

19   vehicles?

20   A.   Yes.

21   Q.   And sir, do you use any drugs?

22   A.   Yes.

23   Q.   What drugs do you use?

24   A.   Weed.

25   Q.   Anything other than marijuana?
```

—————United States v. Flores—————
53

1    A.    No.

2    Q.    Have you used marijuana today prior to coming to court?

3    A.    No.

4    Q.    How frequently do you use marijuana?

5    A.    Twice a day.

6    Q.    And I want to draw your attention back to late October of

7    2019.  At that time, were you friends with an individual named

8    Qwa Brown?

9    A.    Yes.

10   Q.    And how did you know Mr. Brown?

11   A.    We grew up together.

12   Q.    And did you know Mr. Brown to be a marijuana user as

13   well?

14   A.    Yeah.

15   Q.    At some point around late October 2019, did Mr. Brown

16   contact you about grabbing some weed from an individual that

17   he knew?

18   A.    Yes.

19   Q.    Did you know the person that Mr. Brown contacted you

20   about being involved in grabbing weed from?

21   A.    No.

22   Q.    Can you tell the members of the jury, essentially, what

23   the plan was that you discussed with Mr. Brown to grab this

24   marijuana from this other individual?

25   A.    That we were just going to go up there and take it from

─────United States v. Flores─────

54

1   him.  He was going to think that we was buying it and we were

2   going to take it.

3   Q.   There's a little muffle, but did you --

4   A.   I can say it again.

5   Q.   Go ahead, please.

6   A.   We had discussed that we were going to go up there and

7   take it from him and he was going to think that we were buying

8   it.

9   Q.   Got it.  Okay.  Did you get together with Qwa to go

10  execute this plan?

11  A.   Yes.

12  Q.   And who was there?

13  A.   Charles and my girlfriend.

14  Q.   Okay.  Do you know Charles's last name?

15  A.   No.

16  Q.   And did you proceed to a location to meet up with this

17  individual that was going to be the target for this taking?

18  A.   Yes.

19  Q.   And do you remember about where that was?

20  A.   It was on Richmond Highway.  I don't really know the

21  neighborhood name or anything like that.

22  Q.   Do you live in that area?

23  A.   No.

24  Q.   And who was it that -- who was driving at the time?

25  A.   My girlfriend.  I had told her that -- if she could take

55

1  me to a friend house.

2  Q.   And did she know where she was going?

3  A.   No.

4  Q.   Who was it that was directing her on where to go?

5  A.   Qwa.

6  Q.   And about what time was it that you all went with your

7  girlfriend driving and Qwa and Charles to this location; do

8  you remember?

9  A.   Probably noon.  A little bit past noon.

10  Q.   Was it daylight out, do you remember?

11  A.   Yes.

12  Q.   And what happened when you got close to the spot that Qwa

13  was directing your girlfriend to drive to?

14  A.   Me and Charles had got out the car and went up to the

15  house and went to the backyard, and that's where they had met

16  us at.

17  Q.   Okay.  Was the backyard enclosed -- was it a fenced

18  backyard?

19  A.   Yeah.  It was a fence, but it was kind of like an opening

20  on the side of the house that you can get into it, so.

21  Q.   And what happened once you and Charles got to the

22  backyard?

23  A.   We smelled the weed he was showing us and then Charles

24  took it and ran.

25  Q.   Okay.  And who was it that was showing you this weed?

─────────────── United States v. Flores ───────────────

56

1   A.   Melvin.

2   Q.   Did you know that individual prior to getting to the

3   backyard that day?

4   A.   Melvin?

5   Q.   Did you know Melvin prior to that day?

6   A.   No.

7   Q.   Did Qwa -- what did Qwa do while you and Charles went to

8   the backyard?

9   A.   He was sitting in the car.

10  Q.   What about your girlfriend?

11  A.   In the car.

12  Q.   All right.  Was anyone with the individual, you've

13  identified as Melvin, when this weed was being looked at?

14  A.   His friend.

15  Q.   Did you know that individual?

16  A.   No.

17  Q.   So again, describe what happened when Melvin came --

18  well, first of all, did you see where Melvin came from?

19  A.   His house.

20  Q.   And what happened once he came outside?

21  A.   He started showing the weed.

22  Q.   About how much weed would you estimate it was?

23  A.   It was just -- almost the size of the palm of my hand,

24  like that much.

25  Q.   The size of the palm of your hand?

─────United States v. Flores─────
57

```
 1   A.   Yeah.

 2   Q.   You smoke weed twice a day, correct?

 3   A.   Uh-huh.

 4   Q.   Can you estimate about how much it was?

 5   A.   (Inaudible answer.)

 6   Q.   Did you ever buy an ounce of weed?

 7   A.   I can't really recall.  It was --

 8   Q.   Less than a pound?

 9   A.   It was less.

10   Q.   Okay.  All right.  And what happened when Melvin came out

11   of the house and was showing this small amount of weed?

12   A.   Charles took it.

13   Q.   What did he do when he took it?

14   A.   He ran.

15   Q.   What did you do?

16   A.   I stayed right there.

17   Q.   Why didn't you run also?

18   A.   I was seeing what was going on.  I was just watching.

19   Q.   You were seeing what was going on?

20   A.   Uh-huh.

21   Q.   Did you know Charles was going to take it and run at that

22   moment?

23   A.   Yeah.

24   Q.   Is there a reason that you didn't run also?

25   A.   Like I said, I was seeing what was going on.
```

United States v. Flores

58

1  Q.   All right.  And so, after Charles took the weed and ran,

2  what did you observe Melvin do?

3  A.   He pulled something out of his waist.

4  Q.   Did you see what it was?

5  A.   From where I was standing it was just a black object.  He

6  was, like, right on the porch of his backyard and I was at the

7  back of the fence, so it was pretty far.

8  Q.   Okay.  And what happened after he pulled this black

9  object out of his pants?

10 A.   He put it back in.

11 Q.   And you couldn't tell what it was?

12 A.   Not clearly.  Not clearly.

13 Q.   Okay.  Do you remember being asked a similar question to

14 this when you testified in front of the grand jury in this

15 matter?

16 A.   I remember talking about it to Detective Wallace when I

17 was talking to her and she had showed me a picture of

18 something like, I think, a handgun or something like that, and

19 she had asked me did any of these look like it, and I told her

20 probably the first picture, but that's just what it looked

21 like.

22 Q.   So it looked to you like it was a handgun?

23 A.   Similar to it, yeah.

24 Q.   And what happened after Melvin took this black object,

25 that looked like a handgun, out of his pants and put it back

United States v. Flores

59

1   in?

2   A.   I walked off.

3   Q.   Did he say anything to you?

4   A.   No.

5   Q.   Did you say anything to him?

6   A.   No.

7   Q.   Where did you go?

8   A.   Walked back to my girlfriend's car.

9   Q.   And was Qwa still in the car?

10  A.   Yes.

11  Q.   Was Charles in the car?

12  A.   Yes.

13  Q.   Where did you all go?

14  A.   To my grandmother's house.

15  Q.   And what did you do once you were at your grandmother's

16  house?

17  A.   We smoked.

18  Q.   Did you smoke any of the marijuana that Charles had taken

19  from Melvin?

20  A.   Uh-huh.

21  Q.   Was it, in fact, marijuana?

22  A.   Yes.

23  Q.   What happened after that?

24  A.   I dropped Charles and Qwa off.  I dropped Qwa off at his

25  house and dropped Charles off in Gantali (ph).

—United States v. Flores—

60

1    Q.   About what time was it that you dropped Qwa off, do you

2    remember?

3    A.   The sun was going down.

4    Q.   Did you ever speak to Qwa Brown again?

5    A.   Not after that night.

6    Q.   When did you find out that Qwa had been shot and killed?

7    A.   In the morning.

8    Q.   And how did you find out?

9    A.   My friends.  We were in a group chat, and they had just,

10   like, was letting everybody know in the group chat what had

11   happened.

12   Q.   The person that you've identified as Melvin and that came

13   out of the house with the weed on that occasion, do you see

14   him in the courtroom right now?

15   A.   Yeah.

16   Q.   Would you describe who he is by telling us where he's

17   sitting and what he's wearing?

18   A.   Right here at the desk to the left of me.

19           MR. BEN'ARY:  Let the record reflect the

20   identification of the defendant, Melvin Palma --

21           THE COURT:  It shall.

22           MR. BEN'ARY:  Those are my questions.  Thank you.

23           THE COURT:  Mr. Jenkins.

24           MR. JENKINS:  Thank you, Your Honor.

25                         CROSS-EXAMINATION

─United States v. Flores─

61

1   BY MR. JENKINS:

2   Q.   Good afternoon, sir.

3   A.   (Nods head.)

4   Q.   Do I understand it correctly?  It is your understanding

5   that you have an immunity deal with Detective Wallace?

6   A.   Uh-huh.

7   Q.   And you told the jury that you smoked marijuana twice a

8   day, but you haven't had any marijuana today, correct?

9   A.   No, sir.

10  Q.   And how long have you been consuming marijuana twice a

11  day?

12  A.   What do you mean by that; like, how long?

13  Q.   Yeah.  Have you been doing this for the past few weeks,

14  months, years, how long?

15  A.   It's been going on for a while.

16  Q.   Were you consuming marijuana at that rate back in 2019?

17  A.   Yes.

18  Q.   Were you smoking twice a day in October of 2019?

19  A.   Yes.

20  Q.   What about the day in which this robbery occurred, did

21  you smoke marijuana that day?

22  A.   We didn't smoke anything before.

23  Q.   You didn't smoke anything before, correct?

24  A.   No, sir.

25  Q.   But you did smoke after, correct?

─United States v. Flores─

62

```
1   A.   Yes.

2   Q.   What about the day before, did you smoke marijuana the

3   day before?

4   A.   Yes.

5   Q.   Do you remember the time of day, the day before, that you

6   smoked marijuana?

7   A.   No.

8   Q.   You don't?

9   A.   (Nods head.)

10  Q.   Did you smoke marijuana yesterday?

11  A.   Yes.

12  Q.   Did you smoke marijuana twice a day?

13          THE COURT:  Mr. Jenkins, when he either nods or

14  shakes his head if you could identify for the record what his

15  answer is.

16          MR. JENKINS:  Yes, Your Honor.

17  BY MR. JENKINS:

18  Q.   Yesterday did you smoke marijuana twice?

19  A.   Yes.

20  Q.   And when you say you smoked marijuana, can you give us a

21  sense in terms of the quantity?

