UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

------------------------------x
                              :
UNITED STATES OF AMERICA,     : Criminal Action No.
                              :
            versus            : 1:20-cr-142
                              :
MELVIN PALMA FLORES,          : December 14, 2021
                              :
                  Defendant. : Volume II of IV
------------------------------x

        The above-entitled Jury Trial was heard before the
Honorable Rossie D. Alston, Jr., United States District Judge

                A P P E A R A N C E S

 FOR THE GOVERNMENT:      MICHAEL BEN'ARY, AUSA
                          KATHERINE RUMBAUGH, AUSA
                          United States Attorney's Office
                          2100 Jamieson Avenue
                          Alexandria, VA 22314

 FOR THE DEFENDANT:       ROBERT L. JENKINS, Jr. ESQ.
                          1010 Cameron Street
                          Alexandria, VA 22314


OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                 United States District Court
                                 401 Courthouse Square
                                 Tenth Floor
                                 Alexandria, VA 22314

```
                        TABLE OF CONTENTS
                         TRIAL WITNESSES

On behalf of the Government:

Cara McCarthy
```

            Direct examination by Ms. Rumbaugh........... 12
            Cross-examination by Mr. Jenkins.............. 23
            Redirect examination by Ms. Rumbaugh......... 25

```
Kollin Worlds
```

            Direct examination by Mr. Ben'Ary............. 26
            Cross-examination by Mr. Jenkins.............. 48
            Redirect examination by Mr. Ben'Ary.......... 63

```
Hector Flores
```

            Direct examination by Ms. Rumbaugh........... 68
            Cross-examination by Mr. Jenkins.............. 74
            Redirect examination by Ms. Rumbaugh......... 80

```
Laila Sheehy
```

            Direct examination by Ms. Rumbaugh........... 83
            Cross-examination by Mr. Jenkins.............. 105
            Redirect examination by Ms. Rumbaugh......... 120

```
Detective Melissa Wallace
```

            Direct examination by Ms. Rumbaugh........... 140
            Cross-examination by Mr. Jenkins.............. 186
            Redirect examination by Ms. Rumbaugh......... 205

```
                           EXHIBITS

On behalf of the Government:
                                                  Admitted
```

Number 6A......................................... 159
Number 7A......................................... 159
Number 7B......................................... 161
Number 14......................................... 67
Number 15......................................... 66
Number 16......................................... 18
Number 17......................................... 14
Number 35......................................... 103
Number 46A - 46B.................................. 172
Number 47A - 47B.................................. 172

Number 48A - 48C................................... 172

MISCELLANY

Preliminary matters................................ 04
Jury instructions discussions...................... 124
Certificate of Court Reporter...................... 216

1              **P R O C E E D I N G**

2   (Court proceedings commenced at 10:11 a.m.)

3              THE COURT:  Good morning, everybody.

4              MR. JENKINS:  Morning, Your Honor.

5              MS. RUMBAUGH:  Good morning.

6              THE COURT:  Back on the record in the United States

7   of America versus Melvin Palma Flores.  If I could ask the

8   court reporter to please incorporate those sections of the

9   prior day where we talked about the steps that have been taken

10  to ensure the safety of everyone during the pandemic, it would

11  be appreciated.

12             Anything we need to do before we need to bring the

13  jury in?

14             MS. RUMBAUGH:  Yes, Your Honor.  Just briefly.  We

15  have some physical exhibits.  I believe that's Government

16  Exhibit 20 through 25 are the ammunition components that were

17  agreed to by stipulation that we entered into yesterday.

18             THE COURT:  Yes, ma'am.

19             MS. RUMBAUGH:  And then Exhibit No. 26 is the Apple

20  iPhone belonging to Mr. Palma Flores that was also stipulated

21  to yesterday.

22             THE COURT:  Do you concur, Mr. Jenkins?

23             MR. JENKINS:  I do, Your Honor.

24             THE COURT:  Thank you, sir.

25             MS. RUMBAUGH:  And then I believe, as it pertains to

1 the cell phone dump, that also includes 27, which is the data

2 extracted from the phone, and then --

3          THE COURT:  Let me stop you.

4          You concur, Mr. Jenkins?

5          MR. JENKINS:  I do, Your Honor.

6          THE COURT:  Thank you.

7          (Discussion off the record.)

8          THE COURT:  I'm just making sure the deputy clerk

9 heard what I heard.  We're talking about essentially now 20

10 through 27?

11          MS. RUMBAUGH:  Yes, Your Honor.  That's correct.

12          THE COURT:  All right.  Thank you, ma'am.

13          MS. RUMBAUGH:  So 20 through 25 are the ammunition

14 components.  26 and 27 pertain to the phone.

15          And then, additionally, that should be Government's

16 Exhibit 29A through 33 are items that are part of the full

17 phone extraction.

18          THE COURT:  29A through --

19          MS. RUMBAUGH:  Through 33.

20          THE COURT:  I apologize if there's any distraction.

21 My computer decided that it did not want to cooperate, so Ms.

22 Holson is trying to get it back online.

23          Do you concur, Mr. Jenkins?

24          MR. JENKINS:  I do, Your Honor.

25          THE COURT:  The one that has not been made part of

1  the representations this morning is number 28, which is the

2  curriculum vitae of Mr. Bayliss.

3            MS. RUMBAUGH:  Yes, Your Honor, that's correct.

4  We -- because we stipulated to the admissibility of the cell

5  phone evidence, we no longer need Detective Bayliss to testify

6  as to the extraction he performed on the phone.

7            THE COURT:  Very good.  So essentially that

8  particular item has been rendered moot by the stipulations

9  that we've reached.

10            MS. RUMBAUGH:  Yes, Your Honor.

11            THE COURT:  Do you concur, Mr. Jenkins?

12            MR. JENKINS:  I do, Your Honor.

13            THE COURT:  Thank you, sir.  All right.

14            And 51?

15            MS. RUMBAUGH:  Yes, Your Honor.  That is the -- that

16  is a portion of the Cellebrite extraction from the victim's

17  phone.  I believe we've also stipulated to that as well.

18            THE COURT:  Okay.  Mr. Jenkins?

19            MR. JENKINS:  Yes, Your Honor, I concur.

20            THE COURT:  All right.  Now, just to make sure my

21  notes are correct, there was somewhat of a foundation laid for

22  the letter from -- alleged letter from Mr. Palma Flores to

23  L.S., a letter to -- there was a foundation -- partial

24  foundation laid for the admissibility of those items, but I

25  have not marked them as admitted.

1          Is that correct?

2          MS. RUMBAUGH:  That is my understanding, Your Honor.

3          MR. JENKINS:  That's mine as well too, Your Honor.

4   They've been identified.

5          THE COURT:  Yes.  All right.

6          And once again, Counsel, I appreciate your hard work

7   on this.  And the reason why I'm asking these questions is not

8   to rush anybody.  That is not my intention at all.  I just

9   like to be able to tell the jury where we are on things.

10          So how long does the government anticipate for its

11   case this morning?  And again, this has been my experience

12   that when you give people a focus, they're better at

13   listening.

14          Government?

15          MS. RUMBAUGH:  Your Honor, we have five additional

16   witnesses.

17          THE COURT:  Okay.

18          MS. RUMBAUGH:  The ballistics expert who analyzed

19   the ammunition components of this case, Ms. Laila Sheehy, Mr.

20   Kollin Worlds.  I expect that those witnesses would take some

21   time depending on Mr. Jenkins's cross-examination.  Hector

22   Flores, whose direct examination should be relatively short.

23   Again, cross-examination may be longer.  And then finally, the

24   case agent, Detective Wallace, who I anticipate her

25   testimony -- her direct examination may take 30 or 45 minutes.

1        THE COURT:  Okay.  So, again, not to rush, but I'm

2    just trying to prepare myself.  Is it reasonable to think that

3    there's a possibility that we'll be able to instruct the jury

4    today?

5        MS. RUMBAUGH:  Yes, Your Honor.

6        THE COURT:  Mr. Jenkins?

7        MR. JENKINS:  That is my anticipation, Your Honor.

8        THE COURT:  All right.

9        MS. RUMBAUGH:  Your Honor, I think it may be

10   reasonable to expect, again depending on cross-examination,

11   that we may be able to rest our case by lunchtime, depending

12   on when lunch is called.

13       THE COURT:  And Mr. Jenkins, depending on your

14   perspective as to the defendant's case in chief, if he chooses

15   to present one, are you anticipating any additional

16   instructions?

17       MR. JENKINS:  At this point, no, Your Honor.

18       THE COURT:  Okay.  And I'll let you know that I've

19   gone through the instructions a couple of times and most of

20   them look like they're applicable to the case.

21       There is -- I think there was one about me

22   admonishing lawyers, and I don't do that, so I think we can

23   pull that one.

24       And then there was another one that was applicable

25   to me asking questions, and I don't recall asking any

1   questions.  I usually stay out of the way unless there's a

2   circumstance where it's just like a miscommunication, I'll say

3   whatever to just get the case moving.

4           But other than that, I think we're probably okay on

5   the instructions, unless you have some that you would like to

6   offer or like the Court to consider.  And the reason why I'm

7   asking now is because I don't like to make decisions on the

8   applicability of jury instructions on the fly.  I like to sort

9   of read them, digest them, and then go to my own research to

10  make sure they're applicable.

11          MR. JENKINS:  Yes, Your Honor.  I do not have any

12  additions, Your Honor.  But I would like to state for the

13  record that I have conferred with Mr. Palma Flores on whether

14  or not we should submit to the Court an instruction on a

15  lesser included offense with respect to the homicide being

16  prosecuted in this matter.  And Mr. Palma Flores has

17  instructed me not to submit such an instruction for the

18  Court's consideration.

19          THE COURT:  All right.  Mr. Palma Flores,

20  Mr. Jenkins, as he always is, is very thorough in his stating

21  of his nature of his relationship with his clients.  He always

22  does a very good job of making sure that they're informed and

23  making good decisions about how their case is to be

24  prosecuted.

25          And he's indicated to me that at this point that he

1 is not of a mind, based upon your direction, to offer a lesser

2 included offense instruction.

3          Do you agree with his interaction with you, sir?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Are you entirely satisfied with the

6 services of Mr. Jenkins?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Very good, sir.  Thank you.

9          MR. JENKINS:  Thank you, Your Honor.

10          THE COURT:  All right.  Ready to bring the jury in?

11          MS. RUMBAUGH:  Yes, Your Honor.  Sorry, Your Honor,

12 one final housekeeping point.  Our next witness has a

13 demonstrative exhibit.  It's basically an oversized model of a

14 bullet in a cartridge case.  I think that would be helpful in

15 instructing the jury on the type of analysis that she

16 performed.

17          I've asked Mr. Jenkins about whether he objects to

18 that.  He's indicated he doesn't object.  So if the Court is

19 all right with that, I'd like to --

20          THE COURT:  As long as the marshals service is

21 comfortable with that, I'm fine with that.  As I say, what I

22 always try to do is let the professionals do their job, and so

23 if the marshals service is okay with that, then we'll be okay.

24          MARSHAL VENUTI:  Yes, Judge.

25          THE COURT:  Thank you.

1          MS. RUMBAUGH:  It is plastic for the record.

2          MARSHAL VENUTI:  Yes.

3          MS. RUMBAUGH:  All right.  Nothing further, Your

4  Honor.

5          (Jury present.)

6          THE COURT:  Thank you.  You may be seated.  You all

7  might think why is he pointing at us.  I'm counting to make

8  sure that we have all 14 of you here.

9          It seems to me that I do a lot of counting.  I was

10  blessed with the opportunity to do a state championship

11  football game down in Lynchburg this past Saturday.  And it's

12  part of my job when I'm the crew chief, I have to count the

13  offense every play.  So every time they come out to set a

14  play, you'll see me doing this counting thing.  So I guess I'm

15  reliving Saturday, but you all are as important as the young

16  men who were participating in that game on Saturday.

17          Ladies and gentlemen of the jury, were you able to

18  live up to the Court's instruction not to discuss the case or

19  any aspect of the case with anyone?  All individuals of the

20  jury are indeed nodding their heads in agreement.

21          We're ready to start day two.  Once again, the

22  lawyers are working hard and we're moving right along, and we

23  hope to have this case to you as soon as practicable.  Please

24  pay attention as the case continues.

25          MS. RUMBAUGH:  Your Honor, the United States calls

1  Cara McCarthy.

2           (Government's witness, Cara McCarthy, sworn.)

3           (Witness seated.)

4           THE COURT:  Ma'am, you may take the stand.  If

5  you're fully vaccinated and you're comfortable doing so, you

6  may remove your mask, if you're comfortable doing so.

7                      DIRECT EXAMINATION

8  BY MS. RUMBAUGH:

9  Q.    Good morning, ma'am.

10  A.    Good morning.

11  Q.    Would you please state your full name and spell your

12  first and last for the record?

13  A.    My name is Cara McCarthy.  C-a-r-a M-c-C-a-r-t-h-y.

14  Q.    Ms. McCarthy, how are you currently employed?

15  A.    I am employed as the supervisor of the firearms and tool

16  mark section of the Virginia Department of Forensic Science,

17  northern laboratory in Manassas.

18  Q.    When did you first join the Department of Forensic

19  Science?

20  A.    I started with the Department of Forensic Science in

21  April of 2014.

22  Q.    And when did you join the northern lab in Manassas?

23  A.    In April of 2014, I started at our eastern laboratory in

24  Norfolk.  In June of 2016, I transferred to our northern

25  laboratory.

1  Q.   You mentioned that you're a supervisor.  Could you please

2  describe your role and responsibilities within the firearms

3  and tool mark section?

4  A.   Some of my job duties include evaluating firearms-related

5  evidence that is submitted to the laboratory, analyzing the

6  results of that evidence, reporting on my findings in a

7  certificate of analysis, testifying in court when requested,

8  providing training to forensic scientists trainees in the

9  section, and also managing the day-to-day operations of the

10 firearms and tool mark section at the northern laboratory.

11 Q.   Now, prior to joining DFS, where did you work?

12 A.   Prior to DFS I was a firearms and tool mark examiner for

13 the Georgia Bureau of Investigation, Division of Forensic

14 Sciences, in Decatur, Georgia.

15 Q.   So was the type of work you did with GBI the same type of

16 work you now do at DFS?

17 A.   Yes.

18 Q.   I'd like you to take a look at Exhibit 17, if there's an

19 exhibit binder in front of you.

20       Ms. McCarthy, is that your curriculum vitae?

21 A.   Yes, it is.

22 Q.   And does it truly and accurately reflect your educational

23 background and professional experience?

24 A.   Yes, it does.

25       MS. RUMBAUGH:  Your Honor, I move to admit Exhibit

1   17.

2           THE COURT:  Without objection.  Thank you.

3           (Government's Exhibit No. 17 was admitted into

4   evidence.)

5   BY MS. RUMBAUGH:

6   Q.   Now, across the Georgia Bureau of Investigation and

7   Virginia Department of Forensic Science, in approximately how

8   many cases have you provided ballistics analysis?

9   A.   A little over 2,000 cases.

10  Q.   And in those 2,000 cases, would that sometimes involve

11  multiple items of firearms evidence?

12  A.   Yes.  Every case is different.  Some cases involve one

13  piece of evidence and some cases involve multiple pieces of

14  evidence.

15  Q.   And approximately how many times have you testified in

16  court, whether in Georgia or Virginia, regarding your work?

17  A.   Approximately 58 times.

18  Q.   And how many times have you been qualified as an expert?

19  A.   All of those, if I was testifying for the state of

20  Georgia or the Commonwealth of Virginia or district court.

21          MS. RUMBAUGH:  Your Honor, I offer Cara McCarthy as

22  an expert witness in ballistics evidence.

23          MR. JENKINS:  No objection, Your Honor.

24          THE COURT:  So recognized.

25  BY MS. RUMBAUGH:

1  Q.   Now, Ms. McCarthy, I want to ask you a few background

2  questions so the jury understands what we're talking about.

3         What type of evidence does firearm evidence

4  encompass?

5  A.   Evidence that is routinely submitted to our section

6  includes firearms and ammunition components.  For example,

7  bullets and cartridge cases.  Sometimes we also receive

8  clothing for examination for muzzle-to-target distance

9  determinations.

10 Q.   Just to clarify, what exactly are ammunition components?

11 A.   May I us a demonstrative aid?

12 Q.   Yes, please.

13 A.   A cartridge is a single unit of ammunition and it's made

14 up four parts:  the primer, the cartridge case, the propellant

15 inside, and the bullet or the projectile.  Upon firing, these

16 ammunition components separate.  The bullet separates from the

17 cartridge case.  So I have a bullet and a cartridge case.

18 Q.   Now, what type of analysis are you able to do with

19 ammunition components?

20 A.   In the laboratory, we perform a microscopic examination

21 on ammunition components and we use what's called a comparison

22 microscope.  A comparison microscope is essentially two

23 microscopes that are connected by an optical bridge and it

24 allows us to view two bullets or two cartridge cases at the

25 same time under the same magnification and lighting.

1  Q.   Ms. McCarthy, are you familiar with the terms, "class

2  characteristics" and "individual characteristics"?

3  A.   Yes.

4  Q.   Can you please explain to the jury what those terms mean?

5  A.   In the laboratory we start our exams by evaluating for

6  class characteristics.  Class characteristics are design

7  features that are determined by the manufacturer prior to

8  manufacturing.  For example, these can be the shape of the

9  firing pin, the location of the extractor and the injector in

10 the firearm, and also the type of rifling, the number of lands

11 and grooves, the width of those lands and grooves, and the

12 directional twist that make up the rifling in the barrel.

13       Individual characteristics are also evaluated.

14 These are random microscopic imperfections that are created

15 during the manufacturing process.  They're not intended to be

16 there by the manufacturer.  For example, if you walked out

17 into the parking lot and you needed to locate your car, you

18 would first start by grouping the cars together, for example,

19 their make and model.  You would put those into one group and

20 then from there you would evaluate for individual

21 characteristics:  the scratches, the dents, license plate

22 decal.  So you pick the right car and drive home in the right

23 one.

24       We do the same in the laboratory, evaluate for class

25 characteristics and then move on to an evaluation of

1  individual characteristics.

2  Q.   Okay.  And so based on the -- actually, let me ask you

3  this.

4       When you're analyzing firearm evidence, what do you

5  look for first, the class characteristics or the individual

6  characteristics?

7  A.   We start out by first evaluating for class

8  characteristics so we can group cartridge cases or bullets

9  together based on their characteristics.

10  Q.   In this case, in particular, were you asked to analyze

11  certain pieces of evidence?

12  A.   Yes.

13  Q.   And I'd like you to take a look at the physical exhibits,

14  if I could have the court security officer's assistance,

15  Government's Exhibit 20 through 25 which have already been

16  admitted into evidence.

17       Ms. McCarthy, if you could take a look at those

18  packages and look up at me when you're done.

19       Ms. McCarthy, are these the ammunition components

20  that you were asked to analyze in this case?

21  A.   Yes.

22  Q.   And does the exterior packaging around those items

23  contain your initials?

24  A.   Yes.

25  Q.   Now, I'd like you -- and you can set those aside.  We're

1    done with the physical exhibits.

2            Turning back to the binder, if you could turn over

3    to Exhibit 16.  There should be three pages.

4            Do you recognize this?

5    A.    Yes.

6    Q.    What are they?

7    A.    Exhibit 16 includes the certificate of analysis that I

8    issued in this case.

9    Q.    And do these certificates of analysis truly and

10   accurately reflect your conclusions that you drew regarding

11   the ammunition components you analyzed in this case?

12   A.    Yes.

13           MS. RUMBAUGH:  Your Honor, I move to admit Exhibit

14   16.

15           MR. JENKINS:  No objection.

16           THE COURT:  Without objection, 16.

17           (Government's Exhibit No. 16 was admitted into

18   evidence.)

19   BY MS. RUMBAUGH:

20   Q.    Ms. McCarthy, the first page of Exhibit 16, does that

21   pertain to the cartridge cases that you analyzed?

22   A.    Yes.

23   Q.    I'd like to focus on the cartridge cases first.  Could

24   you please describe for the jury your process in analyzing the

25   cartridge cases?

1    A.    The cartridge cases are submitted to the laboratory.

2    When I receive them, I examine them first for their class

3    characteristics.  If the class characteristics are in

4    agreement, then I move on to the evaluation of individual

5    characteristics using the comparison microscope.  I also

6    determine the brand and caliber of the cartridge cases.

7    Q.    And what conclusions did you specifically draw regarding

8    these cartridge cases?

9    A.    The three cartridge cases that I examined in this case

10   were identified as having been fired in the same firearm.

11   Q.    Okay.  Were you able to draw any conclusions regarding

12   the type of firearm that they were fired from?

13   A.    Yes.  The class characteristics on these three cartridge

14   cases are consistent with having been produced by a GLOCK

15   9-millimeter Luger pistol.

16   Q.    Are you able to articulate a level of certainty or a

17   level of support that the bullets were all fired from the same

18   gun?

19   A.    Yes.

20   Q.    And what's that level of support?

21   A.    It is my opinion that the observed class characteristics

22   as well as the quality and quantity of the corresponding

23   individual characteristics provide extremely strong support

24   that the three cartridge cases were fired in one firearm.

25   Q.    What is it about the cartridge cases that led you to

1  believe that they were likely fired from a GLOCK 9-millimeter?

2  And feel free to use your demonstrative if that would be

3  helpful.

4  A.    The shape of the firing pin is an indication of a

5  characteristic that is consistent with GLOCK firearms.  Using

6  that information along with some of the information from the

7  bullets that were submitted in the case, I was able to narrow

8  down to the cartridge cases having been consistent with being

9  fired in a GLOCK 9-millimeter Luger pistol.

10 Q.    How common are those types of characteristics among

11 nonGLOCK pistols?

12 A.    There are a few other firearms manufacturers that use an

13 elliptical-shaped firing pin in their firearms.  However, in

14 combination with the type of rifling that was observed on the

15 bullets in this case, I was able to narrow down to GLOCK

16 9-millimeter Luger pistols.

17 Q.    Ms. McCarthy, can you tell me what the date on this

18 certificate of analysis is?

19 A.    This certificate of analysis is dated October 31st, 2019.

20 Q.    Are you aware that these pieces of evidence were

21 collected from a homicide that occurred just a few days prior?

22 A.    I would have to check my notes for the date of offense,

23 but I am aware they were collected from a homicide.

24 Q.    Is it unusual to see a relatively quick turnaround?  In

25 other words, was there a particular rush to get the cartridge

1  cases analyzed?

2  A.    There was a request by the agency to expedite the

3  examination of the cartridge cases for entry into the NIBIN

4  system.  NIBIN stands for the National Integrated Ballistic

5  Information Network.

6  Q.    And can you explain to the jury what the utility of NIBIN

7  is?

8  A.    NIBIN is used to link crime or criminal events together.

9  Cartridge cases collected at crime scenes as well as cartridge

10  cases produced from test firing firearms are entered into the

11  system to establish potential associations with each other.

12  Q.    Did you find any associations between the cartridge cases

13  that you were asked to test in this case and any other

14  cartridge cases that were entered into NIBIN?

15  A.    No.

16  Q.    All right.  Ms. McCarthy, turning over to the second page

17  of Exhibit 16, is this the certificate of analysis pertaining

18  to the bullets and bullet fragments that you tested in this

19  case?

20  A.    Yes.

21  Q.    And can you please describe for the jury your process in

22  testing those particular ammunition components?

23  A.    Similar to the evaluation of the cartridge cases, for the

24  two bullets and the bullet fragment as well as the lead

25  fragments that I examined in this case, I microscopically

1  examined them using the comparison microscope.

2  Q.  What conclusions were you able to draw regarding these

3  items?

4  A.  Regarding the bullet and then a bullet from autopsy,

5  these two bullets were identified as having been fired in the

6  same firearm.

7        The bullet fragment that was also submitted was

8  compared to the two submitted bullets.  However, the result of

9  the microscopic comparison was inconclusive.  Therefore, I

10  could not identify or eliminate if the bullet fragment was

11  fired in the same firearm as the submitted bullets.

12        The --

13  Q.  Sorry, continue, please.

14  A.  The two lead fragments that were also submitted were

15  microscopically examined and unsuitable for comparison to any

16  firearm.

17  Q.  What is it about lead fragments that lends them to being

18  unsuitable for comparison?

19  A.  As a bullet travels down the barrel, it engages the

20  rifling in the firearm and the rifling imparts its markings

21  onto the bullet.  When we think about a bullet, in this

22  particular case, the bullet has a harder metal jacket with a

23  softer lead core, just like an M&M candy, you have the harder

24  candy shell with a softer chocolate center.

25        As the bullet travels down the barrel, only that

1  harder metal jacket is coming in contact with the rifling.

2  Therefore, any of the lead fragments from the softer lead

3  core, they're not coming in contact with the rifling in the

4  firearm, therefore, they lack any microscopic markings for

5  comparison purposes.

6          MS. RUMBAUGH:  Court's indulgence.

7          THE COURT:  Yes, ma'am.

8          (Counsel confers.)

9          MS. RUMBAUGH:  Nothing further.

10         THE COURT:  Cross-examination.

11         MR. JENKINS:  Yes, Your Honor.

12         THE COURT:  Thank you.

13                    CROSS-EXAMINATION

14 BY MR. JENKINS:

15 Q.    Good morning.

16 A.    Good morning.

17 Q.    Ma'am, as part of your duties and responsibilities or

18 professional training, is it fair to say that you're familiar

19 with firearm manufacturers?

20 A.    Yes.

21 Q.    You know the number of firearm producers in this country,

22 generally speaking?

23 A.    There are a number of them, yes.

24 Q.    And is it also true that you're familiar with ammunition

25 manufacturers?

1  A.   Yes.

2  Q.   Particularly, I believe you testified concerning Exhibit

3  16, your comparative work on some cartridge that you

4  identified as being 9-millimeter GLOCK Luger ammunition, is

5  that correct?

6  A.   There were three cartridge cases that were examined.

7  Those were Remington brand 9-millimeter Luger cases.

8  Q.   Do you know the number of those types of bullets or

9  cartridges that are produced on an annual basis?

10  A.   If we're specifically talking about Remington, this would

11  be thousands and thousands annually that they produce.

12  Q.   Would it be fair to say that the items that you identify

13  by make and brand and ammunition caliber size are not unique?

14  A.   When we talk about the cartridge cases and my conclusions

15  on a certificate, we're talking about the markings that are

16  produced from a firearm, not necessarily the markings produced

17  during the manufacturing of the ammunition.

18  Q.   I'm talking about the actual ammunition, the actual

19  ammunition, the 9-millimeter GLOCK Luger ammunition.

20        Would you agree with me that that's not a unique

21  ammunition?

22  A.   GLOCK would be the manufacturer of the firearm.

23  Remington is the manufacturer of the ammunition.  So if we're

24  talking specifically about the ammunition, Remington

25  9-millimeter Luger ammunition is in general not unique.  There

1  are thousands and thousands of cartridges produced every year

2  from Remington.

3      MR. JENKINS:  No further questions.  Thank you, Your

4  Honor.

5      THE COURT:  Redirect.

6      MS. RUMBAUGH:  Briefly, Your Honor.

7                   REDIRECT EXAMINATION

8  BY MS. RUMBAUGH:

9  Q.   Ms. McCarthy, one of bullets that you tested was

10  recovered from the autopsy of Mr. Brown?

11  A.   Yes, that's correct.

12  Q.   And what was your -- remind me, what was the result of

13  your comparison to the other bullet which was found at the

14  scene?

15  A.   The bullet -- I'm not sure where the other bullet was

16  located from.  However, the one bullet submitted and then the

17  bullet from autopsy, they were microscopically examined,

18  compared to each other, and identified as having been fired

19  from the same firearm.

20      MS. RUMBAUGH:  Nothing further.

21      THE COURT:  Is this witness subject to recall?

22      MS. RUMBAUGH:  Not from the government.

23      MR. JENKINS:  No, Your Honor.

24      THE COURT:  Ma'am, you're free to leave.  Please do

25  not discuss the case or any aspect of the case with anyone

1    while the case is pending.  Thank you, ma'am.

2              (Witness excused.)

3              THE COURT:  Next witness.

4              MR. BEN'ARY:  Your Honor, Kollin Worlds.

5              THE COURT:  Kollin Worlds.

6              (Government's witness, Kollin Worlds, sworn.)

7              (Witness seated.)

8              THE COURT:  Sir, if you're fully vaccinated and

9    you're comfortable doing so, you may remove your mask while

10   testifying.