22  A.   A "g."

23  Q.   I'm sorry.

24  A.   One gram.

25  Q.   Is that on each occasion or is it -- a gram the total
```

─────United States v. Flores─────

63

1   amount you consume in a day?

2   A.   Just two grams in a day for each time that I smoke.   So

3   one gram each time.

4   Q.   And when did you start this consumption habit?

5   A.   When I started smoking?

6   Q.   Yes.

7   A.   Probably when I was 15 or 16.

8   Q.   15 or 16?

9   A.   Yes.

10  Q.   So -- and you're 19 now?

11  A.   I'm 20.

12  Q.   20.   So you've been smoking at this rate for five years?

13  A.   That's correct.

14  Q.   And you indicated that you were friends with Qwa,

15  correct?

16  A.   Yes.

17  Q.   And you knew Qwa to use marijuana, correct?

18  A.   Yes.

19  Q.   But you also knew that Qwa sometimes sold marijuana,

20  correct?

21          (A pause in the proceedings.)

22          THE COURT:   Reask the question, Mr. Jenkins.

23  BY MR. JENKINS:

24  Q.   Sir, you also know that Qwa sometimes sold marijuana, is

25  that not true?

─────United States v. Flores─────

64

1   A.   It could have been what Qwa had going on.  Yes.  It could

2   have been what he had going on.

3   Q.   How long were you friends with Qwa?

4   A.   I knew Qwa since middle school.

5   Q.   I'm sorry?

6   A.   I knew Qwa since middle school.

7   Q.   Since middle school.  So at the time of his death would

8   it be fair to say you had known Qwa for at least ten years?

9            (A pause in the proceedings.)

10  BY MR. JENKINS:

11  Q.   Sir?

12  A.   I can't really -- I'm sorry.

13  Q.   Were you close friends with Qwa?

14  A.   Yes.

15  Q.   How often did you speak with Qwa?

16  A.   Almost every day.

17  Q.   You spoke with him almost every day, you described your

18  relationship as being close, correct?

19  A.   (Inaudible answer.)

20  Q.   You knew him well enough to know that he smoked

21  marijuana, correct?

22  A.   Yes.

23  Q.   But you're saying you don't know whether or not he

24  actually ever sold marijuana, is that your testimony?

25           (A pause in the proceedings.)

─────United States v. Flores─────

65

1   BY MR. JENKINS:

2   Q.   Is that your testimony, sir?

3   A.   I'm just confused.  Can we like --

4   Q.   Well, let me ask you this, sir.  When Qwa called you up

5   and propositioned you with this idea to go grab some

6   marijuana, you remember testifying about that, correct?

7   A.   Yes.

8   Q.   Do you remember what part of the day it was when you got

9   this call from Qwa?

10  A.   It was in the -- it wasn't a call.  It was, kind of, in

11  person when he told me about it.

12  Q.   And did this surprise you?

13  A.   Not really, no.

14  Q.   It didn't surprise you that your friend that you had

15  known since middle school suggested to you, let's go grab some

16  marijuana, that didn't surprise you?

17  A.   Because the plan was to smoke it.

18  Q.   And the reason why it didn't surprise you is because this

19  wasn't the first time Qwa had done something like this with

20  you, was it?

21  A.   No.  Like the dude before, I said I had got caught going

22  into a store, running out with a phone, and going into a car,

23  so.

24  Q.   No, sir.  What I'm specifically talking about, this was

25  not the first time Qwa had suggested to you that, in essence,

─────United States v. Flores─────

66

1  let's go rob somebody?

2  A.    No.

3  Q.    He had done it before, correct?

4  A.    This time when we had done it, it was before we were just

5  smoking weed.

6  Q.    But you testified, have you not, that this was not the

7  first time, correct?

8  A.    Correct.

9  Q.    You weren't surprised when he suggested "let's go grab

10 some weed," correct?

11 A.    Correct.

12 Q.    Did you talk about using any weapons?

13 A.    No.

14 Q.    Did you talk about how you were going to accomplish this?

15 A.    Yes.

16 Q.    Who did you talk about it with?

17 A.    Qwa.

18 Q.    Did you talk about it with Charles?

19 A.    Yes.

20 Q.    And you formulated the plan with Qwa and Charles,

21 correct?

22 A.    Yes.

23 Q.    Each of you had a role, correct?

24 A.    Yes.

25 Q.    You knew what you were going to do, correct?

─────United States v. Flores─────
67

1   A.   Yes.

2   Q.   You knew what Charles was supposed to do, correct?

3   A.   Yes.

4   Q.   Again, because this wasn't the first time you'd been

5   engaged in this type of activity, correct?

6   A.   Yes.

7   Q.   And Qwa knew what his role was to be, correct?

8   A.   Yes.

9   Q.   Because again, this wasn't Qwa's first run at it,

10  correct?

11  A.   Correct.

12  Q.   This was something that you, Charles, and Qwa did.  You

13  robbed drug dealers, correct?

14  A.   We robbed Melvin, correct.

15  Q.   Is Melvin the only drug dealer you ever robbed, is that

16  your testimony?

17  A.   Yes.

18  Q.   But you weren't surprised when Qwa suggested to you let's

19  go rob somebody?

20  A.   Because the plan was to just smoke the weed.

21  Q.   When you wanted to smoke weed, is it your testimony that

22  you would always go rob somebody?

23  A.   No.

24  Q.   Normally how did you obtain your weed?

25  A.   We go buy it.

─United States v. Flores─

68

1   Q.   You normally bought it, correct?

2   A.   Correct.

3   Q.   That is, you contacted a marijuana dealer, correct?

4   Correct?

5   A.   Correct.

6   Q.   You gave them money, correct?

7   A.   Correct.

8   Q.   And then he would give you the weed, correct?

9   A.   Yes.

10  Q.   But on this occasion you set out to rob a weed dealer,

11  correct?

12  A.   Correct.

13  Q.   And this wasn't a surprise to you?

14  A.   (Inaudible answer.)

15  Q.   Sir, you indicated that Melvin took something out of his

16  waistband, correct?

17  A.   Correct.

18  Q.   And you said to this jury that it was a black object,

19  correct?

20  A.   Correct.

21  Q.   But you don't know if it was a handgun or not, correct?

22  A.   It came out of his waistband.

23  Q.   I'm sorry?

24  A.   It came out of his waistband.

25  Q.   But you don't know if it was a handgun, correct?

─────United States v. Flores─────

69

1   A.   From where I was standing, yeah, that's what it looks

2   like, but I'm not certain.

3   Q.   And the reason why you didn't run, the real reason why

4   you didn't run is because you didn't want Melvin to know you

5   were in on it, correct?

6   A.   No.

7   Q.   Is that not true?

8   A.   That's not true.

9   Q.   So you agreed to participate in this robbery, correct?

10  Correct?

11  A.   Correct.

12  Q.   You told us that you knew what Charles' role was,

13  correct?

14  A.   Yes.

15  Q.   You told us that Qwa had a role, correct?

16  A.   Yes.

17  Q.   What exactly was your role?

18  A.   To be there with Charles.

19  Q.   For what purpose?

20  A.   Just in case something happened to him.

21  Q.   So your role was to provide physical presence?

22  A.   Yes.

23  Q.   In the event Melvin resisted, what were you to do?

24  A.   Help Charles.

25  Q.   And when you saw Melvin take out this object from his

─────United States v. Flores─────

70

1    waistband that appeared to be a black object that you thought

2    was a gun, what did you do?

3    A.   I stood there.

4    Q.   Well, I thought you said your role was to help protect

5    Charles -- to help Charles?

6    A.   Charles had already ran off.

7    Q.   And your purpose for remaining there wasn't to disguise

8    your involvement?

9    A.   No.

10   Q.   Melvin didn't fire off this thing that you thought was a

11   gun, correct?

12   A.   No.

13   Q.   Did he threaten anybody with it?

14   A.   No.

15   Q.   After Charles had ran off, how long did you stay in the

16   backyard with Melvin?

17   A.   It wasn't long, probably five, eight seconds, and I

18   walked off.

19   Q.   Did you tell Melvin at that time that you were involved

20   with this robbery?

21   A.   I didn't speak to him.

22   Q.   You didn't speak to him?

23   A.   No.

24   Q.   You didn't explain to him that you were there to help

25   Charles?

─────United States v. Flores─────

71

1   A.   No.

2   Q.   And then you left.  Did you leave and get back in the

3   same car that brought you there?

4   A.   Yes.

5   Q.   That's the car that Qwa was in?

6   A.   Yes.

7   Q.   That's the car that Charles was in?

8   A.   Yes.

9   Q.   That's the car that your girlfriend was in?

10  A.   Yes.

11  Q.   And your testimony was, your girlfriend had no clue what

12  was going on, correct?

13  A.   No.

14  Q.   Just told her, "Hey, take me to a friend's house,"

15  correct?  Is that correct?

16  A.   Yes.

17          MR. JENKINS:  I have no further questions, Your

18  Honor.

19          THE COURT:  Redirect.

20          MR. BEN'ARY:  Briefly.

21                  REDIRECT EXAMINATION

22  BY MR. BEN'ARY:

23  Q.   Sir, do you recall testifying in front of a grand jury

24  about this incident in February of 2020?

25  A.   Yes.

─────────────── United States v. Flores ───────────────

72

1  Q.   And do you recall being asked what happened after Charles

2  ran off with the weed?

3  A.   Yes.

4  Q.   And do you recall at that point you said, "And what

5  Melvin did, smacked his teeth, pulled a gun out of his waist.

6  He didn't point it at me, he put it back in his waist, and

7  went back in his house with his friends."

8          Do you recall if that was your testimony in front of

9  the grand jury?

10  A.   Yes.

11          MR. BEN'ARY:  That's my redirect.  Thank you.

12          THE COURT:  Mr. Jenkins, do we have any Sixth

13  Amendment issues with regard to the way the gentleman wears

14  his hair and the mask?

15          MR. JENKINS:  No, Your Honor.

16          THE COURT:  Okay.  Thank you, sir.

17          Is he subject to recall?

18          MR. BEN'ARY:  Not by the government.

19          THE COURT:  All right, sir.  Thank you.  You may

20  step down, sir.  Please do not discuss the case or any aspect

21  of the case with anyone.

22          (Witness excused.)

23          THE COURT:  Ms. Tinsley.

24          (A pause in the proceedings.)

25          THE COURT:  Next witness.

─────────────── United States v. Flores ───────────────

73

1          MR. BEN'ARY:  Your Honor, respectfully, can I

2    suggest that we adjourn for our lunch break now.  The next

3    witness is the medical examiner.  It may take a few minutes.

4          THE COURT:  Very good.

5          Ladies and gentlemen, we're going to go ahead and

6    let you take your mid-morning break or lunch.  You heard me

7    say at the very beginning of the case and throughout the case,

8    please do not discuss the case or any aspect of the case with

9    anyone.  We're beginning the process of presenting the case to

10   you, and obviously you're not to make any decisions regarding

11   this case until the case is submitted for your deliberations.

12         We're going to go ahead and let you take about 45

13   minutes.  So come back about 1:15.  Remember, we can't go

14   forward until all of you are back.  There are plenty of

15   eateries that have sort of sprung up now around the

16   courthouse.  Tomorrow we'll have a lunch for you brought in;

17   you'll be able to choose what you like to eat.  But today,

18   you'll have to leave the facility.

19         I remind you, if you see any lawyers about, it's

20   okay to say good afternoon.  And it's okay for them to say

21   good afternoon to you.  Again, we cannot start the case until

22   you all are back.  So we look forward to seeing you at 1:15.

23   Again, your contact is Ms. Tinsley.  You may now retire.

24         (Jury excused.)

25         **A F T E R N O O N   P R O C E E D I N G**

─────────United States v. Flores─────────

74

1  (Court proceedings resumed at 1:26 p.m.)

2          THE COURT:  I hope everyone had the benefit of a

3  good lunch and ready to go with the second part of the day.

4          Do we need to do anything before we bring the jury

5  in?

6          MR. BEN'ARY:  Can I just discuss the afternoon

7  schedule briefly, Your Honor?

8          THE COURT:  Yes.

9          MR. BEN'ARY:  So good news and bad news.

10          THE COURT:  Give me the bad news first.

11          MR. BEN'ARY:  We may run out of witnesses before

12  4 o'clock.  The good news is we're dramatically ahead of

13  schedule.

14          THE COURT:  That doesn't surprise me.

15          MR. BEN'ARY:  And so, we have done what we can to

16  get enough witnesses to try to get close to 4:00, but there's

17  another group of witnesses that we had anticipated tomorrow

18  that probably aren't going to be able to get here in time to

19  go on.  I think if it goes the way we think it's going to go,

20  we should only have four witnesses tomorrow.  So we are done

21  with more than half of our case.

22          THE COURT:  Well, I appreciate that.  I appreciate

23  both you and Mr. Jenkins, and Mr. Flores, in your efforts to

24  present this case in an efficient manner.  And so, obviously,

25  I'm not going to get in the way of that.  If we get out a

─────United States v. Flores─────

75

1   little early today that's fine.

2          MR. BEN'ARY:  Thank you, Your Honor.

3          THE COURT:  And, again, I appreciate how hard

4   everyone is working on this case.

5          You say that you think you're going to -- you

6   say that -- ladies and gentlemen, if you can come in and sit

7   down.  We're trying to conduct business.

8          If you had to guesstimate when your entire case is

9   going to be complete -- and the reason why I'm asking this

10  question is because I like to give the jury some sort of sense

11  of how we're doing things so they can plan their day.  What

12  would you say to that, sir?

13         MR. BEN'ARY:  So I do think we have five witnesses

14  tomorrow.  My guess is that on a couple of them it will be a

15  little bit longer cross-examination, but I still think we have

16  a reasonable chance at finishing no later than mid-afternoon

17  tomorrow.  If not, a little bit earlier than that.

18         THE COURT:  Very good.  Very good.

19         Mr. Jenkins, what's your suggestion on that?

20         MR. JENKINS:  Your Honor, I concur with government

21  counsel.  I think we're going to, knowing the witnesses they

22  have planned for this afternoon, we're probably going to be

23  done in the next hour-and-a-half.

24         THE COURT:  Okay.

25         MR. JENKINS:  You know we're probably going to be

────────────── United States v. Flores ──────────────

76

1    done with them.  And then tomorrow, based on what I

2    anticipate, the witnesses, at least two of them, probably are

3    going to be more lengthy in terms of cross-examination, but I

4    also anticipate that we'll be done by lunch.

5              THE COURT:  Very good.  Thank you.  I appreciate

6    your hard work, Mr. Jenkins.

7              Ms. Tinsley, we can bring the jury back in.

8              (Jury present.)

9              THE COURT:  Good afternoon ladies and gentlemen.

10   You may be seated.

11             Good afternoon, ladies and gentlemen.  I need to ask

12   you this question and you're going to get sick of me asking

13   it, but I have to ask it all the time.  Were all of you able

14   to live up to the Court's instructions and not discuss the

15   case or any aspect of the case with anyone?

16             All right.  Very good.  Let the record reflect that

17   the jury is reseated.  Ladies and gentlemen, I have a little

18   bit of good news for you.  We're doing very well in the

19   management of our time.  And so, if you were planning

20   something on Friday this week, I think we will be done before

21   we get to that date.  So the lawyers are working really hard

22   on this case, and we appreciate their diligence and their

23   approach in trying to get the work done and respecting your

24   time and commitment.  So we're doing very well, so if you

25   could continue to be as attentive as you have been throughout