11             MR. BEN'ARY:  May I proceed?

12             THE COURT:  Yes, sir.

13                      DIRECT EXAMINATION

14   BY MR. BEN'ARY:

15   Q.   Make sure that you sit up close to the microphone so that

16   the members of the jury can hear your testimony.  Good

17   morning.

18   A.   Good morning.

19   Q.   Would you tell the members of the jury your full name,

20   and let me have you spell your first and last name please.

21   A.   Kollin Worlds.  K-o-l-l-i-n W-o-r-l-d-s.

22   Q.   And how old are you, Mr. Worlds?

23   A.   Twenty.

24   Q.   Are you currently a student?

25   A.   Yes.

1    Q.    Where do you go to school?

2    A.    NOVA Community College.

3    Q.    And what are you studying?

4    A.    Criminal justice.

5    Q.    As a juvenile did you have some events on your record

6    that include breaking into some vehicles, stealing items out

7    of vehicles?

8    A.    Yes.

9    Q.    And did you have an adjudication as part of your juvenile

10   history for using your grandparents' vehicle without their

11   permission?

12   A.    Yes.

13   Q.    Do you have any criminal convictions on your adult

14   record?

15   A.    No.

16   Q.    As we sit here today, are you currently under the

17   influence of any controlled substance?

18   A.    No.

19   Q.    Do you use any controlled substances on a regular basis?

20   A.    Marijuana.

21   Q.    And about how old were you when you started using

22   marijuana?

23   A.    About 12, 13.

24   Q.    And when is the last time prior to right now that you

25   used marijuana?

1   A.   Two and a half weeks ago.

2   Q.   And up to that point how frequently were you -- did you

3   use marijuana?

4   A.   Three or four times a week.

5   Q.   In your past have you used any other controlled

6   substance?

7   A.   Yes.

8   Q.   And what controlled substance was that?

9   A.   Fentanyl.

10  Q.   And when did you begin using fentanyl?

11  A.   Beginning of this year.

12  Q.   And did you seek treatment to assist you with your abuse

13  of fentanyl?

14  A.   Yes.

15  Q.   And did you complete treatment?

16  A.   Yes, both times.

17  Q.   When did you last complete treatment for fentanyl use?

18  A.   August.

19  Q.   Of 2021?

20  A.   Yes.

21  Q.   And have you used fentanyl since then?

22  A.   No.

23  Q.   Mr. Worlds, you're here pursuant to a subpoena, correct?

24  A.   Yes.

25  Q.   And you have counsel representing you as a witness in

1  this case, correct?

2  A.   Yes.

3  Q.   And do you recall entering into an agreement that you

4  reviewed with your lawyer, between you and your lawyer and the

5  prosecutor's office, called a proffer letter?

6  A.   Yes.

7  Q.   Could you take a look in the binder in front of you,

8  could you take a look at Government's Exhibit 15, please.

9       It should -- there should be a tab that says 15.

10 A.   Yes.

11 Q.   Is that the proffer agreement that you and your lawyer

12 signed and the representatives of the government signed?

13 A.   Yes.

14 Q.   And that proffer letter, what do you understand to be the

15 terms of that proffer letter?

16 A.   Basically saying like if I tell you information that I

17 know, that I won't be -- it won't like be used against me, I

18 guess.

19 Q.   And it's a requirement of that letter that you provide

20 truthful information, correct?

21 A.   Yes, sir.

22 Q.   I want to ask you some questions about October 26, 2019,

23 it's the day that you were in contact with an individual named

24 Melvin Palma Flores.  Do you recall that date?

25 A.   Yes, sir.

1   Q.   And was that -- was that before you began using fentanyl?

2   A.   No, it's after.  It was before, actually.  Yes, before.

3   Q.   You said you started using fentanyl in 2020?

4   A.   Yes, right around March.

5   Q.   But you were using marijuana at the time?

6   A.   Yes.

7   Q.   When you heard from -- was there a time on that date that

8   you heard from an individual that you knew of as Melvin Palma

9   Flores?

10  A.   Yes.

11  Q.   And how did you know Melvin Palma Flores?

12  A.   From elementary school.

13  Q.   Where were you when he first contacted you on that date?

14  A.   Mount Vernon Square.

15              (Court reporter clarification.)

16              MR. BEN'ARY:  I think I had asked if --

17              THE COURT:  Let's do it this way.  Counsel, just go

18  back two questions and ask them again.  That way the court

19  reporter can take it down.

20  BY MR. BEN'ARY:

21  Q.   I'm going to ask you questions about October 26, 2019 was

22  the day that you spent some time with Melvin Palma Flores.

23              THE COURT:  You need to answer audibly, sir.

24              THE WITNESS:  Yes.

25  BY MR. BEN'ARY:

1   Q.   And you said that you were at Mount Vernon Square when

2   you first were contacted by Mr. Palma Flores?

3   A.   Yes.

4   Q.   Where is Mount Vernon Square generally?

5   A.   It's an apartment complex like off of route 1.

6   Q.   And what were you doing there?

7   A.   Smoking weed.

8   Q.   And can you describe for the jury what Mr. Palma Flores

9   said when he contacted you?

10  A.   You want to come smoke weed with me.

11  Q.   And had you hung out with him recently at that point?

12  A.   No.

13  Q.   About how long was it since you had hung out with Mr.

14  Palma Flores?

15  A.   Probably a year or so, two years.

16  Q.   And did you agree to meet up with him?

17  A.   Yes.

18  Q.   And at that point did you have a cell phone?

19  A.   No, I did not.

20  Q.   So how was it that you were contacted by Mr. Palma

21  Flores?

22  A.   I was on -- I was on Snapchat on one of my friend's

23  phone.

24  Q.   All right.  What is Snapchat?

25  A.   It's a social media.

1  Q.   And is there an app that goes along with Snapchat?

2  A.   What do you mean by that?

3  Q.   How do you log into your Snapchat account from somebody

4  else's cell phone?

5  A.   Yeah, it's an app on the phone.

6  Q.   So you open up the app, it asked for a username and

7  password?

8  A.   And you sign in.

9  Q.   And once you're signed into your Snapchat account, do you

10  have access to your contacts?

11  A.   Yes.

12  Q.   And can you receive both text messages and voice calls?

13  A.   Yes.

14  Q.   And what was your Snapchat username at that point?

15  A.   Sluttyboyk.

16  Q.   Slutty, S-L-U-T-T-Y, boy, B-O-Y, K like "Kollin"?

17  A.   Yes.

18  Q.   And when Mr. Palma Flores contacted you and asked you to

19  smoke, at that point did you know Mr. Palma Flores to be a

20  marijuana user?

21  A.   Yes.

22  Q.   And what about selling marijuana, did you know him to

23  sell marijuana as well?

24  A.   Yes.

25  Q.   Okay.  Did you in fact meet up with Mr. Palma Flores?

1  A.   Yes.

2  Q.   And where were you when you met up with Mr. Palma Flores?

3  A.   Mount Vernon Square.

4  Q.   Same spot where you were when you received the Snapchat

5  communication?

6  A.   Yes.

7  Q.   And about what time of day or night was it?

8  A.   It was night, more like night.

9  Q.   Did Mr. Palma Flores arrive in a vehicle?

10 A.   Yes.

11 Q.   What vehicle was it?

12 A.   A gray minivan.

13 Q.   Did you know him to use that gray minivan?

14 A.   Yes.

15 Q.   Did you know who owned it?

16 A.   Yes.

17 Q.   Who owned it?

18 A.   His mother.

19 Q.   And was anyone with Mr. Palma Flores when he arrived at

20 that location at Mount Vernon Square apartments?

21 A.   No.

22 Q.   The person who we've been referring to as Melvin Palma

23 Flores that showed up to pick you up from the Mount Vernon

24 Square apartments, do you see that individual in the

25 courtroom?

1   A.   Yes.

2   Q.   Would you identify him by where he's sitting and possibly

3   an article of clothing that he's wearing?

4   A.   He's sitting to the left of me in a navy gray -- I mean

5   navy blue suit.

6         MR. BEN'ARY:  Would the record reflect an

7   identification of the defendant.

8         THE COURT:  It shall so reflect.

9   BY MR. BEN'ARY:

10  Q.   What did you do right after the defendant picked you up?

11  A.   We logged in -- I mean, we went to General Lee apartments

12  to look for weed.

13  Q.   And were you trying to reach out to connect to people to

14  try and find some marijuana?

15  A.   Yeah, we both were.

16  Q.   And how did you do that if you didn't have a cell phone?

17  A.   I logged into Snapchat on his phone.

18  Q.   Just make sure that you're up on the microphone.

19  A.   I logged into Snapchat on his phone.

20  Q.   At some point -- and again, once you logged into Snapchat

21  in particular on the defendant's phone, you had access to your

22  contacts list, correct?

23  A.   Yes.

24  Q.   At some point, did -- were you joined by another

25  individual?

1   A.   Yes, later.

2   Q.   About how long after?

3   A.   Probably an hour or so.

4   Q.   And what were you doing for that hour?

5   A.   I was just seeing that he might reply back to us.

6   Q.   Again, trying to look for marijuana?

7   A.   Uh-huh.

8   Q.   Just --

9   A.   Yes.

10  Q.   Thank you.  After that hour, were you joined by another

11  individual?

12  A.   Yes.

13  Q.   And who was that?

14  A.   Melvin's girlfriend.

15  Q.   Do you recall her name?

16  A.   Laila.

17  Q.   Did you know Laila prior to meeting her on that occasion?

18  A.   No.

19  Q.   And where did you go to meet up with her?

20  A.   Somewhere in Kingstowne.

21  Q.   Were you driving?

22  A.   No.

23  Q.   What did you do when you got to Kingstowne and met up

24  with Laila?

25  A.   Went to Lockheed Boulevard.

1  Q.  Did you go in the same vehicle, in the gray minivan?

2  A.  No.

3  Q.  What vehicle did you go in?

4  A.  Her car.

5  Q.  And what kind of -- do you remember what kind of a

6  vehicle that was?

7  A.  I don't know the brand, but I know like it was either

8  gray or black.

9  Q.  Okay.  Not a minivan?

10  A.  No, a car.

11  Q.  Whose idea was it to switch into Laila's vehicle?

12  A.  Melvin's.

13  Q.  The defendant's?

14  A.  Uh-huh.

15  Q.  Once you got into Laila's vehicle, who was driving?

16  A.  Laila.

17  Q.  And where was the defendant sitting?

18  A.  In the passenger.

19  Q.  And where were you?

20  A.  In the back behind him.

21  Q.  Were you still using your Snapchat account on the

22  defendant's phone?

23  A.  Yeah, parts of it.

24  Q.  And were there parts of the trip while the defendant was

25  using his phone?

1    A.    Yes.

2    Q.    Did you have to sign into your account each time you got

3    passed the phone back?

4    A.    No.

5    Q.    All right.  And where did you go once you got into

6    Laila's car?

7    A.    Went to Lockheed Boulevard.

8    Q.    And was that -- who was deciding where to go to at that

9    point?

10   A.    Melvin.

11   Q.    All right.  And is there a particular area in the

12   Lockheed Boulevard area that you went to?

13   A.    Yes, by the park.

14   Q.    Did you know anyone that lived in that area?

15   A.    Yes.

16   Q.    Did you know an individual named Xyqwavius or Qwa Brown?

17   A.    Yes.

18   Q.    Did you know that he lived in that area?

19   A.    Yes.

20   Q.    Were you friends with Mr. Brown?

21   A.    Yes.

22   Q.    Was he one of your Snapchat contacts?

23   A.    Yes.

24   Q.    Did the defendant tell you anything about meeting up with

25   Mr. Brown on that evening?

1  A.    No.

2  Q.    Did he mention Mr. Brown at all?

3  A.    No.

4  Q.    Did he mention any disputes he was involved in with

5  Mr. Brown?

6  A.    No.

7  Q.    All right.  Did you arrive in the apartment complex where

8  you knew Mr. Brown to live?

9  A.    Yes.

10  Q.    What happened once you arrived there?

11  A.    We parked and we just sat by the park.

12  Q.    I missed part of what you said there.  You parked --

13  A.    We parked and we sat by the park, like in the car.

14  Q.    Got it.  What happened then?

15  A.    Melvin gets out.

16  Q.    And did you see where he went?

17  A.    No.

18  Q.    Did he say what he was doing?

19  A.    No.

20  Q.    Did you see anyone else around when the defendant got out

21  of the vehicle?

22  A.    No.

23  Q.    Did the defendant come back to the vehicle?

24  A.    Yes.

25  Q.    What happened next?

1    A.    We pulled off and went around.

2    Q.    Where did you go to?

3    A.    The back road.

4    Q.    Was it a back road that was still near the same apartment

5    complex?

6    A.    Yes.

7    Q.    And at that point had you -- I know that you say you knew

8    that Qwa Brown lived there.  Did you see Qwa Brown?

9    A.    Yes.

10   Q.    When did you see him?

11   A.    I seen him walking like down about to get into a car.

12   Q.    And was that during the time that you were stopped that

13   you just described?

14   A.    Uh-huh.

15   Q.    Was Mr. Palma in the car or out of the car?

16   A.    He was out of the car.

17   Q.    All right.  Did you say anything to Qwa Brown?

18   A.    No.

19   Q.    Did you see where he went?

20   A.    No.

21   Q.    All right.  After you see Mr. Brown, Mr. Palma gets back

22   into the car?

23   A.    Yes.

24   Q.    About how long after?

25   A.    Like a minute or two.

1  Q.   All right.  And then that's when you pull up to the side

2  street?

3  A.   Yes.

4  Q.   Did you stop on the side street?

5  A.   Yes.

6  Q.   Why did you stop on the side street?

7  A.   Because he told me that the guy that he was getting the

8  weed from texted him back.

9  Q.   Who told you that?

10 A.   Melvin.

11 Q.   And who had the phone at that point?

12 A.   Melvin.

13 Q.   All right.  And so, who was driving at that point?

14 A.   Laila.

15 Q.   And did she in fact stop the car on that side street?

16 A.   Yes.

17 Q.   What happened then?

18 A.   He said, the guy hit me back, I'll be right back, and

19 then he left.

20 Q.   What did you -- did you get out of the car?

21 A.   No.

22 Q.   Did Laila get out of the car?

23 A.   No.

24 Q.   What were you and Laila doing while Mr. Palma was out of

25 the car?

1  A.    We were in the car just talking.

2  Q.    And what's the next thing your remember?

3  A.    Gunshots.

4  Q.    And how many gunshots did you hear?

5  A.    Four or five.

6  Q.    What was your reaction?

7  A.    Shocked.  We both were shocked.  She looked at me, I

8  looked at her.  Jaws dropped.

9  Q.    And after hearing the gunshots, did you see Mr. Palma

10 again?

11 A.    Yes.

12 Q.    About how long after the gunshots?

13 A.    Probably like a minute, a half a minute.

14 Q.    And describe what he was like when you saw him after the

15 gunshots.

16 A.    He was running back to the car panting.

17 Q.    Panting?

18 A.    Like (makes panting sound.)

19 Q.    And what happened when he got back to the car?

20 A.    He was like telling Laila to "drive, drive."

21 Q.    And how did he -- what was his mannerisms, how did he

22 seem when he got back into the car?

23 A.    Like nervous, antsy.

24 Q.    At some point after Mr. Palma returned to the car, did

25 you get his phone back?

1   A.   No, not right when he got back in the car, no.

2   Q.   Any time after that?

3   A.   Yes.

4   Q.   And did you notice when you got access to Mr. Palma's

5   phone again, were you still signed into your Snapchat account?

6   A.   Yes.

7   Q.   Did you notice that your Snapchat account was in contact

8   with anyone that you hadn't personally been in contact with?

9   A.   Not in contact, but it was an open message that I didn't

10  open before.

11  Q.   And who was that open message to?

12  A.   To Qwa.

13  Q.   To?

14  A.   Qwa.

15  Q.   Mr. Brown?

16  A.   Yes, he sent a message to me and it was opened.

17  Q.   And where did you go after the defendant returned to the

18  car and tells Laila to go?

19  A.   He went to drop her off at her car.

20  Q.   And did you switch back to the gray minivan at that

21  point?

22  A.   Yes.

23  Q.   And where did you go?

24  A.   We went to pick up his mother.

25  Q.   I'm sorry?

1  A.   Well, before that, he went to go change his clothes.

2  Q.   Okay.  Do you know exactly where that occurred?

3  A.   I'm not -- I'm not sure of the exact neighborhood, but it

4  was like in the Kingstowne area.

5  Q.   Okay.  And what makes you say that he changed his

6  clothes?

7  A.   Because he left the car and came back with something

8  different.

9  Q.   Did you get out of the car with him?

10  A.   No.

11  Q.   Do you know what he did with his clothes?

12  A.   No.

13  Q.   After he came back in with different clothes, where did

14  you all go?

15  A.   We went to pick up his mother from work.

16  Q.   And did you stay with Melvin that night?

17  A.   Yes.

18  Q.   At some point did you find out that Qwa was dead?

19  A.   Yes.

20  Q.   When did you find that out?

21  A.   In the morning when I looked on Twitter.

22  Q.   So that -- you stayed with Mr. Palma that night, and the

23  next morning it's on Twitter?

24  A.   Uh-huh, yes.

25  Q.   Did you discuss that at all with the defendant?

1  A.   No.  I just asked him, I was like, You know Qwa died?

2  And then he asked me, Qwa died?  I was like, Yeah.  And then

3  after that it was nothing else said.

4  Q.   Okay.  Did you have some discussion with the defendant

5  about whether or not you should provide any information about

6  your whereabouts that night to the police?

7  A.   Yes.

8  Q.   What did he tell you about that?

9  A.   He told me to keep everything omertà, like the code of

10  silence.

11  Q.   Omertà, O-M-E-R-T-À?

12  A.   Yes, sir.

13  Q.   What does that mean?

14  A.   Like code of silence, like don't tell anything.

15  Q.   And did he suggest to you anything about what to tell law

16  enforcement if you're questioned about who you stayed with

17  that night?

18  A.   Not particularly who I stayed with, just say like, I was

19  like, somewhere like to have an alibi.

20  Q.   And did you initially talk to law enforcement?

21  A.   Yes.

22  Q.   How long after the events of that night?

23  A.   Probably a day or two after.

24  Q.   And what did you tell them about where you stayed that

25  night?

1    A.    I told them I stayed at one of my friend's house.

2    Q.    Not with the defendant?

3    A.    No.

4    Q.    And the friend that you used as your alibi, did you tell

5    that person to also say that you stayed there?

6    A.    Yes.

7    Q.    Eventually did you tell the police that you stayed with

8    the defendant, not with this other individual?

9    A.    Yes.

10   Q.    All right.  I'm going to fast forward to springtime of

11   this year.

12              Did Laila send you a picture of a letter?

13   A.    Yes.

14   Q.    All right.

15   A.    I don't think it was spring though.

16   Q.    When do you think it was?

17   A.    Probably around like December, January.

18   Q.    Okay.  So December 2020 or January 2021?

19   A.    2020, December of 2020 or January 2021.

20   Q.    Had you been in contact with Laila after the event --

21   A.    Yes.

22   Q.    -- going forward?

23   A.    Yes.

24   Q.    Okay.  And how did she send the letter to you?

25   A.    Through Snapchat.

1  Q.   She took -- looked like she took a photo of the letter

2  and sent it to you?

3  A.   Yes.

4  Q.   Why do you think it was a photo of the letter?  Did it

5  have her hand in it?

6  A.   Yeah, yeah.

7  Q.   And take a look in the binder, if you still have it in

8  front of you, at Exhibit 34.  It should be a tab 34.

9  A.   34?

10 Q.   34.

11 A.   I'm on there.

12 Q.   Is that a copy of the letter -- the same letter that she

13 sent you a picture of?

14 A.   Yes.

15 Q.   What's the gist of that letter?

16 A.   Basically trying to flip everything on me.

17 Q.   When you say trying to flip everything on you --

18 A.   So it says like, he's telling me like he's trying to

19 cover what he did up on me.

20 Q.   And when you received that message with the photo of that

21 letter, what did you do?

22 A.   Immediately sent it to my lawyer.

23 Q.   At that point, obviously Laila is in contact with you

24 because she's sending you a photo of the letter.  Were you

25 involved in a relationship with her?

1  A.   I wouldn't say a relationship.  We were just talking.

2  Q.   How long were you talking with her?

3  A.   Like two, three weeks.

4  Q.   And at some point, was it your impression that Laila had

5  found out that you had given the letter to somebody else and

6  it ended up in the hands of law enforcement?

7  A.   Yes.

8  Q.   And what was her reaction to that?

9  A.   She was pissed.

10  Q.   And did she remain in contact with you?

11  A.   No.

12  Q.   Did you try and contact her?

13  A.   Yes.

14  Q.   Were you able to?

15  A.   No.

16  Q.   Why not?

17  A.   She blocked me.

18  Q.   And have you had any contact with her since then?

19  A.   No.

20        MS. BEN'ARY:  Court's indulgence, one moment.

21        THE COURT:  Yes, sir.

22        (Counsel confers.)

23        MR. BEN'ARY:  Thank you, sir.  Mr. Jenkins is going

24  to have some questions for you.

25        THE COURT:  Cross-examination.

1    MR. JENKINS:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3  BY MR. JENKINS:

4  Q.   Good morning, Mr. Worlds.

5  A.   Good morning, sir.  How are you doing?

6  Q.   I'm doing well.  Mr. Worlds, my name is Robert Jenkins

7  and I represent Mr. Melvin Palma Flores.

8                    You and I have never met before, correct?

9  A.   No.

10  Q.   We've never spoken to each other, correct?

11  A.   Yes.

12  Q.   And is it fair to say that I've not offered you anything

13  in exchange for your testimony here today, correct?

14  A.   No.

15  Q.   You don't expect that by testifying or answering my

16  questions you're going to receive anything from me, correct?

17  A.   No.

18  Q.   And you also do not expect to receive anything of value

19  from Mr. Palma Flores in exchange for your testimony here

20  today, correct?

21  A.   Not at all.

22  Q.   As far as you know, I don't have the power to keep you

23  out of jail, correct?

24  A.   Yes, sir.

25  Q.   As far as you know, I don't have the power to charge you

1  with a criminal offense, correct?

2  A.   Yes, sir.

3  Q.   Now, but you have met with the prosecutors in this case

4  before today, correct?

5  A.   Yes, sir.

6  Q.   You've met with them multiple times, haven't you?

7  A.   Yes, sir.

8  Q.   And during those times in which you were meeting with the

9  prosecutor, was I present?

10 A.   No.

11 Q.   During those times you were meeting with the prosecutor,

12 was Mr. Palma Flores present?

13 A.   No.

14 Q.   It was just you and the prosecutors, correct?

15 A.   Yes.

16 Q.   You, the prosecutors, and the detectives in this case,

17 correct?

18 A.   And my lawyer.

19 Q.   And your lawyer, correct?

20 A.   Correct.

21 Q.   But no one from Mr. Palma Flores's defense team, correct?

22 A.   No.

23 Q.   Now, when you first met with law enforcement, first spoke

24 with them, a couple of days after Mr. Brown had been killed,

25 you told them a different story than what you've told here

1    today, correct?

2    A.    Yes, sir.

3    Q.    You told them a different story about what your

4    whereabouts were, correct?

5    A.    Yes, sir.

6    Q.    Now, at that point in time no one had told you that you

7    were identified as a suspect in Mr. Brown's death, correct?

8    A.    No.

9    Q.    This is back in October of 2019, correct?

10   A.    Yes.

11   Q.    But at some point in time things changed, correct?

12   A.    Uh-huh.

13   Q.    You learned that law enforcement actually had identified

14   you as a target of their criminal investigation, correct?

15   A.    Yes.

16   Q.    And you were informed that they believed you played a

17   role in Mr. Brown's death, correct?

18   A.    Yes.

19   Q.    And after you found that out, your story changed,

20   correct?

21   A.    Yeah, you can say that.

22   Q.    That's when it became, well, no, Melvin did it, correct?

23   A.    Repeat that.

24   Q.    That's when you told law enforcement for the first time

25   that it was Melvin who did it, correct?

1  A.    Yes.

2  Q.    That was after they told you that you were a target and

3  they believed that you had killed Mr. Brown, correct?

4  A.    Well, they didn't tell me I was a target.  They just

5  questioned me.

6  Q.    But, did you not on January 2nd, 2020, receive a letter

7  from assistant U.S. Attorney Michael Ben'Ary dated January

8  2nd, 2020, that reads as follows:  "This is to inform you that

9  you are currently the target of a federal grand jury

10 investigation in the Eastern District of Virginia."

11          Do you remember receiving a letter like that?

12 A.    I probably did but I didn't read into it.

13 Q.    Well, can you take a look at the binder book,

14 Government's Exhibit No. 14.  Take a look at that and tell me

15 if you recognize that.

16 A.    I'm looking at it.

17 Q.    Do you recognize it?

18 A.    Yes, I recognize it.

19 Q.    Is that the letter that you received?

20 A.    Yes.

21 Q.    Does that letter not inform you, sir, that you were the

22 target of a federal grand jury investigation?

23 A.    Yes.

24 Q.    And this is, again, at this point in time your story is

25 you were someplace else, correct?

1  A.    Uh-huh.

2  Q.    And then after you got this letter, things changed,

3  correct?

4  A.    No, no, no, not at all.  After she told me that, that's

5  when I was thinking about it, and then that's when I agreed to

6  sign all these papers.

7  Q.    Well, the truth of the matter is you didn't sign any

8  papers until about three weeks after you got this letter,

9  correct?

10  A.    I'm not really sure.

11  Q.    Well, let's take a look at Government's Exhibit 15 which

12  has already been admitted.

13        Is this the letter that you identified in responding

14  to the prosecutor's questions about your proffer agreement?

15  A.    I think it was another paper.

16  Q.    Well, is this the letter that you identified on direct

17  examination as your proffer agreement?

18  A.    Yes.

19  Q.    And it is dated January the 24th, 2020, correct?

20  A.    This page right here?

21  Q.    Yes.

22  A.    No.

23  Q.    At the very top.

24  A.    No.  January 2nd.

25  Q.    Well, that's Exhibit 14, correct?  Look at the bottom.  I

1  want you to take a look at Exhibit 15.

2  A.    Okay.  The 24th.

3  Q.    That's 22 days after you got the target letter, correct?

4  A.    Yes.

5  Q.    Now, according to this agreement -- it was signed by you,

6  correct, page 3?

7  A.    Yeah.

8  Q.    And it was signed by you on February the 4th, 2020,

9  correct?

10  A.    Yes.

11  Q.    That's about 32 days after you got the target letter,

12  correct?

13  A.    Yes.

14  Q.    And up until this point, your story has been you weren't

15  with Melvin that night, correct?

16  A.    Up until this point?

17  Q.    Up until this point.

18  A.    Yeah.

19  Q.    Now, according to this agreement, I believe you testified

20  on direct examination you were obligated to tell the truth,

21  correct?

22  A.    Yes.

23  Q.    When you testified, correct?

24  A.    Yes.

25  Q.    Who determines whether you told the truth?

1  A.   Myself.

2  Q.   Do I get to determine whether you told the truth?

3  A.   You could.

4  Q.   By the terms of your agreement, do I get to determine

5  whether you've told the truth?

6  A.   No, no.

7  Q.   According to the terms of this agreement, does Melvin

8  Flores get to determine whether you told the truth?

9  A.   No.

10  Q.   According to this agreement, did Melvin Flores sign this

11  agreement?

12  A.   No.

13  Q.   Did I sign this agreement?

14  A.   No.

15  Q.   Who's this agreement with?

16  A.   The officials.

17  Q.   It's with the people seated over here, correct?

18  A.   Yes, sir.

19  Q.   And as far as you know, they have the ability to charge

20  you with a crime, correct?

21  A.   Yes, sir.

22  Q.   You don't want to be charged with a crime now, do you?

23  A.   No, sir.

24  Q.   You certainly don't want to be charged with a homicide,

25  do you?

1  A.   No, sir.

2  Q.   I can't charge you with a crime, correct?

3  A.   No.

4  Q.   According to this agreement, they get to determine

5  whether or not you're telling the truth, correct?

6  A.   Yes.

7  Q.   What happens -- what's your understanding of what happens

8  if you say something inconsistent with what they want you to

9  say?

10 A.   Then I'll be in trouble.

11 Q.   You'll be in trouble, right?  So you've got to say the

12 story the way they want you to say it, correct?

13 A.   No.

14 Q.   Well, you said that if you don't say it the way they want

15 you to say it, you could be in trouble, correct?