```
 1   this case, we will still stay on that good course.
 2                Next witness for the government.
 3                THE GOVERNMENT:  Your Honor, thank you.  The United
 4   States calls Dr. Jocelyn Posthumus.
 5                THE COURT:  Interesting name for a forensic.  Can't
 6   make it up sometimes.
 7   (Government's witness, Jocelyn Posthumus, was sworn.)
 8                THE COURT:  Doctor, if you have been fully
 9   vaccinated and you're comfortable doing so, you may remove
10   your mask while testifying.
11                THE WITNESS:  Okay.  That's fine.
12                MR. BEN'ARY:  May I proceed, Your Honor?
13                THE COURT:  You may.
14                          DIRECT EXAMINATION
15   BY MR. BEN'ARY:
16   Q.   Good afternoon.
17   A.   Good afternoon.
18   Q.   Would you tell the members of the jury your name, and
19   please spell your first and last name.
20   A.   Yes.  It's Jocelyn Posthumus, J-o-c-e-l-y-n
21   P-o-s-t-h-u-m-u-s.
22   Q.   And, ma'am, how are you employed?
23   A.   I'm the assistant chief medical examiner here in the
24   State of Virginia at the northern district office, which is
25   located in Manassas.
```

78

1    Q.    What kind of work do you do?

2    A.    I perform autopsies and external examinations in order to

3    determine a cause and manner of death.

4    Q.    And can you give the jury a brief summary of your

5    training in that area, please?

6    A.    Certainly.  So I received my medical degree from Robert

7    Wood Johnson, which is in New Jersey, followed by a four-year

8    pathology residency at the University of Virginia in anatomic

9    and neuropathology.  Subsequently, a one-year fellowship

10   specialized training in forensic pathology at Virginia

11   Commonwealth University here in Richmond.

12   Q.    And do you have a CV, a curriculum vitae, that sets forth

13   your training and experience?

14   A.    Yes, I do.

15   Q.    With the assistance of the court security officer, would

16   you take a look at what's been marked as Government

17   Exhibit 10, please -- I'm sorry, 9.

18              No, I was right.

19              THE COURT:  9.  10 is the curriculum.

20              MR. BEN'ARY:  Yup, 10 is the curriculum vitae.

21   Please take a look at Exhibit 10 there.

22              THE WITNESS:  Yes.

23   BY MR. BEN'ARY:

24   Q.    Is that a copy of your CV?

25   A.    Yes.

79

1  Q.   Is it accurate?

2  A.   Yes.

3       MR. BEN'ARY:  I move to admit Government's Exhibit

4  10.

5       THE COURT:  Without objection.

6       MR. JENKINS:  Without objection.

7  (Government's Exhibit No. 10 was received into evidence.)

8       THE COURT:  And I offer the witness as an expert in

9  medical examination.

10      MR. JENKINS:  No objection, Your Honor.

11      THE COURT:  No objection.  She is so admitted as an

12  expert in that particular science.

13  BY MR. BEN'ARY:

14  Q.   And have you been qualified as an expert in this field in

15  court prior to today?

16  A.   Yes, I have.

17  Q.   Did you perform an autopsy on an individual named

18  Xyqwavius Brown on or about October 26, 2019?

19  A.   Yes, I did.

20  Q.   And can you describe, briefly, the process of performing

21  that examination on a decedent for the members of the jury,

22  please.

23  A.   Certainly.  So as part of an autopsy we do an external

24  examination of the body which includes photographing.  In this

25  particular case, X-rays or radiographs were also performed.  I

1  collect any potential evidence on the body.  This is followed

2  by cleaning the body, undressing, and then fully documenting

3  any injuries and/or identifying features, followed by an

4  internal examination where I look at the internal organs to

5  diagnose any underlying natural disease processes or trauma,

6  followed by the drawing of fluids for potential toxicology,

7  and subsequently issuing a death certificate and writing an

8  autopsy report.

9  Q.   Did you, in fact, prepare an autopsy report documenting

10 your findings for this particular examination?

11 A.   Yes, I did.

12 Q.   And now I will ask you to, please, look at Government's

13 Exhibit 9.

14 A.   Yes.

15 Q.   Do you recognize that?

16 A.   Yes, I do.

17 Q.   What is that?

18 A.   This is a copy of my autopsy report, including view

19 diagrams on Mr. Brown.

20 Q.   And is that a true and accurate copy of your report?

21 A.   Yes, it is.

22       MR. BEN'ARY:  I'd offer Government's Exhibit 9 into

23 evidence.

24       MR. JENKINS:  No objection, Your Honor.

25       THE COURT:  Without objection.

81

1   (Government's Exhibit No. 9 was received into evidence.)

2   BY MR. BEN'ARY:

3   Q.   Does that report contain your findings and conclusions to

4   a reasonable degree of medical certainty?

5   A.   Yes, it does.

6   Q.   I'm going to ask you a couple of follow-up questions on

7   some of those findings.

8           Could you describe for the members of the jury,

9   evidence -- any evidence that you found of bullet wounds on

10  Mr. Brown's body?

11  A.   Certainly.  There were two gunshot wounds to Mr. Brown.

12  The most significant was a gunshot wound to the head with

13  recovery of a bullet.  The second was a gunshot wound to the

14  arm, which is perforating or through-and-through.  So no

15  bullet was recovered.

16  Q.   And you mentioned before that your process includes

17  taking photographs.  Did you have occasion to take photographs

18  of those injuries on this body?

19  A.   Yes, I did.

20  Q.   Could I ask, with the assistance of the court security

21  officer, do you have the binder up there?

22          Could you take a look, please, first at Government's

23  Exhibit 11B?  It should be behind the 11.  Second photograph.

24  A.   Yes.

25  Q.   Is that a photograph that you took?

82

1    A.   Yes, it is.

2    Q.   And what is it a photograph of?

3    A.   This is a photograph of the gunshot wound entrance to the

4    right arm.

5    Q.   And is it a fair and accurate depiction of what you saw

6    when you conducted this medical exam?

7    A.   Yes, it is.

8             MR. BEN'ARY:  I'd offer Exhibit 11B into evidence.

9             MR. JENKINS:  No objection, Your Honor.

10            THE COURT:  Without objection.  11B.

11            MR. BEN'ARY:  I would ask that it be published to

12   the jury, please.

13            THE COURT:  Without objection.

14   (Government's Exhibit No. 11B was received into evidence.)

15            (Exhibit published.)

16   BY MR. BEN'ARY:

17   Q.   Again, now that the photo is up.  Can you give a brief

18   description of what it is that the jury is looking at?

19   A.   So right below or to the right of the ruler you see a

20   darkened, blackened circular or ovoid lesion.  There is some

21   blood coming out of it but that is the gunshot entrance wound.

22   Q.   And is there a way that you can distinguish an

23   entrance -- a gunshot entrance wound from an exit wound?

24   A.   Yes.

25   Q.   And can you explain that to the jury, please?

83

1  A.   So by definition a gunshot entrance wound you cannot

2  reapproximate the edges.  So what that means is, when the

3  bullet strikes the skin, you lose that tissue and the bullet

4  takes that portion of tissue with it through its wound path.

5           In addition, I also look for evidence of gunshot

6  residues on the skin, which would also support that it's an

7  entrance.  There are no gunshot -- visible gunshot residues

8  associated with this injury.

9  Q.   And did you locate an exit wound that corresponds to this

10  entrance wound?

11  A.   Yes, I did.

12  Q.   Could you take a look, please, at the photograph that

13  comes right before in the binder, 11A.

14  A.   Yes.

15  Q.   And what is that a photograph of?

16  A.   This is a photograph of the gunshot exit wound to the

17  right arm.

18  Q.   And is that a fair and accurate photograph of what you

19  remember seeing when you conducted the medical examination?

20  A.   Yes, it is.

21           MR. BEN'ARY:  Can I offer Exhibit 11A into evidence,

22  please?

23           MR. JENKINS:  Without objection.

24           THE COURT:  Without objection.

25  (Government's Exhibit No. 11A was received into evidence.)

84

1          MR. BEN'ARY:  And I'd ask that it be published for

2     the jury, please.

3          THE COURT:  Without objection.

4          (Exhibit published.)

5     BY MR. BEN'ARY:

6     Q.   So again, now that the photo is up, can you just briefly

7     describe what it is that the members of the jury are looking

8     at?

9     A.   So directly above the ruler you'll see an area of redness

10    and absence of tissue.  That is the gunshot exit wound.  And

11    to orient you -- so we're looking at the back of the right

12    arm, near the armpit or the axilla.  Mr. Brown's head is to

13    the right of the photograph.

14    Q.   And he would be lying face down -- oriented when this

15    photograph was taken?

16    A.   Correct.

17          THE COURT:  Mr. Jenkins, do you anticipate any

18    objection to 11C, D, or E?

19          MR. JENKINS:  I do not, Your Honor.  No objection.

20          THE COURT:  Thank you, sir.

21          MR. BEN'ARY:  Thank you.  Then would you publish,

22    please, 11C.

23    BY MR. BEN'ARY:

24    Q.   And, Dr. Posthumus, if you could turn to it in the binder

25    if that helps you.

1      Could you describe for the members of the jury what

2  we are looking at here?

3  A.   So this photograph is a lateral view of Mr. Brown's right

4  side of his body, and what you can appreciate is that pink

5  rod.  It's called a trajectory rod.  And I insert that through

6  the entrance and exit to give you an idea of the trajectory or

7  the wound path that the bullet took.

8  Q.   And based on your findings, does the rod, as inserted

9  here, accurately depict the trajectory of the round that went

10  in through Mr. Brown's front, right shoulder, and exited

11  through the back of his arm?

12  A.   Yes, it does.

13  Q.   I have just two additional photos to show you of the

14  second bullet wound to Mr. Brown's head.

15      MR. BEN'ARY:  Could we publish 11D, please.

16  BY MR. BEN'ARY:

17  Q.   All right.  And can you describe, for the members of the

18  jury, what that is a photograph of?

19  A.   So this photograph is a picture of Mr. Brown's top of his

20  head, and you can see that I have shaved some of the hair

21  around the wound.  And while there are two defects in this

22  photograph, it represents the gunshot entrance wound.  And

23  then subsequent pictures, I'll be able to describe it, is a

24  unique entrance where the bullet strikes the head and the

25  skull at an acute or sharp angle and immediately fragments.

1          So the reason why in this picture you see two holes

2    is, one of the fragments exits while the remainder of the

3    fragmented and deformed bullet enters the head with recovery

4    of that remaining bullet.

5    Q.   When you say "recovery of that remaining bullet" can you

6    just tell the jurors what that means?

7    A.   So after removing the skullcap and examining the brain,

8    the deformed jacketed bullet was recovered or identified

9    within the brain itself.  I collected that and then receipted

10   it to law enforcement.

11   Q.   And I'm going to ask to publish 11E to have you describe

12   what this photo tells you about the injury.  And I won't leave

13   it up there for longer than necessary, but could you describe

14   what the jurors are looking at here, please.

15   A.   So this is that distinctive entrance wound that I started

16   to describe in the prior photograph.  It's called a keyhole

17   entrance.  It's called that because it looks like a keyhole

18   from your standard door.  What you see at the top of the head

19   is that large oblong defect where it has a sharp edged-out

20   edge towards the front, and then it has a crater look towards

21   the back.  Again, this is a keyhole and it's one bullet that

22   strikes the skull at a very sharp angle.

23          MR. BEN'ARY:  Thank you.  You can take that down.

24   BY MR. BEN'ARY:

25   Q.   Did you reach a conclusion to a reasonable degree of

87

1  medical certainty of the manner and cause of Xyqwavius Brown's

2  death?

3  A.   Yes, I did.

4  Q.   And can you describe your findings to the jury, please?

5  A.   The cause of death is gunshot wounds to the head and

6  upper extremity, and the manner of death is homicide.

7  Q.   And I hear that you're -- you've described both bullet

8  wounds as part of the cause of death; is that correct?

9  A.   Correct.

10  Q.   And why is that?

11  A.   Obviously, the most impactful and immediately lethal

12  wound is the gunshot wound to the head.  However, the gunshot

13  wound to the arm does contribute to blood loss and is

14  potentially lethal in the long term.

15       MR. BEN'ARY:  Thank you, Doctor.  Mr. Jenkins may

16  have questions for you.

17       THE COURT:  Cross.

18       MR. JENKINS:  No, thank you, Your Honor.

19       THE COURT:  Thank you, ma'am.

20       Is this witness subject to recall?

21       MR. BEN'ARY:  Not from the United States, Your

22  Honor.

23       THE COURT:  Mr. Jenkins.

24       MR. JENKINS:  No, Your Honor.

25       THE COURT:  Thank you, ma'am.  Please do not discuss

88

 1    the case or any aspect of the case with anyone while the case

 2    is pending.  Thank you.

 3                THE WITNESS:  Yes.

 4                (Witness excused.)

 5                MR. BEN'ARY:  The next witness is Detective Michael

 6    Roberts.

 7                THE COURT:  Michael Roberts.

 8    (Government's witness, Detective Michael Roberts, was sworn.)

 9                THE COURT:  Sir, if you're fully vaccinated, and

10    you're comfortable doing so, you may remove your mask while

11    testifying.

12                THE WITNESS:  Yes, sir.

13                (Witness seated.)

14                MR. BEN'ARY:  Thank you, Your Honor.

15                        DIRECT EXAMINATION

16    BY MR. BEN'ARY:

17    Q.   Good afternoon.

18    A.   Good afternoon.

19    Q.   Would you tell the members of the jury your full name,

20    please.

21    A.   Michael Roberts.

22    Q.   Common spelling on both?

23    A.   Correct.

24    Q.   How are you employed?

25    A.   I'm a detective with the Fairfax County Police

89

1   Department.

2   Q.    Is there a particular part of the police department to

3   which you are assigned?

4   A.    Yes.  I'm a member of the crime scene section.

5   Q.    And how long have you been employed with the police

6   department overall?

7   A.    Overall, just around 20 years now.

8   Q.    And how many years focusing on crime scene?

9   A.    With major crimes it has been six years.

10  Q.    And can you briefly describe some of your

11  responsibilities with the crime scene unit for the members of

12  the jury, please?

13  A.    As a crime scene detective, it is our job to collect and

14  document physical evidence at a crime scene.  We'll document

15  it through photographs, through diagrams, measurements.  And

16  once we've identified it, we'll -- with the physical evidence,

17  we'll collect the evidence and bring it back with us to our

18  section where we'll either possibly process it for latent

19  prints; or send it out for analysis through another section

20  through Department of Forensic Science; or secure it and then

21  store it in a property room.

22  Q.    And do you have specialized training and experience in

23  matters related to shooting reconstruction, crime scene

24  processing, and homicide cases?

25  A.    I do.

90

1   Q.   And have you testified in other trials in your capacity

2   as a crime scene detective?

3   A.   I have.

4   Q.   Do you have a curriculum vitae that describes your

5   training and experience?

6   A.   I do.

7   Q.   Is that binder in front of you?  If not, could I ask that

8   the binder be presented to Detective Roberts.  And I'm going

9   to ask you to take a look at Exhibit 2, please.

10          Is Exhibit 2 a copy of your curriculum vitae?

11  A.   It is.

12          MR. BEN'ARY:  I'd offer Exhibit 2 into evidence.

13          MR. JENKINS:  No objection.

14          THE COURT:  Without objection.

15  (Government's Exhibit No. 2 was received into evidence.)

16          MR. BEN'ARY:  And I would offer Detective Roberts as

17  an expert in the area of crime scene investigation

18  reconstruction.

19          THE COURT:  Mr. Jenkins?

20          MR. JENKINS:  No objection, Your Honor.

21          THE COURT:  So recognized.

22  BY MR. BEN'ARY:

23  Q.   Detective, did you participate in crime scene

24  investigation at 7112 Fairchild Drive on October 26, 2019?

25  A.   I did.

91

1   Q.   And was it in your capacity as a member of the crime

2   scene unit?

3   A.   Yes.  I was the lead crime scene detective on scene.

4   Q.   And did you undertake -- you and your colleagues,

5   undertake procedures to secure that scene and to document

6   evidence and the location of evidence?

7   A.   We did.

8   Q.   Can you give the members of the jury a sense of what that

9   entailed?

10  A.   So when we arrived to the scene, it had already been

11  secured by the patrol officers -- initial responding units.

12  And the only ones on scene, at that time, when I arrived were

13  a few patrol and other major crimes detectives.  At the time

14  we received a briefing on what had happened and where the

15  initial responding officers had possibly located evidentiary

16  items.  We then did a walkthrough of the scene and identified

17  those items along with other items that could possibly be

18  collected from the scene.

19  Q.   At that point when you conducted the bulk of your work,

20  was the victim still on scene?

21  A.   No, he was not.

22  Q.   Was part of your task to mark -- I think you said "marked

23  items of evidence" and photograph their location before

24  they're collected?

25  A.   Correct.

92

1  Q.   And in the binder that you have in front of you, there's

2  a whole series of exhibits behind tab 1 that goes from 1A all

3  the way to -- I think 1 --

4          THE COURT:  Double V.

5          MR. BEN'ARY:  Double V.  Just take a quick look

6  through those if you don't mind.

7          (A pause in the proceedings.)

8  BY MR. BEN'ARY:

9  Q.   Are those all photographs taken as part of the crime

10  scene investigation into this particular incident?

11  A.   Yes, they are.

12          MR. BEN'ARY:  Offer 1A through 1VV into evidence.

13          MR. JENKINS:  No objection, Your Honor.

14          THE COURT:  Without objection 1 single A, all the

15  way through 1 double V, as in "Victor."

16  (Government's Exhibit Nos. 1A - 1VV was admitted into

17  evidence.)

18          MR. BEN'ARY:  Thank you.

19  BY MR. BEN'ARY:

20  Q.   I'm going to ask you to describe what they are in detail.

21          MR. BEN'ARY:  Could we publish 1A, please?

22  BY MR. BEN'ARY:

23  Q.   What is this a photograph of?

24  A.   This is a photograph of the apartment complex as you're

25  looking into the stairwell of 7112.

93

1   Q.   And there's some traffic cones there.  What are those?

2   A.   Those traffic cones were placed there by initial

3   responding units to mark cartridge cases that they had located

4   prior to our arrival.

5   Q.   Could you look at 1D, as in "David," please?

6           What is this a photograph of?

7   A.   This is a photograph of the -- at the top of the stairs

8   looking down into the entrance of the same building.

9   Q.   And there appears to be some discoloration down the right

10  side of the steps.  Based on your involvement in this crime

11  scene investigation, what is that?

12  A.   All the red staining down on the right side of the

13  stairways appeared to be blood.

14  Q.   And as we look at this picture, the fourth step, is that

15  the fourth step from the top of the staircase?  So we're

16  looking from the top of the staircase down; is that right?

17  A.   Yes.  We're at the top of the staircase looking down.

18  Q.   Would you please --

19           MR. BEN'ARY:  Can we publish 1E?

20  BY MR. BEN'ARY:

21  Q.   What is this a photograph of?

22  A.   This is the same stairwell at the bottom of the stairs

23  looking up.

24  Q.   There are some items on some of the stairs there, were

25  those items that were there when you encountered the scene?

94

1   A.   Yes, they are.

2   Q.   And there's a door straightaway at the top of the steps.

3        Did you do some additional investigation into that

4   doorway at the top?

5   A.   Yes.

6   Q.   And why was that?

7   A.   There were two defects in the door when we arrived on the

8   scene.  Upon closer examination, it appears to be bullet

9   strikes and a bullet hole.  So we continued our examinations

10  of those.

11  Q.   Could you turn to 1W, please?

12       What is that a photograph of?

13  A.   This is a photograph of three pieces of evidence that

14  were on the stairs leading up towards the top landing.

15  Q.   It looks like an iPhone, a slide, and a lighter, is that

16  what those are?

17  A.   Correct, yes.

18  Q.   And let me have you look, please, at 1UU.

19       What is that?

20  A.   1UU is one of the blood stains that's on the stairs near

21  the bottom of the stairs.

22  Q.   And on that second stair, is that one of the larger areas

23  of blood collection when you conducted this investigation?

24  A.   Yes, it is.

25  Q.   And 1VV, please.  Same stair from a different angle?

95

1    A.    Correct.

2    Q.    Did you and your colleagues locate any casings and

3    projectiles when you conducted this investigation?

4    A.    Yes.  We located three cartridge cases on the scene and

5    two projectiles and a fragment.

6    Q.    Can you explain to the members of the jury what a

7    cartridge casing is, please?

8    A.    When you're looking at a bullet, you have the cartridge

9    case which is the base part where it holds the primer, it

10   holds the bullet in the top, and all the powder inside.

11   Q.    And in a semiautomatic handgun, what happens to the

12   cartridge casing when it's fired?

13   A.    Once the cartridge -- the gun is fired, the slide, due to

14   all the gases, is forced to the rear and ejects the cartridge

15   case usually out the right side of the gun.

16   Q.    Not the case in a revolver, correct?

17   A.    No.  In a revolver it stays in the cylinder.

18   Q.    And the other object mentioned was a projectile.  What is

19   the projectile?

20   A.    The projectile is anything that comes out the end of a

21   gun.  In this case it would be bullets.

22   Q.    All right.  I'm going to have you look at a couple of

23   additional exhibits here.  Please take a look at Exhibit 1B as

24   in "Bravo."

25              What is this?

96

1   A.   This is the picture of the front of the 7112.  This is

2   the morning after we arrived.  So we had collected all the

3   evidence by this time, and those yellow markings, or tent

4   placards, that we had -- we had placed it by each piece of

5   evidence just to indicate the evidence.

6   Q.   Okay.  And a close look at this photo -- can you see the

7   locations of what was marked as Fairfax County Police Exhibits

8   10, 11, and 12?

9   A.   Yes, you can.

10  Q.   And what are those exhibits?

11  A.   10 and 11 are cartridge cases, 12 was a bullet.

12          MR. BEN'ARY:  And could you publish 1Y, please?

13  BY MR. BEN'ARY:

14  Q.   So that's a closer-up that shows the location of 10 and

15  11?

16  A.   Yes.

17  Q.   And 8 and 9 too.  But 10 and 11 are the firearms

18  evidence?

19  A.   Yes, they are.

20  Q.   And so, just to orient, the stairway that is depicted in

21  the other pictures would be straight -- sort of, straight up

22  the cement portion there to the left?

23  A.   Correct.  The top of the picture would be the landing,

24  just inside the stairwell.

25          MR. BEN'ARY:  Could you publish 1Z, please?

97