16 A.   No.  If I'm lying, I can be in trouble.

17 Q.   They determine if you're lying, correct?

18 A.   Yeah, sure.  Yes, sir.

19 Q.   Now, at some point in time you testified that you got a

20 letter from Ms. Laila Sheehy, correct?

21 A.   I'm not sure of her last name but Laila.

22 Q.   And you said she sent this to you by Snapchat, right?

23 A.   Yes, sir.

24 Q.   And at this point in time, is it fair to say you and

25 Laila are having a friendly relationship?

1    A.    Yes, you can say that.

2    Q.    Is it sexual in nature?

3    A.    It is.

4    Q.    It is sexual in nature?

5    A.    Yes, sir.

6    Q.    So you and Laila are having sex?

7    A.    Well, one time.

8    Q.    You know Laila is Mr. Palma Flores's girlfriend at that

9    point in time, right?

10   A.    Yes.

11   Q.    And you and Mr. Palma Flores, you've been friends since

12   elementary school, correct?

13   A.    Yes.

14   Q.    And you're sleeping with his girlfriend, correct?

15   A.    Yes.

16   Q.    And she sends you a copy of this letter, Government's

17   Exhibit 34, right?  You want to take a look at it?

18   A.    Yes, please.

19   Q.    And in this letter I think you've already testified that

20   your understanding, your interpretation of this letter is that

21   Mr. Palma Flores is telling Laila that you were the person

22   responsible for taking Mr. Brown's life, correct?

23   A.    Yes, that's what the letter says.

24   Q.    He's saying that you're the one that got out of the car

25   and went and shot Mr. Brown, correct?

1  A.    Yes.

2  Q.    And what he's saying is that earlier that day when he was

3  robbed, the marijuana that was taken from him actually

4  belonged to you, correct?

5  A.    Yes, that's what he says.

6  Q.    And what he's saying is that you were upset that Qwa had

7  caused the marijuana that belonged to you to be taken from Mr.

8  Palma Flores, that's what the letter says, correct?

9  A.    Yes.

10  Q.    And that you were upset about that, correct?

11  A.    Yes.

12  Q.    And that you used your Snapchat account to contact

13  Mr. Brown on that night, that's what the letter says, correct?

14  A.    Yes.

15  Q.    And it is true that your Snapchat account, not Mr. Palma

16  Flores's, was in contact with Mr. Brown on that evening,

17  correct?

18  A.    Yes, sir.

19  Q.    And it is true that you were in the vicinity of

20  Mr. Brown's apartment on the night that he was murdered,

21  correct?

22  A.    Yes, sir.

23  Q.    And it is true that during that period you were using

24  marijuana, correct?

25  A.    Not in the car, no.

1  Q.   Well, on that day, correct?

2  A.   Yes, yes.

3  Q.   And you not only used marijuana, Mr. Worlds, but let's be

4  honest, you also sold marijuana, correct?

5  A.   Yes, sometimes.

6  Q.   From time to time, correct?

7  A.   Yes.

8  Q.   And one of your customers was Mr. Palma Flores, correct?

9  A.   Probably once or twice.

10  Q.   Sometimes he bought marijuana from you too, correct?

11  A.   Yes.

12  Q.   And sometimes what you did, when I say sell marijuana to

13  him, you fronted the marijuana to him, correct?

14  A.   No.

15  Q.   You never fronted it?

16  A.   No.

17  Q.   Are you familiar with the term, "fronted"?

18  A.   Yes, sir.

19  Q.   Can you explain to the ladies and gentlemen of the jury

20  what do I mean by fronting?

21  A.   Fronting is basically say if I give him $40, I'm going to

22  front you this $40, just get it back to me, that's basically

23  fronting.

24  Q.   After he sells the weed, correct?

25  A.   Yeah, I'll receive the money.

1  Q.   So if he doesn't sell the weed, you don't get the money

2  back, right?

3  A.   Yeah.

4  Q.   So you've got to have an interest in that weed that you

5  just gave him, correct?

6  A.   Uh-huh.

7  Q.   You need him to be able to sell it in order for you to

8  get your money back, correct?

9  A.   Yes.

10 Q.   He doesn't sell it, you don't get your money back,

11 correct?

12 A.   Uh-huh.

13 Q.   And you do recall that at least on one occasion, if not

14 more, you did front weed to Melvin Palma Flores?

15 A.   No, I did not.

16 Q.   You never did?

17 A.   Never.

18 Q.   But you're familiar with the term?

19 A.   Yes.

20 Q.   How long have you been selling weed?

21 A.   Probably like on and off like 8th grade, 7th grade.

22 Q.   Started selling?

23 A.   8th grade, 7th grade.

24 Q.   And you know other people who sell marijuana too,

25 correct?

1  A.    Yes.

2  Q.    Do you know someone named Jude?

3  A.    Yes.

4  Q.    Who is Jude?

5  A.    A white guy, one of my friends.

6  Q.    What's his relationship to you?

7  A.    Friend.

8  Q.    Friend?

9  A.    Yeah.

10 Q.    Also sells weed?

11 A.    Sometimes, here and there.

12 Q.    And people like you who sell weed, sometimes you get

13 robbed, right?

14 A.    Me?  I never got robbed.

15 Q.    I'm asking you, you're someone who has experience in

16 selling marijuana, correct?

17 A.    Yes.

18 Q.    You know other people who sell marijuana, correct?

19 A.    Yes.

20 Q.    Is it not true that sometimes marijuana dealers get

21 robbed?

22 A.    Possible.

23 Q.    In fact, your friend Jude was robbed, correct?

24 A.    Possible.

25 Q.    Well, I'm not asking you if it's possible.  I'm asking

1  you, isn't it true that your friend, the marijuana dealer,

2  Jude, was robbed?

3           MR. BEN'ARY:  I object to the relevance of whether

4  or not this other person who's not part of this trial got

5  robbed.

6           THE COURT:  I'll give you a little latitude, Mr.

7  Jenkins, but move on.

8           MR. JENKINS:  Thank you.

9  BY MR. JENKINS:

10  Q.   Your friend, correct?

11  A.   Yes.

12  Q.   And you knew Mr. Brown, correct?

13  A.   I did.

14  Q.   Mr. Brown was in the business of robbing drug dealers,

15  wasn't he?

16  A.   Yes.

17  Q.   And he robbed your friend Jude, correct?

18  A.   Yes.

19  Q.   Did he ever rob you?

20  A.   No.

21  Q.   And your understanding was that he also robbed your other

22  friend, Mr. Melvin Palma Flores, correct?

23  A.   Yes.

24  Q.   And he robbed him of marijuana that actually belonged to

25  you, correct?

1  A.   No.

2           MR. JENKINS:  Court's indulgence.

3           THE COURT:  Yes, sir.

4  BY MR. JENKINS:

5  Q.   Sir, you've testified that you consumed marijuana,

6  correct?

7  A.   Yes.

8  Q.   Also fentanyl, correct?

9  A.   Yes.

10  Q.   What about Percocet?

11  A.   No, not Percocet because -- all right, yeah, they're

12  Percocets, but like fentanyl is in the Percocet, so I guess,

13  yeah.

14  Q.   So you were responding to Mr. Ben'Ary and you said

15  fentanyl, you were including the Percocet pills?

16  A.   Yeah, it's the same, yeah.

17  Q.   When is the last time you talked to Laila?

18  A.   Earlier this year.

19  Q.   After Laila sent you that Snapchat picture of the letter

20  in which Mr. Palma Flores was revealing you as the shooter of

21  Mr. Brown, how did it make you feel?

22  A.   Feel sad.

23  Q.   You were angry?

24  A.   Yeah.

25  Q.   You were angry with Mr. Palma Flores, correct?

1  A.    Yeah.  Angry, sad, yeah.

2  Q.    You were going to get him back, right?

3  A.    No.  How would I get him back?

4  Q.    Well, did you kill Mr. Brown?

5  A.    No.

6  Q.    You were angry that Mr. Palma Flores was saying in this

7  letter that you had killed him, correct?

8  A.    Yes.

9  Q.    That didn't make you angry with Mr. Palma Flores?

10  A.    Yeah, angry and sad, why would he do something like that.

11          MR. JENKINS:  No further questions, Your Honor.

12          THE COURT:  Redirect.

13                  REDIRECT EXAMINATION

14  BY MR. BEN'ARY:

15  Q.    Mr. Worlds --

16  A.    Yes, sir.

17  Q.    -- when you met with the prosecutors and the detectives

18  and agents and your lawyer, did anyone ask you to do anything

19  other than tell the truth?

20  A.    Not at all.

21  Q.    When you initially told the police that you were at your

22  friend's -- other friend's house, Kevin's house, right?

23  A.    Yes, sir.

24  Q.    Why did you tell the police that you were at Kevin's

25  house?  Did somebody ask you to do that?

1  A.   Yeah.

2  Q.   Who was that?

3  A.   Melvin.  He didn't ask me to say Kevin but he asked me

4  to say a friend.

5  Q.   Now, did you understand when you were identified as a

6  target of the investigation, that you were identified as a

7  target because your Snapchat account was connected to Qwa

8  Brown's Snapchat account?

9  A.   Yes, sir.

10        MR. JENKINS:  Objection, Your Honor.  Leading.

11        THE COURT:  Watch your form.

12        MR. BEN'ARY:  I understand, Your Honor.  Thank you.

13  BY MR. BEN'ARY:

14  Q.   Can you tell the members of the jury whether or not you

15  believe you were ever a suspect in terms of being the one that

16  shot and killed Qwa Brown?

17  A.   Not at all.

18  Q.   And the proffer letter that you looked at a couple of

19  times, Exhibit 15, do you understand -- do you believe that

20  that that gives you immunity from charges?

21        MR. JENKINS:  Objection to the leading nature of the

22  question, Your Honor.

23        THE COURT:  A leading question requires a

24  suggestion.  There wasn't a suggestion.  You can answer yes or

25  no.

1  BY MR. BEN'ARY:

2  Q.   Do you understand whether or not that proffer letter

3  gives you immunity from charges?

4  A.   It doesn't.

5  Q.   Do you have that letter, 34, in front of you?

6         MR. BEN'ARY:  And at this point, I'm going to move

7  to enter 34 into evidence, it's the subject of one of the

8  stipulations.

9         MR. JENKINS:  No objection, Your Honor.

10         THE COURT:  Very good.

11         (Government's Exhibit No. 34 was admitted into

12  evidence.)

13         MR. BEN'ARY:  Can we pull up 34, please.  Just the

14  first page.  Thank you.

15  BY MR. BEN'ARY:

16  Q.   Is what you're looking at in the binder, the same page

17  that's on the screen?

18  A.   Yes, sir.

19  Q.   And I want you to look at the sentence that is on like

20  the 5th line that starts, "Laila what..."  Do you see what I'm

21  talking about there?

22  A.   "Laila, what I have been thinking about is that if they

23  make you testify, that you can say that the whole reason we

24  got into it -- an argument that night is because you wanted to

25  tell the police that Kollin did it but that I did not want you

1  to tell because he threatened to kill you, my family, and me

2  because he slept over at my house, so he knew where I lived,

3  so I was scared."

4  Q.   Okay.   Was the weed that Qwa set up Melvin to be robbed

5  of earlier that day your weed?

6  A.   No.

7           MR. BEN'ARY:  Those are my questions, Your Honor.

8  Thank you.

9           THE COURT:  Is this witness subject to recall?

10          MR. BEN'ARY:  Not by the United States.

11          MR. JENKINS:  No, Your Honor.  Thank you.

12          THE COURT:  Sir, you're free to go.  Please do not

13 discuss the case or any aspect of the case with anyone while

14 the case is pending.

15          THE WITNESS:  Yes, sir.

16          (Witness excused.)

17          MR. BEN'ARY:  Your Honor, if I neglected to move to

18 admit the proffer letter, Exhibit 15, I would move to admit

19 that now.

20          THE COURT:  Any objection, Mr. Jenkins?

21          MR. JENKINS:  No objection, Your Honor.

22          THE COURT:  15.

23          (Government's Exhibit No. 15 was admitted into

24 evidence.)

25          THE COURT:  And how about 14?

1            MR. BEN'ARY:  Yes, I'll move to admit it.

2            THE COURT:  Without objection, is that correct, Mr.

3    Jenkins?

4            MR. JENKINS:  No objection, Your Honor.

5            (Government's Exhibit No. 14 was admitted into

6    evidence.)

7            THE COURT:  All right.  Ladies and gentlemen, we're

8    going to go ahead and take a little bit of a break here, our

9    early morning -- actually late morning break.  We'll come back

10   in at about 11:35.  11:35.

11           Remember the Court's instruction, do not discuss the

12   case or any aspect of the case with anyone.  Thank you, ladies

13   and gentlemen.  You may retire.

14           (Recess.)

15           THE COURT:  Ready to bring the jury back?

16           MS. RUMBAUGH:  Yes, Your Honor.

17           (Jury present.)

18           THE COURT:  You may be seated.

19           Ladies and gentlemen, I'm sure you lived up to the

20   Court's instructions and did not discuss the case or any

21   aspect of the case with anyone?  But we appreciate your

22   attention to this matter.

23           Next witness.

24           MS. RUMBAUGH:  Yes, Your Honor.  The United States

25   calls Hector Flores.

1          THE COURT:  Hector Flores.

2          (Government's witness, Hector Flores, sworn.)

3          (Witness seated.)

4          THE COURT:  Sir, if you're fully vaccinated and

5    you're comfortable doing so, you may remove your mask while

6    you're testifying.

7                    DIRECT EXAMINATION

8    BY MS. RUMBAUGH:

9    Q.   Good morning, sir.

10   A.   Good morning.

11         THE COURT:  You need to get a little closer to the

12   mike.  Thank you.

13   BY MS. RUMBAUGH:

14   Q.   Sir, could you state your first and last name for the

15   benefit of the jury?

16   A.   Hector Flores.

17   Q.   And can you spell those names for the benefit of the

18   court reporter?

19   A.   H-e-c-t-o-r F-l-o-r-e-s.

20   Q.   Mr. Flores, how old are you?

21   A.   24.

22   Q.   And where do you currently live?

23   A.   Full address?

24   Q.   City.

25   A.   Arlington, Virginia.

1  Q.   Now, Mr. Flores, do you have any sort of agreement with

2  the United States if you testify here?

3  A.   I'm sorry?

4  Q.   Do you have any sort of like immunity agreement or

5  benefit with the United States to be testifying here today?

6  A.   No.

7  Q.   Do you understand that you have a right under the Fifth

8  Amendment not to incriminate yourself?

9  A.   Yes.

10  Q.   Now, Mr. Flores, make sure you speak up so the jury can

11  hear you and feel free to ask me to repeat a question if you

12  can't understand it.

13  A.   All right.

14  Q.   Do you know Melvin Palma Flores?

15  A.   I do.

16  Q.   Do you see him here in the courtroom today?

17  A.   I do.

18  Q.   Would you please identify him by where he's sitting and

19  what he's wearing?

20  A.   He's sitting on my left-hand side wearing a tie, dress

21  shirt.

22       MS. RUMBAUGH:  Your Honor, let the record reflect

23  the witness has identified the defendant.

24       THE COURT:  It shall so reflect.

25  BY MS. RUMBAUGH:

1    Q.    Mr. Flores, how do you know Melvin Palma Flores?

2    A.    He's my cousin.

3    Q.    Now, Mr. Flores, I'm going to ask you a little bit about

4    your own background and any prior drug use you may have.

5          Do you have any prior criminal convictions?

6    A.    No.

7    Q.    Do you have a conviction for marijuana possession?

8    A.    Yes.

9    Q.    Now, do you use illegal drugs?

10    A.    No.

11    Q.    Have you used illegal drugs in the past?

12    A.    No.

13    Q.    Have you used marijuana in the past?

14    A.    Yes.

15    Q.    Do you know that marijuana is still illegal at the

16    federal level?

17    A.    Well...

18    Q.    How often did you use marijuana in the past?

19    A.    In the past, used to be every day.

20    Q.    All right. And I'm going to ask you questions about late

21    October of 2019.

22    A.    All right.

23    Q.    How often were you using marijuana around that time?

24    A.    Probably the same, every day.

25    Q.    Every day?

1    A.    Yeah.

2              THE COURT:  Just speak up, sir.

3              THE WITNESS:  All right.

4    BY MS. RUMBAUGH:

5    Q.    Mr. Flores, are you currently under the influence of any

6    drugs, including marijuana or alcohol?

7    A.    No.

8    Q.    Is there anything about your prior drug use that prevents

9    you from answering my questions truthfully?

10   A.    No, ma'am.

11   Q.    Now, as I said, I'm going to ask you some questions about

12   late October of 2019.  Do you recall around that time frame

13   being woken up by a late night phone call from your cousin,

14   Mr. Palma Flores?

15   A.    I do.

16   Q.    Do you remember approximately what time that phone call

17   came in?

18   A.    I want to say like around 1 a.m.

19   Q.    So 1 a.m.?

20   A.    Yeah.

21   Q.    Okay.  And did you receive one phone call or more than

22   one phone call?

23   A.    It was two phone calls.

24   Q.    And did you answer the first phone call?

25   A.    The first one woke me up, the second one I answered.

1  Q.   So were you sleeping at the time the first phone call

2  came in?

3  A.   Correct.

4  Q.   When you answered the second phone call, what did Mr.

5  Palma Flores say to you?

6  A.   He told me to meet him outside and to bring a lighter.

7  Q.   To bring a lighter?

8  A.   Yes.

9  Q.   Okay.  And where were you living at the time?

10 A.   Where I'm currently at right now.

11 Q.   And I know I said just the city earlier, but can you give

12 us the exact address?

13 A.   4311 North Pershing Drive, Arlington, Virginia.

14 Q.   Now, how -- did you actually go outside?

15 A.   Yes.

16 Q.   How soon after the phone call that you answered did you

17 go outside?

18 A.   It took me like a minute or two to throw on some clothes.

19 Q.   And was Mr. Palma Flores already there when you went

20 outside?

21 A.   Yes.

22 Q.   He was already there?

23 A.   Yes, he was.

24 Q.   Did you have a lighter with you?

25 A.   I did.

1   Q.   Did you give him the lighter?

2   A.   Yes.

3   Q.   What did he do with the lighter?

4   A.   We walked over to the stairs that led down to a storm

5   drain, and he put a shirt on the storm drain and lit it up.

6   Q.   He set it on fire?

7   A.   Yes.

8   Q.   Do you remember anything in particular about the shirt

9   color, anything like that?

10  A.   I recall that it was white, I believe.

11  Q.   That night, did he explain to you why he was burning an

12  article of clothing in the middle of the night?

13  A.   No.

14  Q.   Did he say anything else to you that night about what had

15  happened?

16  A.   No.

17  Q.   Later on, did you ask him about it?

18  A.   Yes.

19  Q.   And approximately how long after that night did you ask

20  him about it?

21  A.   It must have been like a month or two after.

22  Q.   And what did he say?

23  A.   So I asked him what happened that night, and he was like,

24  I killed somebody, and I was shocked.  I couldn't ask anything

25  else.

1          MS. RUMBAUGH:  Court's indulgence.

2          I have no further questions.  Please answer any

3   questions that Mr. Jenkins may ask you.

4          THE WITNESS:  All right.

5          THE COURT:  Mr. Jenkins, cross.

6                    CROSS-EXAMINATION

7   BY MR. JENKINS:

8   Q.    Good afternoon, Mr. Flores.

9          Mr. Flores, is it your testimony that sometime in

10  October of 2019 you got two phone calls late at night from

11  your cousin, correct?

12  A.    Correct.

13  Q.    And he asked you to meet him outside, correct?

14  A.    Correct.

15  Q.    And on that evening he didn't tell you that he had killed

16  anybody, correct?

17  A.    Correct.

18  Q.    He didn't tell you that he had shot anybody, right?

19  A.    No.

20  Q.    And then it's your testimony that about two months or

21  thereafter, that's when he told you, I killed somebody?

22  A.    It was about a month after.

23  Q.    About a month after?

24  A.    A month or two.

25  Q.    So this is still in, what, November of 2019?

1  A.    Correct.

2  Q.    Somewhere about there?

3  A.    Yes.

4  Q.    And the story that you have given to this jury today,

5  when's the first time you told anyone in law enforcement that

6  version?

7  A.    What version?

8  Q.    When was the first time you told anybody in law

9  enforcement that your cousin told you, I killed somebody?

10  A.    Back when I had an interview with the detective.

11  Q.    And that would have been this year, correct, 2021?

12  A.    It might have been last year.  I don't recall.

13  Q.    Well, at the time that you met with -- you met with

14  Detective Wallace, correct?

15  A.    Correct.

16  Q.    You went down to her office or the police station to meet

17  with her, correct?

18  A.    Correct.

19  Q.    And at that point in time you had been interviewed by me,

20  by telephone, correct?

21  A.    Yes.

22  Q.    You also had been interviewed by an investigator working

23  for my office, correct?

24  A.    I don't recall.

25  Q.    A Mr. Eddie Colindres?

1  A.   I don't recall.

2  Q.   Well, do you not recall his name or do you not recall

3  speaking with him?

4  A.   Both.

5  Q.   You don't speaking with him at all?

6  A.   I don't recall that.

7  Q.   Well, do you recall speaking to anyone from my office?

8  A.   No.

9  Q.   But you do recall speaking with me?

10  A.   Yes.

11  Q.   And you would agree with me that up until that point in

12  time, you had not told anybody in law enforcement that your

13  cousin told you, I killed somebody?

14  A.   Correct.

15  Q.   In fact, you hadn't told anybody that, correct?

16  A.   No.

17  Q.   But at that point in time when you met with Detective

18  Wallace, were you aware of a supposed letter that your cousin

19  had written and given to Ms. Sheehy, Laila?

20  A.   Yeah, I'm aware of that.

21  Q.   You're aware of that, right?  And you were aware of this

22  letter before you met with Detective Wallace, correct?

23  A.   I believe so.

24  Q.   And you had some concerns over that letter when you met

25  with Detective Wallace, correct?

1    A.    Yeah.  My name was on it, so yeah.

2    Q.    Your name was in it, correct?  Where your cousin was

3    identifying you as having something to do with the events

4    surrounding the October 2019 incident, correct?

5    A.    Can you repeat that?

6    Q.    Well, what concerned you about your name being in that

7    letter?

8    A.    I mean, just my name being on there, I'm like...

9    Q.    Well, you were concerned that you could get in trouble,

10   correct?

11   A.    Yes.

12   Q.    You were concerned that you could possibly even be

13   charged with an offense, correct?

14   A.    I mean, yeah.  I was pretty scared.  I try to stay out of

15   trouble, you know.

16   Q.    And you didn't want that to happen, correct?

17   A.    (Witness shaking head.)

18   Q.    And you knew at that point in time that your cousin had

19   been identified as a suspect, correct?

20   A.    Yes.

21   Q.    You knew he had been arrested for the offense, correct?

22   A.    Yes.

23   Q.    And you were in contact during this period of time with

24   Laila, correct?

25   A.    No.

1  Q.   You didn't speak with Laila?

2  A.   No.

3  Q.   Well, you were in contact with other members of your

4  family who knew that your cousin had been arrested, correct?

5  A.   No.

6  Q.   You hadn't spoken to Jasmine?

7  A.   No.  I didn't talk to her in a while.

8  Q.   Prior to meeting with Detective Wallace, did you speak

9  with Jasmine at all?

10  A.   Just one phone call.

11  Q.   Okay.  Well, who is Jasmine?

12  A.   My cousin.

13  Q.   Mr. Palma Flores's sister, correct?

14  A.   Correct.

15  Q.   His older sister, correct?

16  A.   Correct.

17  Q.   And prior to meeting with Detective Wallace, you had

18  spoken with Jasmine, correct?

19  A.   Yeah, one phone call.

20  Q.   And this conversation with Detective Wallace, I wasn't

21  present there, correct?

22  A.   Correct.

23  Q.   Mr. Palma Flores, your cousin, wasn't there, correct?

24  A.   Correct.

25  Q.   And as you sit here today, you don't think I have the

1   power to charge you with any criminal offense, right?

2   A.   Correct.

3   Q.   You don't think I have the power to keep you out of jail,

4   correct?

5   A.   (Witness nods head.)

6   Q.   But you did understand that Detective Wallace had power

7   to charge you with a criminal offense, correct?

8   A.   Yeah.

9   Q.   And when you met with her, you were concerned that that

10  could happen, correct?

11  A.   Correct.

12  Q.   And for the very first time a year-and-a-half after the

13  murder, you disclosed for the very first time that your cousin

14  supposedly told you, I killed somebody, is that true?

15  A.   It's true.

16  Q.   Nobody else was around when this happened, correct?

17  A.   It was just me and him.

18  Q.   It wasn't recorded or anything like that?

19  A.   No.

20  Q.   After this supposed confession, you didn't call the

21  police and say, Hey, I know who killed Mr. Brown?

22  A.   I didn't know the person's name and I was shocked.

23  Q.   You just didn't say anything, correct?

24  A.   Correct.

25  Q.   Until you were threatened by law enforcement with being

1   charged?

2   A.   I wouldn't really call it threatened, but yeah.

3   Q.   Well, until you became concerned that you might be

4   charged?

5   A.   Correct.

6   Q.   And since you made that disclosure to law enforcement, do

7   you have any further concerns about being charged?

8   A.   No.

9   Q.   All your concerns just went away?

10  A.   Yeah, I guess.

11          MR. JENKINS:  No further questions, Your Honor.

12          THE COURT:  Redirect.

13          MS. RUMBAUGH:  Yes, Your Honor.

14                    REDIRECT EXAMINATION

15  BY MS. RUMBAUGH:

16  Q.   Now, Mr. Flores, has anyone from the government

17  threatened you with being charged with any offense?

18  A.   No.

19  Q.   Okay.  Now, you heard Mr. Jenkins ask you about what your

20  cousin told you and why you didn't immediately call the

21  police.

22          Can you explain why you didn't go to the police with

23  the information he told you?

24  A.   I mean, like I said, I was still shocked of what he told

25  me.  And I didn't know the victim's name or anything or who to

1   contact.

2   Q.   And again, Mr. Palma Flores is your cousin, correct?

3   A.   Correct.

4   Q.   Since Mr. Jenkins brought up the letter, it was the case

5   that you were aware of the letter that mentioned your name in

6   it, is that right?

7   A.   Yeah.

8           MS. RUMBAUGH:  Could we please pull up Government's

9   Exhibit 34, page 5.  And specifically can we zoom into the

10  last, say, three lines of the letter.

11  BY MS. RUMBAUGH:

12  Q.   Mr. Flores, I'm going to have you read a portion of this

13  letter to the jury, and we're to go from the bottom of page 5

14  into the top of page 6.  Can you start reading from where it

15  says, "Also, Babe..."

16  A.   "Also, Babe, since you mentioned my" --

17  Q.   Next page.  And then zoom into let's say the top half of

18  this page.  Continuing on, Mr. Flores.

19  A.   "My cousin Hector, you've got to tell him the plan and

20  tell him if he's willing to testify and say that I came to his

21  house to tell him everything because I was afraid that Kollin

22  was going to kill me to tie up the loose ends.  Just in case

23  the feds try to interrogate him if you tell Jason, Hector or

24  Bryan to testify on my behalf, that is good because that way

25  we can cause some confusion in the court, that way the jury

1  does not find me guilty because..."

2  Q.   You can stop right there, thank you.

3          Mr. Flores, is that story true?

4  A.   No.  I don't know any of those names mentioned in there.

5          MS. RUMBAUGH:  Thank you.  Nothing further.

6          THE COURT:  Thank you, sir.  You may step down.

7  Please do not discuss the case or any aspect of the case with

8  anyone while the case is pending.

9          MS. RUMBAUGH:  Your Honor, he's not subject to

10  recall from the government.

11          THE COURT:  Not subject to recall, Mr. Jenkins?

12          MR. JENKINS:  No, Your Honor.

13          THE COURT:  Thank you.  Next witness.

14          (Witness excused.)

15          MS. RUMBAUGH:  The United States calls Laila Sheehy.

16          THE COURT:  Laila Sheehy or Sheehy.

17          MS. RUMBAUGH:  Your Honor, I've heard it both ways.

18          MR. BEN'ARY:  Your Honor, can I just ask, I think

19  when I'm sitting in my normal seat over here, I might be

20  obstructing some of the jurors' views.  That's why I moved

21  back.

22          THE COURT:  That's fine.  Wherever you're

23  comfortable, just as long as you're on your side of the

24  courtroom.

25          (Government's witness, Laila Sheehy, sworn.)

1          THE COURT:  Ma'am, if you're fully vaccinated and

2    comfortable doing so, you may remove your mask while you're

3    testifying.