```
 1  BY MR. BEN'ARY:

 2  Q.   A close-up depicting the location of Fairfax, Exhibit 10?

 3  A.   Yes.  That is also a cartridge case.

 4  Q.   And let's pull up 1AA.

 5       What is that?

 6  A.   That is a close-up of the number 10, the cartridge case.

 7  Q.   And 1EE, please.

 8  A.   Yes.  It's another close-up photograph of the same

 9  cartridge case.

10       MR. BEN'ARY:  Could you, please, publish 1BB?

11  BY MR. BEN'ARY:

12  Q.   What are we looking at there?

13  A.   This is the location of the other cartridge case, number

14  11, on -- actually on the concrete walkway.

15  Q.   And there's a little metallic object right on the edge

16  there, is that the cartridge casing?

17  A.   Yes, it is.

18  Q.   1CC, please.

19       Is that just a closer-up of the same item of

20  evidence?

21  A.   Correct, it is.

22       MR. BEN'ARY:  Let's skip ahead to 1FF.

23  BY MR. BEN'ARY:

24  Q.   What is Fairfax evidence item 12?

25  A.   That's a bullet on the sidewalk just to the left of the
```

98

1   entrance of the apartment complex.

2   Q.   So a projectile, if we're splitting the items up into

3   casings and projectiles?

4   A.   So that would be a projectile, correct.

5   Q.   Okay.  And if you look back at -- can we look back at 1B

6   quickly.  12 is in the foreground to the left of the walkway

7   into the building?

8   A.   Yes, it is.

9   Q.   And is that the location that that item was found?

10  A.   Yes, it is.

11       MR. BEN'ARY:  Could you pull up 1TT, please?

12  BY MR. BEN'ARY:

13  Q.   It looks like there is a number tent to the left there.

14  Do you recall what item this was?

15  A.   Yes.  That's item 18.  That's a cartridge case that was

16  found under that wooden ramp on the right side of the

17  entrance.

18       MR. BEN'ARY:  And would you pull up 1O, please?

19  BY MR. BEN'ARY:

20  Q.   Different photograph, what is this?

21  A.   That's a fragment that we located on the fifth step up

22  from the bottom landing.  It's a copper fragment that was

23  sitting on the middle of that step.

24  Q.   These shell casings and projectiles, after they're

25  photographed and documented, what do you do with them?

99

1  A.   In this case, the fragment was sent for storage.  The

2  projectiles and the cartridge cases were sent to the

3  department of forensic science for analysis.

4  Q.   And why is the fragment sent to storage instead of for

5  further analysis?

6  A.   It's a small portion of the projectile.  They are not

7  going to be able to look at it to figure out caliber or get

8  any significant kind of details off of it.

9  Q.   Did you and your colleagues also collect the clothes that

10  the victim was wearing?

11  A.   We did.

12  Q.   And where did -- where were they located?

13  A.   They were located on scene on the landing at the base of

14  the stairs.

15  Q.   And can you see them in Exhibit 1A?

16  A.   Yes, you can.

17  Q.   Can you point out to the members of the jury, where they

18  were found?

19  A.   If you're looking at the stairs to the left, there's that

20  black item on -- right there hanging over that first step on

21  the landing.  That would be the sweatshirt.  And then over on

22  the right side by the ramp, that wooden ramp is the pair of

23  jeans.

24  Q.   And those were collected.  And did you perform some

25  additional inspection analysis on those items?

100

1  A.   Yes, I did.

2  Q.   Could you look at a series of photos 1H, I, J, K, L, M,

3  N, please.  And actually go ahead and look at F and G as well.

4  A.   Yes.

5  Q.   Are those photographs of the clothing that was collected

6  there from the scene, plus F and G, which depict an item that

7  was removed from the pocket of the jeans?

8  A.   Yes, they do.

9         MR. BEN'ARY:  Offer 1H through -- did I offer these

10 already?  Are these included in what I offered and were

11 admitted already?

12        THE COURT:  My notes indicate yes.

13        MR. BEN'ARY:  Okay.  Could we pull up 1H, please?

14 BY MR. BEN'ARY:

15 Q.   Is this the black sweatshirt that you pointed out its

16 location a moment ago?

17 A.   Yes, it is.

18 Q.   And did you examine this item of clothing to see if there

19 were any defects consistent with bullet holes?

20 A.   I did.

21 Q.   And did you find any bullet holes?

22 A.   I did.

23 Q.   Notice, if you look closely, there are clips -- metal,

24 sort of, binder clips that appear to be holding the shirt

25 together.

1          Do you know anything about how those cuts got into

2    the item of clothing?

3    A.   Yes.  The cuts up the sleeve and across the chest of both

4    sides are consistent with the way rescue removes clothing off

5    of injured persons.  So the binder clips were placed on there

6    by me in an attempt to reform the sweatshirt to make it look

7    and appear as it would have before it was cut.

8    Q.   If you look at Exhibit 1I, please.  What is that a photo

9    of?

10   A.   That is a picture of a hole that I found on the upper

11   right arm of his sleeve.

12   Q.   And based on your knowledge, training, and experience, is

13   that consistent with a bullet entry hole?

14   A.   Yes, it is.

15   Q.   Could you look at 1K, please?  A closer look at the same

16   defect in the shirt?

17   A.   Yes, it is.

18   Q.   If you look, please, at 1L.  What is that?

19   A.   1L is the back of the right sleeve on the sweatshirt.

20   There's a hole on the upper right arm consistent with an exit

21   of a bullet strike.

22   Q.   And there's white underneath it.  Is that the mannequin

23   underneath that you can see through the hole of the article of

24   clothing?

25   A.   Yes, it is.

1          MR. BEN'ARY:  And could you pull up M -- 1M, please?

2    BY MR. BEN'ARY:

3    Q.   Again, is that just a closer view of the same defect?

4    A.   It is.

5          MR. BEN'ARY:  Could you pull up 1N, please?

6    BY MR. BEN'ARY:

7    Q.   What is this?

8    A.   These are the jeans that we recovered from the scene off

9    of the ramp.

10   Q.   Were there any bullet -- or any defects in this article

11   of clothing consistent with bullet holes based on your

12   examination of the article?

13   A.   No, there were not.

14         MR. BEN'ARY:  And would you pull up 1F, please?

15   BY MR. BEN'ARY:

16   Q.   What is 1F?

17   A.   1F were the contents of the front left pocket of the

18   jeans.

19   Q.   And it's documented there on the envelope; is that

20   correct?

21   A.   Yes, it is.

22         MR. BEN'ARY:  And pull up 1G, please.

23   BY MR. BEN'ARY:

24   Q.   What is that?

25   A.   That is the -- that was that baggy that was in the front

 1   left pocket of the jeans.  It was a piece of a torn bag that

 2   was tied in a knot.  Once it was untied, inside was the

 3   marijuana in that plastic bag.  I had placed it in the plastic

 4   bag for -- just to secure it separate from the other piece of

 5   evidence.

 6   Q.   So the clear zip lock-type plastic bag on the right there

 7   was provided by the police department?

 8   A.   Yes, it was.

 9   Q.   All right.  I mentioned earlier that the door that was at

10   the top of the steps -- you said you did some additional

11   investigation on that door, correct?

12   A.   Yes.

13          MR. BEN'ARY:  Could you pull up 1SS?

14   BY MR. BEN'ARY:

15   Q.   Is that the door that -- is that directly at the top of

16   the steps as you were looking at it in those other

17   photographs?

18   A.   Yes.  That's the door to apartment 203.

19   Q.   And what -- what is significant, that you can point out

20   to the members of the jury, in this picture?

21   A.   That there are two defects in the door.  One is on the

22   left-hand side just above the dead bolt.  And then the second

23   defect is lower, to the -- on the right-hand side, which is

24   actually a bullet hole.

25   Q.   And did you conduct some additional analysis on those two

104

1   defects?

2   A.   I did.

3   Q.   1C, please.  Is that a closer-up view of the defect above

4   the keyhole?

5   A.   Yes, it is.

6   Q.   And 1QQ, please.  Again, same, just a closer-up view?

7   A.   Yes, it is.

8   Q.   And 1PP.  What is that that we're looking at?

9   A.   That is, again, just a closer-up photograph of the same

10  defect.

11  Q.   And what can you tell the members of the jury about this

12  defect and directionality of the projectile that caused it?

13  A.   So this picture is oriented as you would be staring at

14  it.  So this is -- the top is, obviously, at the higher end of

15  the picture.  So it appears to be a ricochet from a

16  projectile.  You can see at the bottom part, there's a fine

17  line which indicates that the bullet is coming in at either

18  a -- usually a lower angle.  And as it travels across the

19  surface, it starts to gouge or dig into the surface and then

20  pops out because it doesn't have enough force to actually

21  penetrate through whatever the surface is.  In this case, it

22  was the steel surface of the door.

23  Q.   And is this consistent with finding fragments of

24  projectiles back towards the sidewalk and the stairs area?

25  A.    Yes.  Once a bullet or a projectile strikes an object, it

105

1   has the ability to fragment in many number of pieces or

2   different size pieces.

3            MR. BEN'ARY:  Let's look at 1OO, please.

4   BY MR. BEN'ARY:

5   Q.   What is that?

6   A.   OO is the bottom half of the same door.  It's showing the

7   defect in the lower right side.

8   Q.   And how would you describe that defect?

9   A.   That is an entry hole for a projectile.

10            MR. BEN'ARY:  Can we look at 1T?

11  BY MR. BEN'ARY:

12  Q.   What is 1T?

13  A.   1T is the inside of the door directly behind the defect

14  on the lower right side of the door.  So this would be an exit

15  for that projectile.

16  Q.   And how would you describe -- it looks like there's a

17  hole and then there's something below the hole.

18            What are we looking at here?

19  A.   The hole is actually the lower portion of this.  What had

20  happened was, is the projectile penetrates from the inside

21  through to the exterior of the door.  It starts to bend the

22  metal in, sort of, a cone-shaped.  And what had happened in

23  this case is it didn't completely separate the part of the

24  door.  So it took that flap and actually bent it upward as the

25  bullet exits.

106

1   Q.   Can you look at 1R, please?

2        All right.  So just to give an orientation, if

3   you're looking at the view that we just saw of the inside of

4   that defect in the door, what is -- what would be right behind

5   you?

6   A.   So yeah, there's a set of bifold doors behind you.

7   Q.   And what is 1R a picture of?

8   A.   It is a picture of those bifold doors.

9   Q.   And what is significant that you can see from this

10  picture?

11  A.   There is a bullet defect entering the exterior side of

12  the door.

13  Q.   And what was inside that closet when you conducted the

14  investigation?

15  A.   We located numerous coats.  One of which had a projectile

16  stuck to the front side of it.

17  Q.   Can you look at 1II, please?

18       What is that?

19  A.   That is a leather jacket that was immediately inside the

20  bifold doors.  That was a hole that had penetrated through the

21  sleeve.

22  Q.   And there's -- it looks like some debris to the -- on

23  that sleeve as well?

24  A.   Yes.  The inside of the door was made of fiber-like

25  board, almost like a cardboard.  And that's the debris -- is

1   just the pieces and flakes of that fiber board that had been

2   blown or knocked off as the bullet went through.

3   Q.   And did you locate the projectile that caused the defect

4   in the -- outer door, closet door, and this jacket?

5   A.   Yes.

6   Q.   Could you look at 1LL, please?

7        What is that?

8   A.   That's a picture of the projectile hanging off the front

9   of a peacoat.

10  Q.   As you encountered it when you conducted your

11  investigation?

12  A.   Yes.  I had to move that leather jacket to the side and

13  this was hanging there.

14  Q.   All right.  Were you able to conduct a trajectory

15  analysis on this projectile?

16  A.   Yes.

17  Q.   And what do you need in order to accomplish a trajectory

18  analysis?

19  A.   So to do a trajectory analysis, we have rods and cones,

20  which we stick through the defect in order to find a -- the

21  path -- the most likely path it had taken, and we had also

22  used protractors and angle finders to get the azimuth and

23  inclination of the bullet as it's traveling.

24  Q.   Could you do a trajectory analysis on the ricochet the

25  same way you did it on the round that went through the door?

108

1    A.    No.   So when you need to do a trajectory analysis, you

2    need two points of the same projectile.   With a ricochet, you

3    only have that one deflection.

4    Q.    Could you look at 3A through -- let's go all the way

5    through 5, please.   So 3A through F, and then 4 and 5.

6            THE COURT:   Mr. Jenkins, assuming a proper

7    foundation, are you going to have any objection to 3A through

8    5?

9            MR. JENKINS:   No, Your Honor.

10            THE COURT:   Very good.

11   BY MR. BEN'ARY:

12   Q.    So briefly, are 3A, B, C, D, E, F, photos that show your

13   placement of rods and the protractor as you conducted your

14   trajectory analysis?

15   A.    Yes, they are.

16            MR. BEN'ARY:   We offer those into evidence, please.

17            MR. JENKINS:   No objection.

18            THE COURT:   Without objection.

19   (Government's Exhibit Nos. 3A, B, C, D, E, F were received

20   into evidence.)

21   BY MR. BEN'ARY:

22   Q.    And 4 and 5 are diagrams that were prepared that show the

23   results of this analysis?

24   A.    Correct.

25   Q.    And are they accurate based on your training and

1   experience in trajectory analysis?

2   A.   Yes, they are.

3           MR. BEN'ARY:  I'm going to offer 4 and 5 as well.

4           THE COURT:  Without objection.

5   (Government's Exhibit Nos. 4 and 5 were admitted into

6   evidence.)

7           MR. BEN'ARY:  Can we pull up 3A, please?

8   BY MR. BEN'ARY:

9   Q.   What are we looking at on 3A?

10  A.   So 3A is -- on the right side of the picture is the

11  inside of the metal door to the apartment.  And inside the

12  defect is a -- that purple rod is the trajectory rod.  And

13  then in the middle of the defect that -- the black cone is

14  called a centering cone.  This is designed to center that rod

15  into the defect.

16  Q.   And as it lines up, is it consistent with a projectile

17  traveling through the exterior door and then striking the

18  closet door where that hole is located?

19  A.   Yes, it is.

20  Q.   If you look at 3 -- let's skip to 3E, please.

21          Go to E, sorry.  What is this?

22  A.   So this is the outside of the same defect.  The

23  trajectory rod is -- and the cone are centering it on the

24  defect.

25  Q.   All right.

1       MR. BEN'ARY:  3C, please.

2   BY MR. BEN'ARY:

3   Q.   What are we looking at on 3C?

4   A.   So 3C we are at the base of the stairs and took a

5   photograph directly up the stairs.  And in the middle of that

6   defect you can see the tip of the trajectory rod and the

7   centering code in there indicating that the -- the projectile

8   was -- came from this direction.

9   Q.   All right.  Let's look at Exhibit 4, which is the first

10  of your diagrams.

11       All right.  Can you just walk the members of the

12  jury through what this diagram sets out, please.

13  A.   So at the top left is a diagram of the outside of the

14  door.  The red dotted lines are measurements indicating its

15  height is 1 foot 8 inches from the floor and then 1 foot and a

16  quarter inch from the -- the right side doorframe.  The hinge

17  side of the door.

18       And then the center photo at the top is the same

19  door.  This is inside of the door.  Again, it's showing that

20  it's about 1 foot 8 inches from the floor and a foot from the

21  same side of the doorframe, the hinge side of the doorframe.

22  And then the measurement above that is a -- to the same

23  defect, it's to the same hole.  Except, instead of going to

24  the doorframe, we actually went to the wall just to the left

25  side of the door.  And the reason we did that was because when

1    we get over to the bifold doors that were behind us, which is

2    the top right photo, we couldn't measure, obviously, from the