4          You can have a seat.

5          (Witness seated.)

6                    DIRECT EXAMINATION

7    BY MS. RUMBAUGH:

8    Q.   Good morning, ma'am.

9    A.   Good morning.

10   Q.   Please state your full name for the benefit of the jury.

11   A.   Laila Sheehy.

12   Q.   And can you spell your first and last name.

13   A.   L-a-i-l-a S-h-e-e-h-y.

14   Q.   Again, how do you pronounce your last name?

15   A.   Sheehy.

16   Q.   Ms. Sheehy, how old are you?

17   A.   Twenty years old.

18   Q.   Where do you currently live?

19   A.   Arlington, Virginia.

20   Q.   Ms. Sheehy, are you represented by an attorney?

21   A.   Yes.

22   Q.   And is your attorney here today?

23   A.   Yes.

24   Q.   Have you had an opportunity to consult with your attorney

25   about the testimony you're about to give?

1   A.   Yes.

2   Q.   Do you understand that you have a right under the

3   Constitution not to incriminate yourself?

4   A.   Yes.

5   Q.   Do you have any sort of immunity agreement or agreement

6   for any sort of benefit with the United States for testifying

7   here today?

8   A.   No.

9   Q.   Now, Ms. Sheehy, may I ask you to make sure that you

10  speak up into the microphone so that the jury can all hear

11  you, and if you can't understand a question I ask you, please

12  ask me to repeat it, okay?

13  A.   Okay.

14  Q.   Do you know Melvin Palma Flores?

15  A.   Yes.

16  Q.   Do you see him in the courtroom here today?

17  A.   Yes.

18  Q.   Could you please identify him by where he's sitting and

19  what he's wearing?

20  A.   In the front, he has a khaki shirt on.

21          MS. RUMBAUGH:  Your Honor, I'd ask that the record

22  reflect that the witness has identified the defendant.

23          THE COURT:  It shall so reflect.

24  BY MS. RUMBAUGH:

25  Q.   Ms. Sheehy, I'm going to ask you a little bit about your

1  background, okay?

2  A.    Okay.

3  Q.    Do you have any prior criminal convictions?

4  A.    No.

5  Q.    Are you currently under the influence of drugs or

6  alcohol?

7  A.    No.

8  Q.    Have you used illegal drugs, including marijuana, in the

9  past?

10  A.    Yes.

11  Q.    What illegal drugs have you used?

12  A.    Opioids, THC, alcohol.

13  Q.    So, Percocets?

14  A.    Yes.

15  Q.    And you said THC as well, correct?

16  A.    Yes.

17  Q.    And alcohol?

18  A.    Yes.

19  Q.    Ms. Sheehy, is there anything about your prior drug use

20  or alcohol use that you think will make it difficult for you

21  to honestly answer my questions here today?

22  A.    No.

23  Q.    Now, Ms. Sheehy, have you been diagnosed with any sort of

24  mental health issues?

25  A.    Yes.

1   Q.   Can you please explain what mental health?

2   A.   Depression, bipolar depression, and bipolar disorder.

3   Q.   Are you currently taking any medication?

4   A.   No.

5   Q.   Were you previously taking medication for those

6   conditions?

7   A.   Yes.

8   Q.   Why did you stop taking your medication?

9   A.   Because of the way it made me feel.

10  Q.   Describe how it was making you feel.

11  A.   Loopy, like I wasn't -- I don't know how to explain.

12  Q.   Is there anything about your mental health issues sitting

13  here today that prevents you from recalling events truthfully

14  and answering my questions truthfully?

15  A.   No.

16  Q.   Now, how did you meet Mr. Palma Flores?

17  A.   Through a friend.

18  Q.   And approximately when was that?

19  A.   Like 2017, '18, something like that.

20  Q.   So a few years ago?

21  A.   Yes.

22  Q.   What was the nature of your relationship with Mr. Palma

23  Flores?

24  A.   He was my boyfriend.

25  Q.   And how long did that boyfriend/girlfriend relationship

1  last?

2  A.    About a year.

3  Q.    Do you indeed have a child in common with Mr. Palma

4  Flores?

5  A.    Yes.

6  Q.    Now, when you and Mr. Palma Flores were in a

7  relationship, did he have any sort of legitimate employment?

8  A.    No.

9  Q.    Did he sell drugs?

10  A.    Yes.

11  Q.    What kind of drugs did he sell?

12  A.    Marijuana.

13  Q.    Anything else?

14  A.    THC.  I don't know.

15  Q.    Was that THC cartridges?

16  A.    Yes.

17  Q.    Did you personally witness him selling drugs?

18  A.    Yes.

19  Q.    Did you know him to carry guns when he sold drugs?

20  A.    Yes, but not really.

21  Q.    Ms. Sheehy, take a moment, it's all right.

22         And I'm going to ask you again, did you know him to

23  carry guns while he was selling drugs?

24  A.    (Indiscernible.)

25  Q.    Why did he carry guns?

1  A.   So he wouldn't get robbed.

2  Q.   Did you know him to have been robbed in the past?

3  A.   Yes.

4  Q.   Were you personally with him when he was robbed?

5  A.   Yes.

6  Q.   Did you know someone named Kollin Worlds?

7  A.   Yes.

8  Q.   How did you meet Kollin the first time?

9  A.   Through Melvin.

10  Q.   Can you repeat that?

11  A.   Through Melvin.

12  Q.   Do you know Kollin and Melvin to be friends?

13  A.   Yes.

14  Q.   Did Kollin sometimes buy weed from Melvin?

15  A.   Yes.

16  Q.   Are you familiar with someone named Xyqwavius Brown or

17  Qwa?

18  A.   Yes.

19  Q.   I want to direct your attention to late October 2019.  Do

20  you remember going to Qwa's apartment complex with Melvin

21  Palma Flores and Kollin Worlds?

22  A.   Yes.

23  Q.   Where was the apartment complex, if you remember?

24  A.   Richmond Highway.

25  Q.   Ms. Sheehy, where were you earlier in the day before you

1    met up with Mr. Palma Flores?

2    A.    With some friends.

3    Q.    What were you guys doing?

4    A.    We went out for drinks and we went shopping.

5    Q.    Had you been using drugs that day?

6    A.    Yes.

7    Q.    What kind of drugs were you using?

8    A.    I had Percocet and I was smoking and drinking.

9    Q.    Were you smoking marijuana?

10   A.    Yes.

11   Q.    And you said you had used a Percocet?

12   A.    (Witness nods head.)

13   Q.    What kind of alcohol were you drinking?

14   A.    Vodka.

15   Q.    Do you remember how much vodka you had been drinking?

16   A.    No.

17   Q.    Ms. Sheehy, have you ever blacked out because of alcohol

18   that you drank or drugs that you've used?

19   A.    Not that I can remember.

20   Q.    And on that particular day, did you black out?

21   A.    No.

22   Q.    Now, while you were with your friends, was Mr. Palma

23   Flores reaching out to you?

24   A.    Yes.

25   Q.    How was he contacting you or trying to contact you?

1  A.   Through Instagram.

2  Q.   And what did he want?

3  A.   I don't know.  He just said that something was wrong and

4  he wasn't feeling well and he wanted to talk to me.

5  Q.   Did you eventually meet up with him that day?

6  A.   Yes.

7  Q.   Where did you meet up with him?

8  A.   My friend's neighborhood.

9  Q.   And is that in the Kingstowne area?

10 A.   Yes.

11 Q.   Who was with him?

12 A.   Kollin.

13 Q.   Do you remember if Mr. Palma Flores was driving a vehicle

14 when he came to meet you?

15 A.   I didn't see the vehicle that he was driving when he came

16 to meet me.

17 Q.   Okay.  Now, after you met up with Mr. Palma Flores, Mr.

18 Worlds, where did you go?

19 A.   To Richmond Highway.

20 Q.   Did you go to the apartment complex where Mr. Brown

21 lived?

22 A.   Yes.

23 Q.   How did you know how to get there, who was providing

24 directions?

25 A.   I didn't know how to get there.  Kollin was telling me

1  how to.

2  Q.   What was Mr. Worlds doing on the way over there?

3  A.   He was on the phone.

4  Q.   And were Mr. Worlds and Mr. Palma Flores passing the

5  phone back and forth?

6  A.   It was on the armrest.

7  Q.   So in the -- on the center console in the front seats?

8  A.   (Witness nods head.)

9  Q.   Do you know who they were -- do you know if they were in

10  contact with Qwa Brown?

11  A.   Yes.

12  Q.   Do you know what method they were using to communicate

13  with Mr. Brown?

14  A.   Snapchat.

15  Q.   Snapchat?

16  A.   (Witness nods head.)

17  Q.   When you all were on your way to Qwa Brown's apartment

18  complex, what was your understanding of why the three of you

19  were going over there?

20  A.   I didn't know.

21  Q.   Describe for me what happened when you arrived at Mr.

22  Brown's apartment complex.

23  A.   We just drove around.

24  Q.   Okay.  At some point, was the car parked?

25  A.   Yes.

1   Q.   And what happened then?

2   A.   Melvin got out of the car.

3   Q.   And did -- at some point did you see anyone else come up

4   to the car?

5   A.   No.  I saw Qwa walk past the car.

6   Q.   Sorry, can you say that again?

7   A.   I saw Qwa walk past the car.

8   Q.   At that point was Mr. Palma Flores in the car or out of

9   the car?

10  A.   He was out of the car.

11  Q.   What happened when Mr. Brown walked past the car?

12  A.   Melvin got back in the car.

13  Q.   Did Mr. Brown see Melvin at that point?

14  A.   I don't know, no.

15  Q.   What happened then after Melvin got back in the car?

16  A.   We went -- we went and parked.

17  Q.   Okay.  So did Mr. Palma Flores move the car?

18  A.   Yes.

19  Q.   And do you recall roughly where he moved it?  Was it up a

20  hill?

21  A.   Yes.

22  Q.   Okay.  Once the car was parked up the hill, what happened

23  next?

24  A.   Melvin got out of the car.

25  Q.   Where did he go?

1  A.   I don't know.  He just went down the hill.

2  Q.   All right.  What were you and Mr. Worlds doing in the car

3  when he got out?

4  A.   Nothing.  I was just wasn't talking to him.

5  Q.   After Melvin got out of the car, did he go out of your

6  line of sight?

7  A.   Yes.

8  Q.   What happened next?

9  A.   I heard the gunshots.

10  Q.   How many gunshots do you remember hearing?

11  A.   I don't know.

12  Q.   Was it more than one?

13  A.   Yes.

14  Q.   What happened then?

15  A.   Melvin came back to the car.

16  Q.   What was his -- what was he like, what was his demeanor

17  when he came back to the car?

18  A.   I don't know.  Shaky, I guess.

19  Q.   Sorry, can you repeat that?

20  A.   Shaky, I guess.

21  Q.   Do you remember noticing a distinct smell?

22  A.   Like I smelled like fire, fireworks, something like that,

23  I don't know.  Firecracker.

24  Q.   Firecrackers.  Okay.  Did he say anything when he came

25  back to the car?

1    A.    I can't remember.

2    Q.    Did you see him with a gun?

3    A.    I think so.  Yeah, I don't know.

4    Q.    Do you remember seeing a gun in his waistband?

5    A.    Yes.

6    Q.    All right.  What happened then?

7    A.    Oh, Jesus.  We left.

8    Q.    Where did you go?

9    A.    Back to where my friend lived.

10   Q.    Was that back to the Kingstowne area?

11   A.    Yes.

12   Q.    On the ride back to Kingstowne, did Mr. Palma Flores say

13   anything about what had happened?

14   A.    He was just -- he just saying he played with him or

15   something like that.  I don't remember.

16   Q.    Can you repeat that again?

17   A.    He said he was playing with him or something like that.

18   I don't remember.

19   Q.    Did he make any reference to a zip?

20   A.    Oh, yeah.

21   Q.    What is a zip?

22   A.    An ounce of weed.

23   Q.    And what did Mr. Palma Flores say in reference to the

24   zip?

25   A.    He wanted that zip so he can die with it.

1  Q.   Ms. Sheehy, please repeat that for the benefit of the

2  jury and the court reporter.

3          THE COURT:  Ms. Tinsley, if you could adjust the

4  mike just a bit.  Thank you.

5          THE WITNESS:  He wanted that zip so he can die with

6  it.

7          THE COURT:  If the court reporter could read back

8  the statement by the witness.

9          (The court reporter read into the record the

10  witness's last statement.)

11  BY MS. RUMBAUGH:

12  Q.   And again, Ms. Sheehy, is the zip an ounce of marijuana?

13  A.   Yes.

14  Q.   Now, did you come to find out that Mr. Palma Flores had

15  had -- I don't want to say an altercation because that implies

16  a fight but some sort of interaction with Mr. Brown earlier in

17  the day?

18  A.   I didn't know about that.

19  Q.   Did you find out about a robbery later?

20  A.   Yeah, like a couple weeks later.

21  Q.   Did you find out about that from Mr. Palma Flores or from

22  someone else?

23  A.   From someone else.

24  Q.   Now, Ms. Sheehy, after the shooting, do you know what Mr.

25  Palma Flores did with his gun?

1    A.    He said he had threw it in the water.

2    Q.    Do you remember whether he threw it all in one piece or

3    in multiple pieces?

4    A.    No, two different places.

5    Q.    So did he take apart the gun before he disposed of it?

6    A.    Yes.

7    Q.    Did he do anything with the clothes he was wearing that

8    night?

9    A.    I'm not sure.  I didn't see it.

10   Q.    Okay.  Did he tell you anything about what he had done

11   with his clothes after the fact?

12   A.    I don't know.  I'm sorry.

13          THE COURT:  Ma'am, you're going to need, to the

14   extent that you can, you're going to need to speak up.  We all

15   need to be able to hear you.

16          THE WITNESS:  Okay.

17   BY MS. RUMBAUGH:

18   Q.    Let me ask it again.

19          Ms. Sheehy, did Mr. Palma Flores ever tell you

20   anything about what he did with his clothes that he was

21   wearing the night of the shooting?

22   A.    I don't remember.  My head hurts right now.  I'm sorry.

23   Q.    All right, Ms. Sheehy, I want to direct your attention --

24   A.    Okay.

25   Q.    -- to December 2019.  Was there an incident of domestic

1  violence between yourself and Mr. Palma Flores around that

2  time?

3  A.   Yes.

4  Q.   Can you explain what happened?

5  A.   I was on my phone, and I was talking about contacting the

6  police, and we started fighting.  He grabbed me and threw my

7  body to the floor and we were fighting.

8  Q.   So just to be clear, did the fight start -- did the

9  assault start because you had been trying to contact the

10 police about the shooting?

11 A.   Yes.

12 Q.   How did the assault eventually end?

13 A.   I don't remember.  We drove and parked in some people's

14 house and the lady called the cops.

15 Q.   Was that just a civilian who was a witness who called the

16 cops?

17 A.   Yeah.

18 Q.   Ms. Sheehy, is it fair to say that you had been trying to

19 contact the police prior to the assault?

20 A.   Yes.

21 Q.   All right.  I'd like to show you what's been admitted

22 into evidence as Government's Exhibit 34.  Let's just pull up

23 the first page.

24      Ms. Sheehy, do you recognize this?

25 A.   Yes.

1  Q.   Is this a letter that the defendant wrote to you?

2  A.   Yes.

3  Q.   I'd like you to read for us some of the contents of the

4  letter.  I want you to start at the very beginning, and I'm

5  going to ask that Ms. Lee blow up the section of the letter so

6  you'll be able to see it more clearly.  Okay?

7  A.   Okay.

8  Q.   Ms. Sheehy, can you please read the portion of the letter

9  that's blown up on the screen?

10  A.   "Hey, Babe, in this letter I'm going to tell you

11  everything I can't on the phone.  I truly forgive you for

12  telling on me but now we got to find a way to fix this.

13  Lately what I have been thinking is that if they make you

14  testify, that you say that the whole reason we got into an

15  argument that night is because you wanted to tell the police

16  that Kollin did it, but that I did not want you to tell

17  because he threatened to kill you, my family, and me because

18  he slept over at my house, so he knew where I lived.  So I was

19  scared and that is why I bought the AR-15 because I feared for

20  my family life and ours."

21  Q.   Ms. Sheehy, what's going on in this letter?

22  A.   He wanted me to lie for him.

23  Q.   All right.  Let's go over to page 2.  I'm going to have

24  Ms. Lee pull up another portion of the letter.

25        All right.  Ms. Sheehy, do you see the top line

1  where it says, "As of right..."?

2  A.    Yes.

3  Q.    Can you please read that section until where it says --

4  ends on the sentence where it ends, "If we told on him."

5  A.    "As of right now, Babe, we all have to get our stories

6  the same.  That way when I get everything looks the same and

7  sounds the same.  So my whole game plan is that you say when

8  we got to an argument that night was because you were tired of

9  keeping your mouth shut about the truth and that you were

10  going to tell the police it was Kollin, but I was afraid that

11  he was going to kill us or my family if we told on him."

12  Q.    Okay.  Ms. Sheehy, is it true that you got into an

13  argument that night because you were going to tell the cops

14  that Kollin murdered Mr. Brown?

15  A.    No.

16  Q.    Okay.  Let's go over to page 3, please.  All right.

17  Could you please start at where it says, "The reason Kollin

18  did that..."

19  A.    "The reason Kollin did that to Lil bruh was because the

20  gas that he had ran off with was Kollin's.  I was just selling

21  it for him because I was in debt with him from him giving me

22  gas to spark and me not being able to pay it off.  So he told

23  me to just start selling his gas and that way I could pay my

24  debt off.  So the gas that boy ran off with wasn't mine, it

25  was really Kollin's.  Therefore, I didn't have no reason to do

1   anything to forf..."

2   Q.   I'll stop you right there.  Are you familiar with the

3   term "forf"?

4   A.   Yes.

5   Q.   Where does that term come from?

6   A.   It comes from Alabama.

7   Q.   It's a regional term from Alabama?

8   A.   Yes.

9   Q.   And what does it mean?

10  A.   It can mean a lot of things.  It depends on how you use

11  it in a sentence.

12  Q.   Here, how do you interpret Mr. Palma Flores using the

13  term "forf"?

14  A.   As in lame or he just using it to -- to like -- I don't

15  know, like a person.

16  Q.   Is he referring to a person?

17  A.   Yes.

18  Q.   And is he referring to the person who got shot?

19  A.   Yes.

20  Q.   All right.  Now I'm going to have you read another

21  section from that same page.  All right.  So picking up where

22  it says at the top, "Also when we," and then please read to

23  the end of that section.

24  A.   "Also when we went to forf crib, we were with Jason

25  unless he already told the police he was somewhere else during

1  when the shit happened to forf because that way you have

2  another witness that can confirm your story because the

3  prosecutor is going to try to make it seem like you were

4  lying, but if you have someone else saying your story is true,

5  then they can never prove that you are lying."

6  Q.   Ms. Sheehy, how did this letter come to be in your

7  possession?

8  A.   Jason.

9  Q.   How did this letter come to you?

10  A.   Jason, the guy Jason.

11  Q.   Who is Jason?

12  A.   Melvin's friend.

13  Q.   And was there anyone else involved in transmitting the

14  letter to you?

15  A.   Yeah, someone was calling me but I don't know who it was.

16  Q.   Okay.  Did you eventually talk to that unknown person?

17  A.   Yes.

18  Q.   And what did that person tell you?

19  A.   He just told me that Jason had the letter.

20  Q.   And so then you said that Jason delivered the letter to

21  you?

22  A.   Yes.

23  Q.   And again, who is Jason relative to Mr. Palma Flores?

24  A.   His friend.

25  Q.   What did you do with the letter?

1   A.   I gave it to my lawyer.

2   Q.   Did you also show it to Kollin Worlds?

3   A.   Yes, he saw it too.

4   Q.   Say that again.

5   A.   Yes.

6   Q.   Now, Ms. Sheehy, I believe you testified at the time of

7   the shooting that you didn't know Mr. Worlds?

8   A.   I didn't know him, no.

9   Q.   Okay.  So how did it come to be that you all were in

10  touch such that you were showing him this letter?

11  A.   We hooked up after a party.

12  Q.   Say that again, please.

13  A.   We hooked up after a party.

14  Q.   Okay.  So do you remember approximately when that hookup

15  occurred?

16  A.   I don't know.  Probably like -- it was New Year's Eve.

17  New Year's Eve.

18  Q.   Was it this year?

19  A.   Yes.

20  Q.   Now, just to be clear, you were not hooking -- were you

21  hooking up with Mr. Worlds at the time of the murder?

22  A.   No.

23  Q.   All right.  I'd like you to take a look at Government's

24  Exhibit 35 which, if I'm not mistaken, has not been admitted

25  yet.

1        Ms. Sheehy, do you recognize this exhibit?  Sorry,

2   I'll give you a moment to take a look at it.

3        Do you have Government Exhibit 35 in front of you?

4   A.   Yes.

5   Q.   Do you recognize that?

6   A.   Yes.

7   Q.   Is that another letter that Mr. Palma Flores wrote to

8   you?

9   A.   Yes.

10       MS. RUMBAUGH:  Your Honor, I'd move to admit

11  Government's Exhibit 35 into evidence.

12       MR. JENKINS:  No objection, Your Honor.

13       THE COURT:  Without objection.

14       (Government's Exhibit No. 35 was admitted into

15  evidence.)

16       MS. RUMBAUGH:  Ms. Lee, could we please pull up page

17  1 and zoom in on that section.  Thank you.

18  BY MS. RUMBAUGH:

19  Q.   Ms. Sheehy, can you please read the sentence that begins

20  at the top, "First off..."

21  A.   "First off, all I can do.  I'm so betrayed by you when I

22  found out that you were cheating on me with Summer's brother.

23  I really went crazy."

24  Q.   Okay.  Do you see where it says, "Summer's brother"?

25  A.   Yes.

1  Q.   What does that mean to you?

2  A.   My cousin.

3  Q.   Do you have a cousin named Summer?

4  A.   Her name is September.

5  Q.   Why is Mr. Palma Flores referring to her as Summer here?

6  A.   He used to always call her that.

7  Q.   And who is Summer's brother?

8  A.   He's a police officer.

9  Q.   So is this code for something?

10  A.   Yes.

11  Q.   What is it code for?

12  A.   He's saying I was talking to the cops.

13  Q.   Now, Ms. Sheehy, you mentioned that you had consumed

14  drugs and alcohol on the day leading up to the shooting, is

15  that correct?

16  A.   Yes.

17  Q.   To reiterate, is there anything about you using drugs and

18  alcohol that day that prevents you from recalling the events

19  of that evening, specifically the shooting of Mr. Brown,

20  truthfully?

21  A.   No.

22  Q.   Ms. Sheehy, have you ever experienced a shooting before?

23  A.   Yes.

24  Q.   Can you please describe what happened?

25  A.   I was at the park on my 12th birthday -- no, 13th

1  birthday, and I got shot.

2  Q.   Had you been smoking and drinking alcohol that day?

3  A.   Yes.

4  Q.   And do you nonetheless remember the specific details of

5  that?

6  A.   Yes.

7       MS. RUMBAUGH:  No further questions.  Ms. Sheehy,

8  please answer Mr. Jenkins's questions.

9       THE COURT:  Mr. Jenkins, would you prefer to go

10  before or after lunch?

11       MR. JENKINS:  Before, Your Honor.

12       THE COURT:  Okay.  Go ahead, sir.

13       MR. JENKINS:  Thank you, Your Honor.

14                   CROSS-EXAMINATION

15  BY MR. JENKINS:

16  Q.   Good afternoon, Ms. Sheehy.

17  A.   Good afternoon.

18  Q.   Do you need a break?

19  A.   Yes, please.

20       THE COURT:  Did you want to use the ladies room or

21  did you just want to take a second to compose yourself?

22       THE WITNESS:  I just need a second, please.

23       THE COURT:  Okay, we can do that.

24       Ladies and gentlemen of the jury, why don't we all

25  take a stretch break right now while that's happening if you

1    want to do so.

2           We're off the record at this point.

3           (Discussion off the record.)

4           THE COURT:  All right.  Ma'am, are you ready?

5           (Witness nods head.)

6           MR. JENKINS:  Thank you, Your Honor.  May I proceed?

7           THE COURT:  You may, sir.

8    BY MR. JENKINS:

9    Q.   Good afternoon again, Ms. Sheehy.

10   A.   Good afternoon.

11   Q.   Ms. Sheehy, you and I haven't had the opportunity to

12   meet, correct?

13   A.   Correct.

14   Q.   But you know I represent Melvin, correct?

15   A.   Yes.

16   Q.   And you and Melvin have been in an on again and off again

17   romantic relationship for quite some time?

18   A.   Yes.

19   Q.   For the better part of four years, correct?

20   A.   Yes.

21   Q.   And you have a son together, correct?

22   A.   Yes.

23   Q.   And is it fair to say that things haven't always been

24   good between you and Melvin?

25   A.   Yes.

1  Q.   Sometimes things have been very good, however, correct?

2  A.   Yes.

3  Q.   One of the reasons why things haven't always been good

4  between you and Melvin is because there have been occasions in

5  which you believed that Melvin was unfaithful to you, correct?

6  A.   Yes.

7  Q.   And you and Melvin also have gotten into physical

8  altercations, correct?

9  A.   Yes.

10  Q.   I believe you testified that you've been diagnosed with

11  certain mental conditions.  Do you remember that testimony?

12  A.   Yes.

13  Q.   Can you tell me when you first were diagnosed with these

14  mental conditions?

15  A.   When I was 12 years old.

16  Q.   When you were 12 years old?

17  A.   Yes.

18  Q.   So is it fair to say that you were dealing with these

19  mental conditions back in 2019?

20  A.   Yes, sir.

21  Q.   Is it fair to say that you continue to deal with these

22  mental conditions, correct?

23  A.   Yes, sir.

24  Q.   And one of them is manic depressive, correct?

25  A.   Yes, sir.

1  Q.   And what's the other?

2  A.   Bipolar depression, bipolar disorder.

3  Q.   Is it fair to say that those conditions sometimes make

4  you prone to erratic behavior?

5  A.   Yes.

6  Q.   And sometimes it's difficult for you to control that,

7  correct?

8  A.   Yes, sir.

9  Q.   And sometimes it's difficult for you to manage your

10  emotions, is that correct?

11  A.   Yes, sir.

12  Q.   Now, at some point in time, you and Kollin became

13  romantically involved, correct?

14  A.   Yes.

15  Q.   And when you became romantically involved with Kollin,

16  did you know that Kollin and Mr. Palma Flores were friends?

17  A.   Yes.

18  Q.   And they were long time friends, correct?

19  A.   Yes.

20  Q.   You understood that they were friends since they were

21  small children, correct?

22  A.   No.

23  Q.   Well, you knew they had been friends for years?

24  A.   Yes.

25  Q.   And when you started the romantic relationship with

1    Kollin, this was after Mr. Palma Flores had been arrested,

2    correct?

3    A.    Yes.

4    Q.    And did you reveal to Mr. Palma Flores that you were

5    engaging in sexual behavior with his friend Kollin?

6    A.    No.

7    Q.    In fact, you've never told him that, correct?

8    A.    That's correct.

9    Q.    As far as you know, this is the first time that he's

10   learning that, correct?

11   A.    Correct.

12   Q.    And at the time you -- at some point in time you shared

13   Government's Exhibit 34, that's the letter that Jason

14   delivered to you, do you remember that letter?

15   A.    Yes, sir.

16   Q.    At the time you -- at some point in time you shared that

17   letter with Kollin, didn't you?

18   A.    Yes, sir.

19   Q.    Why?

20   A.    Because we just talking about it and talking about how

21   wrong it was.

22   Q.    Well, you knew in the letter Mr. Palma Flores was

23   alleging that it was Kollin who actually committed the murder,

24   correct?

25   A.    Yes.

1  Q.   And in the letter Mr. Palma Flores was indicating that

2  even the robbery that he suffered was weed that was belonging

3  to Kollin, correct?

4  A.   Correct.

5  Q.   And in the letter Mr. Palma Flores was saying he didn't

6  have a motive to kill Mr. Brown, correct?

7  A.   Yes.

8  Q.   And in fact, in the letter Mr. Palma Flores is saying

9  Kollin was the one who had the motive to kill Mr. Brown,

10 correct?

11 A.   Correct.

12 Q.   And am I correct that nowhere in the letter does Mr.

13 Palma Flores ever admit to shooting and killing Mr. Brown,

14 correct?

15 A.   Correct.

16 Q.   In fact, the things that you've said here today that Mr.

17 Palma Flores said to you when he allegedly came back to the

18 vehicle, that's not recounted in the letter, correct?