3    same doorframe, we had to measure from the wall.  So we

4    measured from the wall again and got 1-foot, three-and-a-half

5    inches, and then it was 2-feet, nine inches from the floor.

6              And then the bottom picture on the left, as you see,

7    there's a stairwell, which is the front door, and then the

8    closet door is on the left side of the picture.  And it just

9    shows you the triangulation of the two bullet -- of the --

10   sorry.  The triangle is a 20-degree angle, and it shows the

11   20-degree angle from the hole in the front door to the hole in

12   the back door.  The 20 degrees is the actual trajectory that

13   we determined was the path of the bullet.

14   Q.   And then what's that last diagram there on the --

15   A.   Oh, I'm sorry.  The last one is the horizontal angle.  So

16   as you're outside of the door, looking at the door, we use a

17   zero-degree protractor to measure this.  So zero would be at

18   the flat plane of the door, 90 degrees would be perpendicular

19   to the door.

20             So with this we were 87 degrees from a left to right

21   angle indicating that the projectile was going from left to

22   right, and at an 87-degree angle as it hit the door and went

23   through the door.

24             MR. BEN'ARY:  Can we pull up Exhibit 5, please?

25   BY MR. BEN'ARY:

112

1   Q.   Can you walk the members of the jury through this

2   diagram?

3   A.   So this is a cutaway view of the -- of the front of the

4   building, the stairs leading from the landing up to the

5   apartment, and then the exterior door and the bifold door.

6           You can see the same measurements for the height

7   from the floor to the defect in the bifold door and in the

8   exterior door.  The same measurements from the last exhibit.

9   And then we just connected them with that 20-degree line and

10  if you extend that 20-degree line, it comes down to the

11  pathway below.

12  Q.   And so the trajectory, as you measured it, is the

13  dotted --

14  A.   The dotted green line.

15  Q.   With the arrow at the right end of it?

16  A.   Yes.

17  Q.   What is the non-dotted line connected by the two dots

18  that leads up the stairs there?

19  A.   Oh, that -- that is the handrail on the side of the

20  stairs.

21  Q.   And is the trajectory that you measured consistent with

22  the location of the shell casings that were found and

23  collected?

24  A.   Yes, it was.

25  Q.   In addition to this part of the investigation, were you

113

1   also involved in a search warrant on December 30, 2019, at the

2   defendant's residence?

3   A.   Yes, I was.

4   Q.   And did you basically perform the same tasks to include

5   taking photographs of -- of items that were seized as

6   evidence?

7   A.   Yes, I was.

8   Q.   And could you look at all of Exhibit 12, please.

9        Are those all photographs taken during the execution

10  of the search warrant that I just mentioned, December 30,

11  2019?

12  A.   Yes, they are.

13       MR. BEN'ARY:  I would move in the 12 series of

14  exhibits.  I think it's A through double A.

15       MR. JENKINS:  No objection, Your Honor.

16       THE COURT:  Without objection.  12A through 12AA.

17  (Government's Exhibit Nos. 12A through 12AA were admitted into

18  evidence.)

19  BY MR. BEN'ARY:

20  Q.   Did you and your colleagues locate a stack of United

21  States currency during the execution of this search warrant?

22  A.   We did.  We found a stack of currency on the -- sitting

23  on the middle of the bed in plain view wrapped with two rubber

24  bands around either end.

25       MR. BEN'ARY:  Could you pull up 12N, please?

114

1   BY MR. BEN'ARY:

2   Q.   Is that a photograph of the stack of cash as --

3   A.   Yes, it is.

4   Q.   -- as you encountered it?

5   A.   Yes, it is.

6   Q.   And 12O, please.  Side view of the same stack?

7   A.   It is.  Correct.

8   Q.   And did the police department count the U.S. currency

9   pictured in this stack?

10  A.   We did.

11  Q.   And how much, approximately, was it?

12  A.   It was, approximately, $3,234.

13  Q.   And there's several photographs laying it out to be

14  counted, correct?

15  A.   Yes.

16  Q.   Let's go to 12M, please, as in "Michael."

17          What is this?

18  A.   This is a wallet that we recovered out of the room.

19  Q.   Was it the same room as the stack of currency was in?

20  A.   Yes, it was.  It was on the same bed.

21  Q.   Did you and your colleagues also locate a backpack with

22  several items in it in the same room?

23  A.   Yes, we did.

24  Q.   Okay.

25          MR. BEN'ARY:  And let's pull up 12E, please.

115

1   BY MR. BEN'ARY:

2   Q.   What is that?

3   A.   This is a backpack -- as you walked in the door, this was

4   just to the right of the door at the base of that red ottoman

5   and it was inside of the room.

6   Q.   And did you and your colleagues examine the contents of

7   that backpack and take additional photographs?

8   A.   We did.

9   Q.   And let's take a look at Exhibit 12F, please.

10          Are those some of the contents of the backpack laid

11  out?

12  A.   Yes, they are.

13  Q.   What are those items?

14  A.   So the item in the foreground is a food saver.  Directly

15  behind that are FoodSaver bags.  At the top of the picture is

16  a sealed FoodSaver bag with marijuana in it.  And then to the

17  right of that is a mason jar, again, with marijuana in it.

18  Q.   FoodSaver is like a vacuum sealer; is that correct?

19  A.   Yes, it's a vacuum sealer.  It takes the air out of those

20  plastic bags and then seals them to keep the air out.

21          MR. BEN'ARY:  12Y, please.

22  BY MR. BEN'ARY:

23  Q.   What is 12Y?

24  A.   12Y is a digital scale that was also found in that

25  backpack.

116

1   Q.   Did you and your colleagues additionally locate a rifle

2   along with magazines and ammunition?

3   A.   We did.

4            MR. BEN'ARY:  Could you pull up 12H, please?

5   BY MR. BEN'ARY:

6   Q.   What is that?

7   A.   That is a rifle that we located in the closet of the

8   bedroom.  It was on the floor in plain view.

9   Q.   And did you locate magazines and ammunition that would be

10  accepted by this rifle?

11  A.   Yes.  In this photo, the magazine is seated in the rifle.

12  It's a 30-round magazine which was loaded with 30 rounds of

13  223 ammunition, which is what the rifle takes.

14  Q.   And were there other similar caliber rounds as well as

15  other magazines?

16  A.   Yes.  There were two more magazines.  Again, both of

17  those magazines were 30-round magazines, also loaded with 30

18  rounds.  And there was a box of ammunition sitting on the

19  dresser with the same 223 rounds sitting in that box.

20  Q.   In addition to that caliber of ammunition, did you and

21  your colleagues locate small caliber ammunition as well?

22  A.   We did.

23            MR. BEN'ARY:  And could you show 12J, please?

24  BY MR. BEN'ARY:

25  Q.   What is that?

1   A.   Those are three .45-caliber cartridges that were found in

2   a Nike shoe box underneath the bed in the bedroom.

3   Q.   And did you find any handguns -- pistols during the

4   execution of this search warrant?

5   A.   No, we did not.

6   Q.   And last couple of questions for you.

7        Did you also perform examination of two handwritten

8   letters for the presence of latent fingerprints?

9   A.   Yes, I did.

10   Q.   And in the binder there, could you look at Exhibits 34

11   and 35.

12   A.   Yes.

13   Q.   Did you perform an examination of both of those letters

14   to look for latent fingerprints?

15   A.   I did.

16   Q.   Did you identify latent fingerprints on each of those

17   letters?

18   A.   Yes, I did.

19   Q.   And did you submit your results to the section of the

20   police department that conducts fingerprint comparison

21   analysis?

22   A.   I did.

23        MR. BEN'ARY:  Court's indulgence.  One moment,

24   please, Your Honor.

25        THE COURT:  Yes, sir.

                                                                        118

1           (A pause in the proceedings.)

2           MR. BEN'ARY:  Detective, thank you.  Mr. Jenkins may

3    have some questions for you.

4           THE COURT:  Mr. Jenkins.

5           MR. JENKINS:  Thank you, Your Honor.

6                         CROSS-EXAMINATION

7    BY MR. JENKINS:

8    Q.   Good afternoon, Detective.

9    A.   Good afternoon.

10   Q.   Detective, I want to take you back to when you first

11   arrived on the crime scene.

12           Now, I understand it was your job to process the

13   crime scene, correct?

14   A.   Correct.

15   Q.   When I say "process," it is to collect whatever items you

16   might find to be of evidentiary value, correct?

17   A.   Yes.

18   Q.   Because the goal is to assist law enforcement or to put

19   law enforcement in a position to be able to identify who may

20   have perpetrated the crime, correct?

21   A.   Correct.

22   Q.   And one of the things that you've explained to us here

23   today is that you take photographs to document the scene,

24   correct?

25   A.   Correct.

1   Q.   And you may also, as you've testified here today, create

2   certain diagrams, correct?

3   A.   Correct.

4   Q.   And again, this is all for the purpose of assisting law

5   enforcement to be able to identify who may have perpetrated

6   the offense, correct?

7   A.   Yes.

8   Q.   Now, you indicated, also, that you collected, or you

9   located at this scene, some bullet casings, correct?

10  A.   Yes.

11  Q.   And those are the outer shell of a bullet, correct?

12  A.   Yes.

13  Q.   It's the portion that is expelled from a semiautomatic

14  when the firearm is discharged, correct?

15  A.   Yeah, it is.  That's not the only place it comes from,

16  but, yes.

17  Q.   You also, if I understand you correctly, testified that

18  one of the things that you would typically do with those

19  bullet casings is to submit them to the department of forensic

20  science for latent print examination, correct?

21  A.   No.  In this case we did not submit them for latent print

22  examination.

23  Q.   Well, I'm not asking you whether you did --

24  A.   Oh, okay.

25  Q.   -- or not, I'm asking, is that a reason you would have to

120

1  collect the casings?

2  A.   That's one of the reasons, yes, we could, yes.

3  Q.   And that's because, based on your training and

4  experience, you've learned that sometimes when someone loads a

5  firearm with a bullet, they may leave a fingerprint on the

6  casing, correct?

7  A.   Correct.

8  Q.   And so your purpose for you collecting the casing at a

9  crime scene, at least one purpose, is for you to submit it to

10  the department of forensic science so they could examine it to

11  determine whether a fingerprint was actually left on the

12  casing, correct?

13  A.   Yes.

14  Q.   And in this case I think you've already testified, you

15  didn't do that, correct?

16  A.   Correct.

17  Q.   So you can't tell this jury whether or not the

18  defendant's fingerprint was found on any of the casings that

19  you collected, correct?

20  A.   Correct.

21  Q.   Now, you also, in diagram Exhibits 4 and 5 -- can you get

22  those in front of you and could you put up 4?

23         Now, this Exhibit 4, this is one of your diagrams

24  that you created in order to help explain the trajectory of

25  one of the bullets that went through the door and ended up in

121

1    the closet, correct?

2    A.    Correct.

3              MR. BEN'ARY:  And if you could go to Exhibit 5.

4    BY MR. BEN'ARY:

5    Q.    Now, Exhibit 5 is, again, a diagram created by you,

6    correct?

7    A.    No.  I did not physically create the diagrams.  The

8    information, the data that was collected by me, another

9    detective actually put it all together in the diagram.

10   Q.    But --

11   A.    But it was through -- it was created from the information

12   that I collected, correct.

13   Q.    From the data you supplied?

14   A.    Yes.

15   Q.    And the goal of this diagram is to demonstrate to the

16   viewer where, based on your data, the bullet traveled,

17   correct?

18   A.    Yes.

19   Q.    Now, what it does not tell us is anything about the

20   shooter, correct?

21   A.    No, it does not.

22   Q.    It doesn't tell us his height, for example, correct?

23   A.    No.

24   Q.    It doesn't tell us if it was a male or a female, correct?

25   A.    No.

122

1  Q.   It doesn't tell us if he was black?

2  A.   No.

3  Q.   It doesn't tell us if he was white?

4  A.   No.

5  Q.   Or whether he was Hispanic, correct?

6  A.   No.

7  Q.   It just shows the trajectory of the bullet, correct?

8  A.   Yes.

9  Q.   Now, in your search of the defendant's bedroom, I'm going

10  to take you to Government's Exhibit 12J.

11        Now, these are the small caliber bullets that were

12  found in the defendant's bedroom, correct?

13  A.   Correct.

14  Q.   And when I say "small" that is in comparison to what is

15  depicted in Government's Exhibit 12K, correct?

16  A.   No, these are the same bullets.

17  Q.   But you did find a different set of bullets, correct?

18  A.   Yes.  We found these 45 -- three .45-caliber cartridges

19  and then we also found rifle cartridges.

20  Q.   Now, the casings that you recovered from the crime scene,

21  were you able to determine the caliber of those casings?

22  A.   Yes.  The cartridge cases were 9-millimeter.

23  Q.   They were 9-millimeter, correct?

24  A.   Yes.

25  Q.   And what you found in the defendant's room were -- which

123

1   is depicted in Government's Exhibit 12J, those are not

2   9-millimeter ammunition, correct?

3   A.    No, they're not.

4   Q.    They're .45-caliber, correct?

5   A.    Yes.

6   Q.    That's different than 9-millimeter, correct?

7   A.    It is.

8   Q.    Different from what you found on the crime scene,

9   correct?

10  A.    Yes.

11  Q.    Now, you also found some larger -- would you describe

12  them as shotgun ammunition?

13  A.    No, they're rifle ammunition.

14  Q.    Rifle ammunition.

15  A.    Yes.

16  Q.    And am I also correct that the rifle ammunition that you

17  found in the defendant's bedroom didn't match up with the

18  casings found at the crime scene, correct?

19  A.    No, no.

20  Q.    They were different, correct?

21  A.    Yes.

22  Q.    They weren't 9-millimeter casings -- bullets, correct?

23  A.    No.

24         MR. JENKINS:  Your Honor, I believe those are all

25  the questions that I have.

124

1            THE COURT:  Mr. Ben'Ary.

2            MR. BEN'ARY:  May I have the Court's indulgence for

3    one moment?

4            THE COURT:  You may.

5            (Counsel confers.)

6            MR. JENKINS:  Your Honor, I forgot to ask maybe two

7    or three more questions.

8            THE COURT:  Yes.

9            MR. JENKINS:  Thank you.

10   BY MR. JENKINS:

11   Q.   Detective, when you use the term in your profession

12   "latent prints," I know maybe laymen might think only

13   fingerprints and that wouldn't be true, correct?

14   A.   No.

15   Q.   Latent prints goes beyond just fingerprints, correct?

16   A.   Yes.

17   Q.   For example, someone in your line of work may also take a

18   latent print of a footprint?

19   A.   Yes.

20   Q.   Is that correct?

21   A.   Correct.

22   Q.   Because sometimes when we walk we leave footprints behind

23   on hard surfaces, correct?

24   A.   Yes.

25   Q.   And you actually have a way in which you can lay

1  something on the ground, and do some other things, and pull up

2  that print, correct?

3  A.   Yes, we do.

4  Q.   And then you can use that to match to a particular

5  suspect's, let's say, footing that you believe they may have

6  been wearing when the crime was committed, correct?

7  A.   The shoe -- are you about shoe wear now?

8  Q.   Yes.

9  A.   Yes.  Yes, we can do that.

10  Q.   And that's also called a latent print, correct?

11  A.   We call it "shoe wear."  It is a type of latent print,

12  yes.

13  Q.   But that's something that you do, correct?

14  A.   Yes, we do that.

15  Q.   In processing a crime scene, correct?

16  A.   Yes.

17  Q.   Now, let me ask you, what about on natural surfaces, like

18  grass or soil?

19  A.   On soil, yes.

20  Q.   So, for example, like, what is depicted in the photograph

21  that you took right outside of where the shooting occurred.

22         MR. JENKINS:  What series is that?

23         MR. BEN'ARY:  One.

24         MR. JENKINS:  One.  Court's indulgence.  If you can

25  get 1B up.

126