19 A.   Correct.

20 Q.   There's nothing in the letter about him getting rid of a

21 gun, correct?

22 A.   Correct.

23 Q.   Nothing in the letter about him taking apart a gun,

24 correct?

25 A.   Correct.

1  Q.   And when you showed this -- gave this letter to Kollin,

2  you were upset about what was in the letter, correct?

3  A.   Correct.

4  Q.   Because at that moment this is one of those bad periods

5  between you and Mr. Palma Flores, correct?

6  A.   Correct.

7  Q.   You weren't particularly happy with him, correct?

8  A.   Yes.

9  Q.   And you wanted to see something bad happen to him,

10 correct?

11 A.   Yes.

12 Q.   And you showed the letter to Kollin, correct?

13 A.   Correct.

14 Q.   And you and Kollin talked about the letter, correct?

15 A.   Correct.

16 Q.   And you and Kollin talked about how you should respond,

17 what you should do --

18 A.   No.

19 Q.   -- in light of the letter?  But you did talk about the

20 letter, correct?

21 A.   Yes.

22 Q.   You knew Kollin knew about the letter, correct?

23 A.   Yes.

24 Q.   How did Kollin respond when he got the letter?

25 A.   He was just like, that's wild.

1  Q.    I'm sorry?

2  A.    He just said that that's wild.

3  Q.    He was upset?

4  A.    No, not really.

5  Q.    He wasn't upset?

6  A.    No.

7  Q.    But the letter was accusing him of committing the murder?

8  A.    Yes.

9  Q.    But as far as you know, he wasn't upset when he got that

10 letter?

11 A.    No, he just kind of laughed.

12 Q.    And then, at that point in time, did you give the letter

13 to your lawyer?

14 A.    My lawyer asked me for it because he said that the

15 prosecutors had had it.

16 Q.    Well, I'm just trying to get the timing of when you gave

17 it.  Did you give it to your lawyers before or after you

18 shared it with Kollin?

19 A.    After.

20 Q.    It was after you shared it with Kollin?

21 A.    Yes.

22 Q.    So the first person you gave it to was Kollin, correct?

23 A.    Correct.

24 Q.    The person who you now were sleeping with, correct?

25 A.    I wasn't sleeping with him when I showed him the letter.

1  Q.   So you hadn't started sleeping with him when you showed

2  him the letter?

3  A.   No.

4  Q.   You started sleeping with him --

5  A.   I'm sorry, I don't remember.

6  Q.   Take your time.  I know it may be difficult to remember

7  the timing of this.

8            I think you indicated that, best you could recall,

9  you and Kollin first hooked up it was New Year's Eve, correct?

10 A.   Yes.

11 Q.   And the letter was written -- is dated December of 2020,

12 correct?

13 A.   Correct.

14 Q.   So it was like a couple weeks before New Year's Eve,

15 correct?

16 A.   Yes.

17 Q.   To the best of your recollection, it was around that time

18 frame that you actually shared the letter with Kollin,

19 correct?

20 A.   Yes.

21 Q.   You can't precisely remember whether it was before or

22 after the first time you, quote/unquote, hooked up with him,

23 correct?

24 A.   It was after.

25 Q.   It was after?

1  A.   It was after.

2  Q.   So it was after you were engaging in sexual relationships

3  with him?

4  A.   It wasn't a relationship.  It was a one time thing.

5  Q.   And you showed him -- and you showed him the letter?

6  A.   Yes.

7  Q.   Now, prior to this first time when you hooked up and

8  ended up having sex, had you and Kollin been in contact with

9  one another?

10 A.   Before or after?

11 Q.   Before.

12 A.   Yes.

13 Q.   How were you in contact with each other?

14 A.   He was Snapping me.

15 Q.   He was Snapchatting you?

16 A.   Yes.

17 Q.   So before the night of October 26, 2019, your testimony

18 is you don't know Kollin, correct?

19 A.   No.  I'm sorry, I got confused.  No, I didn't know him

20 before then.

21 Q.   But then at some point in time he starts Snapchatting

22 you, correct?

23 A.   Yes.

24 Q.   And you developed a friendly relationship, correct?

25 A.   Correct.

1  Q.   And at the time that you start developing this friendly

2  relationship, before it turns into any sexual relationship,

3  you and Melvin still were on and off again, correct?

4  A.   No.

5  Q.   Were you on?

6  A.   No.  We were off.

7  Q.   You were off.  And these -- were there communications

8  anything beyond just a Snapchat?

9  A.   Between who?  Me and Kollin?

10  Q.   Between you and Kollin.

11  A.   Yes, we text.

12  Q.   And you also text?

13  A.   Yes.

14  Q.   That's SMS?

15  A.   Yes.

16  Q.   How often were you communicating with Kollin during this

17  period of time prior to your first hookup?

18  A.   It was just off and on for like a couple of nights.

19  Q.   And at this point in time, again, you and Melvin are off,

20  correct?

21  A.   Yes.

22  Q.   You're not particularly happy with Melvin, correct?

23  A.   Correct.

24  Q.   Part of the reason why you're not happy with him is him

25  having relationships with other women, correct?

1  A.    Correct.

2  Q.    And him doing other things that you didn't like, correct?

3  A.    Correct.

4  Q.    And then you and Kollin had this hookup, correct?

5  A.    Correct.

6  Q.    And then afterwards, do you guys stay in contact with

7  each other?

8  A.    Yes.

9  Q.    How often are you communicating after you have your first

10 hookup?

11 A.    Like every day.

12 Q.    I'm sorry?

13 A.    Every day.

14 Q.    Every day.  Isn't it fair to say it was multiple times a

15 day?

16 A.    Yes.

17 Q.    You cared for Kollin?

18 A.    No.

19 Q.    You just liked talking to him every day just because?

20 A.    He was the distraction.

21 Q.    He was what?

22 A.    A distraction.

23 Q.    And are you still in communication with him?

24 A.    No.  I blocked him.

25 Q.    You blocked him?

1  A.   Yes.

2  Q.   And when did you block him?

3  A.   His birthday.

4  Q.   Do you know when that was?

5  A.   I don't remember.

6  Q.   How long was it after you had shared the letter with him

7  that you blocked him?

8  A.   After.

9  Q.   It was months after?

10  A.   Yes.

11  Q.   It wasn't immediately after, correct?

12  A.   No.

13  Q.   And did you ever learn whether or not he had shared the

14  letter with anyone?

15  A.   I didn't know.

16  Q.   You didn't know?

17  A.   No.

18  Q.   It's your testimony that Kollin never told you that he

19  shared it?

20  A.   He never told me.  My lawyer told me -- called me and

21  told me that the prosecutors had the letter, that they needed

22  it or I could get prosecuted for it.  So she told me that it

23  was in my best interest that I cooperate with them and give

24  them the letter.

25  Q.   But you're very clear that Kollin never told you that he

1  gave them the letter?

2  A.   Yeah, he never told me.

3  Q.   And you're very clear that Kollin didn't tell you and

4  then in response to that you blocked him?

5  A.   No.

6  Q.   In fact, it's your very clear recollection that it was

7  months after you had showed the letter to him that you stopped

8  and cut off communications with Kollin, correct?

9  A.   I cut off communications with him because he asked me to

10  go out of town with him and I didn't trust him.

11  Q.   I'm sorry, he asked you what?

12  A.   He asked me to go out of town with him and I did not

13  trust him.

14  Q.   And when he asked you to go out of town with him, when

15  was this in relationship to you sharing the letter with him?

16  A.   Months after that.

17  Q.   What did you understand his purpose for inviting you out

18  of town would be?

19  A.   I didn't know.  That's why I blocked him.

20  Q.   Did you believe it was for to continue a romantic

21  engagement?

22  A.   Yes.

23  Q.   At this period of time, is it fair to say that you still

24  were on friendly terms?

25  A.   No, not really.  I don't know.  I don't know.

1  Q.   Were you surprised at this point in time when he invited

2  to take you out of town?

3  A.   Yes, because he kept asking after the one time we hooked

4  up, he kept asking me to meet, come over to his house, but I

5  would say no.  So I didn't understand why he would want me to

6  go out of town with him.  That's why I blocked him.

7  Q.   And is it fair to say that since Melvin has been arrested

8  in this matter, you still have maintained some contact with

9  him, correct?

10  A.   Yes.

11  Q.   Because you have a son together, correct?

12  A.   Correct.

13  Q.   And much of your contact with him is for the purpose of

14  coparenting your son, correct?

15  A.   Correct.

16  Q.   But there have been other times in which your

17  communications have gone beyond just your son, correct?

18  A.   Correct.

19  Q.   In which you and Melvin have talked about your

20  relationship, correct?

21  A.   Correct.

22  Q.   And you've talked about statements that you made to law

23  enforcement, correct?

24  A.   Correct.

25  Q.   And how you wish you hadn't said those things to law

1  enforcement, correct?

2  A.   Correct.

3  Q.   And how you wish that you could help Melvin get out of

4  this trouble, correct?

5  A.   Correct.

6  Q.   And how you still at this moment care for Melvin?

7  A.   Yes.

8  Q.   And how you regretted actually saying the things that you

9  said to the detectives, correct?

10  A.   No.

11  Q.   But you never told him about sleeping with Kollin,

12  correct?

13  A.   No.

14        MR. JENKINS:  I have no further questions, Your

15  Honor.

16        THE COURT:  Redirect?

17        MS. RUMBAUGH:  Yes, Your Honor.

18                    REDIRECT EXAMINATION

19  BY MS. RUMBAUGH:

20  Q.   Mr. Jenkins asked you about Mr. Palma Flores cheating on

21  you.  Do you remember that?

22  A.   Yes.

23  Q.   And I want to go back to the December 2019 assault that I

24  asked you about.

25  A.   Okay.

1    Q.    In the altercation that led up to Mr. Palma Flores

2    assaulting you, was he looking -- were you looking at his

3    phone?

4    A.    Yes, we were both looking at each other's phone.

5    Q.    Why were you looking at each other's phone?

6    A.    We didn't trust each other and -- yeah.

7    Q.    When you say you didn't trust each other, was that

8    because you believed he had cheated on you?

9    A.    Correct.

10   Q.    And was that also because he believed that you had

11   cheated on him?

12   A.    Yes.

13   Q.    And when he looked at your phone, did he see anything

14   that prompted the assault?

15   A.    Yes.

16   Q.    What did he see?

17   A.    The Google search of the detective for the murder trial,

18   the murder case.

19   Q.    So did he see on your phone that you had looked up how to

20   get in contact with the homicide detective about the murder?

21   A.    Correct.

22   Q.    Now, Mr. Jenkins also asked you about the letter that Mr.

23   Palma Flores wrote to you.  Have you read that letter in its

24   entirety?

25   A.    Which letter?  I'm sorry.

1  Q.   Let's pull up Government's Exhibit 34, please.

2        Ms. Sheehy, you're familiar with this letter,

3  correct?

4  A.   Yes.

5  Q.   And to your knowledge, anywhere in this letter, does Mr.

6  Palma Flores say, I am innocent?

7  A.   No.

8  Q.   Anywhere in this letter, does Mr. Palma Flores say, I am

9  being framed for murder?

10 A.   No.

11 Q.   All right.  And finally, Ms. Sheehy, do you remember --

12 Well, let me ask you this first.

13       Is it your testimony that you and Kollin Worlds

14 hooked up on New Year's Eve this year, meaning December 2020

15 to January 2021?

16 A.   That's correct.

17 Q.   Okay.  Now, do you remember testifying before the grand

18 jury in the Eastern District of Virginia in January of 2020,

19 so one year prior?

20 A.   Yes.

21 Q.   And at that time when you testified before the grand

22 jury, were you hooking up with Mr. Worlds?

23 A.   No.

24 Q.   Were you in contact with Mr. Worlds?

25 A.   No.

1    MS. RUMBAUGH:  Your Honor, I have nothing further.

2    THE COURT:  Is this witness subject to recall?

3    MS. RUMBAUGH:  Not by the government.

4    THE COURT:  Mr. Jenkins?

5    MR. JENKINS:  No, Your Honor.

6    THE COURT:  Ma'am, you may step down.  Please do not

7 discuss the case or any aspect of the case with anyone other

8 than your counsel.

9         (Witness excused.)

10    THE COURT:  Next witness from the government.

11    MS. RUMBAUGH:  Your Honor, our next witness is going

12 to be Detective Melissa Wallace.  I anticipate that her direct

13 examination is going to take some time.  I believe it's 12:45,

14 so I leave it to Your Honor's discretion whether we break for

15 lunch now.

16    THE COURT:  I think we're at a very good point.

17         Once again, ladies and gentlemen, thank you for your

18 attentiveness.  As I indicated yesterday, we've arranged for

19 lunch for you from the choices that you have made.  We're

20 going to take you to a different area, give you a little bit

21 more room, so that you can enjoy your lunch.

22         If you want to step outside to get some fresh air,

23 obviously that's your discretion, you can do that as you

24 choose.  But remember, we need to have you back in here no

25 later than 2 o'clock.  We have some things to do as the

1  lawyers and judge in this case.  So 2 o'clock we're going to

2  have you back in.  So if you can be back on site, if you

3  choose to go out and get some fresh air, be back in the

4  courthouse no later than 1:45.

5          Please do not discuss the case or any aspect of the

6  case with anyone now that the case is pending before you.  We

7  are heading into the home stretch we believe, so we appreciate

8  your attentiveness.

9          You may now retire.

10          (Jury dismissed.)

11          THE COURT:  You may be seated.

12          Counsel, Ms. Rumbaugh, will that be your last

13  witness?

14          MS. RUMBAUGH:  Yes, Your Honor.

15          THE COURT:  Mr. Jenkins, I don't want to interrupt

16  you with your client, feel free.

17          Not holding you to it right now, but do you

18  anticipate putting on any evidence?

19          MR. JENKINS:  Not at this time, Your Honor.

20          THE COURT:  Obviously, I'm not holding you to that.

21  I'm just trying to do some preparation on my end so that we

22  can be prepared.

23          You figure this next witness is going to be maybe an

24  hour, an hour and 15 or 20 minutes between the direct and

25  cross?

1          MS. RUMBAUGH:  I think that's fair, Your Honor.  I

2    expect that my direct examination will be 40 to 45 minutes.

3          MR. JENKINS:  I would agree, Your Honor.  I suspect

4    that Detective Wallace's cross-examination is going to be

5    fairly lengthy.

6          THE COURT:  Okay.  So let's assume it's 45 minutes

7    each side.  So we're looking at an hour-and-a-half.

8          What I would propose, counsel, is this.  After we

9    get through the examination and cross-examination, if the

10   government decides to rest at that point and if the defendant

11   decides not to put on any evidence, I will tell you that I

12   instruct before closing arguments.  That's my style.

13         So what I would like to do now with your permission

14   is this.  I've gone through the instructions.  And, Mr.

15   Jenkins, you still have the ability to offer a lesser included

16   if you choose to do so.

17         I've gone through the instructions, and there are

18   only three that I think have no applicability, so I'd like to

19   go over those so that when we come back, we don't have to take

20   a break to go over the jury instructions.

21         Instruction number J, or letter J, it is the duty of

22   the Court to admonish an attorney who out of zeal for his or

23   her cause does something.  I haven't admonished anybody and I

24   don't predict that I will admonish anybody.  So I would

25   suggest that's not applicable.  If there is some unusual

1  occasion that the stars misalign and I have to admonish either

2  one of you or the three of you, we'll put it back in.

3          But do we all agree at this point there's nothing

4  there?  Okay.

5          Instruction lettered L, Court's comments on certain

6  evidence.  I don't recall me commenting on any evidence at

7  all.  Do we agree on that?

8          MS. RUMBAUGH:  Agreed, Your Honor.

9          MR. JENKINS:  Agreed, Your Honor.

10          THE COURT:  So we'll take that out unless something

11  happens down the road.

12          Instruction lettered M, evidence admitted for a

13  limited purpose only.  I didn't hear anything suggesting that.

14  Did you all?

15          MS. RUMBAUGH:  No, Your Honor.  I agree with you.

16          MR. JENKINS:  No, Your Honor.

17          THE COURT:  All right.  Very good.  Those are the

18  three that I think need to go out.

19          Now, we need to edit a couple.  I just want to make

20  sure.  Credibility of witnesses, immunized witnesses, numbered

21  -- actually lettered Y.  Are we talking about Elijah Canaday

22  and Kollin Worlds?  Are those the two people that we're

23  talking about?

24          MR. JENKINS:  I think we may have a difference of

25  opinion.

1          THE COURT:  I think it's easier on Worlds.  Canaday

2    was --

3          MR. JENKINS:  Well, Your Honor, the reason why I

4    believe it's applicable to him is that while, first and

5    foremost, I know the government's position will be that he

6    doesn't have a formal immunity agreement.

7          Nevertheless, his response to my question on

8    cross-examination was that he did.  And in fact, he elaborated

9    by saying the immunity agreement was given to him by Detective

10   Wallace.  That's the evidence before the jury.  That's what

11   his testimony is.

12         THE COURT:  I'll let you know, Mr. Jenkins, I'm with

13   you right now unless Ms. Rumbaugh can talk me out of it.

14         MS. RUMBAUGH:  Well, Your Honor, I doubt that, but I

15   will say that Detective Wallace is expected to address that on

16   her direct examination, and she will testify that no promises

17   or immunity were provided to Mr. Kyle-Canaday.

18         THE COURT:  That's consistent with his testimony but

19   the term, "immunity," was sort of thrown around and I, quite

20   frankly, as a person who's trained in the law couldn't figure

21   out whether there was one or not.

22         So I think based upon the evidence that we heard,

23   there is at least enough there that the jury can consider it

24   in the way that they want to.

25         MS. RUMBAUGH:  Yes, Your Honor.

1          THE COURT:  And this instruction isn't particularly

2     suggestive of anything one way or another.

3          So what I would propose is this:  Where it says

4     witness name, that we put in Elijah Kyle-Canaday and Kollin

5     Worlds may be considered to be immunized witnesses in this

6     case.  And the term, "may," actually does leave some room for

7     how we should evaluate that testimony.

8          MR. JENKINS:  I agree, Your Honor.

9          THE COURT:  So we'll go ahead and adapt that

10    particular one to that.

11         Then we're looking at lettered Z, credibility of

12    witness accomplice.  Who are we talking about here?

13         MR. JENKINS:  Well, Your Honor, from the defense

14    standpoint, one, it could be argued that Mr. Worlds was an

15    accomplice.  If the government is advancing on the theory that

16    it was Mr. Palma Flores who got out of the car and then

17    perpetrated the shooting, I think it is uncontroverted that

18    Mr. Worlds's Snapchat was used.  He said he didn't know the

19    clear purpose of it.  He says he didn't know why they were

20    traveling there, that they were traveling there for some

21    different purpose.  I think the jury can infer otherwise.

22         THE COURT:  But accomplice has a, as you know, I

23    don't need to teach you the law, the term "accomplice" has

24    some legal significance.  And I would suggest that in the

25    context of what I heard, and there may be more to it that I

1   don't know about, but he would not, based upon the Court's

2   evaluation of the evidence, if we had a case charging him as

3   an accomplice in something, would there really be enough

4   evidence to suggest that?

5           MR. JENKINS:  Well, I just think it's close, Your

6   Honor, and I think that there is enough for the jury to infer

7   it and, therefore, it should be left up to them.

8           You know, I still would argue and intend to argue

9   that his role was more expansive than what he testified to.

10  And I believe that there is circumstantial evidence to support

11  that.  So that's why I think that the instruction would be

12  appropriate.

13          MR. BEN'ARY:  So, Your Honor, the way I look at

14  instruction Z, it is for -- it looks like it is for charged

15  accomplices.  That second paragraph there says, the fact that

16  an alleged accomplice has entered or has agreed to enter a

17  plea of guilty is not evidence of guilt of the defendant.

18          So that's a situation that is not present here.

19  They don't have to make that evaluation.  He has not entered a

20  plea of guilty.  He's not been charged.

21          And further, if I understand the defense in this

22  case, and I have to admit I'm having a little trouble

23  understanding it, in order for there to be any sort of

24  suggestion that Mr. Worlds was an accomplice, I think that

25  that means that Mr. Palma Flores would have had to have gone

1  through and committed the shooting.  If Mr. Palma Flores

2  didn't do it, Mr. Worlds can't be an accomplice.

3          THE COURT:  I think the instruction lettered Z as

4  now written is not applicable to the facts and circumstances

5  as the Court has heard the evidence.  So I'll note your

6  objection, Mr. Jenkins.

7          Instruction lettered double A.  I just want to make

8  sure that we're putting the right people where it says witness

9  name, and I'm thinking that the names that we are talking

10 about are Canaday, Worlds, and the young lady, Ms. Sheehy,

11 that just testified.  Is that what who we're talking about?

12         MS. RUMBAUGH:  Yes, Your Honor.

13         MR. JENKINS:  Your Honor, I think Mr. Flores, Hector

14 Flores, should be included also.

15         THE COURT:  Any objection to that?

16         MS. RUMBAUGH:  No objection.

17         THE COURT:  All right.  What we'll do is we'll amend

18 or adapt that particular instruction to reflect the names of

19 Canaday, Worlds, Sheehy and Flores.

20         Instruction lettered DD.  Do we have -- did we have

21 evidence of any deals being made or any lenient sentences

22 being offered?

23         MS. RUMBAUGH:  Your Honor, I read this as someone

24 who has got pending criminal charges and has a cooperation

25 agreement with the United States, and we don't have that in

1  this case.

2          THE COURT:  Do you agree, Mr. Jenkins?

3          MR. JENKINS:  I do agree, Your Honor.

4          THE COURT:  All right.  We'll remove DD.

5          And, Counsel, I don't want you to think that because

6  some of these instructions have been deemed inapplicable in

7  the context of what we're doing, that I did not appreciate you

8  all providing these to me in advance.  Evidence is always sort

9  of evolving, and I appreciate you all anticipating what the

10  evidence could be.  So please don't interpret this as my

11  criticism of what you're trying to do because this case has

12  been tried very, very efficiently and very well.

13          MS. RUMBAUGH:  Thank you, Your Honor.  I would also

14  point out instruction number CC, I don't believe any witness

15  in this case has convictions of felony.

16          THE COURT:  The only thing that I can say on this

17  one and, again, it's terminology, we all know what this means.

18  We had some people who apparently have been convicted of

19  crimes, that if they were an adult would be deemed a felony.

20  I think back when I was a juvenile court judge, we called them

21  delinquent acts, which would otherwise be qualified as

22  felonies.

23          There really aren't any felonies that I heard.  Do

24  we agree on that?

25          MR. JENKINS:  I would agree, Your Honor.

1    MS. RUMBAUGH:  Yes, Your Honor.

2    THE COURT:  All right.  Very good.  We're going to

3  remove CC.

4    I'm going to FF.  Again, that will apply if Mr.

5  Palma Flores decides not to testify.  So if he does testify,

6  we'll integrate that one back in.

7    Are you okay with that, Mr. Jenkins?

8    MR. JENKINS:  Yes, Your Honor.

9    THE COURT:  Very good.

10    Instruction lettered triple N.  I'm assuming the

11  government is responding to the suggestion that the footprints

12  were not taken from the scene.  Is that the focus there?

13    MS. RUMBAUGH:  Yes, Your Honor, I think there was

14  the --

15    THE COURT:  Mr. Jenkins did a cross-examination --

16  cross-examined on the reality that in this case there were no

17  footprints taken from the area surrounding the alleged crime

18  scene.

19    MS. RUMBAUGH:  Yes, Your Honor.  And Mr. Jenkins

20  also cross-examined, I believe it was, a crime scene detective

21  on the fact that no fingerprints were examined on the

22  cartridge casings.

23    THE COURT:  Do you agree that that was what the

24  evidence was, Mr. Jenkins?

25    MR. JENKINS:  Yes, Your Honor.

1          THE COURT:  Okay.  Then that one, obviously, will

2    remain.

3          What I would suggest that we do on -- this is the

4    last one that the Court has gone through and if you all have

5    any to add.

6          Instruction lettered triple O.  I would like to take

7    out, the forms of the verdict should be read to the jury.

8    That's on page 2.  It's a key for me to read the forms but it

9    shouldn't really be in the instruction.

10          Do we agree?

11          MR. JENKINS:  I agree, Your Honor.

12          MS. RUMBAUGH:  Yes.

13          THE COURT:  Trish, when we get to instruction

14    lettered triple O, or Marlon or whoever, make sure that you

15    hand up the verdict forms to me so that I can read them as

16    part of this instruction.  I'll leave a note in here in case

17    you all forgot.

18          All right.  Those are the only ones I had any

19    particular comments on.  I'll listen to counsel, if you had

20    any other ones.

21          MR. BEN'ARY:  Your Honor, we had -- we had offered

22    malice and premeditation and I think they're at the end, Q and

23    RRR, and we would simply suggest that they be put sort of

24    close to the other instructions.

25          THE COURT:  Yes, that's what I did.  They were

1  submitted to the Court on the back end, and what I've done is

2  I've tried to put the instructions in a way where they sort of

3  follow formulaic.  So I put the malice -- and I'll give you

4  the instructions in the order that I'm going to read them but

5  I actually did not put them on the end.  I put them right

6  after the discussion of malice.

7           MR. BEN'ARY:  Very well.

8           And then with respect to the verdict form, we've got

9  a draft.  We were sort of waiting to see if we need a special

10  finding for the lesser included.

11          THE COURT:  Okay.  Communication between counsel has

12  been very good, and I have no doubt that when I'm ready to

13  read them, that you all will have it straight.

14          MR. BEN'ARY:  Thank you.

15          THE COURT:  But again, we've been very, very good.

16  And what we'll do is I will give these to my law clerks and

17  they will reformulate them so that they're consistent with

18  what the Court has decided to do.  We'll also give them to you

19  in the order that the Court is going to read them.

20          I would also encourage you, if at any time the Court

21  misses an important word, I'm not talking about a noun marker

22  or anything like that, but if I miss an important word or if I

23  state something that's not consistent with what's on the paper

24  that is substantive in any manner, just simply raise your hand

25  and I'll try to read it better.

1         (Discussion off the record.)

2         THE COURT:  Mr. Palma Flores, you've been very

3  attentive to the process that we've gone through, and I've

4  seen you and observed you having conversations with your

5  lawyer during the whole trial, and they've been appropriate

6  and timely, obviously, but I still need to ask you these

7  questions.

8         Are you entirely satisfied with the services of Mr.

9  Jenkins?

10        THE DEFENDANT:  Yes, Your Honor.

11        THE COURT:  Very good, sir.  Thank you.  All right.

12        We will go ahead since we've gotten through this, we

13  will go ahead and take our lunch break until 2 o'clock.  I

14  told the jury to come back at quarter to.  We'll come back at

15  2 o'clock.

16        And then we will go ahead and proceed with the next

17  witness.  If we get through the witness by 3:30 or so, I'll go

18  ahead and instruct the jury.  You can go ahead and do your

19  closing arguments.  And then I'm probably going to let them go

20  for the day.  That's probably the best goal.

21        Would you all agree?

22        MR. JENKINS:  Yes, Your Honor.

23        MS. RUMBAUGH:  No objection.

24        THE COURT:  Very good.  Thank you, Counsel.

25        (Lunch Recess 1:00 p.m.)

1          (Court proceedings resumed at 2:11 p.m.)

2          THE COURT:  Back on the record of United States

3     versus Palma Flores.

4          Counsel, I've been informed now that there's a

5     dispute over instruction letter ZZ.  There are two that were

6     offered by the government.  There wasn't any objection early.

7     The Court was of the view that they were essentially

8     duplicative and so now there's an issue.  What's the issue?

9          MR. BEN'ARY:  So I'm not sure that it's exactly a

10    dispute.  The way that the statute is worded, a violation of

11    924(j) is a violation of 924(c) where there's a death

12    resulting from the use of a firearm.

13         The first ZZ is just 924(c), so I think we agree

14    that that would not be the appropriate instruction.  The

15    second ZZ does include that death resulted.  So that, I think,

16    is correct.

17         But I think that because it's charged as first

18    degree murder, we need to add -- we need to add some language

19    onto the end of that to make it clear that the jury has to

20    find that this was a premeditated killing with malice

21    aforethought.  And we've offered the definitions of malice and

22    premeditation, but I think it does need to go onto this

23    instruction.

24         THE COURT:  Again, I compliment you all on working

25    together and trying to figure these things out, but I would

1    prefer that we work these things out in advance so we're not

2    having these discussions now.  But again, it is what it is.

3           Have you gotten an instruction that has the relevant

4    language therein?