```
1   BY MR. JENKINS:
2   Q.   Now, in this picture right here we see some -- a little
3   grassy area, correct?
4   A.   Yes.
5   Q.   Where soil is, correct?
6   A.   Yes.
7   Q.   Now, if someone were to walk in that area, for example,
8   they could leave their shoe marking behind, correct?
9   A.   They could, yes.
10  Q.   And that could assist you with being able to identify a
11  particular suspect, correct?
12  A.   Yes.
13  Q.   And what you would do in order to capture that, unlike
14  the hard surface, is that you would use a -- a mold, correct?
15  A.   Yes, we could.
16  Q.   Where you actually pour something on the ground and it
17  helps to capture those prints, correct?
18  A.   We could, yes.
19  Q.   And that's a useful tool in your investigative work,
20  correct?
21  A.   It is.
22  Q.   It's something that can be very helpful in identifying a
23  particular suspect, correct?
24  A.   In this case it would identify, like I said, a pair of
25  shoes.  It would not identify an individual person.
```

127

1   Q.   Well, at least be able to identify a pair of shoes,

2   correct?

3   A.   Yes.

4   Q.   That could be connected to a particular perpetrator,

5   correct?

6   A.   Correct, yes.

7   Q.   And in this situation right here you didn't do that

8   either, correct?

9   A.   We did not -- we did not have the opportunity to do any

10  shoe wear, no.

11  Q.   Well, you didn't do it, correct?

12  A.   No, we didn't.

13         MR. JENKINS:  No further questions.

14         THE COURT:  Redirect.

15                    REDIRECT EXAMINATION

16  BY MR. BEN'ARY:

17  Q.   Detective, why didn't you do any of the shoe wear

18  analysis that --

19  A.   We didn't locate any shoe wear.  We looked through the

20  area for different shoe wear.  It is dirt and there's -- a lot

21  of the grass is gone.  But it was hard-packed dirt and was not

22  conducive to leaving any kind of impressions.

23  Q.   All right.  And counsel asked you about submitting the

24  cartridge casings for latent fingerprint analysis?

25  A.   Yes.

1   Q.   He asked you if you submitted them, you said you did not.

2   A.   We did not.

3   Q.   Why not?

4   A.   Through fingerprint analysis it could be detrimental to

5   doing any kind of a firearms examination.  By using super glue

6   or chemicals to process for latent prints could actually

7   damage the microscopic details that they're looking for.

8   Q.   And so, you and your colleagues chose to have the rounds

9   examined for ballistic tool markings as opposed to risking

10  that being degraded by latent fingerprint examination?

11  A.   Yes, we did.

12  Q.   And the shell casings from the scene were successfully

13  compared to one another, correct?

14  A.   Yes, they were.

15          MR. BEN'ARY:  Thank you, Your Honor.

16          THE COURT:  Is this witness subject to recall?

17          MR. BEN'ARY:  Not by the government, Your Honor.

18          THE COURT:  Mr. Jenkins.

19          MR. JENKINS:  No, Your Honor.

20          THE COURT:  All right, sir.  You're not subject to

21  recall.  Please do not discuss the case or any aspect of the

22  case with anyone now that the case is pending.

23          THE WITNESS:  Yes, Your Honor.

24          THE COURT:  Thank you, sir.

25          (Witness excused.)

1          THE COURT:  Counsel, I believe that this is probably

2   a pretty good time to take our mid-afternoon break.  So let's

3   do that.

4          Ladies and gentlemen, I'm going to give you until

5   3 o'clock.  It might be a good time to maybe get a piece of

6   candy, or drink of water, or something to get us through the

7   rest of the day.  So we'll see you back here at 3 o'clock.

8   Please remember the Court's instruction not to discuss the

9   case until the case is finally submitted to you.

10         (Jury dismissed and a break was taken.)

11         (Court resumes.)

12         THE COURT:  Anything we need to do before we bring

13  the jury in?

14         MR. BEN'ARY:  Your Honor, once they come in but

15  before the witness takes the stand, I would propose to offer

16  in the telecommunications record pursuant to the 902.11.  So

17  it would be 43AB, 44AB, 45AB.

18         THE COURT:  Without objection, Mr. Jenkins?

19         MR. JENKINS:  No objection, Your Honor.

20         THE COURT:  Thank you, sir.

21  (Government's Exhibit Nos. 43AB, 44AB, 45AB were received into

22  evidence.)

23         THE COURT:  Anything else?

24         MR. BEN'ARY:  No, Your Honor.  If it's before 4:00

25  and the witness is done, we can at least take advantage of the

130

1    time by offering in the stipulations that we've reached.

2                THE COURT:  That's fine.  That was my thought based

3    upon your suggestions on how we might be on time.  I'm

4    anticipating that this is going to be the last witness of the

5    day?

6                MR. BEN'ARY:  This is it for -- that we have

7    available for the afternoon.

8                THE COURT:  Very good.  That's fine.  And then you

9    can read the stipulations in as you choose at the time that

10   you choose.

11               MR. BEN'ARY:  Okay.  Thank you.

12               THE COURT:  What I'll do is I'll give, sort of, a

13   preliminary instruction as to what a stipulation is.  That way

14   they will have the opportunity to evaluate it appropriately.

15               MR. BEN'ARY:  Thank you.

16               THE COURT:  Okay.  Ms. Tinsley, thank you.

17               (Jury present.)

18               THE COURT:  Let the record reflect that the jury is

19   reseated.  We're back on the record in the United States of

20   America versus Melvin Palma Flores.

21               Ladies and gentlemen, I'm assuming you, once again,

22   lived up to the Court's instruction not to discuss the case or

23   any aspect of the case with anyone.

24               This is going to be the last witness for today.  I

25   will give you some little thought as to how we're going to

131

1   proceed going forward.  We're going to -- there are some

2   exhibits that the parties have agreed are admissible.  I'm

3   sure Mr. Ben'Ary will make reference to them.  They are 43AB,

4   44AB, and 45AB.  Those were admitted by agreement.

5          In addition to that, ladies and gentlemen, I believe

6   that the government is, at some point during the course of the

7   afternoon, going to read something called a stipulation into

8   the record.  A stipulation is an agreement by the counsel that

9   what a person would have said on the stand is what they're

10  going to read.  You are to give it whatever appropriate weight

11  you want to give it just as if the person had testified on the

12  stand in your vision.

13         So I believe that's where we're going to be today.

14  And just in case I don't remember, we're going to be starting

15  tomorrow at 10:00.  So that gives you a little bit more time

16  and less traffic to fight as you come in.  I don't think we

17  ever get the opportunity to not fight traffic when we're

18  coming in here, but it will give you a little bit better

19  opportunity to do that.  So tomorrow we'll start at 10:00.

20         Remember, we can't start until all of you are here.

21  So if you could get here around 9:45 that would be great and

22  we'll go -- we'll start our business at about 10:00 tomorrow.

23         Mr. Ben'Ary.

24         MR. BEN'ARY:  And, Your Honor, can I just real quick

25  for the record identify what those 43 and 44 exhibits are?

132

1          THE COURT:  Yes, sir.

2          MR. BEN'ARY:  So 43A are AT&T business records for

3    cell site location data and call detail records for a certain

4    phone number, 571-344-3993.

5          43B is a declaration by a records custodian that

6    these are business records.

7          44A are also AT&T records for a network event

8    location system, NELOS data, associated with that same phone

9    number.

10          44B is the certificate from the records custodian

11    from AT&T related to those records.

12          45A are business records of Sprint/T-Mobile for a

13    separate phone number.

14          And then 45B is a certificate from the records

15    custodian for Sprint/T-Mobile.

16          THE COURT:  Thank you, sir.  Next witness.

17          MR. BEN'ARY:  The next witness is Fairfax County

18    Police Department analyst, Kara White.

19          THE COURT:  Ms. White.

20          (Government's witness, Kara White, was sworn.)

21          (Witness seated.)

22          THE COURT:  Ma'am, if you're fully vaccinated and

23    you're comfortable doing so, you may remove your mask while

24    you're testifying.

25          THE WITNESS:  Okay.  Thank you.

133

1          MR. BEN'ARY:  May I proceed, Your Honor?

2          THE COURT:  Yes.

3                    DIRECT EXAMINATION

4    BY MR. BEN'ARY:

5    Q.   Good afternoon.

6    A.   Good afternoon.

7    Q.   Would you tell the members of the jury your name, and let

8    me have you go ahead and spell your first and last name.

9    A.   My name is Kara White.  Spelled K-a-r-a, last name is

10   White, W-h-i-t-e.

11   Q.   And how are you employed?

12   A.    I'm a crime analyst with the Fairfax County Police

13   Department.

14   Q.   And how long have you been employed as a crime analyst

15   with the county police department?

16   A.   For 21 years.

17   Q.   And do you have experience dealing with cellular phone

18   data?

19   A.   Yes, I do.

20   Q.   A particular data involving the location of cellular

21   telephones?

22   A.   Yes.

23   Q.   And have you examined business records from cellular

24   service providers in connection with your job in cases other

25   than this one?

134

```
 1   A.   Many times, yes.

 2   Q.   And have you testified as an expert before in the

 3   analysis of cellular phone location data and call detail data?

 4   A.   Yes.

 5   Q.   Do you have a curriculum vitae that sets forth your

 6   training and experience?

 7   A.   Yes, I do.

 8   Q.   Can you look, please, in the binder that is going to be

 9   handed to you in a moment at Exhibit 37.

10   A.   Yes.

11   Q.   Is that your CV?

12   A.   Yes, it is.

13            MR. BEN'ARY:  I'd offer 37 into evidence.

14            THE COURT:  Without objection.

15            MR. JENKINS:  No objection, Your Honor.

16            THE COURT:  No objection.

17   (Government's Exhibit No. 37 was admitted into evidence.)

18            MR. BEN'ARY:  And I would offer the witness as an

19   expert in cellular telephone location data analysis.