5           MR. BEN'ARY:  So we, I think, it was brought to our

6    attention as we came up here.  And we both looked at it and I

7    think have agreed that it needs to be tweaked.

8           THE COURT:  Do you have the tweak?

9           MR. BEN'ARY:  I do not.

10          MR. JENKINS:  Your Honor, if I may, because I

11   suspect that this might be of concern for the Court in terms

12   of whether this will adversely impact the Court's ability to

13   charge the jury today.

14          During the lunch break, counsel did have some

15   conversations about how we would suggest that the Court

16   proceed at this hour.

17          In light of the anticipated testimony of Detective

18   Wallace and also the amount of time that the parties expect to

19   use for closing and rebuttal and the time we anticipate it

20   would take the Court to read all the jury instructions, and at

21   least the defense's preference, that instructions and closing

22   be on the same day.  That it all be completed at the same

23   time.

24          My concern is that there's not enough time between

25   now and four o'clock to accomplish all of that.  So what we

1    would suggest to the Court is that we adjourn for the day

2    after Detective Wallace's testimony is completed.  That would

3    afford counsel the evening to submit to chambers a proposed

4    language to address ZZ and also allow for instructions and

5    closing and rebuttal to all be accomplished tomorrow in

6    consecutive order.

7            THE COURT:  Well, let me tell you how the Court

8    feels about it.  The bottom line is this.  I don't know how

9    long you're going to take and I have to manage the time as

10   best I can.

11           So we will see where we are and we'll go from there,

12   but I don't want to make any commitments to counsel that we're

13   going to not stay within the confines of what we originally

14   thought.  But if time and circumstances dictate otherwise,

15   we'll take a look at it.

16           But I would hope that if you do get the advantage of

17   these tweaks that apparently need to take place, that we tweak

18   everything we need to tweak before we get into court tomorrow

19   morning.

20           MR. JENKINS:  Absolutely, Your Honor.  And it also

21   would afford Mr. Ben'Ary and I to also give some further

22   consideration on the jury verdict form as to whether or not

23   the jury needs to make a special finding with respect to the

24   malice aforethought.  That's something that we just started to

25   discuss.

1          THE COURT:  All right.  And I appreciate what you're

2     trying to do but, as I said, we set these times for submitting

3     jury instructions and setting up time to discuss the jury

4     instructions and all other aspects of the case so we can get

5     ahead of the things that we can reasonably do.

6          And I am not a big fan of trying to do things in the

7     middle of the trial.  It doesn't give the Court an opportunity

8     to do its proper research, doesn't give me an opportunity to

9     reflect on the appropriateness of things and the like.

10          So again, I just encourage you to continue to put

11     your heads together so that we don't run into these kinds of

12     situations.

13          Next witness.

14          Go ahead and bring the jury in.

15          You can call the witness.

16          MS. RUMBAUGH:  Yes, Your Honor.  The United States

17     calls Detective Melissa Wallace.

18          (Jury present.)

19          THE COURT:  The jury is reseated.

20          Ladies and gentlemen of the jury, I'm going to ask

21     the question again.  Were you all able to live up to the

22     Court's instructions not to discuss the case or any aspect of

23     the case with anyone?  Very good.

24          The government has called its next witness.

25          MS. RUMBAUGH:  Yes, Your Honor.  Detective Melissa

1   Wallace.

2           THE COURT:  All right.

3   (Government's witness, Detective Melissa Wallace, sworn.)

4           (Witness seated.)

5           THE COURT:  Ma'am, if you're fully vaccinated and

6   you're comfortable doing so, you're free to remove your mask.

7           THE WITNESS:  Thank you, Your Honor.

8                       DIRECT EXAMINATION

9   BY MS. RUMBAUGH:

10  Q.    Good afternoon, ma'am.

11  A.    Good afternoon.

12  Q.    Would you please state your name for the jury.

13  A.    Melissa Wallace.  M-e-l-i-s-s-a W-a-l-l-a-c-e.

14  Q.    Where do you work?

15  A.    Fairfax County Police Department.

16  Q.    What is your title?

17  A.    Detective.

18  Q.    How long have you worked for the Fairfax County Police

19  Department?

20  A.    Twenty years.

21  Q.    Would you please describe your current duties?

22  A.    I'm a detective in the cold case homicide division of the

23  major crimes bureau.

24  Q.    How long have you been with cold case?

25  A.    About seven months now.

1  Q.  Before that, where were you?

2  A.  In the homicide division.

3  Q.  How long were you in the homicide division?

4  A.  Three years.

5  Q.  Prior to that, were you assigned to a different section

6  within the Fairfax County Police Department?

7  A.  I was in the robbery section of major crimes.  Before

8  that, criminal investigation section, domestic violence, and I

9  was also trained as a crime scene investigator.

10  Q.  How long did you spend as a crime scene investigator?

11  A.  Three years.

12  Q.  Are you the lead detective involved in this

13  investigation?

14  A.  Yes.

15  Q.  What does it mean to be the lead detective?

16  A.  The lead detective has the sole responsibility for the

17  case from beginning to end.  I do at times ask my other squad

18  mates for help, for assistance, delegate responsibilities to

19  them throughout the investigation.  But ultimately, the

20  responsibility for the case is mine.

21  Q.  Overall, how long have you focused on homicide and other

22  death investigations?

23  A.  I was doing death investigations prior to homicide when I

24  was in crime scene.  So between that and homicide, probably

25  over six years now, close to seven.

1  Q.   Now, in the course of your experience in homicide and

2  conducting death investigations, did you investigate any

3  drug-related offenses?

4  A.   Yes.

5  Q.   What types of drugs have come up in your investigations?

6  A.   Everything from low levels of marijuana, large levels of

7  marijuana, cocaine, prescription pills, lots of fentanyl.

8  Q.   Detective Wallace, are you familiar with the federal drug

9  schedules?

10  A.   Yes.

11  Q.   And what schedule -- excuse me -- what schedule is

12  marijuana?

13  A.   Schedule 1.

14  Q.   Thank you.  Are you familiar with some of the street

15  slang used to refer to marijuana?

16  A.   Yes.

17  Q.   Can you give me a few examples?

18  A.   Weed, obviously is the most common.  We hear the term

19  "gas" a lot nowadays.  It's probably the most common one that

20  I hear.  "Gas."

21  Q.   Are you familiar with the term "zip"?

22  A.   Yes.

23  Q.   What does a zip refer to?

24  A.   It's my understanding it's an ounce of marijuana.

25  Q.   Are you familiar with the manner and ways drugs are

1  sometimes packaged for distribution?

2  A.    Yes.

3  Q.    Can you describe some of those ways?

4  A.    Packaged for distribution is usually when you take a

5  larger amount, you break it down into smaller amounts,

6  individually package those smaller amounts so they can be sold

7  to other individuals.

8  Q.    Have you investigated drug dealers that carry firearms?

9  A.    Yes.

10  Q.    What are some of the reasons that drug dealers might

11  carry firearms?

12  A.    For their own protection and they're protecting their

13  product as well from robberies.

14  Q.    Does drug dealing tend to be a cash business?

15  A.    Yes.

16  Q.    Are you familiar with someone named Melvin Palma Flores?

17  A.    Yes.

18  Q.    Do you see him here in the courtroom today?

19  A.    I do.

20  Q.    Could you please identify him by where he's sitting and

21  wearing?

22  A.    He's sitting with his counsel to my left wearing a beige

23  sweater.

24          MS. RUMBAUGH:  Your Honor, let the record reflect

25  the witness has identified the defendant.

1    THE COURT:  It shall so reflect.

2  BY MS. RUMBAUGH:

3  Q.   Detective Wallace, I want to direct your attention to the

4  early morning hours of October 26, 2019.

5    Were you on duty that night?

6  A.   I was called out.

7  Q.   Why were you called out?

8  A.   I was called out for a homicide that had occurred.

9  Q.   Okay.  Where did the shooting -- where did the homicide

10  take place?

11  A.   7112 Fairchild Drive in the Alexandria portion of Fairfax

12  County.

13  Q.   Was it a shooting?

14  A.   Yes.

15  Q.   And you mentioned that that was in Fairfax County,

16  correct?

17  A.   Yes.

18  Q.   Is Fairfax County within the Eastern District of

19  Virginia?

20  A.   Yes.

21  Q.   All right.  At this time, with the assistance of the

22  court security officer, I'd like you to take a look at

23  Government's Exhibit 6A.

24  A.   Okay.

25  Q.   Do you recognize this exhibit?

1  A.    Yes.

2  Q.    What is it?

3  A.    This is a 911 call.

4  Q.    And how do you know that's what it is?

5  A.    There's a certificate of authenticity attached with this

6  disk which is standard.

7  Q.    And does that audio file -- is that audio file a true and

8  accurate copy of one of the 911 calls received in regards to

9  the shooting on October 26, 2019?

10  A.    Yes.

11         MS. RUMBAUGH:  Your Honor, I'd move to admit

12  Government's Exhibit 6A.

13         MR. JENKINS:  No objection, Your Honor.

14         THE COURT:  Without objection.

15  (Government's Exhibit No. 6A was admitted into evidence.)

16         MS. RUMBAUGH:  And, Your Honor, now I'd like to ask

17  Ms. Lee to play the first two minutes and 14 seconds for the

18  jury.

19         THE COURT:  You may.

20         Ma'am, you're obviously experienced with the Court,

21  if you could stay within the confines as directed by AUSA

22  Rumbaugh, it would be appreciated.

23         (Audio played.)

24  BY MS. RUMBAUGH:

25  Q.    Detective Wallace, you just heard the example of the 911

1  call.  Were there other 911 calls that came in that night?

2  A.   Yes.

3  Q.   What time was the earliest 911 call that came in?

4  A.   The first call came in at 12:30 a.m.

5  Q.   All right.  So you testified that you were called out to

6  the area around 7112 Fairchild Drive that evening.

7            Can you describe for me what was going on when you

8  arrived at the scene?

9  A.   When I arrived at the scene, the original responding

10  patrol officers had already cordoned off the crime scene area

11  with the tape, so they were securing the crime scene waiting

12  for the detectives to arrive.  So I spoke briefly with one of

13  the officers to get a vague -- an idea of what had happened

14  when they got there.

15            And then I met with lead crime scene detective, Mike

16  Roberts.  Him and I were going to be working this case

17  together from major crimes and crime scene.  So him and I met

18  and started going over the scene together to see what was of

19  importance evidentiary-wise and what needed to be done to

20  process the scene.

21  Q.   When you arrived on the scene, was the body of Xyqwavius

22  Brown still there?

23  A.   No.

24  Q.   Had it already been taken to the hospital?

25  A.   Yes.

1 Q.   Now, you mentioned going through the scene with Detective

2 Roberts, is that correct?

3 A.   Correct.

4 Q.   All right.  And Detective Wallace, are you trained in

5 crime scene processing and evidence handling?

6 A.   Yes.

7 Q.   And in fact, I think you testified that you were assigned

8 to the crime scene section for a number of years?

9 A.   As a supplemental detective, yes.

10 Q.   I'd like to pull up Government's Exhibit 1B, which is in

11 evidence.

12       Detective Wallace, do you recognize this?

13 A.   Yes.

14 Q.   What is it?

15 A.   This is the front of the building, 7112 Fairchild Drive.

16 Q.   Now, were you present for Detective Roberts' testimony

17 here yesterday?

18 A.   Yes.

19 Q.   Do you recall Mr. Jenkins asking Detective Roberts

20 looking for shoe prints in this area?

21 A.   Yes.

22 Q.   Did you personally, in fact, look for shoe prints in this

23 area?

24 A.   Yes.  Detective Roberts and I went through together

25 specifically looking for any shoe wear impression specifically

1  in that mulch area, that would be a softer surface, and then

2  the dirt surface which as he described was a harder packed

3  surface, so we did not find any shoe wear impressions.

4  Q.   Now, Detective Wallace -- and you can take that down,

5  Ms. Lee, thank you.

6           You were also present for the testimony of the

7  medical examiner, Dr. Posthumus, yesterday, correct?

8  A.   Correct.

9  Q.   All right.  And do you recall the photographs of Mr.

10  Brown's gunshot wounds?

11  A.   Yes.

12  Q.   I'm not sure going to show them to the jury again right

13  now, but can you please describe the location of those gunshot

14  wounds?

15  A.   One was what we call a through-and-through, through his

16  arm perforating, which means the bullet went straight through.

17  And the second one was on the top of his head.

18  Q.   Do you have a theory, based on the location of these

19  wounds, as to what happened to the position of Mr. Brown's

20  body when he was shot?

21           MR. JENKINS:  Objection, Your Honor.

22           THE COURT:  Approach.

23           (Side bar.)

24           THE COURT:  I appreciate the form of the question

25  but unless I missed something, I may have, she was never

1    qualified as an expert witness and typically we don't allow

2    people who are non-experts to give their theories, and I'm

3    using your word, I'm not criticizing your word.  I think I'm

4    anticipating Mr. Jenkins's objection.

5            Your response.

6            MS. RUMBAUGH:  Your Honor, I think she was -- she is

7    testifying based on her experience over -- not any particular

8    training, but particularly her experience as a homicide

9    detective.  And I certainly submit, Your Honor, that

10   Mr. Jenkins can cross-examine her on her qualifications and

11   her experience to render that opinion.  But I think it's fair

12   for her to suggest what she thinks may have happened based on

13   her knowledge and her viewing the scene.

14           THE COURT:  There may be a way that you can get

15   there, but I think the term "theory" is what's causing the

16   Court consternation.  You may be able to ask her additional

17   background questions and the like, but I'm not going to let

18   her testify as to her theory of what happened.  But again,

19   there may be another way for you to get there.

20           Does that address your concern?

21           MR. JENKINS:  Yes, Your Honor.

22           (Open court.)

23   BY MS. RUMBAUGH:

24   Q.   So when you were there at the scene that night, do you

25   recall was the victim's phone found at the scene?

1  A.   It was.

2         MS. RUMBAUGH:  And can we please pull up Exhibit 1W.

3  BY MS. RUMBAUGH:

4  Q.   Detective Wallace, do you see the phone belonging to the

5  victim in this photograph?

6  A.   Yes.

7  Q.   What, if anything, about the phone being present at the

8  scene did that tell you about the circumstances of what had

9  happened?

10 A.   So with the phone being present and then also learning

11 that there was a portion of marijuana also present that was

12 still on scene, those items are typically things that we see

13 taken during robbery scenarios.  So with both of those items

14 of value still being on scene, it led me to believe that this

15 incident was not possibly the outcome of a robbery.

16 Q.   Was there also marijuana found at the scene?

17 A.   Yes.

18 Q.   And can marijuana be considered an item of value?

19 A.   Yes.

20 Q.   So if it had been a robbery, would you think that the

21 marijuana would have been taken as well?

22 A.   A drug-related robbery, yes.

23 Q.   Now, Detective Wallace, was there a search conducted of

24 the data in the victim's cell phone?

25 A.   Yes.

1    Q.   I'd like you to take a look at Government's Exhibit 51,

2    please.

3    A.   Okay.

4    Q.   Do you recognize this?

5    A.   Yes.

6    Q.   What is it?

7    A.   This is a partial extraction of the data from the

8    victim's cell phone.

9              MS. RUMBAUGH:  Okay.  I believe this has already

10   been admitted into evidence.

11             Your Honor, at this point just out of an abundance

12   of caution, I would move to admit Exhibit 51 into evidence if

13   it isn't already.

14             THE COURT:  Just checking something.  I believe that

15   that was one that was out of order.

16             Yes, 51 was admitted.  Yes, ma'am.

17             MS. RUMBAUGH:  Thank you, Your Honor, and may I

18   publish it to the jury?

19             THE COURT:  You may.

20             MS. RUMBAUGH:  Now, Ms. Lee, if you could please

21   zoom in to the first five entries on page 2.

22   BY MS. RUMBAUGH:

23   Q.   And Detective Wallace, is this the call log that was

24   found in the victim's phone?

25   A.   Yes.

1    Q.    Okay.  And do you see these five entries?

2    A.    Yes.

3    Q.    Do you see the entries indicating calls from a contact

4    saved under the name Blood?

5    A.    Yes.

6    Q.    Do you know who that is?

7    A.    That is Mr. Brown's sister.  Janay Brown.

8    Q.    Now, if we could please skip over to page 3 and entry

9    number 18.

10   A.    Okay.

11   Q.    Do you see -- do you see this entry?

12   A.    Yes.

13   Q.    And what is this?

14   A.    This is -- it looks like an incoming call from an

15   account, an iCloud account, by the name of Slimysteppa08.

16   Q.    Who is Slimysteppa08?

17   A.    I know this account to belong to Elijah Kyle-Canaday.

18   Q.    And what is the date and time of this call?

19   A.    10/25/19 at 12:09 p.m.

20   Q.    Do you see where it says UTC minus 4?

21   A.    Yes.

22   Q.    What is UTC?

23   A.    UTC is the standard time.

24   Q.    Okay.  But does this time, just to be clear, is this east

25   coast time?

1  A.   Yes.

2  Q.   All right.  If we could skip over to entry No. 13 on page

3  2.

4        Detective Wallace, is this another call between

5  Elijah Kyle-Canaday and Qwa Brown?

6  A.   Yes.

7  Q.   On what date and time was this call placed?

8  A.   10/25/19 at 1:05 p.m.

9  Q.   All right.  Detective Wallace, do you know whether

10  Mr. Kyle-Canaday has a girlfriend?

11  A.   He does.

12  Q.   What is her name?

13  A.   Kiana Davis.

14  Q.   How do you spell Kiana?

15  A.   K-i-a-n-a.

16  Q.   All right.  Could we please zoom in on entry numbers 8

17  through 10 on that same page.

18        What do these appear to be?

19  A.   Communications between an account labeled Kiana --

20  between Kiana and Qwa Brown.

21  Q.   And what's the date and time of these?

22  A.   These are 10/25/19 between 6:28 p.m. to 6:30 p.m.

23  Q.   Detective Wallace, you heard the testimony regarding a

24  robbery that took place in which Mr. Kyle-Canaday was involved

25  and some other individuals as well as his girlfriend.  Do you

1 remember what date that took place?

2 A.   10/25/19.

3         THE COURT:  Can I interrupt, Ms. Rumbaugh.

4         Ladies and gentlemen, I know it's tough and

5 sometimes it's tough for us to breathe, but if you could if

6 you're in the gallery, please keep your masks on or put them

7 on.  Thank you.

8 BY MS. RUMBAUGH:

9 Q.   All right.  Now, I'd like to zoom into entry number 6,

10 also on page 2.

11         Detective Wallace, when you received the data from

12 Mr. Brown's phone, did this entry stick out to you?

13 A.   It did.

14 Q.   Why?

15 A.   Because this appeared to be the last incoming -- I'm

16 sorry -- outgoing phone call from my victim before the 911

17 call came in.

18 Q.   What's the date and time?

19 A.   10/26/19 at 12:11 a.m., an outgoing call to that account.

20 Q.   And I believe you testified that the first 911 call came

21 in at about 12:30?

22 A.   12:30 a.m., yes.

23 Q.   Were you familiar with the moniker Sluttyboyk?

24 A.   Yes.

25 Q.   Is that from a social media platform?

1  A.    Yes.

2  Q.    What platform?

3  A.    Snapchat, I believe.

4  Q.    And how were you familiar with that Snapchat moniker?

5  A.    Well, between seeing that Snapchat moniker and the name

6  Kollin next to it, I recognized it as belonging to Kollin

7  Worlds, who I had actually worked a completely separate

8  unrelated investigation with a couple years prior.

9  Q.    So based on what you saw on the call log in the call

10  between Qwa Brown and who you knew to be Kollin Worlds, what

11  did you do next?

12  A.    Next, there was -- we had a meeting with the squad, so

13  while I had been going through this data and executing the

14  search warrant, my squad had been out conducting interviews

15  with friends and family, trying to see what kind of

16  information they could gather.  And so we had all come back to

17  the Mount Vernon station at one point to debrief what had been

18  going on over the last several hours.

19  Q.    In the investigation that followed, were you hearing any

20  rumors about what had happened?

21          MR. JENKINS:  Objection, Your Honor.

22          MS. RUMBAUGH:  Your Honor, I'm not offering it for

23  the truth of the matter asserted.  I'm offering it to show the

24  steps that the defendant [sic] took in her investigation.

25          THE COURT:  Give me an exception or exemption to the

1   hearsay rule.

2          MS. RUMBAUGH:  Your Honor, again, it's not hearsay

3   because it's not authored for the truth of the matter

4   asserted.  I'm asking Detective Wallace to explain what she

5   was hearing and the steps that she took in response to those

6   rumors.

7          THE COURT:  All right.  Why don't you ask the

8   question a little bit different way so that she knows exactly

9   what the scope of her testimony can be.

10         MS. RUMBAUGH:  Okay.

11  BY MS. RUMBAUGH:

12  Q.   All right.  Detective Wallace, let me ask you this.

13         Based on the -- based on the call you saw in the

14  call log, did you decide that it was relevant to speak to

15  Kollin Worlds?

16  A.   Yes.

17  Q.   And did you interview Kollin Worlds?

18  A.   Yes.

19  Q.   And in his initial interview, what did he tell you about

20  that night?

21  A.   He stated that he had heard that Qwa had died but that he

22  was not involved, he had been in a friend's house the night of

23  the incident.

24  Q.   Did you come to find out later that that was not

25  accurate?

1   A.   Yes.

2   Q.   And you were present for Mr. Worlds's testimony earlier,

3   correct?

4   A.   Correct.

5   Q.   And did you hear Mr. Jenkins asked Mr. Worlds about

6   sending him a target letter?

7   A.   Yes.

8   Q.   Did you in fact send a target letter to Mr. Worlds?

9   A.   Yes.

10  Q.   And why did you send him a target letter?

11  A.   It appeared that he had knowledge of this incident or was

12  involved in some way.

13  Q.   At any point in time did you believe that he had actually

14  shot Qwa Brown?

15  A.   No, there was no evidence of that.

16  Q.   Now, after your interview with Mr. Worlds, did you also

17  come to interview Mr. Palma Flores?

18  A.   Yes.

19  Q.   Now, I'd like to pull up Exhibit Number 38.  And if we

20  could zoom in to the text in the top right corner.

21        Detective Wallace, do you see the phone number

22  571-344-3953?

23  A.   Yes.

24  Q.   Whose phone is that?

25  A.   Melvin Palma Flores's phone.

1  Q.   How do you know?

2  A.   I communicated with him on that number.

3  Q.   When was the first time that you communicated with him on

4  that phone number?

5  A.   I had attempted to the day after the shooting on the

6  27th.  I had called the number and then went to his house and

7  spoke with him.  And then the next day we communicated via

8  text message on that number.

9  Q.   At any time when you communicated with him on the 27th or

10  the 28th, did he tell you anything about his phone being

11  missing?

12  A.   No.

13         MS. RUMBAUGH:  Thank you, Ms. Lee.

14  BY MS. RUMBAUGH:

15  Q.   Now, when you initially interviewed Mr. Palma Flores,

16  what did he tell you about that night?

17  A.   Again, he stated that he had heard about Mr. Brown's

18  death but he had been in his house the entire night with his

19  sister and his nephew.

20  Q.   Did you come to find out later that that was not

21  accurate?

22  A.   Yes.

23  Q.   Now, in that interview, did Mr. Palma Flores also tell

24  you the Snapchat moniker that he used?

25  A.   Yes.

1  Q.   And what moniker was that?

2  A.   I believe it was Melvin.Palma going by the display name

3  of Mel.

4  Q.   Now, Detective Wallace, after you initially interviewed

5  Mr. Worlds and Mr. Melvin Palma Flores, did your investigation

6  slow down for a period?

7  A.   It did.  There was a period where we were doing a lot of

8  search warrants for social media accounts and those take a

9  while for the information to come back from the companies.  So

10 during November, early December, we were just -- it was a lot

11 of sitting and waiting for some of that information to come

12 back, while trying to conduct as many additional interviews as

13 we could.

14 Q.   Again, are we talking about November and December of

15 2019?

16 A.   Yes.

17 Q.   Did that sitting and waiting change at some point?

18 A.   Yes.

19 Q.   How did that change?

20 A.   That changed the night of December 28th, 2019, when I had

21 received a phone call from a patrol officer, Fairfax County

22 patrol officer, advising that a citizen had called in saying

23 she had information on a murder.

24 Q.   All right.  And did you ultimately interview that

25 citizen?

1  A.    Yes.

2  Q.    And who was that citizen?

3  A.    Laila Sheehy.

4  Q.    I'd like you to take a look at Government's Exhibit 7A.

5  It should be a disk.

6  A.    Okay.

7  Q.    Do you recognize this?

8  A.    Yes.

9  Q.    And what is it?

10 A.    This was a 911 call.

11 Q.    911 call from whom?

12 A.    Laila Sheehy.

13 Q.    Have you listened to that disk?

14 A.    Yes.

15 Q.    And is it a true and correct copy of the 911 calls

16 received from Ms. Sheehy in this case?

17 A.    Yes.

18        MS. RUMBAUGH:  Your Honor, I'd move to admit

19 Government's Exhibit 7A.

20        MR. JENKINS:  No objection.

21        THE COURT:  Without objection.

22 (Government's Exhibit No. 7A was admitted into evidence.)

23 BY MS. RUMBAUGH:

24 Q.    Now, Detective Wallace, could I please have you take a

25 look at Government's Exhibit 7B.  It should be right behind

1  the disk.

2  A.   A certification?  I see a disk and a certification.

3          THE COURT:  You may approach the witness.

4          MS. RUMBAUGH:  Thank you, Your Honor.

5          THE COURT:  Yes, ma'am.

6  BY MS. RUMBAUGH:

7  Q.   Detective Wallace, do you see Exhibit 7B?

8  A.   Yes.

9  Q.   Do you recognize that?

10 A.   Yes.

11 Q.   What is it?

12 A.   This is a transcript of that 911 call.

13 Q.   Have you reviewed this transcript for accuracy as

14 compared to the 911 call?

15 A.   Yes.

16 Q.   And is it -- does Exhibit 7B truly and accurately

17 transcribe a 911 call?

18 A.   Yes.

19          MS. RUMBAUGH:  Your Honor, I'd offer into evidence

20 Government's Exhibit 7B.

21          THE COURT:  Without objection?

22          MR. JENKINS:  No objection.

23          THE COURT:  Without objection.

24 (Government's Exhibit No. 7B was admitted into evidence.)

25 BY MS. RUMBAUGH:

1   Q.   So Detective Wallace, did you interview Ms. Sheehy?

2   A.   Yes.

3   Q.   And you were here earlier today for her testimony, is

4   that correct?

5   A.   Yes.

6   Q.   Do you recall Ms. Sheehy testifying regarding a domestic

7   assault incident between her and the defendant?

8   A.   Yes.

9   Q.   When did you interview her relative to that incident?

10  A.   The morning of December 28th.

11  Q.   When you interviewed her, were you able to see visible

12  injuries?

13  A.   Yes.

14  Q.   And were those injuries consistent with a domestic

15  dispute?

16  A.   Yes.

17  Q.   All right.  I would like to pull up Exhibit 38 again.

18  And again, let's blow up the text in the top right corner.

19          Detective Wallace, do you see the phone number

20  256-457-5420?

21  A.   Yes.

22  Q.   Whose number is that?

23  A.   Laila Sheehy's.

24  Q.   How do you know?

25  A.   I communicated with her on that number.

1   Q.   When was the first time you communicated with her on that

2   number?

3   A.   December 28th, 2019.

4   Q.   I'd like to turn now to December 30th, 2019.  Was there a

5   search warrant executed that day at the defendant's house?

6   A.   Yes.

7   Q.   What prompted that search warrant?

8   A.   The search warrant was written in relation to the

9   domestic assault charges that I had obtained arrest warrants

10  for Mr. Palma Flores.

11  Q.   Did law enforcement in executing that search warrant find

12  any sort of small handgun or pistol?

13  A.   No.

14  Q.   Was the defendant arrested that day?

15  A.   Yes.

16  Q.   When he was arrested, was his cell phone seized?

17  A.   Yes.

18  Q.   Did you attain a search warrant for his phone?

19  A.   Yes.

20  Q.   Was the data from his phone extracted pursuant to the

21  search warrant?

22  A.   Yes.

23  Q.   Did you review the data from his phone?

24  A.   Yes.

25           MS. RUMBAUGH:  Your Honor, I am -- I'm now going to

1  ask the witness to review Exhibits 29A through 33, which I

2  believe have already been admitted into evidence.