20            MR. JENKINS:  No objection, Your Honor.

21            THE COURT:  So recognized.

22   BY MR. BEN'ARY:

23   Q.   I'm going to ask you some questions that will be useful

24   to the jury in understanding the analysis that you performed

25   in this case.
```

135

1  A.   Okay.

2  Q.   Can you give a brief description for the members of the

3  jury, please, of how cell phones work on a network?

4  A.   Sure.  So essentially your phone is always in constant

5  contact with the network or, essentially, the towers that

6  service your phone.  The network always needs to know where

7  your phone is located to connect an incoming call.  Your phone

8  is always in this contact with the towers determining from

9  which tower it's receiving the strongest signal and then

10  that's the tower that's going to be utilized to make or

11  receive that phone call.

12          Generally speaking, it's a tower that's physically

13  closest to you or at least in close proximity, enough to be

14  receiving that strongest signal.

15  Q.   Do cellular service providers keep data that relates to

16  what cell towers their devices are connecting to?

17  A.   Yes, they do.

18  Q.   Can you describe the type of data available for the

19  members of the jury, please.

20  A.   Sure.  When we order these historical call detail

21  records, we essentially receive either a spreadsheet or a PDF

22  file from the major carriers such as AT&T, Sprint, T-Mobile,

23  Verizon.  Generally speaking, they contain all the same

24  information; the specifics may vary slightly from company to

25  company, but essentially we'll see a row of data that

1  represents each telephone call or text message that's made or

2  received by the device.  And the information that's included

3  in that row of data will include the date and time of the

4  call, the duration of the call, the two numbers that were

5  involved, the number that made the call and received the call,

6  it would make specific information about the device; and then

7  we're provided what the companies call their "cell site" or

8  cell tower information.  And with that they provide us with a

9  latitude and a longitude of a cell tower, and that was the

10  cell tower that was utilized to connect that call as it either

11  came in or it was made from the device.

12  Q.   When you receive this type of data from the cellular

13  service provider, do you have access to the content of any

14  communications?

15  A.   No, I do not.

16  Q.   With respect to this tower location information, you said

17  that the providers give you a latitude and longitude of their

18  towers?

19  A.   Yes.

20  Q.   And in this case, did you actually go out and put eyes on

21  the cell towers involved to verify the correctness of that

22  location?

23  A.   Yes, I did.

24  Q.   And can you describe for the members of the jury, do

25  different cell providers use different towers?

1   A.   They do.  They can -- one of them rents space on these

2   towers.  So you may have two companies sharing space on the

3   same tower, but they can also -- you could have a location,

4   and, you know, AT&T may rent space on one tower nearby.

5   Sprint has a tower.  So they can be co-located on the same

6   tower, but they don't necessarily have to be.

7   Q.   And how do those cell towers -- how are they set up, how

8   do they work?

9   A.   So in terms of how -- basically, a cell tower provides

10  the ones we see on the side of the road, the large towers.

11  They provide 360-degree coverage around that tower.  And then

12  what that coverage is then divided into -- what they call,

13  three separate sectors, generally speaking.  Each of those

14  sectors will cover 120 degrees of that circle.  So the cell

15  phone company, in addition to providing us the physical

16  location of the tower, they provide us with a piece of

17  information called an azimuth.  And what that azimuth tells us

18  is, out of that 360 degree, which sector of those three the

19  cell phone call was made or received on.  So we, kind of, get

20  a little bit more of a precise location based on what sector

21  it's on.

22  Q.   Now, some cell phones have GPS capabilities, correct?

23  A.   Yes.

24  Q.   This type of information that you're talking about now,

25  the tower and face information, is that the same or different

138

1  than a GPS exact location of a device?

2  A.    It's different than an exact location from a GPS.  This

3  is essentially -- only gives us -- we know where the tower is

4  located and we know what direction from the tower where that

5  device was when the call was made or received.

6  Q.    And in this case, did you review that type of information

7  for a number of devices?

8  A.    The cell tower information, yes.

9  Q.    There also are records now admitted into evidence

10  regarding NELOS.  Are you familiar with that?

11  A.    Yes.  AT&T provides us with NELOS information.

12  Q.    And what is that?  Can you explain to the members of the

13  jury?

14  A.    So NELOS information is a little bit more of a precision

15  location than we get with the cell towers.  Like I said, with

16  the cell towers we're given the location of the tower, and the

17  general direction from the tower for that phone would be

18  located to make or receive the phone call.

19         With NELOS data, what the phone companies are doing

20  when they provide us this more precision location is through

21  various algorithms within their network.  They're trying to

22  determine the -- a closer actual location of the device, not

23  just the direction of the tower from which the call was made

24  or received, but an estimated location of where the device

25  actually was at a given time.

1  Q.   And in this case did you receive information from

2  Sprint/T-Mobile related to a phone number that was described

3  to you as Laila Sheehy's phone?

4  A.   Yes.

5  Q.   And did you receive information from AT&T on a number

6  that was described to you as the defendant's phone?

7  A.   Yes.

8  Q.   And did you prepare a series of maps that allow a visual

9  depiction of these devices from October 25, 2019, up through

10 early morning of October 26, 2019?

11 A.   Yes.

12 Q.   Can you take a look at -- let me have you just look

13 generally at 38, 39, 40, 41, and 42.

14 A.   Yes.   Those are the maps that I created.

15 Q.   And do they accurately depict information that you

16 received from the business records of AT&T and Sprint

17 T-Mobile?

18 A.   Yes.

19       MR. BEN'ARY:  Offer 38, 39, 40, 41, and 42 into

20 evidence.

21       THE COURT:  Without objection.

22       MR. JENKINS:  No objection.

23 (Government's Exhibit Nos. 38, 39, 40, 41, and 42 was received

24 into evidence.)

25       MR. BEN'ARY:  Let's start, please, with 41.  And is

140

1   there any way to maybe cut off the border so you can zoom down

2   a little bit on the actual map.

3   BY MR. BEN'ARY:

4   Q.   All right.  What we're looking at here is Exhibit 41.

5            Is this focused on a particular area in the

6   8:00 p.m. to 2:00 a.m.?  That's, again, October 25th into 26th

7   of 2019 area?

8   A.   Yes.  It's focused in on the area of Arlington Drive in

9   Alexandria.

10  Q.   Are you familiar with Mount Vernon Square Apartments?

11  A.   Yes.

12  Q.   And is that in that area that's depicted here?

13  A.   Yes.

14  Q.   And let's have you describe, sort of, the different types

15  of information that are depicted on here.

16  A.   Okay.  On the map you'll see there's a couple of orange

17  text boxes, and what those represent are just locations of

18  interest that were part of the investigation.  And then we see

19  several types of phone data indicated here and with various

20  colors of the text boxes, and I'll go a little bit over of

21  what each one means.

22           We have three pieces of data for what was Melvin's

23  phone from AT&T.  The dark blue represents a voice call that

24  was in Melvin's records and provided with a cell tower

25  location.  The purple represents a SMS message that was in

141

1    Melvin's records in which we were provided a location and

2    those are indicated in purple with the purple text boxes,

3    which indicate the time of the text message or the call, and

4    then we see these white or blue circles that represents the

5    NELOS data.  And like said, that's AT&T providing us what

6    they -- send us as an estimate of what the location of the

7    phone was.  And if you look at the map, there's several of

8    those dots, and they have these wider circles surrounding

9    them.  What those circles indicate is AT&T's, sort of, their

10   accuracy radius.  So they would accept any -- that phone was

11   in any location within that circle to be an accurate reading.

12   That's our estimation as to how accurate their latitude and

13   longitude of the location of that device is.  And this map, we

14   don't see any of the phone calls on Laila's phone at this

15   time, but on other maps she'll be represented in red.

16   Q.   All right.  I want to ask you about the dot and the lines

17   coming off of 2122 on the, sort of, middle left side of the

18   map?

19   A.   Yes.

20   Q.   What is that?

21   A.   So when we see the icon like that with the two lines

22   coming across it, what that's indicating -- that dot or circle

23   that's at the center where the lines come together, is the

24   actual location of the cell tower, and then the lines coming

25   off of it are just there to indicate directionality.  So what

142

1   that's showing is that the phone, in this instance, is going

2   to be, sort of, on the east or southeast side of that cell

3   tower for when these phone calls and text messages are made.

4   And so, the times, again, listed on the map indicate either

5   the start time of the phone call or the time of the text

6   message in the records.

7   Q.   And sorry, I lost my train of thought.

8        The time is set forth in military time?

9   A.   Yes, it is.

10  Q.   So 2122 would be 9:22 p.m.?

11  A.   Correct.

12       And the records are provided to us in yet another

13  time zone.  The records are provided to us and AT&T in what's

14  called "coordinated universal time" which, essentially, is

15  equal to general meantime.  So the times have been converted

16  on this map to reflect Eastern daylight time.

17  Q.   And so, can you just describe what it is that your

18  analysis indicates regarding the location of this AT&T phone

19  that was described to you as Melvin's phone in this area

20  between 8:00 and 2:00 a.m. -- 8:00 p.m. and 2:00 a.m.?

21  A.   So what I would say, the device is located -- like,

22  again, like I said, on the east side of this tower.  And,

23  again, these lines don't indicate that that's as far out or

24  that the cell tower reaches.  It's not to give any

25  interpretation as to the strength of that tower and how far

143

1    the signal reaches.  It's just to provide directionality that

2    the phone was on the east side of that tower.  And then we see

3    the newest data around the same time, around the 2100 to

4    22-hour time frame, is in the same general area on the east

5    side of that tower.

6    Q.   Let's look, please, at Exhibit 38.

7             And 38 is a wider view of the sort of Route 1

8    Alexandria corridor of Fairfax County?

9    A.   Yes.

10   Q.   And this covers 8:00 p.m. to 11:00 p.m. on October 25,

11   2019?

12   A.   Correct.

13   Q.   All right.  And let's focus first on information about

14   the phone that was described to you as Laila's phone, the

15   Sprint phone.

16            What is -- what can you say about that phone's

17   location during those hours?

18   A.   Okay.  And the records that we received from Sprint

19   regarding Laila's phone, we only received location information

20   when there was a voice phone call.  Sprint does not provide us

21   location information for text messages.  So any of these tower

22   indicators we see for Laila's phone indicate a voice call.

23   And what we see here, there's a tower here close to Potomac

24   Mills Mall down in Prince William County and her phone appears

25   to be down in that area from about 8:15 to 8:50 p.m.

144

1   Q.   All right.  And then can you describe what you can glean

2   from this map with respect to the AT&T phone that you -- that

3   was described to you as Melvin's phone?

4   A.   So the first record received from Melvin's phone in this

5   time frame is at 8:15 p.m.  It's marked there as 2015.  Again,

6   we have these same orange text boxes that indicate a location

7   of interest in the investigation.  This 8:15 call appears to

8   be in the general area of Melvin's home address on Burgundy

9   Road.  We then see the phone in the 9:00 p.m. hour, and this

10  was just a zoomed out version around 9:20 p.m. that we just

11  looked at where we had the zoomed in version of this map in

12  which the phone appears to be over in that area on Arlington

13  Drive.  From after the 9:00 p.m. hour, the phone is seen

14  again, if we look up a little bit further north around

15  10:02 p.m., and so it says 2202 and 2210 hours.  That tower is

16  located in the area of Route 1 near Washington, Reagan

17  National Airport.  We see the phone then through NELOS data

18  sort of continuing to move around different areas in Arlington

19  in the 10 o'clock hour.

20  Q.   Let's look at Exhibit 40.  And this is a sort of

21  closer-in view of the Kingstowne area, correct?

22  A.   Correct.

23  Q.   And let's start again with Laila's phone, what

24  information is depicted here?

25  A.   So we see initially for Laila's phone, we have some voice

145

1    calls at 2320 and 2323 hours in the area of Kingstowne.  We

2    see here that AT&T and Sprint appear to have a tower on the

3    same location as we have Melvin also has a voice call at 2322

4    on a tower at the same location.  And then we don't see

5    Laila's phone back in this area again until after midnight

6    around 12:30 to 12:40 a.m.

7    Q.   All right.  And what about the AT&T phone, Melvin's

8    phone?

9    A.   So, again, the AT&T phone, like I just mentioned, we do

10   have one voice call at 2322 on a similar tower.  The tower in

11   the same location as Laila's phone.  And then we, again, see

12   this NELOS data, which, again, is sort of the more precision

13   data that AT&T is providing us for a location of the device.

14   And that is around the same time frame of 2322 hours.  And we

15   see that phone, the NELOS data, back in this general area.

16   Again, after midnight.  The time marked here is 12:47 a.m.

17   Q.   Let's turn, please, to Exhibit 39.

18   A.   Okay.

19   Q.   This is the zoomed-out view of the area, correct?

20   A.   Correct.  So we can see those calls around Kingstowne on

21   this map.  It's just zoomed out for further distance.

22   Q.   And this covers the time frame between 11:00 p.m. and

23   2:00 a.m.?

24   A.   Correct.

25   Q.   All right.  Again, let's start Laila's phone.  What

146

1   information is depicted here?

2   A.    Again, we start with those same calls that are in the

3   Kingstowne area around 2320 hours.  The next time we have

4   location information for Laila's phone is closer to midnight

5   in which the phone is up further north up Route 1 in

6   Alexandria.  And then we see the phone -- again, these calls

7   are 0026 and 0040 were depicted on that Kingstowne map.  That

8   is when the phone is back in that general Kingstowne area.

9   Q.    And what about for Melvin's phone?

10  A.    So for Melvin's phone, we see there is some NELOS hits.

11  It looks like just north of the beltway.  And then we see that

12  phone move to the Kingstowne area, which, again, was depicted

13  on the previous map when we saw Melvin and Laila's phone there

14  together at the same time.  Melvin's phone then moves also

15  around the Route 1 corridor.  We have towers moving up north

16  through Route 1 and then we have this NELOS data, again,

17  further north up Route 1 about 12:01 a.m., and then again

18  after that we'll see the NELOS data back in the Kingstowne

19  area which was depicted on the zoomed in map, and then we see

20  additional NELOS data for Melvin's phone up in the Arlington

21  area.  If you look up to the -- just near the top of the map,

22  we see that NELOS data around 1:00 in the morning to just

23  about 2 o'clock in the morning, 1:58.  And then in addition to

24  the NELOS we also have a voice call at 2:01 a.m. in which the

25  phone is located up in the same general Arlington area.

147

1  Q.   Okay.  And then lastly, Exhibit 42.  And this focuses on

2  the area around the defendant's home -- listed home address,

3  correct?

4  A.   Correct.  I was asked to just determine how many times we

5  see through the night that Melvin's phone is in the area of

6  his residence on Burgundy Road.  So you see -- we did have

7  that one call at 8:15 p.m. and then the next time we see the

8  phone in that area we have a NELOS hit at 2:14 and then a

9  voice call at 2:15 in the morning.

10  Q.   This phone was being -- there's no indication that this

11  phone was being used in this area between those time frames;

12  is that correct?

13  A.   I don't see any location data putting it there.

14  Q.   And if there were calls or messages being made or if AT&T

15  had stored NELOS data, you would expect --

16  A.   I would expect to see that, yes.

17        MR. BEN'ARY:  Court's indulgence, please.

18        THE COURT:  Yes, sir.

19        (Counsel confers.)

20        MR. BEN'ARY:  Those are the questions I have.  Thank

21  you.

22        THE COURT:  Thank you, sir.

23        Mr. Jenkins.

24        MR. JENKINS:  Thank you, Your Honor.

25                    CROSS-EXAMINATION