3        THE COURT:  Yes.

4  BY MS. RUMBAUGH:

5  Q.   Detective Wallace, can you peruse through those exhibits

6  and look up at me when you're done.

7  A.   I'm sorry, you said 29A through?

8  Q.   33.

9  A.   Okay.

10 Q.   Are those all exhibits that were recovered from the

11 defendant's phone?

12 A.   Yes.

13 Q.   I'd like to start by publishing 29A, please.

14        Detective Wallace, what does this appear to be?

15 A.   A portion of marijuana.

16 Q.   And 29B, please.  Is that a video?

17 A.   It appears to be a video prior to a picture.  And that

18 appears to me to be marijuana in a jar.

19 Q.   29C now.

20 A.   That is somebody holding marijuana and then it switches

21 to marijuana in a plastic bag.

22 Q.   All right.  29B.

23 A.   Marijuana.

24 Q.   29E.  Does this also appear to be marijuana?

25 A.   Yes.

1  Q.   The next exhibit, 29F, I believe.  Is that marijuana?

2  A.   Also someone holding marijuana.

3  Q.   All right.  Let's look at 30A.

4  A.   That appears to be a stack of cash in a wallet.

5  Q.   Detective Wallace, do you recall hearing Detective

6  Roberts testify and seeing an image of a black wallet

7  recovered from the defendant's house?

8  A.   Yes.

9  Q.   All right.  30B.

10 A.   This is Mr. Palma Flores standing in front of what

11 appears to be a large sum of cash that is laid out in front of

12 him.

13 Q.   All right.  Continuing through -- that was 30B, so 30C.

14        (Video played.)

15 A.   This is a video of Mr. Palma Flores standing in front of

16 cash as well.

17 Q.   Next.

18 A.   This appears to be a large sum of cash rubber banded

19 together.

20 Q.   If we could skip forward to 32, please.  What is this?

21 A.   This appears to be cash next to a baggy containing

22 marijuana.

23 Q.   Now, let's go back to 31A, please.

24        (Video played.)

25 A.   Mr. Palma Flores standing in front of cash that's laid

1 out in front of him. He appears to be holding a gun box.

2 Q.   Let's play 31B. And, Ms. Lee, if you can pause the video

3 before the end.

4          (Video played.)

5 A.   So Mr. Palma Flores standing in front of the same -- what

6 appears to be the same amount of cash with the same gun box,

7 although in this view you can see the word GLOCK on the front.

8 Q.   Okay. Detective Wallace, to your knowledge based on your

9 investigation, did the defendant have any legitimate

10 employment?

11 A.   No.

12 Q.   Now, in the course of your investigation, after the night

13 of the shooting, did you go back to the area around Mr.

14 Brown's apartment during daylight hours?

15 A.   I did.

16 Q.   Who did you go with?

17 A.   I went with Laila Sheehy at first and then went back with

18 Detective Roberts.

19 Q.   And Detective Wallace, you've been in the courtroom

20 throughout this trial, correct?

21 A.   Correct.

22 Q.   You heard both Laila Sheehy and Kollin Worlds testify

23 about what happened and where they went on the night of the

24 shooting, is that right?

25 A.   Yes.

1  Q.   Can we pull up Exhibit 13, please.

2          Detective Wallace, are you familiar with this aerial

3  map?

4  A.   Yes.

5  Q.   Based on your investigation and the testimony you've

6  heard over the last two days, could you please indicate on the

7  map where Mr. Palma Flores, Ms. Sheehy, and Mr. Worlds went

8  that night when they arrived at the Meadow Woods apartment

9  complex?

10 A.   Ms. Sheehy advised they came up through Fairchild Drive

11 which links to Lockheed Boulevard from route 1, and at one

12 point took that left onto Julep Drive.  And if you look north

13 of that on the map, you see the yellow dot, that's indicative

14 of where Xyqwavius Brown's apartment was.

15         So driving continuing down Julep past the apartment,

16 continuing to Mint Place, so not the Mint Place that's labeled

17 here, but if you go one street down, that is also labeled as

18 Mint Place, and it cuts up north to Holly Hill Road which is

19 above Mr. Brown's apartment.  And that's where they had parked

20 on the curb and Mr. -- they said Mr. Palma Flores exited the

21 vehicle and then gunshots were heard.

22 Q.   And so, on this map can you describe for the jurors where

23 Mr. Palma Flores would have gone from the car to carry out the

24 shooting?

25 A.   So looking at the map, to the left of H, the first H in

1  Holly Hill Road, you see the Mint Place Road.  And then off to

2  that left there juts out a small portion of the street that

3  doesn't all the way go through.

4          If you were to just go directly above the very end

5  of that portion of the street, that is where Ms. Sheehy

6  indicated to me where they parked on the curb.

7  Q.   All right.  So now I'd like you to take a look at

8  Exhibits 49A through 49F which are not yet admitted.

9          Do you recognize these?

10 A.   I do.

11 Q.   What are they?

12 A.   These are a series of photographs that Detective Roberts

13 took when him and I met back at that same location that I just

14 described.  It's a series of photographs starting from that

15 curb area and sequentially going down towards Mr. Brown's

16 apartment.

17 Q.   Do they truly and accurately depict the area around 7112

18 Fairchild Drive in the Meadow Woods apartment complex during

19 daylight hours?

20 A.   Yes.

21         MS. RUMBAUGH:  Your Honor, I'd offer into evidence

22 49A through 49F.

23         MR. JENKINS:  No objection, Your Honor.

24         THE COURT:  Without objection, 49A through F.

25 (Government Exhibit Nos. 49A - 49F were admitted into

1  evidence.)

2  BY MS. RUMBAUGH:

3  Q.   I'd like to pull up 49A, please.

4        Detective Wallace, describe what we're looking at

5  here.

6  A.   So this would be the first picture in the series which

7  would indicate your view if you were parked on that curb and

8  looking down the small hill area into that small portion of

9  road that I described on the map.

10  Q.   And then 49B.

11  A.   Once you get down to that small road portion, that is

12  what your view would be.

13  Q.   49C.

14  A.   Just going further down that road, more view to the left,

15  and Mr. Brown's apartment would be the apartment that's in the

16  foreground in front if you were going to continue heading

17  straight.

18  Q.   49D.

19  A.   Just getting closer as we're walking down that portion of

20  pavement.

21  Q.   49E.

22  A.   Closer still and that is Mr. Brown's apartment building.

23  Q.   49F.

24  A.   Closer up of Mr. Brown's apartment and you can actually

25  see the 7112 address marker on this photograph.

1  Q.   Do you see the stairwell in the center of building?

2  A.   Yes.

3  Q.   Was that the stairwell where Mr. Brown's body was found?

4  A.   Yes.

5  Q.   All right.  Do you recall Ms. Sheehy's testimony

6  regarding the gun that was involved in the shooting?

7  A.   Yes.

8  Q.   Do you recall her testifying that Mr. Palma Flores

9  dismantled it and disposed of it?

10  A.   Yes.

11  Q.   Did you take steps to try to recover the gun or the gun

12  parts?

13  A.   We did, yes.

14  Q.   Can you describe what was done?

15  A.   So we tried to have her remember where the pieces were

16  thrown.  She stated that there was two separate bodies of

17  water.  She could only remember details enough to identify one

18  of those which was identified as Jones Point Park in

19  Alexandria right underneath the Wilson Bridge.

20  Q.   Did you do anything to try to recover the gun from Jones

21  Point Park?

22  A.   Yes.  She drove with me down there and showed me where

23  she remembers Melvin standing when he tossed two of the

24  pieces.  And so I was able to contact our dive team to see if

25  they can conduct a dive in that area to see if they could

1  recover any of the pieces.

2  Q.   Were they successful?

3  A.   They were not.

4  Q.   Switching gears, Detective Wallace, you mentioned that

5  social media -- you looked into social media records during

6  this investigation?

7  A.   Yes.

8  Q.   Did you obtain search warrants in connection with

9  different social media accounts?

10  A.   Yes.

11  Q.   Specifically, did you obtain a search warrant for the

12  defendant's Instagram account?

13  A.   Yes.

14  Q.   I'd like you to take a look at Government's Exhibit 46A.

15  A.   Okay.

16  Q.   Do you recognize that?

17  A.   Yes.

18  Q.   What is it?

19  A.   This is the full Instagram return for Melvin's Instagram

20  account.

21  Q.   And how do you know?

22  A.   I have reviewed it myself and initialed it.

23  Q.   So the disk that is 46A bears your initials?

24  A.   Yes.

25         MS. RUMBAUGH:  Your Honor, I'd move to admit 46A.

1          MR. JENKINS:  No objection, Your Honor.

2          THE COURT:  Do you anticipate any remaining ones,

3   Mr. Jenkins?

4          MR. JENKINS:  No objection.

5          THE COURT:  Counsel, are you offering 46A, B, 47A,

6   B, 48A, B, C?

7          MS. RUMBAUGH:  Yes, Your Honor.  And then finally --

8   no, no, I think I've gone through 49.  So yes, 48 is the last.

9          THE COURT:  Those come in without objection.

10          Thank you, Mr. Jenkins.

11   (Government Exhibit Nos. 46A, 46B, 47A, 47B, 48A, 48B and 48C

12   were admitted into evidence.)

13   BY MS. RUMBAUGH:

14   Q.   Detective Wallace, I'd like to -- so now that those

15   exhibits have been admitted, I'd like to show you Exhibit 47A,

16   please.

17   A.   Okay.

18          (Video played.)

19   Q.   Detective Wallace, is this video from the defendant's

20   Instagram account?

21   A.   Yes.

22   Q.   Can you describe what it depicts?

23   A.   He appears to be at a gun range and he's firing a handgun

24   at this point in the video.

25          MS. RUMBAUGH:  Keep going.

1   BY MS. RUMBAUGH:

2   Q.   Detective Wallace, are those the videos [sic] that are

3   depicted in this video, are they rifles or pistols?

4   A.   Pistols.

5   Q.   Again, did law enforcement find any small firearms,

6   including any pistols or handguns, when the defendant's

7   residence was searched?

8   A.   No.

9   Q.   Detective Wallace, are you familiar with pistols

10  manufactured by the GLOCK company?

11  A.   Yes.

12  Q.   Explain how you are familiar with GLOCK pistols?

13  A.   I personally owned one at one point as did my husband,

14  and then we have received training through our range through

15  the police department on GLOCK handguns.

16  Q.   Do GLOCK handguns have any distinct features about them?

17  A.   They do.  They have a classic sort of boxy frame, and

18  then on the end of the slide they have parallel it looks like

19  striations or ridges towards the rear.

20  Q.   Did you see those striations on the pistols shown in the

21  video that we just watched?

22  A.   Yes, along with that same boxy style.

23  Q.   Now, did you also obtain a search warrant for various

24  Snapchat accounts in this case?

25  A.   Yes.

1  Q.   And specifically, Kollin Worlds' Snapchat account?

2  A.   Yes.

3  Q.   And Exhibit 48A, which it should be a disk and now has

4  been moved into evidence, is that the full Snapchat return for

5  Mr. Worlds' Snapchat account?

6  A.   Yes.

7  Q.   And what is his Snapchat moniker?

8  A.   Sluttyboyk.

9  Q.   Detective Wallace, have you reviewed the full Snapchat

10  account for Kollin Worlds' account?

11  A.   Yes.

12  Q.   Were there photographs included in that Snapchat return?

13  A.   Yes.

14  Q.   Were there videos included in that Snapchat return?

15  A.   I believe so.

16  Q.   Were there chats included in that Snapchat return?

17  A.   Yes.

18  Q.   In any of the photographs, videos, or chats or any of the

19  other data included in his Snapchat return, did you see any

20  evidence of Mr. Worlds possessing firearms?

21  A.   Not that I recall.

22  Q.   All right.  Let's take a look at 48B, which is also in

23  evidence.

24        MS. RUMBAUGH:  And, Ms. Lee, could you please

25  publish that.

1   BY MS. RUMBAUGH:

2   Q.    Detective Wallace, what are these?

3   A.    These are the chats in Mr. Worlds' Snapchat account.

4   Q.    All right.  I'd like to -- are these in reverse

5   chronological order?

6   A.    Yes.

7   Q.    And do you see the time stamp on the right side?

8   A.    Yes.

9   Q.    Are these times in east coast time or UTC time?

10  A.    These times are in UTC.  So to get to east coast time,

11  you would have to subtract four hours from the time that

12  you're seeing.

13  Q.    So let's go to page 2 of this exhibit.

14            MS. RUMBAUGH:  Ms. Lee, can you zoom in on the

15  last -- the last three entries on that page.

16  BY MS. RUMBAUGH:

17  Q.    Do you see where it says -- do you see the center

18  communication?

19  A.    Yes.

20  Q.    Who is this between?

21  A.    Whoever Marquez to KJ is to Kollin's account.

22  Q.    And what does the body of that message say?

23  A.    I'm about to go re-up right now.

24  Q.    Do you have an understanding of what that means?

25  A.    Go get more marijuana.

1  Q.   What time was this message sent?

2  A.   It says 21:15 hours which that says 9:15, but it would be

3  5:15 p.m.

4        MS. RUMBAUGH:  Now, Ms. Lee, if we could zoom in on

5  the top three messages on this page.

6  BY MS. RUMBAUGH:

7  Q.   Do you see the communications between Sluttyboyk and

8  Campos300?

9  A.   Yes.

10 Q.   Do you know who Campos300 is?

11 A.   Yes.  Kevin Campos.

12 Q.   And is Mr. Campos Kollin Worlds's friend?

13 A.   Yes.

14 Q.   That he referenced earlier today?

15 A.   Yes.

16 Q.   Now, if we could go back to the first page of this

17 exhibit.

18        MS. RUMBAUGH:  And, Ms. Lee, if you could pull up

19 the bottom two messages on this page.

20 BY MS. RUMBAUGH:

21 Q.   Detective Wallace, do you see the communication between

22 Melvin.Palma and Sluttyboyk?

23 A.   Yes.

24 Q.   Again, who is Melvin.Palma?

25 A.   Melvin Palma Flores.

1   Q.   What is the -- what does the body of this message say?

2   A.   MV Square which I take to mean Mount Vernon Square.

3   Q.   Who sent that message?

4   A.   Melvin Palma Flores sent it to Kollin Worlds.

5   Q.   Take a look at that again, the from -- the From column

6   and the To column.

7   A.   So it looks like -- oh, I'm sorry.  I'm sorry.  It looks

8   like the communication was between the two, from Kollin to

9   Melvin.  I apologize.

10  Q.   And is it your understanding that Kollin Worlds was at

11  Melvin -- was at Mount Vernon Square at that time?

12  A.   Yes.

13  Q.   And what time was this?

14  A.   This would have been 9:07 p.m.

15  Q.   All right.  Last one.

16          MS. RUMBAUGH:  Can we zoom in on the one that's

17  about two-thirds of the way down.

18  BY MS. RUMBAUGH:

19  Q.   Detective Wallace, who is this communication between?

20  A.   This is between our victim, Xyqwavius Brown, and Kollin

21  Worlds.

22  Q.   Who sent it?

23  A.   Qwa Brown sent it to Kollin Worlds.

24  Q.   What time?

25  A.   This was 12:25 a.m. on 10/26/19.

1  Q.   And what is the body of the text?

2  A.   Bro, are you blowing me?

3  Q.   What do you interpret that to mean?

4  A.   Like blowing me off.

5  Q.   Is this the last known communication from Qwa Brown

6  before he was killed?

7  A.   Yes.

8  Q.   And remind me once more, when was the first 911 call?

9  A.   12:30 a.m.

10  Q.   Five minutes after this?

11  A.   Yes.

12  Q.   All right.  Detective Wallace, are you -- again, you've

13  been here to listen to all of the testimony here today,

14  correct?

15  A.   Yes.

16  Q.   And are you familiar with the two letters that have been

17  entered into evidence as Government's Exhibit 34 and 35?

18  A.   Yes.

19  Q.   Okay.  I'd like to take a look at 34.  Now, I know that

20  Ms. Sheehy has already read a good bit of it, so I'd like to

21  skip over to page 4.

22       MS. RUMBAUGH:  Ms. Lee, if you could please zoom in

23  to where it starts about a third of the way down, "The only

24  bad thing..."

25       THE WITNESS:  Okay.

1 BY MS. RUMBAUGH:

2 Q.   Detective Wallace, if you could start reading at, "The

3 only bad thing," and read to the end of this section.

4 A.   "The only bad thing, Babe, was that in your statement you

5 said so much incriminating evidence.  So the only way you can

6 reverse that is by saying that Detective Wallace made you say

7 all of that, by coercing you to say that, because you can say

8 when you told her it was Kollin that did it but she did not

9 believe you, because she told you why would Kollin do that if

10 he does not have a reason to do it.  And that is when you told

11 her that I was selling gas for him so I could pay off my

12 debt."

13 Q.   Detective Wallace, did you coerce Ms. Sheehy into saying

14 anything?

15 A.   No.

16 Q.   Let's skip ahead to page 5.  About nine lines down

17 starting with, "Also, what I was thinking..."

18 A.   Okay.

19 Q.   Start with that and read to the end of the section.

20 A.   "Also, what I was thinking was you and Jason go to my

21 friend Bryan's house and tell him that Kollin did it but that

22 he put the blame on me, because one time when Bryant was at

23 the mall, he seen Kollin and they talked, and you guys

24 convinced him to say that Kollin was bragging what he did to

25 forf and how I'm going to get in trouble for it.  Even though

1  I did not do it and to make it more believable, tell Jason to

2  tell him that Kollin told him the same when we went back to

3  Jason's house the next day.  That way the more people we have

4  on our side, the better, because that way the feds do not even

5  see it coming."

6  Q.   Continuing on the next section, starting at the bottom of

7  this page.  See where it says, "Also, Babe, since you

8  mentioned..."  Bottom of page 5.

9  A.   Yes.

10  Q.   Can you start reading from there and continue over to the

11  next page where it says, "the feds tried to interrogate him."

12  A.   I'm sorry, to where it says what?

13  Q.   "Just in case the feds try to interrogate him."

14  A.   Okay.  "Also, Babe, since you mentioned my cousin Hector,

15  you got to tell him the plan and tell him if he willing to

16  testify and say that I came to his house, to tell him

17  everything because I was afraid that Kollin was going to kill

18  me and to tie up the loose ends.  Just in case the feds try to

19  interrogate him."

20  Q.   All right.  I'd like you to skip over to page 7 now.

21  A.   Okay.

22  Q.   And starting at the top of the page through the first --

23  the first six lines of this page.

24  A.   "Or we can say that Kollin just told us to take him to go

25  cop some gas and we did not know what happened until he told

1   us what he did, and he said if we told anyone, he would kill

2   us and my family."

3   Q.   What does gas mean?

4   A.   Gas is slang for marijuana.

5   Q.   On page 7, two lines down halfway, it starts with, "You

6   say you do not..."

7   A.   Okay.

8   Q.   Start reading there through, "dying in prison."

9   A.   "You say you do not want me to be in prison for the rest

10  of my life until I die, so you have to make a decision right

11  now.  You either got me or you don't.  And if you don't, just

12  let me know, that way I just take a plea deal for 17 years

13  because that is way better than getting life in prison and

14  never getting out and dying in prison."

15  Q.   And then on page 8, towards the bottom.  I'd actually

16  like you to start from the bottom nine lines up where it says,

17  "Also, Babe, you don't have to..."

18  A.   All right.  Until the end?

19  Q.   Yes.

20  A.   "Also, Babe, you don't have to be friends with anyone.

21  But if you truly want me to come home, you, Jason, Jasmine and

22  Hector going to have to be on the same page.  That way all of

23  you got the same story.  Another thing I'm confused about,

24  should Jasmine say she lied because I told her everything and

25  she was scared for my life, so that is why she lied to the

1 police, because she was scared. Because if I told the truth,

2 she was scared that something would happen to my family or

3 what. Whatever y'all choose to do, make sure all your stories

4 match, then tell my attorney or ask him for advice as what to

5 do."

6 Q. Detective Wallace, I'd now like to show you Exhibit 35.

7 This is the letter dated December 25th, 2020.

8 A. Okay.

9 Q. And looking over at page 2, I want you to read starting

10 at the end of the third line from the top, it says, I'm, and

11 just that one sentence.

12 A. "I'm not going to lie. At first I didn't believe it, but

13 once I heard the conversation between y'all, I cried."

14 Q. What do you understand this to mean?

15 A. There was a meeting that we had with Melvin and his

16 attorney, and we had played him the conversation between Laila

17 and I when I met with her on the 28th of December.

18 Q. So your understanding is that the conversation he's

19 referring to is the recorded conversation in which Laila was

20 cooperating with you?

21 A. Yes.

22        MS. RUMBAUGH: Your Honor, I have no further

23 questions at this time.

24        THE COURT: Mr. Jenkins, just so I can sort of

25 evaluate what we do with the jury, I'd like to give them a

1  break, how long do you think your examination is going to be,

2  sir?

3          MR. JENKINS:  Your Honor, probably 20 to 30 minutes.

4          THE COURT:  Okay.  Ladies and gentlemen, I'm going

5  to go ahead and give you a short afternoon break.  We are

6  still on pace to be able to finish at four o'clock today.

7  We're on a pretty good pace.

8          I'll let you know in advance what we're talking

9  about doing is getting through this testimony and then

10  figuring out where we are at this point and we'll let you

11  know.

12          But I'm going to let you take about a ten-minute

13  break and please try to be prompt as you come back.  Thank

14  you.

15          (Jury dismissed.)

16          THE COURT:  You all may be seated.

17          It seems like the plan that counsel suggested as we

18  came back in from our lunch break is going to be one that

19  we're going to implement.

20          What I would propose we do is go ahead and let Mr.

21  Jenkins, you complete your cross-examination.  And if the

22  government wants to ask any questions on redirect, they can do

23  that.  That should allow us to get the jury out by four

24  o'clock or thereabouts.

25          I would like to discuss where we are as far as what

1  your client is going to do because that helps me prepare in a

2  different way.  So he doesn't need to necessarily make a final

3  decision today but if you could just give me some sort of

4  frame work as to what you're operating from, that would at

5  least be helpful.

6          MR. JENKINS:  Yes, Your Honor.  Thank you, Your

7  Honor.

8          May it please the Court, we are not prepared to make

9  a commitment, as the Court has already acknowledged, but there

10  certainly is a possibility that Mr. Palma Flores may offer

11  evidence tomorrow.

12          THE COURT:  Okay.  That's fine.  Obviously that is

13  his right.

14          MR. BEN'ARY:  Your Honor, understanding it is a

15  fluid situation, there are reciprocal discovery obligations

16  set forth, we have received nothing.  So if it's anything

17  other than Mr. Palma's testimony and there's anything that

18  would be covered by that, I would ask that --

19          THE COURT:  It's within the rule that suggests that

20  they are going to have to put you on notice of certain things.

21  Obviously, that would be impacted by the scope of his

22  testimony.  But, again, Mr. Jenkins is very adept at what he

23  does, and I'm sure that he understands his obligations under

24  the rules.

25          MR. BEN'ARY:  Understood.  I just want to protect

1    the government's case for the record, Your Honor.

2              THE COURT:  I understand.

3              Let's go ahead and take our afternoon break.  I've

4    got some candy up here if anyone needs some energy.  Feel free

5    to approach the deputy clerk if you need some.  And I will see

6    everybody back in at about 3:30.

7              Also, before I go, I should have mentioned this

8    earlier while we were still -- because I pretty much try to

9    keep a record of everything, I want everybody to know that I

10   kept a record and it appears from what I was able to observe

11   in the back of the courtroom, Ms. Sheehy came into the

12   courtroom at about 2:35 and she left at 2:43.  Mr. Hector

13   Flores, if I'm recognizing him, came into the courtroom at

14   2:22 and has remained throughout.

15             So I'm just making you all aware that those were

16   witnesses who participated and obviously we have the rule on

17   witnesses.  So I just want to make sure you're aware of that.

18             MR. JENKINS:  Yes, Your Honor.

19             THE COURT:  Thank you.

20             (Recess.)

21             THE COURT:  Anything we need to do before we bring

22   the jury back?

23             MS. RUMBAUGH:  No, Your Honor.

24             MR. JENKINS:  No, Your Honor.

25             (Jury present.)

1    THE COURT:  The jury is reseated.

2    I apologize, gentlemen, I should have noticed that

3 there's a little hole right there that you can come around.

4 So next time when you're coming in, just go around and get up

5 that way, the young lady also, just come around.  You're fine.

6 Thank you.

7    Mr. Jenkins.

8    MR. JENKINS:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10 BY MR. JENKINS:

11 Q.   Good afternoon, Detective.

12 A.   Good afternoon, sir.

13 Q.   Detective Wallace, when you arrived at the crime scene on

14 the early morning hours of October 26, 2019, as I understand

15 it, the victim, his body had been removed from the scene,

16 correct?

17 A.   Correct.

18 Q.   And at that point in time your attention was focused on

19 trying to identify things of evidentiary value, correct?

20 A.   Correct.

21 Q.   For example, some of the casings that we've heard

22 testified here today and yesterday, correct?

23 A.   Yes.

24 Q.   The fragments that were testified about, the bullet

25 fragments?

1    A.    Yes.

2    Q.    And of course, the victim's cell phone, lighter, and

3    other personal effects that were on the scene, correct?

4    A.    Yes.

5    Q.    Do I understand correctly that you also tried to canvass

6    the area?

7    A.    I didn't personally.  That was one of the tasks delegated

8    to my squad mates.  But, yes, that did occur.

9    Q.    And one of the things that you looked for was whether or

10   not the buildings were equipped with any surveillance camera,

11   correct?

12   A.    Yes.

13   Q.    Because oftentimes in your work and experience, you found

14   that when shootings or crimes occur in similar situations,

15   there may be exterior surveillance cameras, correct?

16   A.    Yes.

17   Q.    And even in today's world, even the residents might have

18   their own small little doorbell or Ring camera that might

19   actually produce some information for you, correct?

20   A.    Yes.

21   Q.    And in this situation, however, no such surveillance

22   cameras were uncovered, correct?

23   A.    So there were surveillance cameras in the complex.  They

24   did not cover the area where the shooting occurred.  They were

25   more towards the front where Fairchild and I believe it's

1  Julep Drive around the pool, that's where the surveillance

2  cameras for the complex were located.  And I don't believe any

3  of my squad mates located any individual Ring cameras on any

4  individual apartments.

5  Q.   So is it fair to say or am I correct in that throughout

6  your investigation, you did not uncover any actual video

7  recording of the shooting, correct?

8  A.   Correct.

9  Q.   Now, also am I correct that when you arrived on the

10  scene, I believe you testified on direct that you started to

11  interview a number of individuals, right?  Correct?

12  A.   Police officers.

13  Q.   Police officers did.

14         And even subsequent to the morning of October 26th,

15  you yourself conducted a round of other interviews, correct?

16  A.   We had started, yes.

17  Q.   For example, you interviewed the victim's family,

18  correct?

19  A.   Yes.

20  Q.   And you also tried to identify friends or associates of

21  the victim in order to do the same, correct?

22  A.   Yes.

23  Q.   And your goal was to help -- to interview these

24  individuals to try to develop a pool of suspects, correct?

25  A.   Suspects, but also try to find out what was going on in

1  Qwa's life at the time that could have led us down the path of

2  what ended up causing his death.

3  Q.   But ultimately, you wanted to identify a suspect,

4  correct?

5  A.   Of course, yes.

6  Q.   So that, ultimately, you could identify a perpetrator,

7  correct?

8  A.   Yes.

9  Q.   And someone who could be held accountable for taking his

10  life, correct?

11  A.   Yes.

12  Q.   And isn't it true that one of these individuals that you

13  identified as a potential superintendent was in fact Kollin

14  Worlds?

15  A.   Yes.

16  Q.   And that was in part because you have already testified

17  that you noticed that the last communication between the

18  decedent and anyone else was actually with Kollin Worlds's

19  account?

20  A.   His account, yes.

21  Q.   And when you first saw that, of course, you had no way of

22  knowing who was operating that account, correct?

23  A.   Correct.

24  Q.   But you did clearly could see that the last person five

25  minutes before the incident occurred, the victim appeared to

1  have been in communication with Kollin Worlds, correct?

2  A.   Yes.

3  Q.   And then you subsequently met with Mr. Worlds, correct?

4  A.   Yes.

5  Q.   And Mr. Worlds told you that he had an alibi or he wasn't

6  at the apartment complex that night, correct?

7  A.   Yes.

8  Q.   Did he admit to you that he knew the victim?

9  A.   He did.

10 Q.   Did he admit to you that he was involved in the

11 distribution of marijuana?