```
 1   BY MR. JENKINS:
 2   Q.   Good afternoon, Ms. White.
 3   A.   Good afternoon.
 4   Q.   Ms. White, when you began your -- responding to the
 5   prosecutor's questions on direct examination, I believe you
 6   started off by saying that the cell towers -- well, your cell
 7   phone are always in communications with cell towers?
 8   A.   Well, if your phone is on and not on airplane mode.  If
 9   you're connecting to the network, it's -- your phone is always
10   identifying from where it's getting the strongest signal.
11   Q.   So just to be clear, it's not accurate to say that your
12   phone is always in communication with the towers, that's only
13   if it's on, correct?
14   A.   That's correct, yes.  I apologize if I said that.
15   Q.   And that's also if the phone is working properly,
16   correct?
17   A.   Correct.
18   Q.   That's also only if the tower is working correctly,
19   correct?
20   A.   Correct.
21   Q.   And that's also only if the network is working correctly,
22   correct?
23   A.   Correct.
24   Q.   And you're not here to vouch for any of those things,
25   correct?
```

149

1   A.   Correct.

2   Q.   You only know about the data that was given to you by

3   these cell providers, correct?

4   A.   Correct.

5   Q.   You have no way of verifying their accuracy, correct?

6   A.   Correct.

7   Q.   You don't know --

8   A.   Other than just to view the cell tower that there is one

9   at that location, but other than that, I have no independent

10  verification.

11  Q.   I'm talking about the particular data that suggest a

12  phone call was made at a particular time?

13  A.   No, I don't.  I don't have a way to verify that.

14  Q.   Same way through with SMS messaging, correct?

15  A.   Correct.

16  Q.   Now, tell me what happens when someone uses their cell

17  phone but instead of using the built in SMS messaging system,

18  they use some social app or something like that in order to

19  send a message.

20       Would that be captured in the records?

21  A.   Well, for AT&T that does get captured, those are sent as

22  a data record.  So it's not sent as a voice or a SMS, even if

23  you use iMessage on an iPhone, it's not considered a routine

24  SMS message.  They come across as a data record.  So AT&T

25  provides us with that information, but we have no way of

1   knowing -- you may see a data transaction occur, but we have

2   no way of knowing whether that was you connecting to an app,

3   whether there was an iMessage.  So we see data information but

4   we don't know specifically what it is.

5   Q.   So in the records that you received --

6   A.   Yes.

7   Q.   -- just with respect, first, to the phone that you

8   understood was associated with my client, Mr. Melvin Palma

9   Flores --

10  A.   Yes.

11  Q.   -- is it your testimony that those records did not

12  include those types of communications you just described for

13  the jury where data --

14  A.   There is --

15  Q.   -- exchange occurred?

16  A.   There is data records in those records.  I don't use

17  those in my analysis in that the data records, the way they

18  transact across the towers, aren't as precise as the voice and

19  SMS messages.  So then I become less able to verify any of

20  that or I don't use the data records when I do the analysis.

21  Q.   So is it fair to say what's depicted in Government's

22  Exhibit 38, 39, 40, and 41, they don't include any of those

23  data records, correct?

24  A.   Correct.  When I -- when I plotted the information on the

25  map, I put it on for my own reference as I am going through

151

1  the records.  But because I don't, I understand through

2  training and experience that those data records aren't always

3  as, let's say, accurate with time stamps and things like that

4  as the voice and SMS, but I don't include them when I do my

5  full analysis.

6  Q.   And you were instructed by someone, I'm assuming law

7  enforcement, to use cell records for a phone that you

8  understood to be associated with Melvin Flores, correct?

9  A.   Correct.

10  Q.   And a Laila Sheehy, correct?

11  A.   Correct.

12  Q.   Did anyone ask you to do a similar analysis for a cell

13  phone in the name of Kollin Worlds?

14  A.   I was not asked.

15  Q.   So only those two individuals, correct?

16  A.   Correct.

17  Q.   Now, if someone -- and also the data that you relied on

18  to determine when a voice call was made, you can't tell who

19  actually was using the phone at the time, correct?

20  A.   That's correct.  I'm sorry, that's correct.  It only

21  is -- the device is -- is what's making or receiving these

22  phone calls.  I don't know who actually has it in their hand.

23  Q.   So, for example, if I gave you my cell phone to make a

24  phone call and you engaged the phone and you used the phone,

25  you can't distinguish between whether it was me using the

1    phone or you using the phone, correct?

2    A.   That's correct.

3    Q.   All you can tell is that that phone was being used?

4    A.   Correct.

5    Q.   Now, in terms of the location, on your maps it shows the

6    direction in which the phone was coming in contact with the

7    tower, correct?

8    A.   Correct.

9    Q.   But different towers, do I understand correct, have

10   different coverage areas, correct?

11   A.   Yes, they do.

12   Q.   Some are broader than others, correct?

13   A.   That's correct.

14   Q.   And, in fact, what we find is that in urban areas we

15   normally see a higher concentration of towers, correct?

16   A.   Correct.

17   Q.   And as a consequence of that they normally have a shorter

18   coverage area, correct?

19   A.   Correct.  Well, the phone company they're -- they don't

20   want anybody to ever have a dropped call, right.  So they will

21   have towers to cover the population in that area with some

22   overlap so that as you travel or move around with your phone

23   you're not going to drop calls.  So that's -- you'll have the

24   little bit of overlap, so your tower will go out almost as far

25   as until it kind of intersects with the signal strength of the

153

1    next closest tower in that direction.

2    Q.   But what you're saying is that's the goal --

3    A.   That's the goal.

4    Q.   -- to not have dropped calls, correct?

5    A.   Correct, yes.

6    Q.   But we all have experience -- I'm sure you've experienced

7    dropped calls, correct?

8    A.   Yes.

9    Q.   But in more rural areas we tend to find that the service

10   area of the towers tend to be larger, correct?

11   A.   That's my understanding, yes.

12   Q.   And when the service area is larger, does that make it

13   more difficult or less difficult for you to actually place the

14   phone?

15   A.   Well, in none of the tower records am I actually placing

16   the phone in a specific spot.  I can only say the phone is

17   likely to be this direction from this physical location of a

18   cell tower.  I don't have any way to determine within that

19   area of coverage where the phone may be at any given time.

20   Q.   And just to give the jury -- orient the jury, when we

21   talk about areas of coverage, give us an approximation, a cell

22   tower, does it cover one block, ten city blocks, one mile, ten

23   miles?

24   A.   So in my experience in most of the work that I do covers

25   Fairfax County.  And generally speaking, about every one to

1    two miles as the crow flies, you're going to encounter another

2    cell tower.  So the telephone companies don't provide us with

3    an exact distance or coverage area, but given that we see that

4    coverage goes out until you overlap with another neighboring

5    tower, I would say you're roughly within, you know,

6    one-and-a-half, two miles in most of Fairfax County,

7    especially the Alexandria area, before you'll run into another

8    tower.

9    Q.   So, for example, if you were using your phone in this

10   very courthouse, and you had the data that suggested that the

11   phone was in a certain direction of a nearby tower, you could

12   either be sitting in this courtroom or you could be two miles

13   east on Duke Street?

14   A.   Yes.  If a tower reached out that far, yes, you could.

15   Q.   Or you could be two miles west on Duke Street?

16   A.   Well, it depends which way the coverage was facing, but

17   if you were on the west side of the tower then, yeah, you

18   could be anywhere in the distance that tower reaches on that

19   west side of that tower.

20   Q.   Or you could be a block over?

21   A.   Correct.

22   Q.   It's no way of telling, correct?

23   A.   Correct.

24            MR. JENKINS:  I have no further questions, Your

25   Honor.

155

1          THE COURT:  Redirect.

2          MR. BEN'ARY:  Thank you, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. BEN'ARY:

5    Q.   Do you -- Mr. Jenkins asked you a question about whether

6    you plotted cell data for a phone belonging to Kollin Worlds?

7    A.   Yes.

8    Q.   Do you know whether Mr. Worlds even had a phone or not?

9    A.   My understanding was that he did not have a phone.

10   Q.   With respect to whether the towers or networks are

11   working -- Mr. Jenkins asked again -- if the towers or

12   networks aren't working, you won't see this type of location

13   data?

14   A.   Correct.

15   Q.   Is there any indication from the records that you looked

16   at for October 25th and 26th of 2019 that there was a problem

17   with the tower or the network?

18   A.   Not that I saw.

19   Q.   And with respect to phones, Mr. Jenkins clarify that a

20   phone that's off or I think you said airplane mode or not

21   working wouldn't connect to the network, correct?

22   A.   Yes, and that was my mistake by saying "always."  But

23   basically if your phone is on and connecting to the cellular

24   network, the network knows where it is.

25   Q.   So for the company, the cell service provider, AT&T and

156

1    Sprint, to have records of these calls or the NELOS data, the

2    phone would have to be on and working and connecting to the

3    network, correct?

4    A.    Correct.

5    Q.    And these phones were on and connected to the network

6    during the time periods that we looked at, correct?

7    A.    Correct.  We were provided records showing that.

8              MR. BEN'ARY:  Thank you, Your Honor.  That's all I

9    have.

10             THE COURT:  Is this witness subject to recall?

11             MR. BEN'ARY:  Not by the government.

12             THE COURT:  Mr. Jenkins.

13             MR. JENKINS:  No, Your Honor.

14             THE COURT:  Thank you, ma'am.  You may step down.

15   Please do not discuss the case or any aspect of the case with

16   anyone while the case is pending.

17             THE WITNESS:  Okay.  Thank you.

18             (Witness excused.)

19             THE COURT:  Would you like to read your stipulations

20   in at this time?

21             MR. BEN'ARY:  I think that's a good idea, Your

22   Honor, if it pleases the Court.

23             THE COURT:  Yes, sir.

24             Ladies and gentlemen of the jury, you heard me

25   earlier talk about stipulations.  Stipulations are agreements

1    of the parties that if a witness had taken the stand, he or

2    she would have testified to the thing in question.  You're to

3    give it whatever weight you deem appropriate.

4            MR. BEN'ARY:  Your Honor, may it please the Court.

5            We would offer in Government's Exhibit 52.  It's

6    entitled, "Stipulation Concerning Letter Evidence."  May I

7    read it in the record?

8            THE COURT:  Yes, sir.

9            MR. BEN'ARY:  The United States of America by and

10   through undersigned counsel and the defendant, Melvin Palma

11   Flores -- sorry, going too fast.

12           Melvin Palma Flores, through his counsel, for

13   purposes of trial, stipulate to the authenticity, foundation,

14   proper chain of custody and hearsay exceptions, Federal Rules

15   of Evidence 803 and 807.  For the exhibits, testimony, and

16   facts as set forth below, Government's Exhibit 34 is a letter

17   authored by the defendant and sent to Laila Sheehy in and

18   around October 2020.  Government's Exhibit 35 is a letter

19   authored by the defendant and sent to Laila Sheehy in or

20   around December 2020, and it's signed by the parties.

21           THE COURT:  Yes, sir.

22           You confirm, Mr. Jenkins?

23           MR. JENKINS:  That is correct, Your Honor.

24           THE COURT:  Thank you.

25           MR. BEN'ARY:  Your Honor, we'd offer Government's

1   Exhibit 53.  It's entitled, "Stipulation Concerning Ballistic

2   Evidence."  It has a very similar first paragraph that I would

3   propose not reading again.

4           THE COURT:  Yes, sir.

5           MR. BEN'ARY:  And skip to the facts of it which

6   state that:  On October 26, 2019, Detective Michael Roberts of

7   the Fairfax County Police Department collected the following

8   exhibits from the area around 7112 Fairchild Drive in

9   Alexandria, Virginia and logged them into Fairfax County

10  Police Department evidence.  And it lists Government's Exhibit

11  20.  And what it is 21, 22, 23, 24.  It's cartridge casings

12  and bullet fragments and a bullet.

13          On October 26, 2019, Dr. Jocelyn Posthumus of the

14  Virginia Office of the Chief Medical Examiner performed an

15  autopsy on the body of Xyqwavius Brown.  During the autopsy,

16  Dr. Posthumus recovered a bullet and two lead fragments,

17  Government's Exhibit 25, from inside Brown's skull.  Fairfax

18  County Police Department, Detective Olan Faulk, took

19  possession of Government's Exhibit 25 from Dr. Posthumus and

20  logged it into Fairfax County Police Department evidence.

21          On October 29, 2019, Detective Roberts submitted

22  Government's Exhibit 20 to 25 to the Virginia Department of

23  Forensic Science Firearms and Toolmarks Section for forensic

24  analysis.  Forensic scientist supervisor, Cara with a C,

25  McCarthy, performed comprehensive forensic analysis on

159

1  Government Exhibits 20 to 25 using recognized and reliable

2  methods.

3         Ms. McCarthy's conclusions are reflected in her

4  certificates of -- certificate of analysis marked as

5  Government's Exhibit 16.

6         THE COURT:  Confirmed, Mr. Jenkins?

7         MR. JENKINS:  Yes, Your Honor.

8         THE COURT:  Thank you.

9         MR. BEN'ARY:  And then finally, a stipulation

10  concerning cell phone evidence marked as Government's

11  Exhibit 54.

12         On October 26, 2019, the cell phone belonging to XB

13  was recovered by Fairfax County Police Department detectives

14  from the area around 7112 Fairchild Drive in Alexandria,

15  Virginia.  XB's cell phone was provided to FCPD Detective Ryan

16  Bayliss to conduct an extraction from the data from the cell

17  phone pursuant to a search warrant.  The data obtained by

18  Detective Bayliss from XB's cell phone includes Government's

19  Exhibit 51.

20         On December 30, 2019, FCPD Detective Melissa

21  Wallace, seized an Apple iPhone 11 device named Mel's iPhone,

22  Government's Exhibit 26, from the person of the defendant.

23  Government's Exhibit 26 was logged and maintained in FCPD

24  evidence.

25         On February 12, 2020, pursuant to a search warrant,

160

1 Detective Bayliss extracted the data from Government's

2 Exhibit 26.  The data obtained by Detective Bayliss includes

3 Government's Exhibit 27 and 29A through 33, and it's signed by

4 the parties.

5           THE COURT:  Confirmed, Mr. Jenkins?

6           MR. JENKINS:  Yes, Your Honor.

7           THE COURT:  Very good.  Thank you, Counsel.  Is that

8 your last witness for the day?

9           MR. BEN'ARY:  Your Honor, it is.

10           We went a little bit faster than we expected and

11 hope to conclude tomorrow morning.

12           THE COURT:  Very good.

13           Ladies and gentlemen of the jury, this is the point

14 in time, and I sort of made a promise to you that I would try

15 to have you out of here by 4 o'clock today and I met my

16 commitment.  I'm really excited about that.  So what we're

17 going to do is allow you to retire for the end of the day.

18 And what I always say when I let a jury go for the first time

19 is I give my own experience.  When you get home, your spouse

20 or your loved one is going to say, "What did you do today?"

21 And your response is going to be: "I was on jury duty."  And

22 then if your spouse or loved one is like mine, they will say:

23 "Well, what was going on?"

24           That's where you start getting yourself into

25 trouble.  So you can say that the judge said that you were

161

1   going to ask me that question and I am not allowed to answer.

2   At some point I'll be able to talk to you about it, but I just

3   want to let you know that the judge warned me about this and I

4   don't want to get into trouble.

5           And he actually told a little bit of a story about a

6   juror who did not follow through that instruction and ended up

7   having to pay $23,000 into the court treasury.  You don't want

8   to do that during the Christmas and holiday season, so please

9   adhere to the instruction that the Court give you.

10          Ladies and gentlemen, you've been very attentive

11  today and I'm sure that Mr. Flores, Mr. Jenkins, and counsel

12  for the government really appreciate that.  If you didn't have

13  good citizens like you who are willing to meet your public and

14  private responsibility as citizens of the United States our

15  system would fail.  So I would like to let you know how much I

16  appreciate your attentiveness today.

17          Tomorrow we'll start at 10 o'clock.  We'll have a

18  lunch for you.  We'll probably like to have you on-site at a

19  quarter of 10:00.  As you go for the day, Ms. Tinsley, who is

20  the best courtroom security officer in this courthouse --

21  she's going to roll her eyes, but I always say that because

22  she is -- she's going to want to take your telephone number.

23  And that is because if there's a situation or a circumstance

24  that arises, she's going to contact you and make sure that,

25  number one, that you're okay.  And number two to make sure

162

 1   that you're going to be able to get here.  So it is important

 2   because we cannot start until everybody is here.

 3            I hear that it has warmed up a little bit outside.

 4   It's still light outside.  I hope that you can get home safe

 5   and we'll see you tomorrow morning no later than 10:00 a.m.

 6   Thank you, ladies and gentlemen.

 7            (Jury dismissed.)

 8            THE COURT:  All right.  Ladies and gentlemen, you

 9   can be seated.

10            Mr. Flores, are you entirely satisfied with the

11   services of your counsel?

12            THE DEFENDANT:  Yes, Your Honor.

13            THE COURT:  Very good.  Mr. Flores, we'll start

14   tomorrow at 10 o'clock.  I'm sure that Mr. Jenkins will spend

15   some time with you in preparation for tomorrow.  Things are

16   going to be moving pretty quickly tomorrow.  We're going to be

17   probably, based upon what counsel has indicated, providing

18   jury instructions and closing arguments in your case.  So if

19   there's anything that you want to share with Mr. Jenkins, make

20   sure that you do that between now and tomorrow morning, sir.

21            THE DEFENDANT:  Thank you, Your Honor.

22            THE COURT:  Do you have any questions?

23            THE DEFENDANT:  No, Your Honor.

24            THE COURT:  Very good.  Anything from the

25   government?

163

1          MR. BEN'ARY:  No, Your Honor.

2          THE COURT:  Mr. Jenkins.

3          MR. JENKINS:  No, Your Honor.

4          THE COURT:  Very good.  You all be safe.  Have a

5    good trip home.

6

7              **(Proceedings adjourned at 3:46 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3           I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus MELVIN**

8    **PALMA FLORES**, Criminal Action No.: 1:20-cr-142, in said

9    court on the 13th day of December, 2021.

10          I further certify that the foregoing 164 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this June 7, 2023.

17

18

19

20

21   _____
     Tonia M. Harris, RPR
22   Official Court Reporter

23

24

25

                                                          164