12 A.   Not at that time.  His parents were right next to him

13 when we were talking to him, so I did not get into that with

14 him with his mom and dad sitting there.

15 Q.   Did he acknowledge to you that, as he testified here

16 yesterday, that he was aware that the victim was into robbing

17 drug dealers?

18 A.   I don't recall if he said robbing drug dealers.  I know

19 he definitely knew Mr. Brown was involved in selling and using

20 marijuana.  But specifically for robbing, I can't remember if

21 he ever told me that directly.

22 Q.   And based on your investigation, you concluded that in

23 the early morning hours of October 26, 2019, moments before

24 Mr. Brown was sadly shot, that Kollin Worlds was in the

25 vicinity?

1  A.   Kollin didn't have a phone, so I was never able to do any

2  GPS location on a phone that he was using to put him in the

3  vicinity at that time.  Later on as the investigation unfolded

4  and he spoke with us with his attorney, he told us he was in

5  the vicinity.

6  Q.   So my question is as a consequence of your entire

7  investigation, you were able to confirm that Kollin Worlds in

8  fact was in the vicinity at the time, date, location, when Mr.

9  Brown was shot?

10  A.   Yes.

11  Q.   Now, you never recovered any -- the murder weapon,

12  correct?

13  A.   Correct.

14  Q.   You never uncovered any forensic evidence that connects

15  Mr. Palma Flores to the shooting, correct?

16  A.   Forensic as far as DNA, no.

17  Q.   What about fingerprints?

18  A.   No fingerprints.

19  Q.   What about blood evidence?

20  A.   No blood evidence.

21  Q.   Now, you, in interviewing a witness in a case like this,

22  a homicide case, who comes forth and offers information to aid

23  in your investigation, am I correct that you're trained to

24  attempt to evaluate their credibility?

25  A.   Yes.

1  Q.   To try to determine whether or not they're telling the

2  truth, correct?

3  A.   Yes.

4  Q.   Because you just don't want to accept anything someone

5  might say to you, correct?

6  A.   Right.

7  Q.   Because as you found in this case, there were a lot of

8  rumors out there about what happened, correct?

9  A.   Yes.

10  Q.   There was a lot of people offering you all kinds of

11  theories as to who shot and killed Mr. Brown, correct?

12  A.   Correct.

13  Q.   And to the best of your ability, you attempted to track

14  down some of those, correct?

15  A.   Yes.

16  Q.   At least the ones one that you found to be halfway

17  credible, correct?

18  A.   And some people just refused to talk, so we tried as best

19  we could.

20  Q.   But it's very important for you to corroborate,

21  particularly the essential element of a potential witness's

22  account, correct?

23  A.   Yes.

24  Q.   For example, like when Laila Sheehy explained to you what

25  Mr. Palma Flores allegedly did with the murder weapon, you

1   identified immediately that it would be very helpful if you

2   could corroborate that, correct?

3   A.   Yes.

4   Q.   It would be important for you to be able to establish

5   independent of her word that what she was telling you was the

6   truth, correct?

7   A.   Yes.

8   Q.   You didn't want to just go by what she said, correct?

9   A.   Not just by what she said.

10  Q.   And you took efforts to do that, correct?

11  A.   Yes.

12  Q.   She told you -- she reported to you where part of the gun

13  supposedly was thrown, correct?

14  A.   Yes.

15  Q.   And you went there, correct?

16  A.   Yes.

17  Q.   You had a dive team search, correct?

18  A.   Yes.

19  Q.   No results, correct?

20  A.   Correct.

21  Q.   Is it fair to say you were unable to corroborate that

22  part of her story?

23  A.   Not with anything -- not with physical evidence.

24  Q.   You would agree with me that of the story she explained

25  to you about the defendant's involvement in this crime, that

1   was significant, correct?

2   A.   I'm sorry, can you repeat that, sir?

3   Q.   Would you agree with me that her account of what the

4   defendant did with the murder weapon was significant, correct?

5   A.   Yes.

6   Q.   It was material, correct?

7   A.   Yes.

8   Q.   Now, you also had the occasion to meet and speak with

9   Hector Flores, correct?

10  A.   Yes.

11  Q.   And Hector Flores told you an account very similar to the

12  one that he testified earlier today, correct?

13  A.   Yes, sir.

14  Q.   But he didn't share that story with you in October of

15  2019, correct?

16  A.   No.

17  Q.   He didn't share it with you in December 2019, correct?

18  A.   No.

19  Q.   In fact, he didn't share it with you in the entire

20  calendar year 2019, correct?

21  A.   Right.

22  Q.   He didn't share it with you in January of 2020, correct?

23  A.   All of 2020.

24  Q.   The entire calendar year he didn't share it with you,

25  correct?

1    A.   Correct.

2    Q.   Am I correct it wasn't until some time in 2021, this

3    year, that Mr. Hector Flores came forth and told you the story

4    that he told this jury today?

5    A.   Yes.

6    Q.   That was the first time, correct?

7    A.   March of this year.

8    Q.   March of this year.  Up until this point, you had not

9    heard from Mr. Hector Flores, correct?

10   A.   Correct.

11   Q.   And among other things, Mr. Hector Flores told you that

12   months after the shooting, that his cousin told him, I killed

13   someone, correct?

14   A.   Yes.

15   Q.   And other than him telling you that, other than Hector

16   Flores telling you that Mr. Palma Flores told him that, were

17   you able to independently corroborate that that conversation

18   ever even occurred?

19   A.   No.

20   Q.   You just don't want to go off what Hector Flores said,

21   correct?

22   A.   I had heard that from Laila, though, as well.

23   Q.   Well, I'm talking about the existence of the

24   conversation.  Because Hector Flores couldn't tell you the

25   date when that conversation occurred, correct?

1    A.    Correct.

2    Q.    He couldn't tell you even the month of when that

3    conversation occurred, correct?

4    A.    He could tell me vaguely the month.

5    Q.    He couldn't tell you the time of day?

6    A.    Correct.

7    Q.    He didn't tell you where the conversation occurred?

8    A.    He said it was at Melvin's house.

9    Q.    It was at Melvin's house?

10   A.    Melvin's house.

11   Q.    At some unknown time on some unknown date, correct?

12   A.    Towards the --

13   Q.    According to him, no one else was around?

14   A.    Correct.

15   Q.    Now, you also -- I think we've already talked about your

16   investigation into Kollin, correct?

17   A.    Yes.

18   Q.    And you were able to, again, corroborate that his account

19   last spoke with the victim, correct?

20   A.    Yes.

21   Q.    Now according to him, it wasn't he who was communicating

22   through that social media account but it was Mr. Palma Flores,

23   correct?

24   A.    Yes.

25   Q.    And he told you the account that he borrowed Mr. Palma

1  Flores's phone and he logged into his chat -- Snap account,

2  and that's how the communications occurred, correct?

3  A.    Yes.

4  Q.    And that it was, according to Kollin, Mr. Palma Flores

5  who was actually doing the communicating?

6  A.    Yes.

7            THE COURT:  Mr. Jenkins, let me slow you down.

8            Ladies and gentlemen, if we're going to wear the

9  masks, we need to wear them correctly to get the full benefit.

10  Thank you.

11  BY MR. JENKINS:

12  Q.    Now, you've testified with respect to Government's

13  Exhibit 48A, and I'll just remind you that's the extraction of

14  Mr. Palma Flores's phone.

15  A.    Okay.

16  Q.    And you reviewed that extraction?

17  A.    Yes.

18  Q.    The entire thing, correct?

19  A.    I can't say the entire thing because there could be

20  hundreds of thousands of files on the extraction.

21  Q.    Is it fair to say you were searching it for anything that

22  might be relevant to your investigation?

23  A.    Yes.

24  Q.    And would I be correct in assuming that if you had

25  identified any forensic evidence from Mr. Palma Flores's phone

1  extraction that actually corroborated Kollin's description to

2  you about logging into Mr. Palma Flores's phone on his

3  Snapchat account, you would have found that relevant, correct?

4  A.   Yes, I just don't know if that would be something that

5  would come up in that data.  I don't know how I could search

6  for that.

7  Q.   But the point is you would tell this jury that you were

8  unable to corroborate that, correct?

9  A.   Yes.

10  Q.   You only have what Kollin tells you about who was using

11  the phone to communicate with the victim, correct?

12  A.   And what Laila told me as well.

13  Q.   Well, we'll talk about Laila, but that's what Kollin told

14  you, correct?

15  A.   Yes.

16  Q.   And you don't have any forensic evidence, that is

17  computer data, that actually corroborates what he told you,

18  correct?

19  A.   Correct.

20  Q.   He told you he didn't have a phone, correct?

21  A.   Correct.

22  Q.   You were unable to corroborate that either, correct?

23  A.   His parents said he didn't have a phone.

24  Q.   Well, his mom and dad told you he didn't have a phone.

25  A.   Right.

1  Q.   Other than what is mommy and daddy told you, were you

2  able to corroborate whether or not he didn't have a phone?

3  A.   No.

4  Q.   That's just what Kollin told you and his mother and dad?

5  A.   Yes.

6  Q.   Now there were, outside of the one 911 call that you

7  testified here today, that wasn't the only 911 call, correct?

8  A.   Correct.

9  Q.   And unlike the 911 call we heard in Exhibit 6A, others

10 actually described to some degree what they saw --

11 A.   Yes.

12 Q.   -- during the shooting, correct?

13       Were any of the descriptions, without telling us

14 what they were, did you find them to be valuable to your

15 investigation?

16 A.   Not really.  They were very vague.

17 Q.   Is it fair to say that none of the descriptions provided

18 matched my client, Mr. Palma Flores?

19 A.   The only description was that a person seen in the area

20 leaving was shorter.  So between Kollin and Melvin, Kollin is

21 the taller of the two and Melvin is the shorter, and that was

22 the only conclusion I could draw from that.

23 Q.   But you also had other descriptions, right, of multiple

24 people fleeing, correct?

25 A.   No, just one person fleeing.

1 Q.   What about the Hispanic males?

2 A.   From my understanding of the call, and I don't know if we

3 need to listen to it, it was that someone could hear Hispanic

4 males arguing.  I don't know if there was ever a physical

5 description of Hispanic males.  But someone arguing in Spanish

6 saying something like, let's go, let's go, is from what my

7 recollection is of that call.

8 Q.   Detective, you testified about Government's Exhibit 14

9 and that's, I'll remind you, the target letter that you caused

10 or were involved in sending to him.  Do you remember that

11 testimony?

12 A.   To Kollin?

13 Q.   Yes.

14 A.   Yes.

15 Q.   Now, this wasn't the first time you've been involved with

16 sending out a letter to an individual in relation to a federal

17 grand jury investigation, correct?

18 A.   This is my first federal trial.

19 Q.   And do you know -- well, is there a distinction between a

20 letter that is sent to someone who you believe, as the lead

21 detective, has information about your investigation versus

22 someone who may be a target of the investigation?

23         MS. RUMBAUGH:  Objection, Your Honor.  I'm not sure

24 how she would know that.

25         THE COURT:  Rephrase your question, Mr. Jenkins.

1    MR. JENKINS:  I will, Your Honor.

2    BY MR. JENKINS:

3    Q.    You testified on direct examination that Kollin received

4    a target letter, correct?

5    A.    Yes.

6    Q.    And you interpreted in the target letter not that he was

7    someone who you believed had committed the crime, correct?

8    A.    Correct.

9    Q.    But instead, someone who may just have information,

10   correct?

11   A.    Correct.  Well, he could have been.  I just didn't know

12   at that time.  I hadn't spoken with him.

13   Q.    So it's fair to say that at the time you caused that

14   letter to be sent to him, you hadn't concluded whether or not

15   he had perpetrated the crime or not?

16   A.    From what Laila had said, it appeared that he had not.  I

17   just hadn't spoken to him personally to get his side of the

18   story at that point.

19   Q.    But you hadn't concluded one way or the other, correct?

20   A.    One way or another.

21   Q.    When you sent that target letter to him, correct?

22   A.    Yes.

23   Q.    Now, earlier in that day -- well, you also searched not

24   just the defendant's phone extraction but also that of

25   Kollin's, correct?

1          MS. RUMBAUGH:  Objection, Your Honor.  She testified

2     that Kollin didn't have a phone.

3          MR. JENKINS:  Oh, I'm sorry.  I didn't mean Kollin.

4     BY MR. JENKINS:

5     Q.  When you searched the phone extraction for the defendant,

6     I believe you testified on direct examination that you didn't

7     uncover any photographs of Kollin in possession of any

8     firearms, am I correct?

9          MS. RUMBAUGH:  Objection.  That wasn't in regards to

10    the defendant's phone, that was --

11         THE COURT:  Why don't you all -- just a second.  Why

12    don't you all, just put on the white noise and see if the

13    discussion --

14         (Counsel confers.)

15         MR. JENKINS:  Your Honor, I think we've already

16    resolved it.

17    BY MR. JENKINS:

18    Q.  You searched Kollin Worlds's Snapchat?

19    A.  Yes.

20    Q.  And your testimony on direct examination was that you

21    didn't find any photograph of him in possession of firearms?

22    A.  I don't recall seeing any.  Again, there could be

23    hundreds of thousands, so I don't recall seeing any.

24    Q.  And when you also searched the defendant's cell phone, do

25    you recall whether or not you saw any photographs of Kollin

1  Worlds in the possession of handguns?

2  A.   I'm sorry, you're saying when I searched Mr. Palma

3  Flores's cell phone, did I find any videos or evidence of

4  Kollin on his phone?

5  Q.   Correct.

6  A.   Not that I recall.

7  Q.   Because you know that, and you heard him testify, that

8  Kollin Worlds and Mr. Palma Flores were friends, correct?

9  A.   Yes.

10  Q.   For a long time, correct?

11  A.   Yes.

12  Q.   You would agree with me that you did observe or recall

13  observing many photographs of Mr. Palma Flores as well as

14  other associates of his on his phone account, correct?

15  A.   Yes.

16  Q.   Did you, during the course of your investigation, learn

17  of an individual named Jude?

18  A.   Yes.

19  Q.   And who is Jude?

20  A.   Jude is a West Potomac student who is friends with Kollin

21  and also that group of friends down there in the West Potomac

22  area.

23  Q.   Do you recall hearing Kollin testify -- Mr. Worlds

24  testify earlier today that Jude sold marijuana?

25  A.   Yes.

1  Q.   Were you able to corroborate that?

2  A.   I think Jude -- we ended up interviewing Jude, and I

3  believe he did tell us in person that he did.

4          THE COURT:  Let's approach.

5          (Side bar.)

6          THE COURT:  I just want to make sure because I want

7  the record to be clear, is Jude a juvenile, do we know that?

8          MS. RUMBAUGH:  I haven't asked Detective Wallace.  I

9  don't recall specifically.

10         THE COURT:  We have to be real careful about putting

11 in the record information about a juvenile.

12         MR. JENKINS:  I understand that.  Here is my basis

13 to believe that he wasn't as the Court and everybody probably

14 is able to detect.

15         THE COURT:  Let me stop you there.  Good faith offer

16 believes he is not, what we'll do is we'll follow up and if he

17 is indeed a juvenile, we'll redact the record to make sure

18 that we don't have his name.  Is everyone fine?

19         MS. RUMBAUGH:  That's fine.

20         MR. JENKINS:  And, Your Honor, I'll be concluding

21 very shortly.

22 BY MR. JENKINS:

23 Q.   So Detective, again, Jude, I think he admitted to you

24 that he was a marijuana dealer, correct?

25 A.   Yes.

1  Q.   And you heard Mr. Kollin Worlds testify that his friend

2  Jude had been a victim of a robbery, correct?

3  A.   Yes.

4  Q.   And what about an individual by the name of Marvin?

5  A.   Marvin?  I don't recall that name.

6  Q.   What about a Kevin Campos?

7  A.   Yes.

8  Q.   And that was a friend of --

9  A.   Kollin's.

10       MR. JENKINS:  Your Honor, I believe those are all

11  the questions that I have.

12       THE COURT:  Redirect?

13       MS. RUMBAUGH:  Very briefly, Your Honor.

14       THE COURT:  Yes.

15                 REDIRECT EXAMINATION

16  BY MS. RUMBAUGH:

17  Q.   Detective Wallace, did you hear Mr. Jenkins ask you about

18  getting independent verification information that Ms. Sheehy

19  provided?

20  A.   Yes.

21  Q.   I'd like to pull up Government's Exhibit 38.  And this is

22  the map of the phone data on October the 25th, 2019, 8 p.m. to

23  11 p.m., is that correct?

24  A.   Yes.

25  Q.   Does this phone data corroborate Ms. Sheehy's testimony?

1  A.   Yes.

2  Q.   I'd like to pull up Government's Exhibit 39.

3       Actually, let's go back to 38 for a moment, Ms. Lee.

4       Detective Wallace, very briefly can you explain on

5  the map how this information corroborates Ms. Sheehy's

6  testimony?

7  A.   This map is illustrative of the story of her being in

8  Kingstowne, being picked up by Melvin, and then driving to the

9  Fairchild Drive area, and then being dropped back off in

10  Kingstowne, and then Melvin being up in Arlington afterwards

11  near Hector Flores's house.

12  Q.   I'm actually going to ask you to take a look at

13  Government's Exhibit 39.

14       Do you have 39 on the screen in front of you?

15  A.   Yes.

16  Q.   And what's the time frame for this period?

17  A.   11 p.m. on the 25th until 2 a.m. on the 26th of October.

18  Q.   Okay.  And do these phone records corroborate

19  Ms. Sheehy's testimony?

20  A.   Yes.

21  Q.   Can you explain how?

22  A.   The same thing.  It just shows her explanation of where

23  their travels went throughout the night, so that the times

24  match up with those locations.

25  Q.   All right.  Detective Wallace, do you remember hearing

1  both Mr. Worlds and Ms. Sheehy testify today?

2  A.   Yes.

3  Q.   Does Mr. Worlds corroborate Ms. Sheehy's testimony?

4  A.   Yes.

5  Q.   Do you remember Mr. Jenkins asking you about Hector

6  Flores's testimony?

7  A.   Yes.

8  Q.   And how he didn't share his story right away?

9  A.   Yes.

10  Q.   And he asked you about not being able to corroborate the

11  defendant's confession --

12  A.   Correct.

13  Q.   -- to him?

14       Do the phone records that we just looked at, do

15  those phone records corroborate Hector's testimony?

16  A.   Showing that Melvin was near his house at the time that

17  night, yes.

18  Q.   Now, Detective Wallace, lastly, Mr. Jenkins asked you

19  about the evidence found on Mr. Palma Flores's phone.  Do you

20  recall seeing any gaps in the data on that phone?

21  A.   Yes.

22  Q.   Can you describe what the gap in the data was?

23  A.   Well, obviously the data of the time frame that I was

24  looking at was the 26th, and the data is missing from the 25th

25  through early part of November.

1       MS. RUMBAUGH:  Nothing further.

2       THE COURT:  Is this witness subject to recall?

3       MS. RUMBAUGH:  No, Your Honor.

4       THE COURT:  Thank you, ma'am.  You may step down.

5  As the case agent, pursuant to the rules, you may remain in

6  the room.

7       Next witness for the government.

8       MS. RUMBAUGH:  The government rests.

9       THE COURT:  Very good.

10       Ladies and gentlemen, we're going to let you go for

11  the day.  As you heard from Ms. Rumbaugh, the government has

12  rested its case.  We will bring you back in tomorrow and we

13  will proceed accordingly.

14       If I could get you all to commit to be here no later

15  than quarter of ten tomorrow, can everybody do that?  Quarter

16  of ten tomorrow, we look forward to seeing you.

17       Remember what I've said to you throughout the

18  litigation, and you're probably going to get sick of hearing

19  it, please don't discuss the case or any aspect of the case

20  with anyone until the case is submitted to you for your

21  deliberations.

22       As I indicated earlier, we're doing very well, the

23  lawyers are being very efficient in the use of your time and

24  the Court's time, but yet presenting this case in a way that

25  is beneficial for you to hear it.  I appreciate your

1  attentiveness.  As a matter of fact, you've been one of the

2  more attentive juries I've had.  I usually have to make a

3  little noise around 3:00 to make some people stay with me, but

4  we gave you a little energy and so hopefully that helped you

5  get through the last little bit.

6          We'll see you no later than 9:45 tomorrow.  Thank

7  you, ladies and gentlemen.

8          (Jury dismissed.)

9          THE COURT:  You all may be seated.  Thank you.

10          MR. BEN'ARY:  I know that we rested, Your Honor, but

11  before formally resting I just wanted to preserve the chance

12  to go over the exhibits that were actually admitted, accepted

13  into evidence, with the clerk.  We may have neglected one

14  along the way, and I would reserve the right to reopen just if

15  any got missed along the way.

16          THE COURT:  Sure.  And the process that we use,

17  because of issues confronting another judge in another case,

18  we actually go through a drill in my court where we actually

19  get you to confirm with the deputy clerk what items have been

20  admitted into evidence and what items have not.  I also keep a

21  track of everything myself and compare it with the deputy

22  clerks.

23          I think with regard to pretty much everything except

24  maybe one or two, there are probably no issues, but we'll give

25  you that opportunity now at the close of business today and at

1  the close of the case to make sure.  And we'll have a document

2  where everyone can sign off on indicating that that's their

3  understanding what has been admitted and what has not been.

4          Mr. Palma Flores, are you still completely satisfied

5  with the services of your counsel?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  I'm sure that Mr. Jenkins is going to

8  have an opportunity to speak with you about what your

9  prerogative is going forward.  Obviously, I encourage you to

10 listen to his advice and take into consideration what he has

11 to offer.

12         With the permission of the marshals service, Mr.

13 Jenkins, I'm going to ask that you be able to have a little

14 bit of time with Mr. Palma Flores at the conclusion of today

15 if the marshals service is fine with that.

16         MR. JENKINS:  Thank you, Your Honor.

17         THE COURT:  This will probably -- I'm saying this

18 for the benefit of the marshals -- help us tomorrow if we can

19 allow them to have this conversation today, because more

20 likely depending on what you all have to do as opposed to what

21 others may be involved in moving Mr. Palma Flores, so I

22 appreciate your willingness to do that.

23         Counsel, once again I compliment you on your

24 presentation.  We'll look forward to seeing you tomorrow.  I

25 hope everyone has an enjoyable day.

1            Mr. Jenkins wants to tell me something.

2            MR. JENKINS:  Yes, Your Honor.  Your Honor, I know

3     that the hour is late.  I'm not certain if the Court would

4     prefer that I move forward with a motion that I have at this

5     time or do it tomorrow morning prior to the jury coming in.

6            THE COURT:  Let's do it now if you're comfortable

7     doing it.

8            MR. JENKINS:  I am, Your Honor.

9            THE COURT:  All right, sir.

10           MR. JENKINS:  Your Honor, may it please the Court.

11    At this point in time on behalf of the defendant, Mr. Melvin

12    Palma Flores, pursuant to Federal Rules of Criminal Procedure

13    29(a), I would ask that the Court enter a judgment of

14    acquittal on the basis that now that the government has

15    concluded its presentation of evidence, that it has failed to

16    make a prima facie case on all three counts.

17           I know that the Court has paid attention very

18    closely to the evidence that's come before it, so I won't

19    attempt to recount it.  And I also understand that the Court

20    is familiar with the standard and it is one that is very

21    favorable to the government.  And that the Court is to resolve

22    any conflicts in evidence in favor of the government and give

23    it all reasonable inferences.

24           And I stress, reasonable, Your Honor, because

25    ultimately the determination is whether or not the Court can

1  conclude that a rational fact-finder could find based off of

2  the evidence presented, even in the light most favorable to

3  the government, that the defendant is guilty beyond a

4  reasonable doubt of all three counts.

5       And, Your Honor, I'll particularly focus in on first

6  the firearm count.  And while there has been testimony that

7  Mr. Palma Flores was in possession of suspected marijuana,

8  although there's no actual forensic evidence to support that,

9  just the naked observations of several witnesses, I will

10  concede.  And also that he possessed one or more firearms.

11      Of course, that in and of itself is not violative of

12  the law in which he is charged with.  The government must

13  establish that he actually possessed those firearms and used

14  them in relation to his drug trafficking offense.

15      The closest where the government comes with tying

16  the knot there, Your Honor, is Detective Wallace's testimony

17  that those engaged in the sale of marijuana often use drugs

18  [sic] and she laid out the reasons why they may.  But there's

19  no testimony that that's exactly what Mr. Palma Flores did in

20  relation to his.

21      One, you have testimony or evidence that he 's at a

22  gun range.  There's no drugs involved there at all.  And then,

23  there's the recovery of what appears to be an AR-15 rifle at

24  his home, Your Honor, but there's no testimony that anyone has

25  presented so far that that gun was in fact used in relation to

1  any drug trafficking.

2        THE COURT:  Is that an obligation of the government

3  to prove that the precise firearm that was found in his home

4  is necessarily the one that perpetrated the offense or is it

5  the suggestion that a drug dealer, I'm using the term you used

6  earlier in your opening statement, typically does have

7  firearms as a means of protection.  Is that what the

8  government needs?

9        MR. JENKINS:  I think they have to go a little bit

10 further than just simply proving the possession and the

11 engagement in the drug trafficking offense.  They have to

12 actually establish under statute that the gun was used, in

13 fact, to further it.  Not just that it could but that in fact

14 it was used.

15       THE COURT:  Doesn't that fly in the face of the

16 legislative prerogative in this case that there's a focus, for

17 lack of a better way of putting it, in making sure that people

18 are going to deal drugs, that they don't also have firearms

19 while they're doing it.  There's a two-part inquiry as far as

20 the legislative history is concerned.

21       MR. JENKINS:  Absolutely, Your Honor.  And the case

22 law, however, is replete with cases in which the Fourth

23 Circuit and even the Supreme Court has distinguished someone

24 who may be engaged in unlawful drug dealing but at the same

25 time might be a hunter.  And, therefore, law enforcement comes

1  in, they find a 12-gauge shotgun or they find a deer hunting

2  rifle in the closet away from the drugs and there's no

3  evidence that a rifle was ever used in relation to the drug

4  trafficking, the Supreme Court has said that's not enough.

5         So it's not simply a strict liability test of here's

6  drugs, here's a gun, that's enough.  The government has to

7  connect the dots.

8         THE COURT:  But as I understand the government's

9  theory of the case, and again they can help me if I'm wrong on

10  this, is that they don't necessarily have to prove that the

11  guns that were found in possession of the narcotics,

12  unnecessarily the gun that committed the offense involving the

13  death of the deceased.

14         MR. JENKINS:  That is correct, Your Honor.  They

15  don't have to do that.  That's where I return to my argument

16  that while there may be some evidence that Mr. Palma Flores is

17  the individual who got out of the vehicle that has been

18  testified substantially here by Mr. Worlds as well as

19  Ms. Sheehy, there is in our view, through cross-examination, a

20  fair amount of evidence to suggest that it was Mr. Worlds who

21  actually exited the vehicle.

22         We would submit, Your Honor, that on balance, we

23  don't believe that any rational fact-finder could conclude

24  beyond a reasonable doubt that it in fact was Mr. Palma Flores

25  who exited the vehicle and perpetrated the offense as opposed

1  to Mr. Kollin Worlds.

2          And I do appreciate the Court's indulgence.

3          THE COURT:  And I appreciate your argument, sir, but

4  I think even looking at your theory of the case, and that is

5  it seems to suggest in your theory of the case that it was not

6  your client who committed the offense but rather another

7  individual.  I think that at a minimum a reasonable

8  fact-finder could conclude that your client was indeed

9  responsible.  They may believe that someone else is

10 responsible.

11         But this standard that we have right here at the

12 conclusion of government's case, I believe that your motion to

13 pose a verdict of acquittal is denied.

14         MR. JENKINS:  Thank you, Your Honor.

15         THE COURT:  Did you all want to say anything?

16         MR. BEN'ARY:  No, Your Honor.

17         THE COURT:  Off the record.

18         (Discussion off the record.)

19         THE COURT:  Anything else we need to take up?

20         MS. RUMBAUGH:  No, Your Honor.

21         MR. JENKINS:  No, Your Honor.

22         THE COURT:  Very good.  We stand adjourned.

23         **(Proceedings adjourned at 4:15 p.m.)**

24

25

**CERTIFICATE OF REPORTER**

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus MELVIN**

8    **PALMA FLORES**, Criminal Action No.: 1:20-cr-142, in said

9    court on the 14th day of December, 2021.

10         I further certify that the foregoing 216 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this June 9, 2023.

17

18

19

20

21   _____

22   Tonia M. Harris, RPR

23   Official Court Reporter

24

25