1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF VIRGINIA
2                    ALEXANDRIA DIVISION

3   ------------------------------x
                                  :
4   UNITED STATES OF AMERICA,      : Criminal Action No.
                                  :
5            versus               : 1:20-cr-142
                                  :
6   MELVIN PALMA FLORES,           : December 15, 2021
                                  :
7                  Defendant. : Volume III of IV
    ------------------------------x
8
          The above-entitled Jury Trial was heard before the
9   Honorable Rossie D. Alston, Jr., United States District Judge

10                  A P P E A R A N C E S

11   FOR THE GOVERNMENT:    MICHAEL BEN'ARY, AUSA
                            KATHERINE RUMBAUGH, AUSA
12                          United States Attorney's Office
                            2100 Jamieson Avenue
13                          Alexandria, VA 22314

14   FOR THE DEFENDANT:     ROBERT L. JENKINS, Jr. ESQ.
                            1010 Cameron Street
15                          Alexandria, VA 22314

16

17   OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                      United States District Court
18                                    401 Courthouse Square
                                      Tenth Floor
19                                    Alexandria, VA 22314

20

21

22

23

24

25

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Defendant:

Melvin Palma Flores

          Direct examination by Mr. Jenkins............. 30
          Cross-examination by Mr. Jenkins.............. 76
          Redirect examination by Mr. Jenkins........... 88

EXHIBITS

On behalf of the Defendant:

                                                    Admitted

Number 1.......................................... 22

MISCELLANY

Preliminary matters............................... 03
Court's Instructions.............................. 93
Closing arguments by Mr. Ben'Ary.................. 134
Closing arguments by Mr. Jenkins.................. 151
Rebuttal closing arguments by Mr. Ben'Ary......... 160
Certificate of Court Reporter..................... 177

1        **P R O C E E D I N G**

2    (Court proceedings commenced at 10:04 a.m.)

3            THE COURT:  Back on the record.  The United States

4    of America versus Melvin Palma Flores.  Representatives from

5    the government are present.  Mr. Jenkins is present along with

6    Mr. Melvin Palma Flores.

7            The Court adopts, by reference, the statement it has

8    made at the beginning of the trial regarding the steps taken

9    to deal with the circumstances we're all facing through the

10   pandemic.

11           Is there anything we need to do before we bring the

12   jury in?

13           MR. JENKINS:  I'll go ahead and raise it.

14           MR. BEN'ARY:  Okay, go ahead.

15           MR. JENKINS:  Yes, Your Honor.  May it please the

16   Court, Your Honor.  Robert Jenkins on behalf of the defendant,

17   Mr. Melvin Palma Flores.  Your Honor, this morning I

18   anticipate that the defense will present the testimony of

19   Mr. Melvin Palma Flores in his own defense.  And in doing so,

20   Your Honor, we intend to offer a piece of evidence which I

21   suspect the government would object, and I believe that the

22   Court would appreciate us resolving this issue prior to

23   Mr. Palma Flores beginning his testimony.

24           Your Honor, the evidence specifically would be a

25   letter, a handwritten letter, in which Mr. Palma Flores was --

1  would testify was received by him while he was detained at the

2  Fairfax Adult Detention Center as a consequence of his arrest

3  for the allegations which the Court has heard some testimony

4  about from Ms. Sheehy as well as Detective Wallace about a

5  certain domestic assault situation that occurred, I believe,

6  in December 2019.  And shortly after his detention there he

7  received this letter from Ms. Sheehy which does two things,

8  Your Honor.

9         Number one, throughout the letter -- and we do have

10  copies for the Court -- Ms. Sheehy is explaining why she's

11  upset with the defendant, the many things that the defendant

12  has done to anger her.  But most significantly, Your Honor, in

13  the letter she goes on to talk about how the charges that have

14  been placed against the defendant -- and we believe she was

15  referring to those domestic assault charges -- are false --

16  I'm sorry, Your Honor.

17         This is -- the defendant was not detained at the

18  Fairfax Adult Detention Center but the Alexandria Detention

19  Center when he received this letter, so I am corrected.

20  Nevertheless, Your Honor, in the letter she also indicates

21  that the charges against the defendant are false and that she

22  was threatened with the same being done to her, that is, we

23  would infer false charges being placed against her.

24         THE COURT:  Let me interrupt you and just make sure

25  I have the context of everything.  I'm assuming from what

1  you're saying, and again correct me if I'm wrong, that this is

2  not something that was in the possession of the government so,

3  therefore, it's exculpatory.  You're not suggesting that, are

4  you?

5      MR. JENKINS:  I'm not suggesting that at all, Your

6  Honor.  In fact, I have every reason to believe that the

7  government just learned of its existence this morning when I

8  made the disclosure to them about it.

9      THE COURT:  Okay.

10      MR. JENKINS:  In the letter, Your Honor, as I said,

11  because she suggests -- or it says that the charges against

12  Mr. Palma Flores are false, and that she was threatened with

13  the same.  We believe the -- the proper interpretation is

14  false charges being placed against her.  The Court may recall

15  that Detective Wallace was asked on cross-examination -- well,

16  on redirect as to whether or not she had coerced Ms. Sheehy

17  into making the disclosures to her concerning Mr. Palma

18  Flores' alleged criminal conduct, and Detective Wallace denied

19  doing so.

20      The Court may also recall that in Government

21  Exhibit 34, the purported letter from Mr. Palma Flores to

22  Ms. Sheehy -- in that very same letter he suggests that she

23  testify that, in fact, she was coerced by Detective Wallace.

24      THE COURT:  When did you get this letter?

25      MR. JENKINS:  Your Honor, I became aware of the

1    letter this morning.

2              THE COURT:  Okay.  Another problem that's raised --

3    and again I'm going to hear from the government, but another

4    problem that's raised is that, I would assume based upon your

5    competence and ability, that if you had known about this

6    letter, you would have used it in some way to --

7              MR. JENKINS:  I would have confronted Ms. Sheehy and

8    I would have also --

9              THE COURT:  -- confront her and challenge her?

10             MR. JENKINS:  Yes.

11             THE COURT:  Again, this is why I'm thankful that I

12   take good notes.  Now, Ms. Sheehy is compromised -- Sheehy, I

13   believe, is the correct pronunciation -- is compromised

14   because she came back in the courtroom yesterday and I made a

15   note of it and listened to part of the trial, which is a

16   violation of the rule against witnesses.

17             MR. JENKINS:  That is absolutely true, Your Honor,

18   as I understand it based on what the Court shared with us on

19   yesterday.  And the Court is correct, that if I was in a

20   position to do so, I would have found this to be useful.

21             THE COURT:  Yes, sir.

22             MR. JENKINS:  In my cross-examination of Ms. Sheehy

23   and perhaps even Detective Wallace.  But, nevertheless, I

24   wasn't in a position to do so.  But now that it has been

25   shared with me, Your Honor, certainly Brady would have

1  obligated the government, if it had it, to share it with me.

2  They didn't have it.

3          THE COURT:  Right.

4          MR. JENKINS:  But the law still is clear that the

5  defendant has a right to present favorable evidence.

6          Now, I know that the timing of it should give the

7  Court concern, and I'm certain the government is going to

8  raise some other evidentiary rule challenges to it also.  But

9  I think that this is a very significant piece of evidence and

10 that the Court could first permit Mr. Palma Flores to testify

11 about.  He certainly, I believe, can testify he's familiar

12 with Ms. Sheehy's writing.  He can testify as to whether or

13 not it's his opinion whether or not it is hers, whether or not

14 he received it, and the contents of the letter and his

15 understanding of what is in it.  And the jury can certainly

16 give what weight to it as it sees fit.

17         If the Court is concerned or troubled by the fact

18 that ordinarily it would be proper for me to confront

19 Ms. Sheehy about what is purported in this letter and give her

20 an opportunity to either embrace it or deny it.  Then on

21 behalf of Mr. Palma Flores, I would ask that the Court permit

22 us to recall Ms. Sheehy for that limited purpose.

23         The Court has already expressed some concerns given

24 her violation of the rule on witnesses.  And in response to

25 that, I would ask that the Court then consider declaring a

1  mistrial in this matter so that once again --

2        THE COURT:  Let me stop you there.  This is your

3  client.  Again, I'm not assessing any blame to you whatsoever,

4  Mr. Jenkins.  You know how much I respect your work.  But your

5  client needs to understand that this is not trial by ambush.

6  If he has something that's helpful to his case, he has a

7  responsibility if he wants to help his case, to let you know

8  about it in a timely fashion so that we can conduct a

9  litigation.  And he can't, on the back end, present something

10 to you that is critical, from his perspective, to his case and

11 then if I don't allow it claim that he's entitled to a

12 mistrial.  He's approbating and reprobating.  He's suggesting

13 that we do one thing, holds back on something, and then wants

14 a remedy because of something that he did.

15        MR. JENKINS:  And I certainly appreciate that, Your

16 Honor.  Without revealing any confidence, let me suggest this

17 to the Court -- or offer this to the Court.  It is certainly

18 conceivable to me that Mr. Palma Flores did not understand the

19 import of the contents of this letter until such time that

20 Ms. Sheehy and Detective Wallace both had testified.

21        THE COURT:  I would have to think that he's very

22 unsophisticated if he does not understand the significance of

23 having a letter, which is contrary to the testimony of a key

24 witness in the government's case.

25        MR. JENKINS:  I certainly understand that, Your

1  Honor.  And then the second thing that I would offer is that

2  certainly Mr. Palma Flores was confronted, since last evening,

3  with a very important decision about whether or not to

4  exercise his right to testify under the Fifth Amendment.  And

5  in preparation for doing so, I certainly can imagine that

6  Mr. Palma Flores took it upon himself to try to review

7  everything that might be in his possession that could be

8  helpful or useful in his own testimony.  And he's not a

9  lawyer, so he may not have understood the evidentiary of

10  limitations on how something like this letter could be used

11  and also the rules governing --

12          THE COURT:  Again, Mr. Jenkins -- and the trouble

13  that the Court has is simple.  The government's case is part

14  circumstantial and part direct.  A critical part of the

15  government's case is the testimony of Ms. Sheehy.

16          MR. JENKINS:  Yes.

17          THE COURT:  And I am sure, based upon your level of

18  preparation and your discussions with him, you had some idea

19  of the significance of the testimony of Ms. Sheehy.  And it

20  would seem to me to be reasonable is that if your client is in

21  possession of a document, which theoretically or potentially

22  undermines the testimony of a critical witness of the

23  government, that he would have at least made you aware of it.

24          MR. JENKINS:  And I understand that, Your Honor, and

25  I would just query this.  If -- you know, if it was through

1   either a woeful act or if it was just negligence or just the

2   fact that he just didn't recognize its import, I think the

3   focus of the Court should be is it weighty enough?  Is it

4   significant enough to impact the credibility of the key

5   witness in this case?  I would submit such that the jury

6   should be denied its benefit.  And I just would suggest to the

7   Court that it is of such significance that it calls for

8   extraordinary steps to ensure that this young man has every

9   opportunity to present favorable evidence in his defense to

10  this jury, which is going to make the ultimate call as to

11  whether or not this Court is going to be empowered to sentence

12  this young man to as much as life in prison without the

13  possibility of parole.  So I would ask the Court to give due

14  consideration to it in light of the gravity of the moment.

15          MR. BEN'ARY:  Your Honor, thank you.  Let me begin

16  by just giving the Court a little bit of context.  I'm trying

17  to digest this letter as well, but as best I can tell, there's

18  one line that's relevant in here and it says:  "They put all

19  those false charges on you and wanted to do the same to me."

20  That's it.  It doesn't say what charges, it doesn't say why

21  they're false, it doesn't say who put the false charges --

22          THE COURT:  Somebody hand up the letter so that I

23  can have a look at it.

24          MR. BEN'ARY:  It doesn't say who put the false

25  charges on.  So it is -- it is of such slate probative value,

1    Your Honor, that I would suggest that it is -- it should not

2    be admitted.  And here are the basis for not admitting the

3    letter, and the line I'm focusing on is the bottom of the

4    first page there.

5            The first reason that this should not be admitted,

6    Your Honor, is because it is clearly in violation of the

7    Court's discovery order.  The government has taken great steps

8    over months, years to provide the defense with access to

9    information, objects, letters in its possession that would be

10   part of its case.  The Court's discovery order requires

11   reciprocal discovery on that.  I'm not blaming Mr. Jenkins.  I

12   understand he just got it this morning, but it's in his

13   client's possession, should be deemed in the possession of the

14   defense, and we have not been given access to it.  So

15   accepting it into evidence would be a violation of the

16   discovery order and should not be admissible on that basis.

17           The better argument, Your Honor, is I think that

18   there are rules about examining a witness and impeaching a

19   witness with that witness's prior statement.  The letter that

20   you have in front of you is extrinsic evidence of a prior

21   inconsistent statement.  Rule 613, Federal Rules of Evidence,

22   (b), sets forth the rules for using extrinsic evidence of a

23   prior inconsistent statement.  And it says, "Extrinsic

24   evidence of a witness's prior inconsistent statement is

25   admissible only if the witness is given an opportunity to

1 explain or deny the statement, and an adverse party is given

2 an opportunity to examine the witness about it."

3          Ms. Sheehy was not given the opportunity to explain

4 or deny the statement.  She is no longer a witness in the

5 case.  She was released.  She is not -- she has been released

6 from subpoena.  She is not here.  And even if she were here,

7 she has been in violation of the rule on witnesses.  So the

8 rules of evidence do not permit the introduction of this

9 prior -- this extrinsic evidence of Ms. Sheehy's prior

10 inconsistent statement.  And given the extremely slight

11 evidentiary value of this letter, I would submit that there is

12 no cause for the Court to go against the Federal Rules of

13 Evidence and allow its admission at this point in the game.

14          THE COURT:  All right, sir.  Let me take a moment,

15 Mr. Jenkins, to read the letter.

16          MR. JENKINS:  Yes, Your Honor.

17          (A pause in the proceedings.)

18          THE COURT:  Okay.  Mr. Jenkins.

19          MR. JENKINS:  Yes, Your Honor.  Your Honor, I would

20 like the opportunity just to respond to the government's

21 points.  First and foremost, I think that the letter is -- it

22 s value goes beyond simply the one line making references

23 about the false charges.  In the beginning of the letter, Your

24 Honor, the writer says, "Your dad knew me and Katie had court

25 and I asked him to help us get advice from a lawyer because

1  they wasn't treating us fairly."

2       Mr. Palma Flores would testify that, as the

3  government has adduced throughout the course of this trial,

4  with respect to Government's Exhibit 34 and 35, that these two

5  individuals, when exchanging letters, often used code words

6  and names to suggest other individuals that they did not want

7  others to know who they were talking about.

8       Mr. Palma Flores would talk about -- would testify

9  that the "Katie" referenced in this sentence is actually

10  Mr. Kollin Worlds who testified, who the Court, I'm sure, can

11  appreciate the defense in this case is that there were three

12  people in the car outside of Mr. Brown's apartment complex.

13  One got out, committed the shooting, and then the three

14  departed.

15       The government maintains that the individual who did

16  that was Mr. Palma Flores, while we maintain it was Mr. Kollin

17  Worlds.  And that when the writer indicates that "Katie,"

18  again, Kollin Worlds, and her had court, she's referring to

19  engagements or meeting with law enforcement, and that

20  "they" that were not treating them fairly is law enforcement.

21  And that she's upset that the defendant, while getting himself

22  proper legal counsel, was not taking any steps to ensure that

23  they also had proper legal counsel.  So it not only goes to

24  the coercion issue --

25       THE COURT:  Hold on, Mr. Jenkins.

1       Ladies and gentlemen, you need to make a decision as

2  to whether you're going to be in the courtroom or not be in

3  the courtroom.  We cannot have you interrupting the process as

4  we're going through it this morning, or at any other time

5  during the course of this proceeding.  So if you're going to

6  make a decision to be in here, you're expected to stay in here

7  unless there is an emergency until we take a break.

8       Thank you, Mr. Jenkins.

9       MR. JENKINS:  Thank you, Your Honor.

10      So I think that's an important part of the case --

11  excuse me, of the letter.  Also, because again our defense

12  theory is that Ms. Sheehy and Mr. Worlds were coordinating

13  their efforts to shield themselves and to blame the defendant

14  for what Mr. Worlds had did -- excuse me -- did in

15  perpetrating the offense.  In the letter, she also, Your

16  Honor, goes on to talk about -- excuse me -- Court's

17  indulgence --

18      (Counsel and Defendant confers.)

19      MR. JENKINS:  She goes on to the top of the second

20  page, Your Honor, and she writes, "You think I was going to

21  sit behind bars pregnant for someone who never gave a shit

22  about me?"

23      Again, Mr. Palma Flores would interpret this as

24  Ms. Sheehy telling him that she's not going to get in trouble

25  in trying to protect him or do anything that might help him if

1    that causes her any legal difficulties.

2          And so we think that the letter goes beyond just the

3    one sentence that might be favorable and just overall --

4    overall -- the Court has now had the benefit to read it in its

5    entirety.  Clearly the writer of this letter is angry with the

6    person who the letter is being directed to.  And we think that

7    actually goes to bias also.

8          So we believe --

9          THE COURT:  All those things -- and again

10   Mr. Jenkins, all of those things are very good points, but the

11   timing of it is what is problematic for the Court.  You

12   weren't given the opportunity to conduct the proper

13   cross-examination of Ms. Sheehy because your client made the

14   decision to not give you information which was advantageous to

15   his case.  This isn't something where we can sort of say,

16   well, how can anybody understand that this would be

17   advantageous.  This is pretty simple.  This is evidence that's

18   critical -- allegedly, critical to the testimony of a

19   significant witness of the government.  And now we have a

20   situation where you're suggesting, as an advocate, that we

21   somehow get around Rule 613(b).  How do we do that at this

22   point?

23         MR. JENKINS:  Well, Your Honor, certainly I think

24   the remedy is to permit the defense to recall Ms. Sheehy.

25   Now, I understand the rule on witness.  But, Your Honor, for

1  this limited purpose, I don't think there's any testimony that

2  she could have heard that would shape or impact her ability to

3  answer:  Did you write this letter?

4          THE COURT:  Let me ask you this, is Ms. Sheehy here?

5          MR. JENKINS:  She is not here today.  But, Your

6  Honor, this trial was scheduled, as the Court informed the

7  panel, that jury selection is for five days.

8          THE COURT:  But every witness that gets on the stand

9  I specifically say, "Is this witness subject to recall?"  I do

10 that every time.  It's almost rote for the Court.  And when I

11 asked both government and you, as representative of

12 Mr. Flores, was this witness subject to recall, every single

13 time, "No."  There was not one witness that I can recall,

14 correct me if I'm wrong --

15         MR. JENKINS:  That's right.

16         THE COURT:  -- that was subject to recall.  And now

17 with her having sat in the courtroom and heard at least a

18 portion of the trial, the fact that she was not subject to

19 recall, the fact that your client gives you something on the

20 eve of his testimony, which is, in his view, critical to his

21 case, puts the Court at a very big disadvantage and it's

22 inconsistent with the formal statement of the rule.

23         MR. JENKINS:  And I certainly understand that, Your

24 Honor.  But I think the purpose of the rule on witness is to

25 prevent a witness's testimony from being colored by hearing

1  other testimony in the case.  And if she was going to be

2  examined by the defense on any issue or any testimony that she

3  may have overheard, I would appreciate why the rule needs to

4  be strictly enforced.  But that's not the situation we are

5  confronted with here today.  She's simply -- in order to

6  comply with the rule -- be given the opportunity to be

7  confronted with the letter.  She can say I wrote the letter,

8  or I didn't write the letter.  I think her examination would

9  be very limited in scope, Your Honor.  And once she's had the

10 opportunity to do so, depending on what her answer is, I think

11 even the government may concede, depending on what her answer

12 is, that then Mr. Flores can have the letter introduced either

13 through her or through his own testimony.

14         THE COURT:  She was in the courtroom, not through

15 some arguably extraneous witness.  She was in the courtroom

16 during the testimony of Detective Melissa Wallace who is the

17 case agent in the case.

18         MR. BEN'ARY:  And can I just add one point on

19 contact with other people involved in the trial?  According to

20 the Alexandria Sheriff's Department, Mr. Palma, the defendant,

21 and Ms. Sheehy spent over an hour on the phone last night.  I

22 don't see how she's recalled at this point.  This is a

23 situation caused by the defendant.  It will open up a whole

24 can of worms.  Ms. Sheehy sent a series of text messages to

25 Detective Wallace last night as well claiming she can't

1  believe Mr. Palma is going to trial, saying that he is guilty.

2  She can't believe he's blaming it on Kollin.  And, you know,

3  are we going to then reopen our case in rebuttal to put that

4  all in.  It's just opening up a whole can of worms for a

5  letter that has essentially severely limited probative value

6  and it would be in violation of the rules of evidence.

7          THE COURT:  Okay.

8          I'll give you the last word, Mr. Jenkins.

9          MR. JENKINS:  I'm sorry, Your Honor?

10          THE COURT:  I'll give you the last word, sir.

11          MR. JENKINS:  Your Honor, I don't think I have

12  anything further to add.  I think the Court understands the

13  position.  I do concede that it would -- introduction of the

14  letter at this point would be contrary to the rule, but we do

15  believe that there is a remedy available to the Court, albeit

16  an extraordinary one.  But in light of the significance of the

17  matter, we would ask the Court to exercise its discretion.

18          THE COURT:  All right.  The Court believes that

19  based upon the circumstances outlined, which have previously

20  been articulated that apparently Mr. Palma Flores presented

21  this significant letter to his lawyer at -- on the eve of the

22  last day of trial and the application of Rule 613(b) and the

23  fact the Court made a specific record of finding that

24  Ms. Laila Sheehy was in the courtroom from approximately 2:35

25  to 2:43 during the testimony of Detective Melissa Wallace, and

1  that there are other extraneous matter, which also give the

2  Court great concern and that in the exercise of discretion, it

3  is not going to allow the admissibility of this particular

4  letter.

5        Mr. Jenkins, I note your exceptions.

6        MR. JENKINS:  Your Honor, will the letter, for

7  appellate purposes, be made a part of the record?

8        THE COURT:  I'll have the deputy clerk mark it and

9  then I will make a record of denying to its admissibility.

10       MR. JENKINS:  Thank you, Your Honor.

11       THE COURT:  All right.

12       Mr. Palma -- I'm sorry.  I'll let you have a moment

13  with your lawyer.

14       MR. JENKINS:  Thank you, Your Honor.

15       (Counsel and Defendant confers.)

16       MR. JENKINS:  Your Honor, Mr. Palma Flores is

17  prepared to address the Court.

18       THE COURT:  All right.  First, give me some sort of

19  context.

20       MR. JENKINS:  Your Honor, Mr. Palma Flores -- in

21  fact, if --

22       You can have a seat.

23       I would just proffer, if I may, Your Honor, proffer

24  this to the Court, that Mr. Palma Flores wanted the Court to

25  understand and appreciate that it was not intentional on his

1  part to withhold the letter and his timing of when he chose to

2  disclose it to his counsel.  It was truly because he did not

3  appreciate its significance.  He certainly heard the Court's

4  view on that and opinion of that.  But he also would want the

5  Court to know that in the last two years he's received many

6  letters from Ms. Sheehy and others, and he simply forgot that

7  he had some of these letters.  And it was truly out of his

8  concern in preparation for the presentation of his own

9  testimony here today that he took the opportunity last night

10  to go through all of his personal effects so he could refresh

11  his recollection about certain events that had transpired over

12  the last two years that have been testified in the court

13  during the course of this trial.

14          And it is only through that that he then discovered

15  the letter was in his possession and thought that it would be

16  prudent to make his attorney aware of it.

17          THE COURT:  All right.  As long as your client is

18  going to say just what you said, I don't think I need to

19  specifically hear from him.  I will make that statement or

20  representation that you made a part of the record.  I don't

21  want to get into another constitutional situation by allowing

22  him to address the Court without the benefit of the government

23  having an opportunity to confront him on that.  So there are a

24  lot of issues that we're spending a lot of constitutional

25  implications of that, but unless he's going to say something

1  significantly different from what you proffered to the Court,

2  I choose not to hear from him.

3           MR. JENKINS:  Thank you, Your Honor.  If I could

4  just confer.

5           THE COURT:  Yes, sir.

6           (Counsel and Defendant confers.)

7           MR. JENKINS:  Then the only last piece of item to

8  address prior to the jury being brought in, Mr. Palma Flores

9  has advised me that while he understands his right to testify

10 pursuant to the Fifth Amendment, that he is going to waive

11 that right and not testify here today.  He would simply ask

12 that the Court mark one exhibit, which the government does not

13 object to being marked as a defense exhibit and its admission.

14 And that will be a photograph, that is, of Mr. Kollin Worlds

15 in the possession of a handgun.  We believe that it is a part

16 of the Government's Exhibit 48A, but out of an abundance of

17 caution we would ask that this photograph be marked and

18 admitted into evidence.

19           THE COURT:  Without objection?

20           MR. BEN'ARY:  Without objection, Your Honor.

21           THE COURT:  All right.  48A.  Let's do it this way.

22 Is it a defense exhibit or a government exhibit?

23           MR. BEN'ARY:  So this exhibit is marked Defendant's

24 Exhibit 1.  It's part -- we believe, Mr. Jenkins has

25 represented that it's part of Mr. Worlds's Snapchat account,

1  which is in evidence as 48A, but it would be helpful, I mean,

2  it's got thousands --

3          THE COURT:  Let's mark it -- I think the best way to

4  do it is to mark it as Defense Exhibit No. 1.

5          Without objection?

6          MR. BEN'ARY:  Without objection.

7  (Defendant's Exhibit No. 1 admitted into evidence.)

8          THE COURT:  Let's do this one as 1 and that one as

9  2.  The first one is the letter that I've denied is 1, so that

10  will be 2.

11          MR. JENKINS:  Your Honor, I apologize on behalf of

12  Mr. Palma Flores, and I ask the Court just to be mindful of

13  his age and his inexperience with these types of matters, but

14  he has appealed upon me to request if the Court would afford

15  him a ten-minute recess so that he could confer with counsel

16  so that he could be absolutely certain about his waiver of his

17  right to testify.

18          THE COURT:  I don't have any problem with that at

19  all.  We'll go ahead and accommodate that.  Let me ask this.

20  There are no people in here.  If we were to go into recess,

21  where would Mr. Palma Flores go?

22          THE MARSHAL:  We can keep him in here.

23          THE COURT:  I'm going to go ahead and clear the

24  courtroom.

25          Let Mr. Jenkins hear what I'm going to do.

1      I'm going to go ahead and clear the courtroom.  I'll

2  let you have an opportunity, Mr. Jenkins, to confer with

3  Mr. Palma Flores, and then we're going to come back here at

4  10:45.

5      So ladies and gentlemen, there is some information

6  and circumstances that dictate that I clear the courtroom at

7  this time, so that Mr. Jenkins can have an opportunity to

8  confer with his client.  We will be back in session at 10:45.

9  If you could please step out.  Thank you.

10      THE BAILIFF:  All rise.  This court stands adjourned

11  until 10:45.

12      (Recess.)

13      (Court proceedings resumed at 10:49 a.m.)

14      THE COURT:  We're back on the record of United

15  States of America versus Melvin Palma Flores.

16      Mr. Jenkins, have you had an opportunity to counsel

17  with your client?

18      MR. JENKINS:  I have, Your Honor.  And Mr. Palma

19  Flores wishes to exercise his Fifth Amendment right to

20  testify.

21      THE COURT:  Yes, sir.  That's entirely his right.

22      Mr. Palma Flores, I'm going to ask you a few

23  questions with regard to your decision.  I know the answers to

24  many of these questions.  Did you have an opportunity to

25  discuss with Mr. Jenkins your decision to testify or not

1    testify in this case?

2             THE DEFENDANT:  Yes, Your Honor.

3             THE COURT:  Okay.  And after discussions with

4    Mr. Jenkins, did he provide you the circumstances in outlining

5    the implications of your decision to testify including the

6    ability of the government to cross-examine you?  Has he

7    discussed that with you?

8             THE DEFENDANT:  Yes, Your Honor.

9             THE COURT:  Did you have any questions that you

10   asked Mr. Jenkins that he was unable to answer with regard to

11   you exercising your Fifth Amendment right to testify?

12            THE DEFENDANT:  I'm sorry, Your Honor, but, you

13   know, I really thought I was going to have more time, you

14   know.  So I don't think I had enough time to prepare for this.

15            THE COURT:  Okay.  Mr. Palma Flores, as your counsel

16   has previously indicated, this case has been pending for, I

17   believe, over a year or two.  And I know that Mr. Jenkins is a

18   very well-respected officer of the Court and has taken the

19   time that he needs to take with you to make sure that you were

20   both prepared for trial today and knew the implications of all

21   the circumstances associated with any decision that you made

22   during the course of this trial.

23            I'll ask you one final question, sir.  Is it your

24   voluntary decision -- in other words, is anyone forcing you to

25   testify today?

1          THE DEFENDANT:  No, Your Honor.

2          THE COURT:  All right, Sir.  Do you have any

3     additional questions that you want to ask the Court related to

4     your decision to testify?

5          THE DEFENDANT:  No, Your Honor.

6          THE COURT:  Is the government satisfied with the

7     colloquy that the Court exercised with Mr. Flores?

8          MR. BEN'ARY:  Oh, yes, Your Honor.

9          THE COURT:  Mr. Jenkins, are you, sir?

10          MR. JENKINS:  I am, Your Honor.

11          (Counsel and Defendant confers.)

12          THE COURT:  All right.  Counsel, there's a few

13     little cleanup things that we need to do with the instructions

14     prior to Mr. Palma Flores taking the stand.

15          I'm going to deal with the easy one first.  During

16     the course of a trial, I may ask a question of a witness.  I

17     don't think that that has any application unless something

18     happens unusual with regard to Mr. Palma Flores.

19          Do we agree that that one can be removed?

20          MR. BEN'ARY:  Yes.

21          MR. JENKINS:  Agreed, Your Honor.

22          THE COURT:  All right.  And then there's Y,

23     credibility to immunize witnesses.  What we have done with

24     that is insert the names Elijah Kyle-Canady and Kollin Worlds

25     into "the name of individuals."

1          Satisfied with that?

2          MR. JENKINS:  Yes, Your Honor.

3          THE COURT:  Very good.  The next one is FF.  I

4   believe it's -- affect the defendant's decision not to testify

5   since Mr. Palma Flores is exercising his right, that would not

6   be appropriate to give at this point.

7          Do we agree?

8          MR. BEN'ARY:  Agreed.

9          MR. JENKINS:  Agreed, Your Honor.

10         THE COURT:  All right.  That will be removed.  And

11  finally, was there some sort of resolution on ZZ?

12         MR. JENKINS:  Yes, Your Honor.

13         MR. BEN'ARY:  So we, I think, had e-mailed it this

14  morning, Your Honor.  We are in agreement that it actually

15  becomes two instructions, ZZ-1 and ZZ-2.  It provides the

16  elements of 924(j) and then a definition of murder.  And then

17  it is read in connection with the definitions previously

18  offered for malice and premeditation.

19         THE COURT:  All right.  Marlon, this morning I was

20  made aware of that, and I directed that it be inserted and

21  reinserted at the proper place.

22         MR. BEN'ARY:  And not to add to the workload, but it

23  looks like in the last line of ZZ-2, it should read "presence

24  or absence of premeditation" instead of "presence or absence

25  or premeditation."

1          THE COURT:  Counsel, I'm going to use my black

2     pen -- or actually it's a blue pen and just make the R an F.

3          Does anyone have any problem with that?

4          MR. JENKINS:  No objection.

5          MR. BEN'ARY:  No objection.

6          THE COURT:  Very good.  All right.  My suggestion is

7     this, when we come back in, since Mr. Melvin Palma Flores has

8     exercised his right to testify --

9          Mr. Jenkins, I think the first thing that, maybe,

10    you want to do -- you can do it another way if you choose

11    to -- is offer Defendant's Exhibit No. 2, which has been

12    admitted.

13         MR. JENKINS:  Yes, Your Honor.

14         THE COURT:  That way the jury will be aware that

15    that has become part of the court record.

16         MR. JENKINS:  Yes, Your Honor.

17         THE COURT:  And, Trish, make sure -- make sure that

18    that No. 1 does not go back.  You can put it in a separate

19    folder, I don't care, but just make sure it's not with the

20    rest of the stuff.

21         All right.  We ready to bring the jury back in?

22         MR. JENKINS:  Yes, Your Honor.

23         MR. BEN'ARY:  One just very brief housekeeping

24    matter, Your Honor.  Yesterday the Court made a note that it

25    was the Court's observation that Hector Flores came back into

1  the courtroom.  And I don't think that it will have any legal

2  significance, but I think that it actually was not Hector

3  Flores.

4  　　　　　THE COURT:  Someone that maybe looked like him?

5  　　　　　MR. BEN'ARY:  There's another individual -- it's

6  difficult with the mask -- with a similar stature and

7  hairstyle.

8  　　　　　THE COURT:  But we all agree that Ms. Sheehy came

9  back in?

10  　　　　　MR. BEN'ARY:  Yes, Your Honor.

11  　　　　　THE COURT:  Very good.  Actually, it's easier to

12  identify Ms. Sheehy, because she was the individual who came

13  in without a mask on and I noticed that right over there to

14  the left.

15  　　　　　Very good.  Ms. Tinsley.

16  　　　　　Ladies and gentlemen, as the jury comes back in, I'm

17  going to ask that if you need to be in the courtroom, or want

18  to be in the courtroom, this is your time to be here.  We're

19  not going to be getting up and walking out during the course

20  of the litigation.  So you need to stay in here until we take

21  a break.

22  　　　　　(Jury present.)

23  　　　　　THE COURT:  All right.  You may have a seat, ladies

24  and gentlemen, in the gallery.

25  　　　　　Good morning, ladies and gentlemen.  It's okay to

1   speak back, there's no rule against that.  Glad to have you

2   all back here today.  We are heading into day three.  Please

3   be assured that during the time that you were not brought into

4   the courtroom, we were in here working on things that you need

5   not concern yourself with.  So it wasn't that, necessarily,

6   we're running late, but we had to take care of some matters

7   before we brought you back in.  Have all of you been able to

8   live up to the Court's instruction not to discuss the case or

9   any aspect of the case with anyone?

10                  Very good.  Thank you, ladies and gentlemen.

11                  The prosecution has rested its case.

12                  Now, Mr. Jenkins.

13                  MR. JENKINS:  Thank you, Your Honor.  Your Honor,

14  may it please the Court, the defense would call Mr. Melvin

15  Palma Flores.

16                  THE COURT:  Come on up, sir.

17  (Defendant's witness, Melvin Palma Flores, was sworn.)

18                      (Witness seated.)

19                  THE COURT:  You may take the stand, sir.  As has

20  been the case throughout the proceeding, you have been

21  unmasked.  You're free to testify without the mask on at this

22  point, sir.

23                  MR. JENKINS:  May counsel proceed, Your Honor?

24                  THE COURT:  You may.

25                  MR. JENKINS:  Thank you.

1          DIRECT EXAMINATION

2   BY MR. JENKINS:

3   Q.   Good morning, Mr. Palma Flores.

4   A.   Good morning.

5   Q.   Do you prefer Mr. Palma Flores or Mr. Flores?

6   A.   Palma Flores is fine.

7   Q.   Mr. Palma Flores, how old are you?

8   A.   20 years old.

9   Q.   Back in October of 2019, how old were you?

10  A.   I just turned -- well, my birthday is in October --

11  October 17.  So are we talking before the 17 or after the 17?

12  Q.   After the 17th.

13  A.   I just turned 18 years old.

14  Q.   You just turned 18 years old?

15  A.   That's correct.

16  Q.   And where were you residing at that time?

17  A.   Alexandria, Virginia.

18  Q.   And what were you doing to earn a living during that

19  period of time?

20  A.   I sold marijuana.

21  Q.   Can you give us a sense of the scale of your sales of

22  marijuana?

23  A.   Probably like -- like, at one time or overall are we

24  talking?

25  Q.   Typically, in an average week.

1  A.   Rough estimate probably, like, 4 ounces, maybe.

2  Q.   How much money were you earning on a weekly basis from

3  selling marijuana?

4  A.   On a good week, probably like $3,000.

5  Q.   Did you own any firearms?

6  A.   At the beginning, I didn't.  But once I seen, like, a lot

7  of my close friends were, like, getting, you know, robbed --

8  and sometimes it wasn't even just, like, you know, snatch and

9  grab, more so, like, at gunpoint, you know.  I started to get

10  scared.  And I'm, like, you know, I think I'm going to need a

11  firearm, but it's not like I always throughout the whole

12  career of selling marijuana I used to carry a firearm.

13  Q.   Okay.  I'm going to need you to keep your voice up, okay?

14  A.   Okay.

15  Q.   I want to take you back to October the 25th, 2019.  Do

16  you recall the events of that day?

17  A.   Yes.  Yes, I do.

18  Q.   Earlier in the day, where were you?

19  A.   I was at my house, which is my mother's house.

20  Q.   Did there come a time in which someone contacted you

21  about purchasing marijuana?

22  A.   Um, yes.  Qwa texted me and said he had a friend that

23  wanted to buy some marijuana, if I was going to be able to

24  give him some.

25  Q.   The "Qwa" that you just referred to, is that Mr. Brown?

1  A.   That's correct.

2  Q.   The decedent in this case?

3  A.   That's correct.

4  Q.   How long had you known Qwa Brown?

5  A.   Probably, the first time we met, I was probably about 14

6  or 15.  I can't remember exactly.

7  Q.   So at that point in time, is it safe to say you knew him

8  about four or five years?

9  A.   Yes.

10 Q.   Okay.  And what was the nature of your relationship with

11 Mr. Brown?

12 A.   I mean, he would buy marijuana from me.  Sometimes we

13 would smoke together, you know.  Just, you know, good friends.

14 Q.   You considered him a friend?

15 A.   Correct.

16 Q.   After you got this call from him on October 25th, what

17 happened?

18 A.   He said a friend of his was going to come and get some

19 marijuana if I was willing to give him the marijuana.  I said

20 "yes" as long as he actually knows him and that's a friend of

21 his.  He said, "Yeah, that's a friend of mine."  I said,

22 "Okay."

23 Q.   Where was the exchange to take place?

24 A.   At my house.

25 Q.   Did there come a time in which someone arrived at your

1  house after having this conversation with Mr. Brown?

2  A.   Yes.

3  Q.   Okay.  Who arrived at your house?

4  A.   I knew the other person as Charles, I don't know his last

5  name or nothing like that.  But the second individual was

6  Elijah, the person that testified on the first day of my

7  trial.

8  Q.   And the two of them showed up at your house?

9  A.   Correct.

10  Q.   Did you see how they arrived at your house?

11  A.   Um, they -- it was like -- I don't know -- I don't know

12  how to explain it, but it's just once I seen them coming into

13  my backyard -- I was in my living room.  I was playing video

14  games with my friend, and then I seen two people, like, walk

15  into my front yard, going towards the back, and I'm like "What

16  the hell is that?"  You know.  And then, once I go to the

17  backyard, I see there's two individuals.  I'm like, "Can I

18  help you guys?"  And I think that's when Charles was like,

19  "Yeah, I'm here for the marijuana."

20  Q.   And did you sell Charles a quantity of marijuana?

21  A.   I was supposed to, but once I brought it out, he just,

22  you know -- he seen it, he's like, "Okay.  This is the ounce?"

23  I was like, "Yeah."  And then he just ran with it.

24  Q.   It was an ounce of marijuana?

25  A.   Correct.

1  Q.   What was the amount that you intended to sell that ounce

2  of marijuana to Charles for, if you recall?

3  A.   It's been two years, so maybe like 300 to $600, I can't

4  really remember what was the exact price.

5  Q.   But at some point in time, it's your testimony that

6  Charles grabbed the marijuana?

7  A.   Correct.

8  Q.   What did he do?

9  A.   He just ran off with it.

10  Q.   When Charles grabbed the marijuana and ran off, what did

11  the second individual, Elijah, do?

12  A.   He just stood there, you know, kind of, like mean-mugging

13  me.  You know, I was starting to get a little...

14  Q.   Did you know Elijah?

15  A.   Before that, never seen him.

16  Q.   Did you know Charles before that?

17  A.   Before that, never seen him.

18  Q.   Now, when Elijah is standing looking at you and Charles

19  is running away, what, if anything, did you do?

20  A.   Well, he just didn't stand there.  He started approaching

21  me.  And I was, like, "Why is this guy approaching me?"  So I

22  started to get scared.  And then I had a gun in my waistband,

23  so I brandished the firearm.  And once he seen that, he

24  started walking away, too.  Once he started walking away, I

25  just put the gun back in my waistband and I went inside.

1  Q.   Do you remember what type of gun you had that day?

2  A.   I'm not really -- I'm not too familiar with guns, but I

3  know it was, like, a .45-caliber, but I don't know the brand,

4  the name, the model, or anything like that.

5  Q.   And once you placed the firearm back in your waistband,

6  what did Elijah do?

7  A.   Like I said, he walked off.

8  Q.   After this incident, did you speak with Qwa Brown?

9  A.   Yeah.  I called him and I was like, "Hey, you know,

10  the" -- "your friend that you sent me, you know, he" -- "he

11  took the marijuana without paying for it."  And then, you

12  know, he was like, "Oh, that's messed up."  You know, he

13  started telling me that he was going to look into it and stuff

14  like that.

15  Q.   Keep your voice up, Mr. --

16  A.   He said -- he said -- I called him.  I'm like, "Hey, your

17  friend that you sent me," you know -- we say "run off."

18  That's when -- or "snatch and grab," you know, taking the

19  marijuana without paying for it.  And I was explaining to him

20  what happened and he was like, "Oh, that's messed up.  I

21  didn't know nothing about it," and he was going to look into

22  it.  And that was the last of the conversation.

23  Q.   Do you know an individual by the name of Kollin Worlds?

24  A.   Yes.

25  Q.   And Kollin Worlds testified on yesterday here before this

1  jury?

2  A.    Yes.

3  Q.    How long had you known Kollin Worlds prior to the events

4  of October 25, 2019?

5  A.    (Laughing).   We -- we went to the same elementary school.

6  So if I'm not mistaken, we met each other, I want to say,

7  probably third or fourth grade.  I can't remember.  I think,

8  if I'm not mistaken, third grade.

9              MR. JENKINS:  Court's indulgence.  Your Honor, if I

10  can publish to the jury at this time what has previously been

11  admitted as defense Exhibit 2.

12             THE COURT:  Yes, sir.

13  BY MR. JENKINS:

14  Q.    Mr. Palma Flores, can you take a look at the screen?  Is

15  that the individual that you've testified to, your former

16  friend Kollin Worlds?

17  A.    Yes, sir.

18  Q.    And that's the same individual who testified on

19  yesterday?

20  A.    Yes, sir.

21  Q.    Had you seen this photograph before?

22  A.    Um, besides the time he sent it to me, no.

23  Q.    Tell us about that.  When did you first see this

24  photograph?

25  A.    It was after, you know, the --

1  Q.    Was it after Mr. Brown was killed?

2  A.    Yes.

3  Q.    In this photograph, what is Mr. Worlds holding in his

4  hand?

5  A.    It looks, like, obviously a gun.

6  Q.    Did you understand it to be a gun when you received it --

7  when you received this photograph?

8  A.    Yes.  Because, um, it has -- it has a laser beam on it,

9  so usually that's on, you know, guns.

10  Q.    Had you -- how did you receive this photograph?

11  A.    He sent it to me through Snapchat.

12  Q.    Had you communicated with Kollin Worlds through Snapchat

13  before?

14  A.    Yes.

15  Q.    Are you familiar with his Snapchat account?

16  A.    Yes.

17  Q.    Do you see the image that is above Mr. Worlds's head?

18  A.    Yes.

19  Q.    Do you recognize that?

20  A.    Yeah.  That's -- it's called a -- if I'm not mistaken,

21  your bit emoji [sic] is like a -- you can make a -- you could

22  say a resemblance to you, and then every time it just pops up

23  as your Snapchat account.

24  Q.    Did you -- when you received this photograph, did you

25  recognize that bit emoji as being associated with Kollin

1  Worlds?

2  A.   Yes.

3  Q.   Now, Mr. Palma Flores, beyond being your friend, back in

4  October of 2019, did you and Mr. World [sic] have any business

5  dealings together?

6  A.   As far as "business," you mean the marijuana, or just

7  business dealings in general?

8  Q.   Marijuana, business dealings, you describe it.

9  A.   Yeah.  You know, sometimes he would borrow clothes from

10  me.  Or if there was some shoes that he liked that I had, I

11  would sell them to him.  Obviously, you know, I would buy

12  marijuana from him.  Sometimes, you know, I would let him

13  borrow marijuana.  You know, just back-and-forth relationship.

14  Q.   Was there ever an occasion in which you sold marijuana

15  for him?

16  A.   Yes.

17  Q.   The marijuana that was taken from you on October the

18  25th, 2019, by Charles, who did that marijuana belong to?

19  A.   Kollin.

20  Q.   What was -- were you selling it on behalf of Kollin?

21  A.   It's something that's called "fronting."  Another word

22  for it is "consignment."  You know, so let's say -- he would

23  be like, "Hey, I'll front you this X amount of marijuana, this

24  type of marijuana.  You know, you don't got to pay me right

25  now, just sell it for me and then give me this back" -- "this

1   amount of money back and you can keep the rest."

2   Q.   And after Charles took the marijuana from you, did you

3   speak with Kollin about what had occurred?

4   A.   Yes.

5   Q.   How did Kollin respond?

6   A.   He was, basically, trying to find out who took the

7   marijuana, but since I had never seen those two individuals

8   before, it was hard to explain to him.

9   Q.   Well, did you share with him how you came to be

10  introduced to these two individuals?

11  A.   Yes.

12  Q.   Did Kollin know that it was Mr. Brown who had made the

13  introduction?

14  A.   Yes.

15  Q.   And how did he respond to hearing that?

16  A.   He got mad because he has another friend named Jude, and

17  I guess he was -- came to the assumption that, I guess, Qwa

18  robbed Jude, too.  I don't know exactly when, but it was

19  before I got robbed.

20  Q.   Mr. Palma Flores, let me stop you there.  Do you recall

21  his testimony about Jude being robbed?

22  A.   I don't remember.

23  Q.   Well, tell us what you understood about Jude being

24  robbed?

25  A.   Basically, he was supposed to sell -- I don't know how

1  many ounces to Qwa, but I know he was supposed to sell a

2  couple of ounces to Qwa, and Qwa again did a snatch and grab.

3  Q.   After this occurred, what did you do next that day?

4  A.   Which day?

5  Q.   On October 25th?

6  A.   I was with one of my friends -- Jason was at the house

7  with me, you know.  I go drop him off at Edison and then I go

8  call Kollin and just explained everything that happened, and

9  he was like "Okay."

10  Q.   At this point, what are you using for transportation?

11  A.   My mother's van.

12  Q.   Do you know an individual by the name of Laila Sheehy?

13  A.   Yes.

14  Q.   How do you know her?

15  A.   Um, I was somewhat intimate with her.

16  Q.   You were involved in a relationship with her?

17  A.   We started off as friends, and then, you know, after a

18  while we became, you know, boyfriend and girlfriend.

19  Q.   Do you have a child in common?

20  A.   Yes.

21  Q.   How old is your child?

22  A.   He just turned one in September -- on September 28th.

23  Q.   On October 25, 2019, did you see Ms. Sheehy?

24  A.   I don't think I seen her, because if I'm not mistaken --

25  and I'm sorry, this was two years ago, so I'm trying to

1  remember.

2  Q.   The day in which you were robbed.

3  A.   I didn't see her that day.  I seen her later on that

4  night.

5  Q.   So you interpreted my question as being the daylight

6  hours.  I'm talking about the entire day of October 25th, day

7  and night, did there come a time in which you saw Ms. Sheehy?

8  A.   I think so.

9  Q.   Around what time of day was it?

10  A.   I know it was at nighttime.  That's why I'm saying I

11  don't know if it was on the October 25th night leading into

12  October 26th morning, but I know I definitely seen her October

13  26th.

14  Q.   What was the occasion for you to see her, how did it

15  happen?

16  A.   Um, I just wanted to talk to her because, you know, we

17  were going through some things, and I just felt like I wanted

18  to vent about the situation.

19  Q.   Where did you meet her?

20  A.   In Kingstowne area.

21  Q.   Is Kingstowne, Alexandria portion?

22  A.   Yes.

23  Q.   Did you and -- did you meet her at a residence or a

24  commercial place?  Where did you meet her?

25  A.   I met her at -- I think by her -- it was by her friend's

1    house, but not exactly at her friend's house.

2    Q.   How were you communicating with her before you actually

3    met with her?

4    A.   That's the thing.  We stopped talking for a little bit.

5    Like, the -- our relationship is sometimes -- you know, when

6    we're on good terms, we're on good terms.  We're talking --

7              MR. BEN'ARY:  I'm going to object.  This is not

8    responsive to the question.

9              MR. JENKINS:  Well, what I want to know -- I'll

10   rephrase, Your Honor.

11             THE COURT:  Thank you.

12   BY MR. JENKINS:

13   Q.   Did you speak with her by text message or telephone?  How

14   did you get in contact with her in order to arrange the

15   meeting?

16   A.   I think I probably called her.

17   Q.   Once you and Ms. Sheehy were together, was there anyone

18   else there?

19   A.   Yes.

20   Q.   Who?

21   A.   Kollin.

22   Q.   What, if anything, did you, Ms. Sheehy, and Kollin do

23   once you got together?

24   A.   You know, we were -- Kollin was supposed to re-up, which

25   means buy more marijuana, and then I was supposed to -- he was

1  supposed to give me a little bit more since I didn't have any

2  more marijuana.

3  Q.   Did you know -- did you know who Kollin's source of

4  supply for marijuana was at that time?

5  A.   No.  Because then that would be pointless.  Then I

6  wouldn't have to go through him, I could just go straight to

7  the source.  So people usually don't let you know who their

8  marijuana supplier is.

9  Q.   At that point in time, on October 25, 2019, did you know

10 where Mr. Brown lived?

11 A.   No.  I never been to his house.  Every time we had

12 dealings, he would come to my house or my neighborhood.

13 Q.   Did there come a time in which you, Kollin, and

14 Ms. Sheehy left the Kingstowne area?

15 A.   Yes.

16 Q.   And where did you go?

17 A.   To the Richmond Highway area.

18 Q.   For what purpose?

19 A.   To get more marijuana.

20 Q.   Whose home were you going to get the marijuana from?

21 A.   I don't know.

22 Q.   Where did you go in the Kingstowne area, do you remember

23 exactly?

24 A.   It was -- it was across the street from the elementary

25 school.  I think -- the neighborhood is called --

1  Q.   Let me have you take a look at --

2          MR. JENKINS:  If I could have it pulled up,

3  Government's Exhibit 13.  This has previously been admitted

4  into evidence.

5  BY MR. JENKINS:

6  Q.   Mr. Palma Flores, do you remember the testimony on

7  yesterday and Monday about this exhibit?

8  A.   Yes.

9  Q.   Okay.  Is this the location you just described for the

10  jury as to where you, Ms. Sheehy, and Mr. Kollin Worlds had

11  traveled to?

12  A.   Yes.

13  Q.   How did you arrive at this location -- I mean, which --

14  what vehicle?

15  A.   We were in Laila's car.

16  Q.   Who was driving Laila's car?

17  A.   Laila.

18  Q.   Where were you seated in the vehicle?

19  A.   In the passenger seat.

20  Q.   In the front or in the back?

21  A.   In the front.

22  Q.   Where was Mr. Worlds seated?

23  A.   In the backseat.

24  Q.   I believe you testified that you came to this location

25  with the understanding that Mr. World was going to re-up,

1  correct?

2  A.   Yes, sir.

3  Q.   And that is get more marijuana from his supplier,

4  correct?

5  A.   That's correct, sir.

6  Q.   What happened when you arrived at this location?

7  A.   We basically just -- he was leading us because, you know,

8  I never been there before; but he told us to wait here, he was

9  going to go get more marijuana.  He should be back, like,

10 five, ten, -- five, ten minutes tops.

11 Q.   When you were in their car, at this point in time, did

12 you have your cell phone with you?

13 A.   No.

14 Q.   Where was your cell phone?

15 A.   With Kollin.

16 Q.   Did Kollin ask to use your phone?

17 A.   Yeah.  Because he doesn't have a phone.

18 Q.   What was your understanding as to why Kollin wanted to

19 use your phone?

20 A.   That way he would be able to know when the marijuana

21 dealer is outside.

22 Q.   And did you permit Kollin to use your phone?

23 A.   Yes.

24 Q.   Did there come a time in which Kollin exited the vehicle?

25 A.   Yes.

1  Q.   Where did he go?

2  A.   It was really dark that night, so he went to -- I was,

3  obviously -- I'm in the passenger seat, so that's the

4  right-hand side of the car.  He got out through the right-hand

5  side of the car and went towards my right-hand side.

6  Q.   What, if anything, do you recall happening after he got

7  out of the car?

8  A.   We were waiting like 10, 15 minutes and then some shots

9  rang out.

10  Q.   Prior to that, I think you heard the testimony of

11  Mr. Worlds, that he indicated that you were using your phone

12  to communicate with Mr. Brown through Mr. Kollin Worlds's

13  Snapchat, do you remember that testimony?

14  A.   Yes.

15  Q.   Was that true?

16  A.   No.

17  Q.   Did you ever log in on your phone with Mr. Kollin

18  Worlds's Snapchat?  Did you ever log in to his account on your

19  phone?

20  A.   No.  I didn't know his password.

21  Q.   After you heard the gunshots, what happened next?

22  A.   Um, I got scared, because that was the first time I ever

23  heard gunshots, but I'm just looking at Laila like, "What the

24  fuck?"  And a couple minutes later, Kollin is running up to

25  the car.

1  Q.   You said that was the first time you heard gunshots.  Is

2  that outside of a gun range?

3          MR. BEN'ARY:  I'm going to object to the leading

4  nature of that question.

5          THE COURT:  It was.

6          Rephrase, Mr. Jenkins.

7          MR. JENKINS:  I'll rephrase.

8  BY MR. JENKINS:

9  Q.   Is it true that that's the first time you ever heard a

10 gunshot?

11 A.   Yes.

12 Q.   And after -- after he -- did he come back to the car?

13 A.   Yes.

14 Q.   What happened next?

15 A.   He told us to "Go, go, go, go."

16 Q.   Where did you go?

17 A.   We just went straight down, like, this straight road

18 ahead and then we made a left hand.

19 Q.   Without you telling us what he said, did he say anything

20 to you about what had happened?

21         THE COURT:  Yes or no?

22 A.   Yes.

23 BY MR. JENKINS:

24 Q.   When you left this area, where did you go to?  Where is

25 the next place you went to?

1  A.   We went back to -- so when I went to go pick up Laila, I

2  left my mom's car in that neighborhood, so we went back to the

3  Kingstowne area and I got in my mother's van, and then Laila

4  had to go home.

5  Q.   Do you know someone by the name of Hector Flores?

6  A.   Yes.

7  Q.   How do you know Hector Flores?

8  A.   He's my cousin.

9  Q.   Did you see him on this evening?

10  A.   Yes.

11  Q.   Could you please describe for the jury the circumstances

12  under which you saw your cousin, Hector Flores, on this

13  evening?

14  A.   I had to go back to Arlington because my mother works the

15  graveyard shift, so I was en route to go pick her up, but

16  Kollin wanted me to burn his clothes.

17  Q.   Did you know why Kollin wanted you to burn his clothes?

18  A.   At first, no.  But then I got to thinking, okay, I just

19  heard gunshots, you know.  He came back to the car talking

20  about "go, go, go," now he's asking me to burn his clothes;

21  and I was like either he got in a shoot-out or something

22  happened.

23  Q.   Did you agree to burn his clothes?

24  A.   Yes.

25  Q.   Why?

1  A.   You know, that was my friend.  Like, there's nothing --

2  Q.   Where did you go to burn his clothes?

3  A.   To my cousin Hector.

4  Q.   How did you contact Hector?

5  A.   I called him.

6  Q.   And what, if anything, did you say to Hector?

7  A.   I said, um, "Can you come outside with a lighter?"

8  Q.   Did he come outside with the lighter?

9  A.   Yes.

10  Q.   And what did you do?

11  A.   I burned Kollin's clothes.

12  Q.   Where was Kollin when you were burning his clothes?

13  A.   In my mother's van.

14  Q.   After you finished burning the clothing -- did you talk

15  to Hector that night about what had happened?

16  A.   No.

17  Q.   After you completed burning Kollin's clothes, what did

18  you do?

19  A.   I went back to the van, and I went to go pick up my

20  mother.

21  Q.   Was Kollin with you when you went to pick up your mother?

22  A.   Yes.

23  Q.   Did you actually go pick up your mother?

24  A.   Yes.

25  Q.   And what did you do next?

1  A.   We picked my mother up and then my mother -- she said she

2  was hungry, so she took us to IHOP.

3  Q.   Okay.  And when you say "us," is that you and Kollin?

4  A.   That's correct.

5  Q.   At some point in time, did you separate from Kollin?

6  A.   No.  We were -- well, he came to us -- he came with us to

7  eat at IHOP, and after IHOP we went back to my house and he

8  slept over.  And then we went to my friend Jason's house the

9  next morning and that's when he left.

10  Q.   At that point in time, did you know that Mr. Brown had

11  been shot and killed?

12  A.   While he was sleeping over, no.

13  Q.   When is it that you first learned -- did there come a

14  time in which you learned that Mr. Brown had been shot and

15  killed?

16  A.   When -- I'm going through social media and they're

17  saying, "Rest in peace, Qwa."  And I was like that's -- that's

18  weird, like, I was just talking to him.

19  Q.   How -- well, when was that?  How soon was -- how close in

20  time was that to when you had had this situation where you

21  heard the gunshots?  Was it the same day, was it the next day,

22  when was it?

23  A.   It was the -- it was a couple hours after that.  So it

24  was the same day on the 26th.

25  Q.   Now, at some point in time, were you contacted by

1 Detective Wallace?

2 A.   Yes.

3 Q.   And when were you contacted by Detective Wallace?

4 A.   I can't remember off the top of my head, but --

5 Q.   Was it near in time when the shooting had occurred?

6 A.   Yes.

7 Q.   Did you agree to meet with Detective Wallace?

8 A.   Yes.

9 Q.   Did you agree to speak with her?

10 A.   Yes.

11 Q.   Did she explain to you that you had a right not to speak

12 with her?

13 A.   No.

14 Q.   Did she ask you about your whereabouts the night that

15 Mr. Brown was shot?

16 A.   Yes.

17 Q.   What, if anything, did you tell her?

18 A.   I told her I was home with my sister.

19 Q.   Was that true?

20 A.   No.

21 Q.   Why did you lie?

22 A.   Um, I'm afraid of the police.

23 Q.   Mr. Palma Flores, after speaking with Detective

24 Wallace -- at this point in time, when you spoke with

25 Detective Wallace, were you and Ms. Sheehy in a good place in

1  your relationship or a bad place?

2  A.    I would say somewhere in the middle.  It wasn't good nor

3  bad; we was trying to repair our relationship.

4  Q.    I want to take you now to December of 2019.  You've heard

5  some testimony from Ms. Sheehy that there was a domestic

6  incident between the two of you; do you remember that

7  testimony?

8  A.    Correct.

9  Q.    Do you remember the events leading up to that?

10  A.    Yes.

11  Q.    Can you tell the ladies and gentlemen of the jury what

12  happened in December of 2019 between you and Ms. Sheehy?

13  A.    So I wake up -- I was sleeping and then I wake up out of

14  nowhere because my phone is constantly ringing.  And I look at

15  it and it's Laila.  I pick up the phone, I'm like "Hello" and

16  she's like "Hey."  She was working at Motel 6.  She like, "I'm

17  about to have a lunch break.  I'm about to come over because I

18  need to talk to you."  And the -- the tone in her voice, she

19  sounded like -- like it was up to no good.  It was a storm

20  brewing, like.

21  Q.    She was to come over to your house?

22  A.    Correct.

23  Q.    To your mother's house?

24  A.    Correct.

25  Q.    Did she come over to your mother's house?

1  A.   Yes.

2  Q.   Did you -- well, what happened when she got over?

3  A.   She said, "Let me see your phone.  Let me see your

4  phone."  I was like, "For what?"  She like, "Oh, I know

5  you" -- "you're talking to that bitch again."

6  Q.   She was accusing you of being unfaithful?

7  A.   Correct.

8  Q.   Is this the first time she had ever accused you of being

9  unfaithful?

10  A.   No.

11  Q.   What happened?

12  A.   I gave her the phone.  She starts going through the

13  phone, Instagram, Snapchat, my text messages, my call logs,

14  just, you know, searching stuff up.  And I'm like, "What are

15  you talking about?  I just woke up."  She's like, "No.  You

16  trying to play me like I'm crazy.  She just told me you were

17  talking to her."  I'm like, "Who are you talking about?  I

18  just woke up."  And you're like, "Oh, you always want to play

19  stupid.  Don't" -- "don't act dumb now."  I'm like, "I'm not

20  acting dumb.  What are you talking about?"

21  Q.   At this point in time, Mr. Palma Flores, between October

22  and December of 2019, had you and Ms. Sheehy discussed the

23  events surrounding the shooting of Mr. Brown?

24  A.   Yes.

25  Q.   On this day in which you're having this argument about

1  cheating?

2  A.   No.  Prior to that, it was -- Kollin wanted us to meet up

3  with him.  So we --

4          MR. BEN'ARY:  Anything that Kollin said.

5          MR. JENKINS:  Your Honor, I don't think he said

6  that.  He just said they met up.

7          MR. BEN'ARY:  No, I think he said -- was saying what

8  Kollin said.

9          THE COURT:  Just focus him.

10          MR. JENKINS:  Yeah.

11  BY MR. JENKINS:

12  Q.   Well, don't tell us what Kollin said.  But did you meet

13  up with Kollin?

14  A.   I said Kollin wanted to meet up.

15  Q.   Okay.  Meet up with who?

16  A.   Me and Laila.

17  Q.   And afterwards -- well, was this before or after the

18  December 2019 incident between you and Ms. Sheehy?

19  A.   That was a couple days before, if I'm not mistaken.  We

20  went to his cousin's apartment out in D.C.

21  Q.   Was this before or after you had received a photograph by

22  Snapchat that you identified as Defense Exhibit 2?

23  A.   That was before.

24  Q.   It was before you had received that photograph?

25  A.   Yes.

1  Q.   Taking you back to the argument with Ms. Sheehy, she

2  testified that at some point in time you looked through her

3  phone; was that true?

4  A.   No.  I feel like usually it's the woman that's supposed

5  to go through the man's phone.  I don't go through women's

6  phone.

7  Q.   Did -- she also testified that during that argument you

8  talked about her attempting to get in contact with law

9  enforcement; do you remember that testimony?

10 A.   Yes.

11 Q.   Was that true?

12 A.   That was not true.  We were just having an argument as

13 far as my infidelity.

14 Q.   Now, after that incident, did there come a time in which

15 you were arrested for domestic violence?

16 A.   Yes.

17 Q.   And did you and Ms. Sheehy talk about your arrest?

18 A.   Um, yeah.

19 Q.   Now, I want to fast forward a little bit.  Your cousin,

20 Hector Flores, you recall his testimony on yesterday, correct?

21 A.   Correct.

22 Q.   And Mr. Flores testified that at some point in time, a

23 couple months after the shooting, that he had a conversation

24 with you in which you told him you killed somebody?

25 A.   That never happened.

1   Q.   Did you ever tell anyone that you killed Mr. Brown?

2   A.   No.

3   Q.   Now, Mr. Palma Flores, when you were -- after your arrest

4   in this case, did you have occasion to communicate with

5   Ms. Sheehy?

6   A.   Correct.

7   Q.   How did you communicate with her?

8   A.   The phone, mail, that's pretty much it.

9   Q.   Mail was one of the ways in which you communicated with

10  her?

11  A.   Correct.

12       MR. JENKINS:  If I can have published to the jury at

13  this time Government's Exhibit 35.

14  BY MR. JENKINS:

15  Q.   Can you tell us what's on the screen now, Mr. Palma

16  Flores?  Is it one of your letters to Ms. Sheehy?

17  A.   Yes, sir.

18  Q.   Now, in this letter, Mr. Palma Flores, you mentioned --

19  make reference to Ms. Sheehy cheating on you with Summer's

20  brother?

21  A.   That's correct.

22  Q.   And you remember Ms. Sheehy testifying about that?

23  A.   Yes.

24  Q.   And testifying that Summer's brother was a reference to a

25  family member of hers who was in law enforcement?

1  A.    Yes.

2  Q.    Was that true?

3  A.    No.

4  Q.    Tell the ladies and gentlemen of the jury, what did you

5  mean by that in this letter?

6  A.    She has a friend named Summer and she cheated on me with

7  her brother.

8  Q.    Did this have anything to do with law enforcement?

9  A.    No.

10  Q.    Did this have anything to do with Mr. Brown's shooting

11  and killing?

12  A.    No.

13  Q.    I'm going to now turn your attention to Government's

14  Exhibit No. 34.

15        Now, before I -- before we talk about this exhibit,

16  you said you -- after your arrest you communicated with

17  Ms. Sheehy by mail.  Is that from the jail?

18  A.    Correct.

19  Q.    Okay.  And do I take it, normally, you would just mail it

20  out from the jail?

21  A.    Yes.

22  Q.    Let me take -- draw your attention now to Government's

23  Exhibit 34.  What is this?

24  A.    This is a letter I wrote to Laila.

25  Q.    And did you send this letter out through the normal means

1   as you testified you sent out Government's Exhibit 35?

2   A.   No.

3   Q.   Tell us about the circumstances on how you sent this

4   letter out.

5   A.   It was a person in the jail that was getting released

6   soon, so I started writing a letter to her so he could give

7   to -- if not a friend or give it directly to her.

8   Q.   Why didn't you just put it in the normal mail?

9   A.   Because they -- people at the ADC review the mail.

10   Q.   Was there something contained in this letter you didn't

11   want the sheriffs at the jail to read -- to have access to?

12   A.   Yes.

13   Q.   Why?

14   A.   Because I didn't trust my lawyer at the time.  He was

15   railroading me and, you know, we were just -- weren't seeing

16   eye to eye.  I was trying to -- you know, just reach out to

17   her and tell her, like, the stuff that she's doing is messed

18   up.

19   Q.   At that point in time I didn't represent you, correct?

20   A.   No, sir.

21   Q.   But is it fair to say you were dissatisfied with your

22   counsel at that time?

23   A.   That's correct.

24   Q.   Now, I want to go to the contents of the letter.  Do you

25   have it before you?

1    MR. JENKINS:  If you can blow up the first five

2  lines of it.

3  BY MR. JENKINS:

4  Q.    Now, Mr. Palma Flores, can you read the portion that's on

5  the screen?

6  A.    It says, "Hey babe, in this letter I'm going to tell you

7  everything I can't on the phone."

8  Q.    Stop there.  Stop there.  What do you mean by that?

9  A.    You know, just like the mail is monitored, the jail phone

10  calls are monitored as well.

11  Q.    Okay.  Please continue.

12  A.    "I truly forgive you for telling on me, but now we got to

13  find a way to fix this.  Lately" --

14  Q.    What did you mean by "telling on me"?

15  A.    You know, because, like, the way Laila works is -- is you

16  do something she doesn't like.

17    MR. BEN'ARY:  Objection.  Nonresponsive to the

18  question.

19  BY MR. JENKINS:

20  Q.    Let me ask you this.  I withdraw that question.

21    At this point in time, when you wrote this letter,

22  were you aware whether or not Ms. Sheehy had met with law

23  enforcement?

24  A.    Yes.

25  Q.    Were you aware of -- as to whether or not she had

1  discussed with law enforcement the events surrounding

2  Mr. Brown's shooting and killing?

3  A.   Yes.

4  Q.   When you reference in this letter about "telling on me,"

5  what are you referring to?

6  A.   Her saying that I was the one that murdered Mr. Brown.

7  Q.   And when you go on to say, "We have to find a way to fix

8  this," what did you mean by that?

9  A.   You need to stop what you're doing.  Like, you're playing

10  with my livelihood.  Like, this isn't funny anymore.  Like,

11  you have to tell the truth.

12  Q.   Now, if you can --

13          MR. JENKINS:  Court's indulgence.

14          THE COURT:  Yes, sir.

15          (A pause in the proceedings.)

16  BY MR. JENKINS:

17  Q.   I want to show you a different portion of the first page.

18  Can you read that portion for the jury?

19  A.   "The Feds are going to make it seem to the jury that you

20  are lying for me because you are my girlfriend, and we have to

21  do whatever we can to make them think otherwise."

22  Q.   What did you mean by that, Mr. Palma Flores?

23  A.   Basically, you know, since she was my girlfriend, you

24  know, she gave a false testimony on me.  If she were to say

25  anything else rather than a false testimony she gave to the

1    police, they'd think she's trying to cover up for me because

2    she's my girlfriend.

3    Q.   So when you go on to say that we -- "we have to do

4    whatever we can to make them think otherwise," what are you

5    meaning by that?

6    A.   You know, like, you got to start telling the truth.

7    Like, you can't keep on lying on me.

8            MR. JENKINS:  Go down to the last line of the first

9    page.  The last two.

10   BY MR. JENKINS:

11   Q.   Now, here you say, "All they showed me was an audio

12   recording of..."  What are you referring to?

13   A.   My old lawyer, before you, set up a -- I don't know if it

14   was a meeting with the prosecutor or if the prosecutor made a

15   meeting with them, but they showed us an audio recording of

16   Laila accusing me of killing Mr. Brown.

17   Q.   When you heard that audio recording of Ms. Sheehy

18   accusing you of killing Mr. Brown, how did it make you feel?

19   A.   I was devastated.

20           MR. JENKINS:  Go to the second page at the top.  The

21   first line.

22   BY MR. JENKINS:

23   Q.   Now here in the letter you write that "You snitching on

24   me," what did you mean by that?

25   A.   After the audio recording, you know, I was -- you can

1  tell she was putting the blame on me.

2  Q.   Now, I want to take you down just a little bit further.

3  Now, in this page of the letter, again there's a reference to

4  an attorney.  That first reference is to your first attorney,

5  correct?

6  A.   It says the same --

7  Q.   It says, "Also, attorney would also always tell me that

8  you are cooperating with them."  That's in reference to your

9  first attorney, correct?

10 A.   Oh, I'm sorry.  I was looking at the little magnified

11 part.  It says, "The same and sounds the same, so my whole

12 game plan is that you say..."

13 Q.   Okay.  Let me ask you about that portion that you just

14 read.  What did you mean by "the same and sounds the same so

15 my whole game plan is that you say"?  What did you mean by

16 that?

17 A.   That, you know, basically, she was trying to make it seem

18 like I was to blame for what happened to Mr. Brown, so it's,

19 like, you got to start telling the truth, like, you can't keep

20 lying on me, and due to the fact that, you know, she would say

21 one thing and then say another thing, it was, like, you're all

22 over the board.

23          MR. JENKINS:  Go to the next page, page 3.

24 BY MR. JENKINS:

25 Q.   Takes you to page 3 of your letter.  Now, here you say,

1  "Do anything to Fort or Forf."  What is Forf?

2  A.   Forf is, like, another term for a person.  Well, it has

3  multiple meanings, but it just depends the way you want to use

4  it.

5  Q.   How did you intend it when you wrote it here in your

6  letter?

7  A.   I was talking about Mr. Brown.

8  Q.   You go on to say, "Also, when we went to Forf..."

9        Is that Mr. Brown?

10  A.   Correct.

11  Q.   "Mr. Brown's crib we were with Jason."  Now, who is

12  Jason?

13  A.   Jason is my friend.

14  Q.   Was it true that Jason went with you to Mr. Brown's

15  apartment?

16  A.   No.

17  Q.   Why are you saying that in this letter?

18  A.   Because, basically, when I told my lawyer what happened

19  and, you know, that he was sending -- he was trying to get in

20  contact with Laila.  He really wasn't trying to listen to me,

21  and he was making me try to take a plea deal instead, and I

22  was, like, I'm not taking a plea deal because I didn't do

23  anything.

24  Q.   Had you talked to Jason, at this point in time, about

25  what had happened with Mr. Brown?

1   A.   Before I got incarcerated, I did.

2   Q.   Let me take you to page 4 of your letter, top three

3   lines.

4        Can you read the top three lines for the jury?

5   A.   "Also, when the Feds would not be able to" -- "also, the

6   feds would not be able to prove we are lying because after

7   everything we can say we..."

8   Q.   When you say "The Feds would not be able to prove we are

9   lying," what are you referring to?

10  A.   The police.

11  Q.   Why would -- did you have concerns that the quote/unquote

12  "Feds" would think you were lying?

13  A.   Yes.

14  Q.   Why?

15  A.   Because before I got booked, Detective Wallace was making

16  it seem like I'm the one that killed Mr. Brown.

17  Q.   Were you concerned that law enforcement would not believe

18  you that it was someone else who had killed Mr. Brown?

19  A.   Yes.

20       MR. BEN'ARY:  Objection to leading questions.

21       THE COURT:  Watch your form, Mr. Jenkins.

22       MR. JENKINS:  Thank you, Your Honor.

23       If we can go down to the middle of the same page --

24  from here to here.  Yes.

25  BY MR. JENKINS:

1  Q.   Now, Mr. Palma Flores, could you read this to the jury?

2  A.   "Thing, bae, was that in your statement, you gave" -- "in

3  that statement, you said so much incriminating evidence.  So

4  the only way you can..."

5  Q.   Who are you referring to as "bae"?

6  A.   Laila.

7  Q.   And what do you mean by this?

8  A.   Um.

9  Q.   That she said "so many" -- "so much incriminating

10 evidence."  What do you mean by that?

11 A.   After hearing the audio recording, you know, she, you

12 know, said a whole bunch of lies and put the whole blame on

13 me.

14 Q.   I think I have one final question concerning the letter.

15 If you can go to page 5.

16      Now, Mr. Palma Flores, in this portion of your

17 letter, you mentioned a person by the name of Bryant.  Do you

18 see that?

19 A.   Yes.

20 Q.   Who is Bryant?

21 A.   Bryant is my friend.

22 Q.   And you also discuss in this portion of the letter Jason?

23 A.   Correct.

24 Q.   And Jason was another friend of yours, correct?

25 A.   Correct.

1  Q.  And in this portion of the letter, you seem to be

2  suggesting that Jason and Laila have a conversation with

3  Bryant, correct?

4  A.  Correct.

5          THE COURT:  Just a second, Mr. Jenkins.  Somebody's

6  hungry out there.  Yes, sir, thank you.

7  BY MR. JENKINS:

8  Q.  Why did you want Jason and Laila to speak with Bryant?

9  A.  Because while I was in the ADC, I was hearing that

10  Mr. Worlds was bragging about killing Mr. Brown.

11  Q.  And what role did you want Mr. Bryant to play?

12  A.  You know, basically, just see if what he was saying was

13  true.

14  Q.  Now, did you know someone who used the alias or nickname

15  "Slutty C"?

16  A.  Yes.

17  Q.  Who is Slutty C?

18  A.  That's my friend, Christian.

19  Q.  And Christian is also mentioned in the letter, correct?

20  A.  Yes.

21  Q.  Go to page 8.  Now, can you read that portion for the

22  jury?

23  A.  Yes.

24          "It's Kollin because in the letter I said go" --

25  "just go to Slutty."  But Jason has a cousin named Christian,

1  and his name is Slutty -- C on Snap.

2  Q.   So in this portion, what did you intend by this portion

3  of the letter?

4  A.   Basically, you know, Laila wrote me a letter basically

5  informing me that --

6         MR. BEN'ARY:  Objection.

7         THE COURT:  Sustained.

8  BY MR. JENKINS:

9  Q.   You can't -- you can't tell us about that, okay?

10        But just tell us what you meant by this, what did

11 you want to have happen?

12 A.   Basically, she told me not to --

13        MR. BEN'ARY:  Objection.

14        THE COURT:  Sustained.

15        MR. JENKINS:  I'll move on, Your Honor.

16        THE COURT:  Thank you.

17        MR. JENKINS:  If I can have Government Exhibit 48B

18 displayed for the witness.

19 BY MR. JENKINS:

20 Q.   Mr. Palma Flores, take a look at the screen.  Do you

21 recognize this exhibit?

22 A.   Yes.

23 Q.   Do you remember when it was introduced into evidence?

24 A.   Yes.

25 Q.   I want you to take a look at -- the 5th line.  Can you

1  highlight the 5th line from the top?

2          First of all, do you recognize the -- is this

3  Instagram account or Snapchat?  Tell me, what is it?

4  A.   If I'm not mistaken, that's Kollin's Snapchat account.

5  Q.   Which one, is it the Slutty Boy K or Spillgates?

6  A.   Slutty Boy K.

7  Q.   And do you know whose account Spillgates is?

8  A.   Yes.

9  Q.   Who is it?

10  A.   Kollin's cousin.

11  Q.   Now, are you familiar with the address 6147 Les Dorson

12  Lane?

13  A.   Yes.

14  Q.   Where is that?

15  A.   If it's not Jason's house, I know it's in Jason's

16  neighborhood.

17  Q.   Now, this message was sent from your phone, correct?

18  A.   Yes.

19  Q.   Who sent this message?

20  A.   Kollin.

21  Q.   When did he send it?  What's the time?

22  A.   It says Saturday, October 26, 20:21:43.

23  Q.   And this is a message that Kollin sent from your phone to

24  this other individual, correct?

25  A.   Correct.

1  Q.   If I can have you come down 1, 2, 3, 4.  Were you

2  familiar with Mr. Brown's Snapchat account?

3  A.   Yes.

4  Q.   I'm sorry, one more, Mr. Qwa Brown.

5        And do you recognize his Snapchat account on this

6  exhibit?

7  A.   Yes.

8  Q.   Is it in the highlighted portion?

9  A.   Yes.

10 Q.   And this appears to be a message from Mr. Brown to who?

11 A.   Kollin.

12 Q.   And again, was this sent from your phone?

13 A.   No.  It says from Qwa Brown to Slutty Boy K, so that

14 means it was sent from Mr. Brown's phone.

15 Q.   Now, do you see the time that's noted on this

16 communication?

17 A.   It says Saturday, October 26, 4:25:09.

18 Q.   At the time that this message was sent, was your phone in

19 your possession?

20 A.   No.

21        MR. BEN'ARY:  Sorry, can we have the Court's

22 indulgence?

23        THE COURT:  You may.

24        (Counsel confers.)

25        MR. JENKINS:  Thank you, Your Honor.

1  BY MR. JENKINS:

2  Q.   At the time this message was sent, were you physically in

3  possession of your phone?

4  A.   No.

5  Q.   Who had your phone?

6  A.   Kollin did.

7  Q.   And you heard the detective testify that this message was

8  sent approximately five minutes before the first 911 call,

9  correct?

10 A.   Yes.

11 Q.   Now, can you go to the next message?

12          Now, this is sometime later, correct?

13 A.   Yes.

14 Q.   And who?

15          MR. BEN'ARY:  Sorry.  It's, like -- it's earlier --

16          MR. JENKINS:  It's early.  That's right.  It goes to

17 opposite.  I'm sorry, go back up one to the one just before

18 the "Bro, you're blowing me up."  Okay.

19 BY MR. JENKINS:

20 Q.   Now, again, this is from the same Slutty Boy K account,

21 correct?

22 A.   It's from Zachchasin_ky2sluttyboyk (ph).

23 Q.   And Slutty Boy K is Kollin, correct?

24 A.   Yes.

25 Q.   At the time this message was sent, where was your phone?

1  A.   With Kollin.

2  Q.   Did you know Kollin was communicating with Mr. Brown on

3  your phone?

4  A.   No.

5  Q.   Did you ask him to communicate with Mr. Brown on your

6  phone?

7  A.   No.

8  Q.   The --

9          MR. JENKINS:  Court's indulgence.

10          THE COURT:  Yes, sir.

11  BY MR. JENKINS:

12  Q.   Now, Mr. Palma Flores, on yesterday, it was admitted into

13  evidence the extraction from your cell phone; do you remember

14  that?

15  A.   Correct.

16  Q.   Do you remember the video depicting you at a gun range

17  displaying a firearm?

18  A.   Yes.

19  Q.   Was that you?

20  A.   Yes.

21  Q.   Had you been to a gun range before?

22  A.   Yes.

23  Q.   In that video, do you remember what type of firearm were

24  you in possession of?  The video is not up.

25  A.   Oh, like I said, I'm not too good with guns so I wouldn't

1  know, but I just know it was -- me and my friend, Will, went

2  to the shooting range.  I took my AR-15 and he took his two

3  guns, and we were both just shooting at the range, and I

4  borrowed his two guns and he borrowed my AR.

5  Q.   Do you know what kind of gun you borrowed from your

6  friend, the handgun?

7  A.   No.

8  Q.   Now, you also heard the testimony of Detective Wallace

9  about the search of your residence, correct?

10 A.   Yes.

11 Q.   And in that search, it yielded a firearm, correct?

12 A.   Correct.

13 Q.   Is that the AR-15 you just referred to in your testimony?

14 A.   Yes.

15 Q.   It also yielded a number of ammunition; you heard that

16 testimony, correct?

17 A.   Yes.

18 Q.   Ammunition for the AR-15, correct?

19 A.   What's two different types of ammunition?

20          THE COURT:  Watch the form of your questions.

21          MR. JENKINS:  Yes.

22 BY MR. JENKINS:

23 Q.   What were the types of ammunition recovered from your

24 home?

25 A.   If I'm not mistaken, the rifle caliber was a .223, and

1   then the smaller one was a .45-caliber bullet.

2   Q.   Mr. Palma Flores, on yesterday, you heard Ms. Laila

3   Sheehy testify about you disposing of a weapon; do you

4   remember that testimony?

5   A.   Correct.

6   Q.   Did that occur?

7   A.   Never.

8   Q.   At any point in time, did you own a GLOCK 9-millimeter?

9   A.   No.

10  Q.   Now, from your phone extraction, there was a photograph

11  or a video of you holding a gun box; do you remember that

12  testimony?

13  A.   Yes.

14  Q.   Can you explain to the ladies and gentlemen of the jury

15  about the circumstances surrounding that video?

16  A.   I mean, you know, when a gun -- when you buy a gun,

17  usually, it comes in a box or a package and, you know, I was

18  just taking a picture with the package, the box that it came

19  in.

20  Q.   Mr. Palma Flores, did you shoot Mr. Brown?

21  A.   No.

22  Q.   Did you kill Mr. Brown?

23  A.   No.

24  Q.   Were you present, near his residence when he was shot and

25  killed?

1  A.   Yes.

2          MR. JENKINS:  Your Honor, I have no further

3  questions.

4          THE COURT:  What we're going to do is we're going to

5  take a little bit of a comfort break at this point.  Those of

6  us who have been in the court the entire time have been here

7  for a good two hours, so maybe an hour and a half.  Ladies and

8  gentlemen of the jury, we're going to take a real short break,

9  about ten minutes for comfort.  My plan is to allow you to get

10  to eat your lunch sometime between 1:00 and 1:30, that's the

11  goal.  So if you need to get a little snack or something to

12  get you through the rest of the late morning, early afternoon,

13  that's fine.  So we'll come back in at about -- I think that

14  clock says about noon.  Is that what it says?

15          MR. BEN'ARY:  It says noon, Your Honor.

16          THE COURT:  Yeah, about ten after 12:00.  Okay.

17          (Jury dismissed.)

18          THE COURT:  Mr. Ben'Ary, how long do you think

19  you're going to need on your cross?

20          MR. BEN'ARY:  I'll be as quick as I can, Your Honor.

21  Maybe 20 minutes to 25 minutes.

22          THE COURT:  All right.  Mr. Jenkins, based upon that

23  representation of a 20-minute cross -- ladies and gentlemen,

24  you can have a seat, I'm sorry.

25          Based on that representation of a 20-minute cross,

1  maybe ten on rehab, if you need it.

2        MR. JENKINS:  Yes, Your Honor.

3        THE COURT:  All right.  That should put us somewhere

4  around quarter of 1:00 or thereabout.

5        Do you anticipate any additional witnesses, Mr. --

6        MR. JENKINS:  I do not, Your Honor.

7        Do you anticipate a case in rebuttal?

8        MR. BEN'ARY:  I don't anticipate it right now, but

9  we're going to have to see where this goes.

10        THE COURT:  I understand.  I understand.  As I said,

11  I'm just trying to spin a few plates at the same time.  Okay.

12  I will -- we'll look to maybe having the jury go out for their

13  lunch break at 1:00, and maybe if we're to that point

14  instructing them once they come back from their lunch break,

15  and then you all can look forward to closing arguments if

16  applicable after the instructions.

17        And again, as I indicated earlier, I prefer

18  instructing the jury before the closing arguments, that way

19  the lawyers get the benefit of having the instructions with

20  them if they want to make specific reference to them so that

21  will be the goal.

22        All right.  While we're -- at this point, young man,

23  you can step down and go back over with Mr. Jenkins.

24        (Witness excused.)

25        THE COURT:  We'll be in recess until about 12:10.

1          THE BAILIFF:  All rise.  This court stands recess.

2          (Recess.)

3          (Court proceedings resumed at 12:27 p.m.)

4          THE COURT:  Ready to bring the jury back in?

5          MR. BEN'ARY:  Yes, sir.

6          (Jury present.)

7          THE COURT:  You may be seated, ladies and gentlemen.

8          I know I ask you this every time, but, ladies and

9    gentlemen, you've lived up to the Court's instructions not to

10   discuss the case or any aspect of the case with anyone?

11         With the work we're doing today, everyone is going

12   to get in their steps, so that's a good thing if you've got

13   your little monitor and you're going to be ready for the rest

14   of the day, but we appreciate your time and attention.

15         Mr. Ben'Ary.

16         MR. BEN'ARY:  Thank you, Your Honor.

17                         CROSS-EXAMINATION

18   BY MR. BEN'ARY:

19   Q.   Good afternoon, sir.

20   A.   How are you doing, sir?

21   Q.   Doing well.  Thank you.

22         Mr. Jenkins asked you a handful of questions about

23   this occasion at your house on or about October 25th of '19

24   where Qwa set up to have someone come purchase marijuana; do

25   you remember that?

1  A.   That's correct.

2  Q.   And on that occasion, you, in fact, possessed marijuana,

3  correct?

4  A.   Correct.

5  Q.   And you intended to distribute or sell it or give it to

6  someone, correct?

7  A.   Correct.

8  Q.   And that happened at your -- the house where you lived

9  with -- with your family in Fairfax County, correct?

10  A.   Correct.

11  Q.   And you had a gun during that deal, correct?

12  A.   Correct.

13  Q.   You testified that you pulled it out because Elijah

14  started to approach you afterwards; do you remember that?

15  A.   Well, once I seen two people, like I said, come to the

16  backyard, that's when I went to go get a gun.  Because I'm,

17  like, who are these people, because Qwa said only one friend

18  was coming.  So, yes, to answer your question, I did possess a

19  gun.

20  Q.   And you possessed that gun in connection with your

21  marijuana trafficking, correct?

22  A.   Correct.

23  Q.   And it was a handgun, correct?

24  A.   Correct.

25  Q.   Not the AR-15 that was seized in December at your house

1  during the search warrant; is that right?

2  A.   No.

3  Q.   Now, you were not the only person to live in that home,

4  correct?

5  A.   Yes.

6  Q.   Who else lived there with you?

7  A.   My mother, my sister, my nephew; that's pretty much it.

8  Q.   How old is your nephew, sir?

9  A.   I think now he should be five or six.

10  Q.   So back in 2019 when this armed drug deal occurred in the

11  backyard, he was three, two?

12  A.   Two or three.

13  Q.   And this is the same house where you kept a loaded AR-15

14  rifle, correct?

15  A.   Correct.

16        MR. BEN'ARY:  Pull up 12H, please.

17  BY MR. BEN'ARY:

18  Q.   Is that the AR-15 rifle that you kept in the house with

19  your young nephew?

20  A.   Correct.

21  Q.   And you also had handguns in the house, correct?

22  A.   Not handguns, one handgun.

23  Q.   Okay.  Well, let's look at 47A, please.

24        (Video played.)

25  BY MR. BEN'ARY:

1   Q.   Now, that is a handgun, correct?

2   A.   Correct.

3   Q.   And that has -- is a handgun with an extended magazine

4   that holds lots of rounds, right?

5   A.   Correct.

6   Q.   And we'll watch the rest of the video now.

7            MR. BEN'ARY:  Go ahead, please.

8            (Video played.)

9   BY MR. BEN'ARY:

10  Q.   The second gun, also a handgun, but it's a smaller frame

11  than the first one, right?

12  A.   Correct.

13  Q.   The first gun is consistent with about a .45-caliber

14  firearm; is that right?

15  A.   Correct.

16  Q.   And the second one consistent with a 9-millimeter

17  handgun; isn't that right?

18  A.   Um, I thought it was -- well, it was my friend's handgun,

19  but I thought it was a .45 and a .40-caliber handgun.

20  Q.   And the reason that someone posts a video like this to

21  their social media accounts is a warning to people who might

22  try and rob someone of money and marijuana, correct?

23  A.   Incorrect, sir.

24  Q.   Now, when your residence was searched in December of

25  2019, there were no handguns there, correct?

1  A.   Correct.

2  Q.   And there was no 9-millimeter ammunition, correct?

3  A.   Correct.

4  Q.   There were three .45-caliber rounds in a show box,

5  correct?

6  A.   Correct.

7  Q.   So let's go back real quick and talk about what happened

8  after this marijuana deal where Charles snatched the marijuana

9  and ran.

10         After the shooting, there was a lot of talk over

11  social media about that event, correct?

12  A.   Correct.

13  Q.   And some of the talk out there was about how you were too

14  scared to use your gun to prevent that robbery; isn't that

15  right?

16  A.   Correct.

17  Q.   People were posting about it making it seem like you were

18  soft, correct?

19  A.   Correct.

20  Q.   And that is not the reputation that a marijuana dealer

21  wants to have, is it?

22  A.   Incorrect.

23  Q.   Because if people think you're soft, they're going to

24  target you for more robberies of marijuana and more robberies

25  for money, correct?

1  A.   I mean, it's not like I'm trying to make a lifestyle or

2  hobby out of this, it was just I sold, you know, little

3  quantities of marijuana to my close friends.

4  Q.   And even Qwa Brown basically dared you to come and get

5  him, didn't he?

6  A.   I never recalled seeing anything like that.

7  Q.   And so, in response to this, in response to word getting

8  out on the street that you were soft, you engineered a plan to

9  lure Qwa out of his house so you could kill him; isn't that

10 right?

11 A.   No, sir.

12 Q.   You brought your 9-millimeter GLOCK, consistent with the

13 smaller of the two guns from the video because it was easier

14 to conceal than the larger .45, correct?

15 A.   No, sir.

16 Q.   You knew that Kollin Worlds was friends with Qwa, so you

17 contacted Kollin even though you hadn't hung out with him in

18 at least months, correct?

19 A.   No, sir.

20 Q.   Picked up Kollin in Mount Vernon Square Apartments,

21 correct?

22 A.   Correct.

23 Q.   And then you went and switched cars so that your mother's

24 minivan wouldn't be seen in the area around Qwa's residence,

25 correct?

1  A.  No, sir.

2  Q.  You used Kollin's Snapchat to lure Qwa Brown out of his

3  house, correct?

4  A.  No, sir.

5  Q.  Qwa Brown was just sitting on the steps when you

6  approached; isn't that right?

7  A.  No, sir.

8  Q.  And you fired three shots, one that struck his shoulder,

9  and then he ducked, bending forward to avoid being shot a

10  second time; isn't that right?

11  A.  No, sir.

12  Q.  And then you shot him in the top of the head and left him

13  to bleed to death on the steps of his own home; isn't that

14  right, sir?

15  A.  No, sir.

16  Q.  And you went back to the car and left the area, correct?

17  A.  No, sir.

18  Q.  You went to your cousin, Hector's house, where you burned

19  some clothes, correct?

20  A.  Correct.

21  Q.  And then after that, you went and had a meal at IHOP; is

22  that right?

23  A.  Correct.

24  Q.  Since being charged, sir, you've been engaged in a

25  attempt to convince people to lie for you; isn't that right?

1  A.   No, sir.

2  Q.   You tried to convince Jason to lie for you; isn't that

3  right?

4  A.   I wouldn't say lie.

5  Q.   You tried to convince your sister, Jasmine, to lie for

6  you; isn't that right?

7  A.   No.  I mean, I lied about my alibis, where I was that

8  night, but besides that, I haven't told Jasmine to lie about

9  anything.

10  Q.   Well, Jason delivered that letter, Exhibit 34 to Laila,

11  didn't he?

12  A.   I think so.

13  Q.   And when asked about it by authorities, he lied and

14  claimed it wasn't him.  Do you know that?

15        MR. JENKINS:  Objection, Your Honor.

16        THE COURT:  Cross-examination overruled.

17  BY MR. BEN'ARY:

18  Q.   Do you know that to be the case?

19  A.   I didn't.

20  Q.   And Jasmine told authorities that you were home the whole

21  night; are you aware of that?

22  A.   Correct.

23  Q.   And that's a lie, isn't it?

24  A.   Yes.

25        MR. BEN'ARY:  Can I ask that the witness be shown

1  Government's Exhibit 34, which is in the exhibit binder,

2  please?

3            THE CSO:  34?

4            MR. BEN'ARY:  34.

5  BY MR. BEN'ARY:

6  Q.   This is the letter that you wrote to Laila that you had

7  smuggled out of the jail, correct?

8  A.   Correct, sir.

9  Q.   Now, your testimony on direct, I believe, is that your

10 goal in sending this letter was to get Laila to tell the truth

11 that it was really Kollin who committed the murder, not you,

12 right?

13 A.   Yes, sir.

14 Q.   That would be a really important thing to happen for you,

15 right?

16 A.   I mean, yeah, I'm being charged for a crime I didn't do.

17 Q.   And if, in fact, it was Kollin that committed this murder

18 and not you, you would have every reason for all of the

19 authorities to know about it, correct?

20 A.   I mean -- what do you mean by that?

21 Q.   Are you not sure that you would want the law enforcement

22 authorities to know that it wasn't you that committed the

23 murder?

24 A.   Of course.

25 Q.   Of course.

1          But instead of sending this through the mail, you

2    had it smuggled out with an inmate who was getting released,

3    correct?

4    A.    Yes, sir.

5    Q.    And you had every opportunity to alert the authorities

6    that it was really Kollin and not you, didn't you?

7    A.    I never had a opportunity.

8    Q.    And you testified that Detective Wallace contacted you

9    within days of the murder, didn't she?

10   A.    Yes.

11   Q.    Well, at that point, did you tell her that it was really

12   Kollin that did it?

13   A.    No.

14   Q.    Okay.  And you testified on direct it's because you were

15   afraid of the police, right?

16   A.    What do you mean?

17   Q.    I thought that was your direct testimony when Mr. Jenkins

18   was asking you about this, you, I think, indicated you were

19   afraid of police so that caused you some issue?

20   A.    Yeah.  I mean, especially after this incident, like --

21   Q.    I'm not talking about after this incident; I'm talking

22   about a day or two after this shooting that you didn't commit,

23   having an opportunity to tell the police that it was really

24   Kollin.  You didn't do that; is that correct?

25   A.    No, sir.

1  Q.   And did I misunderstand your direct testimony that that

2  was not because you were afraid of Detective Wallace?

3  A.   Well, I wasn't necessarily afraid of Detective Wallace;

4  it's just, I don't know, like, I feel like I'm a young

5  minority, like, if you look at the news, like, I feel like the

6  police isn't meant for us, like, they don't protect us.

7  Q.   Well, fair enough.

8       In any event, you write this letter to Laila and

9  your goal is to get her to just tell the truth, right?

10 A.   Yes, sir.

11 Q.   All right.  Do you have that in front of you?

12 A.   The letter that I wrote?

13 Q.   Correct.

14 A.   Correct.

15 Q.   It's eight and a half or so pages of single-space

16 handwriting on it, right?

17 A.   Correct.

18 Q.   Take a moment there.  I want you to point out for members

19 of the jury, all the times in there where you say "tell the

20 truth."  Take a minute, sir.

21       (A pause in the proceedings.)

22 BY MR. BEN'ARY:

23 Q.   All right.  Mr. Palma, let me try and help you out here.

24 There's not one time when you say "tell the truth" in this

25 letter; is that right?

1  A.   Yes, sir.

2  Q.   Not a single time in eight and a half pages do you tell

3  the person who has the key to your freedom to just tell the

4  truth, do you?

5  A.   No, sir.

6  Q.   That's because the contents of this letter are not the

7  truth; it's a game plan to save your skin, correct?

8  A.   No, sir.

9  Q.   You do everything you can to get as many people here to,

10  as you say, cause some confusion in the court so that the jury

11  doesn't find you guilty, right?  Is that correct?

12  A.   No, sir.

13  Q.   Mr. Palma, you killed Qwa Brown because he robbed you of

14  a zip, an ounce of marijuana; isn't that right?

15  A.   No, sir.  Mr. Brown didn't rob me of anything.

16  Q.   Well, fair enough.

17         You killed Qwa Brown because he set you up for a

18  robbery; isn't that right?

19  A.   No, sir.

20  Q.   And that robbery was of an ounce of marijuana, correct?

21  A.   Yes, sir.

22  Q.   When you stood there at the bottom of those steps at 7112

23  Fairchild Drive, did Qwa Brown even see you coming?

24  A.   I don't know what you're talking about, sir.

25  Q.   What was the look in Qwa Brown's eye, sir, when you

1  pulled that trigger and ended his life?

2  A.   I didn't pull no trigger, sir.

3          MR. BEN'ARY:  Thank you, Your Honor.

4          THE COURT:  Redirect.

5                    REDIRECT EXAMINATION

6  BY MR. JENKINS:

7  Q.   Mr. Palma Flores, briefly.

8          Who robbed you of the marijuana?

9  A.   Some guy named Charles and Elijah.

10 Q.   Was Qwa Brown there?

11 A.   No.

12         MR. JENKINS:  No further questions, Your Honor.

13         THE COURT:  Thank you.  You may step down, sir.

14         (Witness excused.)

15         THE COURT:  Next witness, Mr. Jenkins.

16         MR. JENKINS:  Your Honor, the defense rest.

17         THE COURT:  Very good.

18         Ladies and gentlemen of the jury, at this point, the

19 parties in the matter have rested.

20         Is the government calling any case in rebuttal?  I'm

21 sorry.

22         MR. BEN'ARY:  May I have one moment, please?  I

23 think the answer is no --

24         THE COURT:  Sure.

25         MR. BEN'ARY:  -- but allow me to consult with

1  co-counsel.

2          (Counsel confers.)

3          MR. BEN'ARY:  No, Your Honor, there's no rebuttal.

4          THE COURT:  All right.  Thank you, sir.

5          The case is set now for me to give you the

6  instructions.  What I'm going to do is I'm going to go ahead

7  and let you take your lunch break now.  And then when we come

8  back we'll go ahead and instruct you on the law that you are

9  to apply in deciding this case.  Please do not discuss the

10  case or any aspect of the case with anyone.

11          We have a nice big area for you to spread out and

12  have your lunch.  It's okay to have casual conversation.  I

13  want you to understand that that is not the prohibition, but

14  please do not discuss the case or any aspect of the case with

15  anyone.

16          We should probably have you back in here -- I'd like

17  to have you back in here by 1:30, which means more like 1:40.

18  So we'll shoot for 1:30, and I will see you then.  Enjoy your

19  lunch, ladies and gentlemen.

20          (Jury dismissed.)

21          THE COURT:  Ladies and gentlemen, you can be seated.

22  Thank you.

23          Mr. Jenkins, I'm sure you're going to want to renew

24  the motion that you made at the conclusion of the government's

25  case.  And now, obviously, with the standard changing, do you

1  want to highlight anything for the Court?

2      MR. JENKINS:  No, Your Honor.  I would renew the

3  motion, Your Honor, and I don't have any additional argument.

4  I think the Court is familiar with the arguments and also now

5  had the benefit of the additional testimony, and I trust that

6  the Court can -- I can reserve it to the Court's judgment.

7      THE COURT:  Thank you, sir.  I appreciate your

8  approach.  The Court believes under the circumstances

9  presented and the evidence presented at this point that the

10  motion on behalf of Mr. Palma Flores is appropriate, and the

11  Court denies the same for the reasons previously articulated

12  and for the additional information provided after the

13  defendant presented its case-in-chief.

14      Counsel, I think we're pretty close to where we need

15  to be on the instructions.  What we're going to do is this:

16  Now that we're -- we are where I think we need to be, I'm

17  going to run 14 copies for the members of the jury, then we'll

18  have a separate copy for you.  I will have them in the order

19  that I pretend to read them, and so you'll have the benefit of

20  that.

21      As I said earlier, if I inadvertently state

22  something wrong or misread something, just raise your hand,

23  and we can go back and revisit it.  I usually get pretty good,

24  but I'm imagining it's going to take me about 45 minutes.  So

25  I am not infallible, so I will call on you to let me know if

1  something has gone wrong as far as the instructions are

2  concerned.

3  Mr. Palma Flores, again, I've asked you this

4  question several times throughout the course of this

5  proceeding. And I have observed your lawyer who has worked

6  very hard for you and has done what I believe to be an

7  excellent job. But I need to ask you, are you entirely

8  satisfied with the services of your counsel?

9  THE DEFENDANT: Yes, Your Honor.

10  THE COURT: Very good, sir.

11  All right. I'm going to direct that we take

12  Mr. Palma Flores back downstairs so that he can get a bite to

13  eat. For any people that are still in the courtroom, please

14  understand that you're not to have any contact with any of the

15  jurors or any other persons who are involved in the course of

16  this litigation, accordingly.

17  Obviously, the prosecution team can meet and confer

18  and the defense team can meet and confer, but the bottom line

19  is parties -- people who are outside the parties of the

20  litigation or officials of the Court are instructed not to do

21  anything which could undermine the ability of this Court to

22  provide justice in the disposition of this case.

23  And I remind everybody that the Court does have

24  certain inherent powers, contempt powers, to address any

25  concerns that run afoul of the Court's specific instruction in

1    that regard.

2              Thank you.

3              (Lunch Recess 12:49 p.m.)

4              (Court proceedings resumed at 1:41 p.m.)

5              MR. JENKINS:  Your Honor, I apologize for my tardy

6    return from lunch.

7              THE COURT:  That's fine.  We were all trying to

8    return as quickly as we could.

9              Anything else we need to do before we bring the jury

10   in?

11             MR. BEN'ARY:  I don't believe so, Your Honor.

12             THE COURT:  Counsel, on instruction number M, I'm

13   going to change one word because it says in each of the

14   arguments and before the arguments of counsel, instead of each

15   on the very first one.

16             THE DEPUTY CLERK:  Counsel, do you all have a

17   verdict form that you --

18             THE COURT:  Still waiting on one, Ms. Tinsley?

19             THE CSO:  Yes.

20             (A pause in the proceedings.)

21             (Discussion off the record.)

22             MR. BEN'ARY:  Sir, the parties just noticed one

23   deletion to instruction UU.  And, actually, UU is the

24   definition of a controlled substance but then underneath it

25   says, "For the jury to prove beyond a reasonable doubt that

1    the defendant..." and it says "Conspired to possess,

2    possessed with intent to distribute marijuana." So I think it

3    just -- or "conspire to..."

4              THE COURT: Do we have the right tense?

5              MR. BEN'ARY: Well, it's not a conspiracy. So it's

6    just possess with the intent to distribute marijuana.

7              THE COURT: It's to remove "conspire to."

8              MR. BEN'ARY: Correct.

9              MR. JENKINS: Correct, Your Honor.

10             THE COURT: All right.

11             MR. BEN'ARY: Apologies. You know, these get

12   recycled over and over and sometimes stuff like that creeps

13   in.

14             THE COURT: It's fine. On instruction lettered A,

15   as I indicated, I'm going to put, instead of received in this

16   trial and before the arguments of counsel. And then in the

17   fourth paragraph, counsel will quite properly refer to some of

18   the items, et cetera.

19             (Jury present.)

20                       COURT'S INSTRUCTION

21             THE COURT: All right, ladies and gentlemen, there's

22   a bit of a miscommunication. We were all sitting here because

23   we thought one of you had not gotten back and so we were

24   sitting and we said, Well, do we need to send someone out to

25   find this juror? And Ms. Tinsley informed me that you all

1  were back there, so we wasted a little bit of time, but that's

2  okay.

3          So, ladies and gentlemen of the jury, we've all been

4  able to live up to the Court's instruction not to discuss the

5  case or any aspect of the case with anyone.  Very good.

6          Ladies and gentlemen of the jury, now I'm going to

7  instruct you on the law that you are to apply in this case.

8  And then the lawyers will have an opportunity to tell you how

9  they believe the evidence should be considered.  You'll have a

10 copy of these instructions for each of you when you go back to

11 deliberate.

12         Members of the jury, now that you've heard all the

13 evidence that is to be received in this trial and before the

14 arguments of counsel becomes my duty to give you the final

15 instructions of the Court as to the law that is applicable to

16 this case.  You should use these instructions to guide you in

17 your decisions.  All the instructions of law given to you by

18 the Court, those given to you at the beginning of trial, those

19 given to you during the trial, and these final instructions

20 must guide and govern your deliberations.  It is your duty as

21 jurors to follow the law stated in all of the instructions of

22 the Court to apply these rules of law to the facts as you find

23 them to be from the evidence received during the trial.

24         Counsel will quite properly refer to some of the

25 applicable rules of law in their closing arguments to you.

1   If, however, any difference appears to you between the laws

2   stated by counsel and that as stated by the Court in these

3   instructions, you, of course, are to be governed by the

4   instructions given to you by the Court.

5          You're not to single out any one of the instructions

6   alone as stating the law but must consider the instructions as

7   a whole in reaching your decisions.  Neither are you to be

8   concerned with the wisdom of any rule of law stated by the

9   Court.  Regardless of any opinion you may have as to what the

10  law ought to be, it would be a violation of your sworn duty to

11  base any part of your verdict upon any other view or opinion

12  of the law than that given in these instructions of the Court

13  just as it would be a violation of your sworn duty as the

14  judges of the fact to base your verdict upon anything but the

15  evidence received in this case.

16         You were chosen as jurors for this case -- for this

17  trial in order to evaluate all of the evidence received and to

18  decide each of the factual questions presented by the

19  allegations brought by the government and the second

20  superseding indictment and the pleas of not guilty by the

21  defendant.

22         In resolving the issues presented to you for a

23  decision in this trial, you must not be persuaded by bias,

24  prejudice, or sympathy for or against any of the parties in

25  the case or by any public opinion.  Justice through trial by

jury depends on the willingness of each individual juror to

seek the truth from the same evidence presented to all jurors

here in the courtroom and to arrive at a verdict by applying

the same rules of law as now being given to you -- to each of

you in these instructions of the Court.

There is nothing particularly different in the way

that a juror should consider the evidence in a trial from that

in which any reasonable and careful person would deal with any

very important question that must be resolved by examining

facts, opinions, and evidence.  You are expected to use your

good sense in considering and evaluating the evidence in the

case.  Use the evidence only for those purposes for which it's

been received and give the evidence a reasonable and fair

construction in light of your common knowledge of the natural

tendencies and inclinations of human beings.

If the defendant be proved guilty by a reasonable

doubt, say so; if not proved guilty beyond a reasonable doubt,

say so.  Keep constantly in mind that it would be a violation

of your sworn duty to base a verdict upon anything other than

the evidence received in the case and the instructions of the

Court.  Remember as well that the law never imposes upon a

defendant in a criminal case the burden or duty of calling any

witnesses or producing any evidence because the burden of

proving guilt beyond a reasonable doubt is always with the

government.

1        The evidence, in this case, consists of the sworn

2  testimony of the witnesses, regardless of who may have called

3  them, all exhibits received in evidence, regardless of who may

4  have produced them, all facts which may have been agreed to or

5  stipulated, and all facts and events which may have been

6  judicially noticed.  When the attorneys on both sides

7  stipulate or agrees to the existence of a fact, you may accept

8  the stipulation as evidence and regard that fact as proved.

9  You are not required to do so, however, since you are the sole

10  judges of the facts.

11        Any proposed testimony or exhibits to which an

12  objection was sustained by the Court and any testimony or

13  exhibit ordered stricken by the Court, must be entirely

14  disregarded by you.  Anything you may have seen or heard

15  outside the courtroom is not evidence and must be entirely

16  disregarded.  Questions, objections, statements of counsel are

17  not evidence in the case.

18        You are to base your verdict only in the evidence

19  received in your case.  In your consideration of the evidence

20  received, however, you are not limited to the bald statements

21  of the witnesses or the bald statements in the exhibits.  In

22  other words, you're not limited solely to what you see and

23  hear as the witness testified or as to any exhibits that are

24  admitted.  You are permitted to draw the -- from the facts

25  which you find have been proved such reasonable inferences as

1  you feel are justified in light of your experience and common

2  sense.

3      There are two types of evidence which are generally

4  presented during a trial.  Direct evidence and circumstantial

5  evidence.  Direct evidence is the testimony of a person who

6  asserts or claims to have actual knowledge of a fact such as

7  an eyewitness.  Circumstantial evidence is the proof of a

8  chain of facts and circumstances, indicating the existence of

9  a fact.  The law makes no distinction between the weight or

10 value to be given to either direct or circumstantial evidence.

11 Nor is a greater degree of certainty required of

12 circumstantial evidence than of direct evidence.  You should

13 weigh all the evidence in the case.

14      Inferences are simply deductions or conclusions

15 which reason and common sense lead the jury to draw from the

16 evidence received in the case.  In the absence of evidence in

17 the case to the contrary, you may infer but not compel to

18 infer that official duty has been regularly and properly

19 performed, that private transactions -- bless you -- have been

20 fair and regular, that the ordinary course of business or

21 employment has been followed, that things that have happened

22 according to the ordinary course of nature and ordinary course

23 of habits of life and that the law has been obeyed.  When

24 evidence has been received in the case, concerning any of

25 these questions, you should be guided by the evidence in the

1   application of your common sense.

2          If any reference by the Court or by counsel to

3   matters of testimony or exhibits does not coincide with your

4   own recollection of that event, it is your recollection which

5   should control during your deliberations and not the

6   statements of the Court or of counsel.  You are the sole

7   judges of the evidence received in the case.

8          The questions asked by a lawyer for either party to

9   this case are not evidence.  If a lawyer asks a question of a

10  witness which contains an assertion of fact, therefore, you

11  may not consider the assertion by the lawyer as any evidence

12  of that fact.

13         Only the answers are evidence.

14         The defendant is not on trial for any act or any

15  conduct not specifically charged in the second superseding

16  indictment.

17         Testimony and or exhibit can be admitted into the

18  evidence during a trial only if it meets certain criteria or

19  standards.  It is the sworn duty of the attorneys of each side

20  of a case to object when the other side offers testimony and

21  exhibits which the attorney believes is not properly

22  admissible under the rules of law.  Only by raising an

23  objection can a lawyer request and then obtain a ruling from

24  the Court on the admissibility of the evidence being offered

25  by the other side.

1    You should not be influenced against an attorney or

2  their client because the attorney has made an objection.  Do

3  not attempt, moreover, to interpret my ruling on objections as

4  somehow indicating how I think you should decide the case.  I

5  am simply making a ruling on a legal question regarding that

6  particular piece of testimony or exhibit.

7    There has been evidence that the defendant made

8  statements about the case prior to trial.  You may use that

9  evidence, however, only to help you decide if the defendant

10  said something different earlier and if what the defendant

11  said here in court was true.  You must not, however, consider

12  what was said earlier as any proof of evidence of the guilt of

13  the defendant for the crimes charged in the second superseding

14  indictment.

15    I instruct you that you must presume the defendant

16  to be innocent of the crimes charged.  Thus, the defendant,

17  although accused of crimes in the second superseding

18  indictment, begins the trial with a clean slate with no

19  evidence against him.

20    The second superseding indictment, as you already

21  know, is not evidence of any kind.  The defendant is, of

22  course, not on trial for any act or crime not contained in the

23  second superseding indictment.  The law permits nothing but

24  legal evidence presented before the jury and Court to be

25  considered in support of any charge against the defendant.

1 The presumption of innocence alone, therefore, is efficient to

2 acquit the defendant.

3         The burden is always upon the prosecution to prove

4 guilt beyond a reasonable doubt.  This burden never shifts to

5 a defendant, for the law never imposes upon a criminal

6 defendant in a criminal case the burden or duty of calling any

7 witnesses or producing any evidence.

8         The defendant is not even obligated to produce any

9 evidence by cross-examining the witnesses for the government.

10 It is not required that the government prove guilt beyond all

11 possible doubt.  The test is one of reasonable doubt.  Unless

12 the government proves beyond a reasonable doubt that the

13 defendant has committed each and every element of the offense

14 charged in the second superseding indictment, you must find

15 the defendant not guilty of the offenses.

16         You are here to determine whether the government has

17 proven the guilt of the defendant for the charges in the

18 second superseding indictment beyond a reasonable doubt.

19 You're not called upon to return a verdict as to the guilt or

20 innocence of any other person or persons.  So if the evidence

21 in the case convinces you beyond a reasonable doubt that the

22 guilt of the defendant for the crimes charged in the second

23 superseding indictment, you should so find, even though you

24 may believe that one or more other unindicted persons are also

25 guilty.  But if any reasonable doubt remains in your mind

1 after impartial consideration of all the evidence in the case,

2 it is your duty to find the defendant not guilty.

3          A separate crime is charged in each count of the

4 second superseding indictment.  Each charge in the evidence

5 pertaining to it should be considered separately by the jury.

6 The fact that you may find the defendant guilty and not guilty

7 as to one of the counts, should not control your verdict as to

8 any other count.

9          The rules of evidence ordinarily do not permit

10 witnesses to testify as to their own opinions or their own

11 conclusions about important questions in the trial.  An

12 exception to this rule exists as to those persons who are

13 described as expert witnesses.  An expert witness is someone

14 who, by education or by experience, may have become

15 knowledgeable in some technical scientific or other

16 specialized area.  In such -- if such knowledge or experience

17 may be of assistance to you in understanding some of the

18 evidence or in determining a fact, an expert witness in that

19 area may state an opinion as to a matter in which he or she

20 claims to be an expert.

21          You should consider each expert opinion received in

22 evidence in this case and give it such weight, if any, as you

23 think it deserves.  You should consider the testimony of an

24 expert witness just as you consider other evidence in this

25 case.  If you should decide that the expert -- that the

1  opinion of an expert witness is not based upon sufficient

2  education or experience, or if you conclude that the reasons

3  given in support of the opinion are not sound or you should

4  conclude that the opinion is outweighed by other evidence,

5  including that of other expert witnesses, you may disregard

6  the opinion of, in part or in its entirety.  As I have told

7  you several times, you, the jury, are the sole judges of the

8  facts of this case.

9       Charts or summaries have been prepared by the

10 government and shown to you during the trial for the purpose

11 of explaining facts that are alleged contained in books,

12 records, and other documents which are in evidence in the

13 case.  Such charts or summaries are not evidence in this trial

14 or proof of any fact.  If you find that these charts or

15 summaries do not correctly reflect facts or figures shown by

16 the evidence in this case, you should disregard the charts or

17 summaries.

18      In other words, such charts or summaries are used

19 only as a matter of convenience for you, and to the extent

20 that you find they are not in truth, summaries of facts or

21 figures shown by the evidence in the case, you can disregard

22 them entirely.  Charts or summaries have been prepared by the

23 government have been admitted into evidence and had been shown

24 to you during the trial for the purposes of explaining the

25 facts that are allegedly contained in books, records, or other

1    documents which are also in evidence in the case.

2         You may consider the charts and summaries as you

3    would any other evidence admitted during the trial and give

4    them such weight or importance, if any, as you feel they

5    deserve.

6         Evidence relating to any alleged statement,

7    confession, admission, or act or omission alleged to have been

8    made are done by the defendant outside of the court and after

9    a crime has been committed should always be considered by the

10   jury with caution and weighed with great care.  All such

11   alleged statements, confessions, or admissions should be

12   disregarded entirely, unless the other evidence in the case

13   convinces you, the jury, beyond a reasonable doubt that the

14   statement, confession, admission, or act, or omission was made

15   or done knowingly and voluntarily.

16        In determining whether any alleged statement,

17   confession, admission, or act or omission alleged to have made

18   by the defendant outside of court and after the crime has been

19   committed was knowingly and voluntarily made or done, the jury

20   should consider the age, training, education, occupation, and

21   physical and mental condition of the defendant and his

22   treatment while in custody or under interrogation as shown by

23   all of the evidence in the case.

24        Also consider all other circumstances and evidence

25   surrounding the making of the alleged statement, confession,

1    or admission.  If after considering the evidence you determine

2    that a statement, confession, admission, or act, or omission

3    was made or done knowingly and voluntarily, you need to give

4    it such weight as you feel it deserves under the

5    circumstances.

6         Your decision on the facts of this case should not

7    be determined by the number of witnesses testifying for or

8    against a party.  You should consider all of the facts and

9    circumstances and evidence to determine which of the witnesses

10   you choose to believe or not believe.  You may find that the

11   testimony of a smaller number of witnesses on one side is more

12   credible than the testimony of a greater number of witnesses

13   on the other side.

14        Statements knowing and voluntarily made by the

15   defendant upon being informed that a crime has been committed

16   or being accused of a criminal charge may be considered by the

17   jury.  When the defendant voluntarily offers an explanation or

18   voluntarily makes some statement, tending to show his

19   innocence and it is later shown that the defendant knew that

20   the statement or explanation was false, the jury may consider

21   this as showing a consciousness of guilt on the part of the

22   defendant since it is reasonable to infer that an innocent

23   person does not usually find it necessary to invent or

24   fabricate an explanation or statement, tending to establish

25   his innocence.

1      Whether or not evidence as to a defendant's

2  explanation or statement points to a consciousness of guilt on

3  his part and a significance, if any, to be attached to any

4  such evidence are matters exclusively within the province of

5  the jury since you are the sole judges of the facts of the

6  case.

7      And your evaluation of evidence of an exculpatory

8  statement shown to be false, you may consider that there may

9  be reasons fully consistent with innocence, it could cause a

10  person to give a false statement, showing that he did not

11  commit a crime.  Fear of law enforcement, reluctance to be

12  involved, and simple mistakes may cause a person who has

13  committed no crime to give such a statement or explanation.

14      You as jurors are the sole exclusive judges of the

15  credibility of each of the witnesses called to testify in this

16  case and only you determine the importance of the weight, if

17  any, that their testimony deserves.  After making your

18  assessment concerning the credibility of a witness, you may

19  decide to believe all of the witnesses' testimony, only a

20  portion of it, or none of it.

21      In making your assessment of that witness, you

22  should carefully scrutinize all of the testimony given by that

23  witness, the circumstances under which each witness has

24  testified, and all of the evidence which tend to show whether

25  a witness in your opinion is worthy of belief.  Consider each

1    witness's intelligence, motive to falsify, state of mind, and

2    appearance in manner while on the witness stand.  Consider the

3    witness's ability to observe the matters as to which he or she

4    has testified and considered whether he or she impresses you

5    as having an accurate memory or recollection of these matters.

6            Consider also any relation a witness may bear to

7    either side of the case, the manner in which each witness may

8    be affected by your verdict, and the extent to which, if at

9    all, each witness is either supported or contradicted by other

10   evidence in the case.  Inconsistencies or discrepancies in the

11   testimony of a witness or between the testimony of different

12   witnesses may or may not cause you to believe -- excuse me --

13   to disbelieve or discredit such testimony.

14           Two or more persons witnessing an incident or a

15   transaction may simply see it or hear it differently.

16   Innocent misrecollection, like failure of recollection, is not

17   an uncommon human experience.  In weighing the effect of a

18   discrepancy, however, always consider whether it pertains to a

19   matter of importance or an insignificant detail and consider

20   whether discrepancy results from innocent error or from

21   intentional falsehood.

22           After making your own judgment or assessment

23   concerning the believability of a witness, you can then attach

24   such importance or weight to that testimony, if any, that you

25   feel it deserves.  You will then be in a position to decide

1    whether the government has proven the charges beyond a

2    reasonable doubt.

3         The testimony of a defendant should be judged in the

4    same manner as the testimony of any other witness.

5         The testimony of an immunized witness, someone who

6    has been told either that their crimes would go unpunished in

7    return for their testimony or that their testimony will not be

8    held against them in return for their cooperation from the

9    government, must be examined and weighed by the jury with

10   greater care than the testimony of someone who is appearing in

11   court without the need for such an agreement with the

12   government.

13        Elijah Kyle-Canady and Kollin Worlds may be

14   considered to be immunized witnesses in this case.  The jury

15   must determine whether the testimony of any immunized witness

16   has been affected by self-interest or by the agreement they

17   have with the government or by their own interest in the

18   outcome of the case or by prejudice against the defendant.

19        The testimony of a drug or alcohol abuser must be

20   examined and weighed by the jury with greater care than the

21   testimony of a witness who does not abuse drugs or alcohol.

22   Elijah Kyle-Canady, Kollin Worlds, Laila Sheehy, Hector Flores

23   may be considered to be abusers of drugs or alcohol.  The jury

24   must determine whether the testimony of the drug or alcohol

25   abuser has been affected by drug or alcohol abuse or the need

1    for drugs or alcohol.

2            The testimony of a witness may be discredited or at

3    least sometimes, say, impeached, by showing that he or she

4    previously made statements, which are different than or

5    inconsistent with his or her testimony here in court.  The

6    earlier inconsistent or contradictory statements are only

7    admissible to discredit or impeach the credibility of the

8    witness and not to establish the truth of these earlier

9    statements made somewhere other than here during the trial.

10           It is the province of the jury to determine the

11   credibility of a witness who has made prior inconsistent or

12   contradictory statements.  If a person has shown to have

13   knowingly testified falsely concerning any important or

14   material matter, you, obviously, have a right to distrust the

15   testimony of such an individual concerning other matters.  You

16   may reject all the testimony of that witness or give it such

17   weight or credibility as you may think it deserved.

18           You should judge the testimony of the defendant in

19   the same manner as you judged the testimony of any other

20   witnesses in the case.

21           A second superseding indictment is only a formal

22   method used by the government to accuse the defendant of a

23   crime.  It is not evidence of any kind against the defendant.

24   The defendant is presumed to be innocent of the crimes

25   charged.  Even though the second superseding indictment has

1  been returned against the defendant, the defendant begins this

2  trial with absolutely no evidence against him.  The defendant

3  has pled not guilty to the second superseding indictment and,

4  therefore, denies that he is guilty of the charges.

5        The second superseding indictment charges that the

6  offense alleged in Counts 1, 2, and 3 were committed on or

7  about or in or around a certain date.  Although it's necessary

8  for the government to prove beyond a reasonable doubt that the

9  offenses were committed on a date reasonably near the dates

10  alleged in counts 1, 2, and 3 of the second superseding

11  indictment, it is not necessary for the government to prove

12  that the offense was committed precisely on the date charged.

13        Intent and motive are different concepts that should

14  never be confused.  Motive is what prompts a person to act or

15  fail to act.  Intent refers only to the state of mind with

16  which the act is done or omitted.  Personal advancement and

17  financial gain, for example, are two well-recognized motives

18  for much of human conduct.  These praiseworthy motives,

19  however, may prompt one person to voluntary acts of good while

20  prompting another person to voluntary acts of crime.  Good

21  motive alone is never a defense whether the act done or

22  omitted is a crime.  The motive of the defendant is therefore

23  immaterial except insofar as evidence of motive may aid in the

24  determination of state of mind or the intent of the defendant.

25        The intent of a person or the knowledge that a

person possesses at any given time may not ordinarily be

proved directly because there is no way of directly

scrutinizing the workings of the human mind.  In determining

the issue of what a person knew or what a person intended at a

particular time, you may consider any statement made or acts

done or omitted by that person, and all other facts and

circumstances received in evidence, which may aid in your

determination of that person's knowledge or intent.  You may

infer, but you're certainly not required to infer, that a

person intends natural and probable consequences of acts

knowingly done or knowingly admitted.  It is entirely up to

you, however, to decide what facts to find from the evidence

received during the trial.

Evidence that an act was done or that an offense was

committed by the defendant at some other time is not, of

course, any evidence or proof whatever that at another time

the defendant performed a similar act or committed a similar

offense, including the offenses charged in the second

superseding indictment.

Evidence of a similar act or offense may not be

considered by the jury in determining whether the defendant

actually performed the physical acts charged in the second

superseding indictment.  Normally, such evidence be considered

for any other purpose whatever unless the jury finds beyond a

reasonable doubt from other evidence in the case, standing

1  alone, that the defendant physically did the acts charged in

2  the second superseding indictment.

3  If the jury finds beyond a reasonable doubt from

4  other evidence in the case that the defendant did the act or

5  acts alleged in the particular count under consideration, the

6  jury may then consider evidence as to an alleged earlier or

7  subsequent act of a like nature in determining the state of

8  mind or intent with which the defendant did the acts or acts

9  charged in the particular count.  The defendant is not on

10  trial for any acts or crimes not alleged in the second

11  superseding indictment.  Nor may a defendant be convicted of

12  the crimes charged even if you are to find that he committed

13  other crimes, even crimes similar to the one charged in the

14  second superseding indictment.

15  The government may prove that the defendant acted

16  knowingly by proving beyond a reasonable doubt that this

17  defendant deliberately closed his eyes to what would otherwise

18  have been obvious to him.  No one can avoid responsibility for

19  a crime by deliberately ignoring what is obvious.  A finding

20  beyond a reasonable doubt of an intent of the defendant to

21  avoid knowledge or enlightenment would permit the jury to find

22  knowledge.

23  Stated another way, a person's knowledge of a

24  particular fact may be shown from a deliberate or intentional

25  ignorance or deliberate or intentional blindness to the

1  existence of that fact.  It is, of course, entirely up to you

2  whether you find any deliberate ignorance or deliberate

3  closing of the eyes and any inferences to be drawn from any

4  such evidence.  You may not conclude that the defendant had

5  knowledge, however, from proof of a mistake, negligence,

6  carelessness or a belief in an inaccurate proposition.

7          The Court instructs you, the jury, that although the

8  second superseding indictment may charge a defendant with

9  committing an offense in several ways, using conjunctive

10 language like "and," it is sufficient that the government

11 proves the offense in the disjunctive, or that is to say the

12 jury may convict on a unanimous finding of any of the elements

13 of a conjunctively charged offense.  Therefore, I instruct you

14 that it is not necessary for the government to prove that the

15 defendant did each of those things named in the particular

16 count of the superseding indictment.  It is sufficient if the

17 government proves beyond a reasonable doubt that the defendant

18 did one of the alternative acts charged as long as you all

19 agree that that same particular alternative act was committed.

20         Count 1 of the second superseding indictment charges

21 that on or about October 25, 2019, in Fairfax County,

22 Virginia, within the Eastern District of Virginia, the

23 defendant, Melvin Palma Flores, did knowingly and

24 intentionally and unlawfully possess with the intent to

25 distribute a mixture and substance containing a detectable

1   amount of marijuana, a Schedule I controlled substance.

2          Specifically, one, having determined that the

3   illegal importation, manufacture, distribution, and

4   possession, and improper use of controlled substances have a

5   substantial and detrimental effect on the health and general

6   welfare of the American people, Congress enacted the

7   Controlled Substance Act codified at Title 21 United States

8   Code sections 801 and following:  There are five scheduled --

9   there are five schedules of controlled substances known as

10  Schedules I, II, III, IV, and V.  Substances are scheduled

11  depending on their potential for abuse and recognized medical

12  usage.  Marijuana is a Schedule I controlled substance.  At

13  all times, relevant to this second superseding indictment, the

14  defendant was involved in the distribution of marijuana as a

15  means to make money.

16         The defendant acquired marijuana from a source or

17  sources of supply and redistributed the marijuana to his

18  customers for profit.  The defendant possessed firearms

19  including for protection in carrying out his marijuana

20  distribution activities.  The defendant used a cell phone to

21  communicate with his customers and other associates involved

22  in marijuana distribution.

23         Including through online social media platforms, on

24  or about October 25, 2019, XB contacted the defendant

25  extensively to arrange for some of XB's associates to purchase

1  marijuana from the defendant.  In reality, XB and his

2  associates intended to steal marijuana from the defendant.  On

3  or about October 25, 2019, XB's associates, individual 1 and

4  individual 2 met the defendant at the defendant's home located

5  in Fairfax County within the Eastern District of Virginia.

6  The defendant had in his possession a quantity of marijuana

7  that he intended to distribute to XB and his associates.

8  Instead, individual 1 stole the quantity of marijuana from the

9  defendant and brought it to XB.

10          During this encounter, the defendant displayed a

11  black semiautomatic handgun but did not use it.  Later that

12  day, the defendant picked up one of his associates, individual

13  3 from an apartment in the Mount Vernon area of Fairfax

14  County.  The defendant and individual 3 met up with the

15  defendant's girlfriend, individual 4.  The defendant,

16  individual 3, and individual 4 traveled in individual 4's car

17  to the area of XB's apartment, also located in Fairfax County,

18  Virginia.

19          On or about October 26, 2019, as retaliation for

20  setting up the earlier robbery and in furtherance of his

21  ongoing marijuana distribution business, the defendant used

22  and discharged a firearm shooting XB twice and killing him.

23  The defendant also killed -- excuse me -- the defendant

24  unlawfully killed XB with malice aforethought and that he did

25  so from a premeditated design.  After the defendant killed XB,

1    the defendant -- to cover up and conceal his involvement in

2    the murder, the defendant dismantled and disposed of the

3    firearm he used.  The defendant also burned articles of

4    clothing he had been wearing at the time.

5          In and around October 2020, the defendant wrote a

6    letter addressed to individual 4.  In that letter, he directed

7    individual 4 to lie to law enforcement and say that individual

8    3 had committed the murder of XB rather than the defendant.

9    He further directed individual 4 to recant individual 4's

10    prior truthful statement to law enforcement and that the --

11    that the defendant had killed XB.

12          The defendant arranged with an identified person to

13    deliver the letter to defendant's friend JL; JL then gave the

14    letter to individual 4.  The defendant wrote the letter and

15    arranged for it to go to individual 4 in an attempt to

16    corruptly persuade individual 4 with the intent to influence

17    or prevent the testimony of individual 4 in an official

18    proceeding and to cause or induce individual 4 to withhold her

19    testimony from an official proceeding.

20          Section 841 of Title 1 of the United States Code

21    provides in part, A, "It shall be unlawful for any person

22    knowingly or intentionally, one, to possess with intent to

23    distribute a controlled substance."

24          In order to sustain this burden of proof of the

25    crime of possession of a controlled substance with intent the

distribute, that substance charged in Count 1 of the second

superseding indictment, the government must prove the

following three essential elements beyond a reasonable doubt:

One, that the defendant knowingly possessed a controlled

substance described in the second superseding indictment.

Two, that the defendant knew that this substance was

marijuana.  And three, that the defendant intended to

distribute some or all of this controlled substance.

The term "knowingly" as used in these instructions

to describe the alleged state of mind of the defendant, means

that he was conscious and aware of his actions, realized what

he was doing or what was happening around him, and did not act

because of ignorance, mistake or accident.  Knowledge may also

be inferred from a deliberate disregard for truth or falsity

with a conscious purpose to avoid learning the truth.

The word possess means to own or to exert control

over.  The word possession can take on several different but

related meanings.  The law recognizes two kinds of possession.

Actual possession and constructive possession.  A person who

has knowingly has direct physical control over a thing at a

given time is then in actual possession of it.

A person who, although not in actual possession,

knowingly has both the power and intention at a given time to

exercise dominion over -- or control over a thing, either

directly or through another person or persons, is then in

1  constructive possession of it.  The law also recognizes that

2  possession may be sole or joint.  If one person alone has

3  actual constructive possession of a thing, then possession is

4  sole.  If two or more persons share actual construction and

5  possession of a thing, then possession is joint.  You may find

6  that the elements of possession, as that term is used in these

7  instructions, is present if you find beyond a reasonable doubt

8  that the defendant had actual or constructive possession

9  either alone or jointly with others.

10        A defendant's mere presence at a location where an

11 item is found or his mere association with another person who

12 possesses that item, is not sufficient to establish

13 constructive possession.  However, proximity to the item

14 coupled with actual inferred knowledge or of his presence may

15 be sufficient proof to establish constructive possession.

16 Constructive possession does not require proof that the

17 defendant actually owned the property on which the item was

18 found.

19        The term "to distribute" as used in these

20 instructions, means to deliver or to transfer possession or

21 control of something from one person to another.  The term "to

22 distribute," includes, but is not limited to, the sale of

23 something by one person to another.

24        The phrase "with intent to distribute" means to have

25 in mind or to plan in some way to deliver or to transfer

1 possession or control over a thing to someone else.  In

2 attempting to determine the intent of a person, you may take

3 into consideration all facts and circumstances shown by the

4 evidence received in the case concerning that person.

5 　　　　　In determining a person's intent to distribute

6 controlled substances, the jury may consider among other

7 things:  The purity of the controlled substances, the quantity

8 of the controlled substance, the presence of the equipment

9 used in possession or sale of controlled substance, and large

10 amounts of cash or weapons.  The government must prove beyond

11 a reasonable doubt that the defendant intended to distribute

12 the controlled substances alleged in the second superseding

13 indictment.

14 　　　　　You are instructed as a matter of law that marijuana

15 is a controlled substance.  It is solely for the jury,

16 however, to determine whether or not the government has proved

17 beyond a reasonable doubt that the defendant possessed with

18 intent to distribute marijuana, a Schedule I controlled

19 substance.

20 　　　　　For Count 1, the evidence received in this case need

21 not be proved -- in this case, need not prove the actual

22 amount of the controlled substances that were -- that was part

23 of the alleged transaction, or the exact amount of the

24 controlled substance alleged in the second superseding

25 indictment as possessed with intent to distribute by the

1   defendant.  The government must prove beyond a reasonable

2   doubt, however, that a measurable amount of the controlled

3   substance was, in fact, knowingly and intentionally possessed

4   with the intent to distribute by the defendant.

5        It is not necessary for the government to prove that

6   the defendant knew the precise nature of the controlled

7   substance that were possessed with the intent to distribute.

8   The government must prove beyond a reasonable doubt, however,

9   that the defendant did know that some type of controlled

10   substance was possessed with intent to distribute.

11        Count 2 of the second superseding indictment charged

12   that on or about October 26, 2019, in Fairfax County,

13   Virginia, within the Eastern District of Virginia, the

14   defendant, Melvin Palma Flores, did knowingly use, carry,

15   brandish, and discharge a firearm during and in relation to a

16   drug trafficking crime for which he may be prosecuted -- bless

17   you -- in the court of the United States namely; possession

18   with intent to distribute marijuana as set forth in charge in

19   Count 1 of the second superseding indictment.  And as ongoing

20   distribution of marijuana and knowingly and willfully causing

21   the death of XB through the use of the firearm, such that the

22   killing was first degree, as defined in 18 U.S.C. Section

23   1111(a), and that the defendant with premeditation and malice

24   aforethought did unlawfully kill XB by shooting him with a

25   firearm.

1          Sections 924(c)(1)(A) of Title 18 in the United

2     States Code provides in part, that it shall be unlawful for

3     any person, who during and in relation to any drug trafficking

4     crime for which a person may be prosecuted in a court of the

5     United States, uses or carries a firearm, or who, in

6     furtherance of any such crime, possess a firearm.

7          Section 924(j) of Title 18 of the United States Code

8     provides in part that a person who, in the course of a

9     violation of Section C causes a death of a person through the

10    use of a firearm shall, one, if the killing is murder as

11    defined in Section 1111, be punished by imprisonment for any

12    term of years or life.

13         In order to sustain this burden of proof for the

14    crimes of using -- the crime of using a firearm in relation to

15    a drug trafficking crime, resulting in death as charged in

16    Count 2 of the second superseding indictment, the government

17    must prove the following essential elements beyond a

18    reasonable doubt:  One, that the defendant used or carried a

19    firearm; two, that the defendant did so in relation to a drug

20    trafficking crime, which may be prosecuted at in federal

21    court; and that the defendant caused the death of a person

22    through the use of a firearm; that the killing was -- and,

23    four, that the killing was murder as defined in these

24    instructions.

25         The term "murder," as used in these instructions,

1  means the unlawful killing of a human being with malice

2  aforethought.  The distinction between the first and

3  second-degree murder is a presence or absence of

4  premeditation.

5          As used in these instructions, the term "malice

6  aforethought" means either to kill another person deliberately

7  and intentionally -- and intentionally or to act with callous

8  and wanton disregard for human life.  To prove malice

9  aforethought, the government does not have to show that the

10  government -- that the defendant -- excuse me -- harbored

11  hatred or ill-will against the victim or others, nor does the

12  government have to prove an intent to kill or injure.  The

13  government may prove malice by evidence of conduct, which is

14  reckless and wanton and a gross deviation from a reasonable

15  standard of care of such a nature that you, the jury, may

16  infer that the defendant was aware of a serious risk of death

17  or serious bodily harm.  Thus, the government need only prove

18  that the defendant acted with a depraved heart, that is

19  without the regard for the life and safety of others, and that

20  a death resulted.

21          Premeditation involves a prior design to commit

22  murder, but no particular period of time is necessary for such

23  deliberations and premedication.  There must be some

24  appreciable time for reflection and consideration before

25  execution of the act, although the period of time does not

1   require the lapse of days or hours or even minutes.  Perhaps

2   the best it can be said of deliberation is that it required a

3   cool mind that is capable of reflection and a premeditation

4   that is -- that is required that the one with the cool mind

5   did, in fact, reflect at least for a short period of time

6   before his act of killing.

7          The term "firearm" means, A, any weapon including a

8   starting gun, which will or is designed or may readily be

9   converted to expel a projectile by the action of an explosion;

10  B, the frame or receiver of any such weapon; C, any firearm

11  muffler or firearm silencer; or D, any destructive device.

12  The term "firearm" does not include antique firearm.  You need

13  not find that the firearm was loaded or that it was operable

14  at the time of the offense.

15         The term "drug trafficking crime" means an offense

16  that is a felony and involves the distribution, manufacture,

17  or importation of any controlled substances.  The offense

18  alleged in Count 1 of the superseding -- second superseding

19  indictment possession with intent to distribute marijuana is a

20  drug trafficking crime.

21         "In furtherance of" means the act of furthering,

22  advancing, or helping forward.  Therefore, as to Count 3, the

23  government must prove that the possession of a firearm

24  furthered, advanced, or help forward the drug trafficking

25  crime.  For drug trafficking crimes, factors that the jury may

1  consider in making this determination may include the

2  following -- I'm sorry.

3          The type of drug activity that was being conducted,

4  accessibility of the firearm, the type of firearm, whether the

5  firearm was stolen, the status of the possession, whether it

6  was legitimate or illegal, whether the firearm was loaded, the

7  proximity of the firearm to either drugs or drug profit, the

8  time and circumstances under which the firearm was found,

9  whether the firearm provided defense against the theft of

10 drugs and or reduced the probability that such a theft might

11 be attempted.  The possession is in furtherance if the purpose

12 of the firearm is to protect or embolden the defendant.

13          MR. BEN'ARY:  Your Honor, pardon the interruption.

14 That instruction, triple C --

15          THE COURT:  Yes.

16          MR. BEN'ARY:  -- relates to Count 2.

17          The second sentence begins, "Therefore, as to

18 Count 3" should be "Therefore, as to Count 2."

19          THE COURT:  Okay.  Ladies and gentlemen, I'm going

20 to read that instruction again.

21          Any objection?

22          MR. JENKINS:  No objection.

23          MR. BEN'ARY:  No objection.

24          THE COURT:  The furtherance of means -- "in

25 furtherance of" means the act of furthering, advancing, or

1  helping forward.  Therefore, as to Count 2, the government

2  must prove the possession of a firearm further -- furthered,

3  advanced, or help forward the drug trafficking crime.  For the

4  drug trafficking crimes, factors that the jury may be consider

5  in making this determination may include following:  The type

6  of drug activity that was being conducted, accessibility of

7  the firearm, the type of firearm, whether the firearm was

8  stolen, the status of the possession, whether it was

9  legitimate or illegal, whether the firearm was loaded, the

10  proximity of firearm to either drugs or drug profits, the time

11  and circumstances under which the firearm was found, whether

12  the firearm provided the defense against theft of drugs and or

13  reduced the probability of such a theft might be attempted.

14       The possession is in furtherance if the purpose of

15  the firearm is to protect or embolden the defendant.

16       Distribution of drugs in the common sense

17  recognition that drug dealing is a dangerous and violent

18  enterprise supporting inference that the defendant's

19  possession of a firearm was to facilitate drug dealing.  The

20  frame uses or carries a firearm means having a firearm or

21  firearms available to assist or aid in the commission of the

22  crime identified in Count 2 of the second superseding

23  indictment.  In the determining whether the defendant used or

24  carried a firearm, you may consider all of the factors

25  received in evidence in the case, including the nature of the

underlying crime of violence or drug trafficking alleged, the

proximity of the defendant to the firearms in question --

firearm in question, the usefulness of the firearm to the

crime alleged, and the circumstances surrounding the presence

of the firearm.

The government is not required to show the defendant

actually displayed or fired the weapon.  The government is

required to prove beyond a reasonable doubt, however, that the

firearm was in the defendant's possession or under the

defendant's control at the time that a drug trafficking crime

was committed.

The use -- to use a firearm requires active

employment, which includes brandishing, displaying, bartering,

striking with, and firing or attempt to fire a firearm;

however, would not include storing a firearm near drugs or

drug proceeds.

The term "carry" requires knowing, possession, and

movement conveying, transporting, or bearing the firearm in

some manner; however, the firearm does not have to readily --

be readily accessible.

A firearm is used or carried in relation to a drug

trafficking crime of the firearm with some purpose or effect

with respect to the drug trafficking crime, and if its

presence was not the result of accidents or coincidence.  The

firearm must facilitate or have the potential of facilitating

1 the drug trafficking crime. If a firearm is carried for

2 protection or intimidation, it is carried in relation to the

3 drug trafficking offense.

4 Count 3 of the second superseding indictment charges

5 that in or around October 2020 in the Eastern District of

6 Virginia, the defendant, Melvin Palma Flores, did knowingly

7 attempt to corruptly persuade individual 4 with the intent to

8 influence and prevent the testimony of individual 4 in an

9 official proceeding and with the intent to cause or induce

10 individual 4 to withhold her testimony from an official

11 proceeding, namely the case of the United States versus Melvin

12 Palma Flores in violation of Title 18 United States Code

13 Section 1512(b)1.

14 Section 1512(b)1 of the United States Code provides

15 in pertinent part that whoever knowingly uses intimidation or

16 physical force threatens or corruptly persuades another person

17 with intent to influence, delay or prevent the testimony of

18 any person in an official proceeding shall be guilty of an

19 offense against the United States.

20 In order to sustain its burden of proof of crime of

21 knowingly intimating a witness as charged in Count 3 of the

22 superseding -- second superseding indictment, the government

23 must prove the following two essential elements beyond a

24 reasonable doubt. One, the defendant knowingly intimidated or

25 use physical force, corrupt persuasion against the person

1  identified in the second superseding indictment as a witness;

2  and, two, that the defendant did so intending to influence,

3  delay, or prevent the testimony of that person in an official

4  proceeding.

5       The term "intimidation" as used in these

6  instructions means the use of any words or any actions that

7  would harass, frighten, or threaten a reasonable ordinary

8  person to do something that person would not otherwise do or

9  not to do something that the person otherwise would do.

10      The term "physical force" means physical action

11  against another and includes confinement.

12      The phrase "with intent to influence, delay, or

13  prevent testimony" means to act for the purpose of causing any

14  person to change their testimony information in any way or to

15  withhold testimony or information permanently or only for a

16  period of time.

17      The government is not required to prove that the

18  person to be threatened or intimidated actually felt

19  threatened or intimidated or influenced or that there was any

20  actual delay or withholding of that person's testimony.  The

21  government must prove beyond a reasonable doubt, however, that

22  the defendant acted with intent to influence, delay or prevent

23  testimony.

24      During the trial, you've heard testimony of a

25  witness and argument by counsel that the government did not

1  utilize specific investigative techniques.  You may consider

2  these facts in deciding whether the government has met its

3  burden of proof, because as I told you, you should look at all

4  of the evidence or lack of evidence in deciding whether the

5  defendant is guilty.  However, you should also -- you are also

6  instructed that there's no legal requirement that the

7  government use any specific language to prove -- or

8  investigative techniques to prove its case.  Law enforcement

9  techniques are not your concern.  I'm sure that at least one

10  of you have seen the popular TV shows CSI and Law & Order.

11  The TV standards and the capabilities of law enforcement as

12  portrayed on TV and in the movies do not apply here to this

13  trial.  Witness testimony is sufficient to establish the

14  degree -- witness testimony is sufficient to establish the

15  charges in this case.  Specific investigative techniques such

16  as DNA and fingerprints are not required to be presented in

17  order for you to find the defendant guilty of the charges in

18  the case.  Please dismiss from your deliberations in

19  consideration of the appropriate verdict in this case any

20  investigative techniques which you have -- may have seen on TV

21  or in the movies as well as anything else about which there

22  was no evidence.  Your concern, as I have said, is to

23  determine whether or not on the evidence or lack of evidence,

24  the defendant's guilt has been proven beyond a reasonable

25  doubt.

1      Upon retiring to your jury room to begin your

2 deliberations, you must select one of your members to act as

3 your foreperson.  The foreperson will preside over your

4 deliberations will be your spokesman here in court --

5 spokesperson here in court -- sorry.  Your verdict must

6 represent the collective judgment of you, the jury.  In order

7 to return a verdict, it is necessary that each juror agree to

8 it.  Your verdict, in other words, must be unanimous.  It is

9 your duty as juror to consult with one another and to

10 deliberate with one another with a view toward reaching an

11 agreement if you can do so without violence to individual

12 judgment.  Each of you must decide the case for himself or

13 herself but do so only after the impartial consideration of

14 the evidence in the case with your fellow jurors.  In the

15 course of your deliberations, do not hesitate to examine your

16 own views and to change your opinion if convinced it is

17 erroneous.  Do not surrender your honest conviction, however,

18 solely because of the opinion of your fellow jurors or for the

19 mere purpose of thereby being able to return a unanimous

20 verdict.

21      Ladies and gentlemen of the jury, I'm going to give

22 you a verdict form to be presented to your foreperson and you

23 are to fill out each one of the areas that are designated on

24 the jury form.  And I'm going to ask that in that regard that

25 each -- the foreperson of the jury sign the documents on the

1   last page.  There are three pages here.  You'll see, as I'm

2   illustrating here, there is a place for the foreperson to

3   sign.  The foreperson should sign the verdict after, if you

4   all are able to reach a unanimous verdict.

5           Remember at all times that you are not partisans;

6   you are judges, judges of the facts of this case.  Your sole

7   interest is to seek the truth from the evidence received

8   during the trial.  Your verdict must be based solely on the

9   evidence received in this case.

10          Nothing you have seen or read outside of the court

11  may be considered.  Nothing that I have said or done during

12  the course of the trial is intended in any way to somehow

13  suggest to you what I think your verdict should be.

14          Nothing said in these instructions, nothing in any

15  form of verdict should suggest or convey to you in any way or

16  manner any intimation as to what the verdict I think you

17  should return.  What the verdict shall be is the exclusive

18  responsibility of you, the jury.  As I have told you many

19  times, you are the sole judges of the facts.

20          The punishment provided by law for the offenses

21  charged in the second superseding indictment as the matter

22  exclusively within the province of the court and should never

23  be considered by the jury in any way in arriving at an

24  impartial verdict as to the offense charged.

25          You will take these forms to the jury room and when

1  you have reached the unanimous verdict as to your verdict, you

2  will have your foreperson write your verdict on the form, date

3  and sign the forms, and then return with your verdicts to the

4  courtroom.  As I've indicated throughout, Ms. Tinsley is your

5  liaison.  You just need to let her know, and we'll follow the

6  process as it becomes necessary.  If it becomes necessary

7  during your deliberations to communicate with the Court, you

8  may send a note, signed by your foreperson or by one or more

9  members of the jury, through the court security officer,

10  Ms. Tinsley.  No members of the jury should ever attempt to

11  communicate with the Court by any means other than a signed

12  writing, and the Court will never communicate with any member

13  of the jury, concerning the evidence or opinion or

14  deliberations other than in writing orally here in court.

15        You will note from the oath that you took -- you

16  will note from the oath -- I have stated throughout that you

17  are not to discuss the case or any aspect of the case with

18  anyone, and that is to be your collective judgment as to what

19  the responsibilities are.  You should only discuss the case

20  when all persons are in the jury room and able to deliberate.

21  Bear in mind that you are also never to reveal to any person,

22  not even to the Court, how the jury stands numerically or

23  otherwise on the question of whether or not the government has

24  sustained its burden of proof until after you have reached the

25  unanimous verdict.

1        I am sending the exhibits, which have been received

2   in evidence during the trial with you as you retire for your

3   deliberations.  These are the instructions of law that you are

4   to apply in this case.  As I indicated earlier, I will be

5   providing to you a copy of these instructions, so you will be

6   able to have them individually.

7        At this point, ladies and gentlemen, the government

8   is entitled to present its closing argument.  Then the defense

9   will be able to present its closing arguments.  Because the

10  government bears the burden of proof throughout the

11  proceedings, the government will have an opportunity, if it

12  chooses to do so, to speak in rebuttal to the defense's

13  closing argument.

14        You're free to move about the well.

15        MR. BEN'ARY:  Thank you, Your Honor.

16        THE COURT:  Just a second, Mr. Ben'Ary.  We have a

17  little movement in the back.  Just hold up a second.

18        (A pause in the proceedings.)

19        THE COURT:  I'm going to ask that the court security

20  officers, who are in the back of the courtroom, preclude

21  anyone else from coming in during the closing arguments.

22        Ladies and gentlemen who are here, if you need to

23  leave, this is your time to leave.  I'm not going to allow

24  these closing arguments to be interrupted by people going in

25  and out of that door.  So if you need to leave, this is your

1 time.

2          Thank you, Mr. Ben'Ary.

3                    **CLOSING ARGUMENT**

4          MR. BEN'ARY:  Thank you, Your Honor.  Your Honor,

5 may it please the Court.

6          THE COURT:  Yes, sir.  Thank you.

7          MR. BEN'ARY:  Mr. Jenkins, ladies and gentlemen of

8 the jury.

9          At the beginning of the trial, my colleague,

10 Ms. Rumbaugh, stood up here and told you about the defendant

11 bringing a gun over to Qwa Brown's residence on October 26,

12 2019.  And it was there that this defendant, Melvin Palma

13 Flores, lured Qwa Brown out of his house, ambushed him, and

14 executed him.  Retaliation for a drug robbery that Qwa Brown

15 had set up earlier on October 25th.

16          The evidence in this case has shown exactly that.

17 And that this ambush took some planning.  It took the

18 defendant bringing a gun, we know that he possessed, because

19 he testified he had with him only six hours before the

20 shooting at his house.

21          It involved the defendant finding a means to

22 communicate with Qwa Brown in a way that wouldn't alert him

23 that the guy that he was in this dispute with over the course

24 of that day, October 25th, was about to come and pay him a

25 visit so that Qwa Brown couldn't defend himself.  After that,

1    the defendant brought in his friend, mutual friend with

2    Qwa Brown, Kollin Worlds who happen to have Qwa Brown's

3    Snapchat saved in his contacts.  Finally, the defendant needed

4    a ride because he couldn't show up at a scene where he was

5    about to commit a murder in his mother's gray minivan.  So he

6    brought in Laila Sheehy.

7            Ladies and gentlemen, all of this planning, all of

8    this premeditation was designed for one purpose.  And we know

9    based on the timing of the last communication between the

10   Snapchat accounts of Kollin Worlds and Qwa Brown and then the

11   near five minutes between the first 911 call that there was no

12   argument, there was no fight.  And, in fact, we know from the

13   911 call, the crime scene evidence that Qwa Brown never got

14   off the steps.  This defendant didn't give him that

15   opportunity.  Went there for one purpose and that was to shoot

16   him and kill him and that's exactly what he did.

17           Ladies and gentlemen, we spent a lot of time during

18   the course of this trial talking about corroboration, what

19   facts corroborated with the facts.  And I would submit to you

20   respectfully at this point, after the defendant's testimony,

21   there is a single fact that is in dispute and that is whether

22   it was the defendant who got out of the vehicle and shot

23   Qwa Brown or whether it was Kollin Worlds that got out of the

24   vehicle to shoot and kill Qwa Brown.  I would respectfully

25   suggest to you that there's one version of that that makes all

1  of the other evidence in the case makes sense.  There's

2  another version of it that throws everything else out of

3  whack, that causes mental gymnastics to try to understand the

4  motivations involved, why people said what they said when they

5  said it and just doesn't make common sense.

6      And I would respectfully suggest to you that the

7  version that makes everything else consistent and match up in

8  this case is the version that it was this defendant,

9  Melvin Palma Flores, that shot and killed Xyqwavius Brown on

10 October 26, 2019.

11     There are three charges in the indictment that you

12 are going to have to decide.  The first one is whether the

13 defendant possessed with the intent to distribute marijuana.

14 And I would submit to you his testimony, I essentially asked

15 him elements of that offense during the beginning of my

16 cross-examination.  He admitted he possessed marijuana on that

17 date; he did it with the intent to distribute.  He knew it was

18 marijuana.  Elijah Kyle-Canady told you that they smoked part

19 of that marijuana afterwards.  It was, in fact, marijuana.  I

20 would submit there's no legitimate question as to whether the

21 defendant is guilty on that count.

22     The defendant likewise admitted most of the elements

23 of Count 2, which is use of a firearm in furtherance of a drug

24 trafficking crime resulting in death, and that it was

25 premeditated murder.  He admitted that he possessed a firearm.

He admitted he possessed it in furtherance in connection with

a drug trafficking crime.  And again, we are left with the one

central question in the case, whether it was this defendant

that fired the bullets that ended Qwa Brown's life.

And ladies and gentlemen, we have more than what

Mr. Jenkins referred to in his opening statement as "she

said/he said."  I would submit to you that, by the way, she

said/he said can be enough if the she and the he are found to

be credible witnesses.  But here, ladies and gentlemen, it's

not he said/she said.  Certainly, there are hes and shes that

say that it was the defendant that got out of the car.  He

walked a couple of hundred yards that's depicted in the

photographs in evidence down to Qwa Brown's house; they hear

shots, he comes running back smelling like a firecracker and

directs him to go.  And he goes to his cousin Hector's

apartment where he brings Hector out with a lighter to burn

the clothes, later telling him -- later telling him that he

is -- his brother burned the clothes because he's murdered

someone.

So there certainly is the she, Laila Sheehy, and he,

Kollin Worlds, providing that -- providing that information.

However, there is much more than that.  There is

also telephone location records.  And, of course, the

defendant admits to you now that he was there.  And that's the

thing about business records, cell phone records, ladies and

1    gentlemen.  They don't have a bias; they're not worried about

2    getting in trouble.  They are collected by the phone company;

3    and when law enforcement collects them, they say what they

4    say.  And here, they say the story went -- the facts -- the

5    course of that night went the way that Laila Sheehy told you,

6    they went the way that Kollin Worlds told you, and then went

7    now the way what the defendant has told you.

8           They show the defendant going to pick up Mr. Worlds

9    around Mount Vernon Square, they should've been going up to

10    pick up Laila Sheehy -- Sheehy in the Kingstowne area and then

11    they show the two phones in the area of Qwa Brown's house

12    shortly after midnight on the 10/26/2019.  In addition to

13    that, there's another "he."  There is Hector Flores,

14    defendant's cousin, who is not involved at all that night; and

15    there is no phone records showing that he was anywhere other

16    than perhaps his house.  And he tells you that the defendant

17    showed up late at night, calls him up, gets him out of the

18    house, asked him to bring a lighter, the defendant burns some

19    clothes.  And then sometime later, he asked the defendant what

20    was that about, and the defendant said "I killed someone."

21           Let's think about motivations, ladies and gentlemen

22    of the jury.  Hector Flores has really nothing to do with this

23    case, I would submit, and he testified until he sees his name

24    in this letter.  And I'm going to get to the letter in a

25    moment.  He sees his name as mentioned as a potential witness

by the defendant as someone who was going to come in and concoct some story for him. And at that point, he's contacted by law enforcement, and he lets them know about what happened. That the defendant burned his clothes, that he told him he killed someone.

What's Hector's motivation at this point? What's Hector's motivation to make that story up? Of course, the defendant now says he's being truthful about the clothes. Kollin asked me to burn the clothes so that part is true. But he's making up the other part about me saying that I killed someone. And why would Hector do that? What motivation does Hector have? Certainly not to improve familial relations in the Palma Flores family to come in and testify against your cousin who has been charged with murder falsely.

I would submit to you, ladies and gentlemen, in terms of believing whether it was the defendant or whether it was Kollin Worlds, one of the most problematic pieces of evidence, for the defendant, is his cousin Hector's testimony that the defendant not only burned his clothes that night but told Hector that he did it because he killed someone. Does it make any sense for Kollin Worlds -- for the defendant when Kollin says, Hey, burn my clothes, for the defendant to take him to his cousin's house? Why would he take him to his own cousin's house, somebody connected with him if he's not involve with the shooting? Why would he then take Kollin's

1  clothes out and burn them for Kollin?  You saw Kollin.  He's

2  an able-bodied individual.  There's no reason he couldn't use

3  a lighter just as well as the next guy.  It doesn't make any

4  sense.  I would suggest to you, for this defendant to take

5  Kollin's clothes to his own cousin's house, someone that's

6  going to be connected to him having just been involved in this

7  situation with shots fired.  I would suggest 100 percent

8  inconsistent with Kollin Worlds being the shooter.  It all

9  makes sense if, in fact, the defendant was the shooter as the

10  evidence proves in this case.

11         Now, in terms of motivations, certainly, you can

12  suggest that Kollin, if he was really the shooter, has a

13  motivation to lie.  And I suppose you can suggest that Laila

14  has a motivation to falsify testimony because of the up and

15  down nature of her relationship with the defendant.  But look

16  at the timing, ladies and gentlemen.  Look at the timing of

17  what Laila says -- and I should be calling her Ms. Sheehy,

18  pardon me.

19         Look at the timing of what Ms. Sheehy says when says

20  it.  You have in evidence a transcript of a 911 call that

21  Ms. Sheehy made.

22         And I think this is 7B, Ms. Lee, on page 6.

23         You have the actual recorded call in evidence, but

24  there's also a transcript to help you look for it.

25         Now, this 911 call comes in in December 29th, at the

time when Ms. Sheehy is in no contact with Kollin Worlds.

They're not friends. They haven't had romantic relationships.

There's nothing going on between the two of them. In fact,

until about a year prior to them hooking up at this New Year's

Eve party as they testified.

(Juror sneezed.)

MR. BEN'ARY: Bless you.

And what does Ms. Sheehy tell the police about this?

Who is the individual? Do you remember his name? And it's

butchered here, but Melvin Palmer, and then they get it

straight Melvin Palma.

So at that point before Ms. Sheehy and Mr. Worlds

are in communication at all, what motivation does she have at

this point in time to say that it was Melvin Palma?

And I would suggest there's no possibility of

coordination at that point. She is calling 911 to report the

same version of events that she testified to during trial in

this case, that it was, in fact, the defendant responsible for

the shooting, not Kollin.

And then, ladies and gentlemen, we've spent a lot of

time talking about Government's Exhibit 34. And this is the

letter that the defendant wrote to Ms. Sheehy from jail.

Giving her, basically, instructions on rounding up witnesses

to testify on his behalf.

Could you just pull up the first page?

1    Ladies and gentlemen, as we have talked about this

2    letter over and over again, you know that it's eight-plus

3    handwritten pages, you've seen certainly snippets of it.  I'm

4    going to discuss some of it with you now, but I would ask and

5    encourage and implore you all to read this whole thing as you

6    go back to deliberate.  And as you read it, think to yourself,

7    Is this the letter of someone who is waiting in jail falsely

8    accused, demanding that the truth get out there?  Or is this

9    the letter of someone who knows he's guilty, desperately

10   trying to circle the wagons, to get as many witnesses in the

11   court as possible to lie on his behalf to cause confusion so

12   that he doesn't get convicted.

13       And let's talk about some of this.  First of all, it

14   starts with, "Hey, babe, in this letter, I'm going to tell you

15   everything I can't on the phone."  Again, if he was falsely

16   accused, he would not want to hide the fact that he was

17   falsely accused.  He would be standing at the edge of the

18   highest cliff he could find broadcasting.  He would want the

19   authority to know.  I've been falsely accused.  Go out there

20   and investigate and clear me of this terrible

21   misunderstanding.  He doesn't say that.  He hides it.  He

22   smuggles it out of the jail.

23       "I truly forgive you for telling on me but now we

24   got to find a way to fix this."  Ladies and gentlemen,

25   remember back to when you were child and think about what it

means to tell on someone.  You got caught, you know, drawing

on the wall and your brother or sister told on you.  It

doesn't mean they are framing you for something; it means that

they're reporting what happened to the authority figure, and

that's exactly what Laila Sheehy did here.

And does he tell her, You need to come forward with

the truth; I've been falsely accused; I've been framed?  No,

he says, "We got to find a way to fix this."  Lately, what I

have been thinking is that if they make you testify that you

say the whole reason we got into an argument that night is

because you wanted to tell the police that Kollin did it.  I'm

paraphrasing through some of it.  You can read the whole thing

word-for-word yourself.

"Lately what I have been thinking"; not, Hey, the

truth all along is; not, Hey, I need you to say what you

really know about this.  Lately what I, Melvin Palma Flores,

have been thinking is that if they make you testify, you say,

and then he lays out his story.  And guess what?  It's a story

that blames the whole thing on Kollin just like you heard in

court during this trial.  And it is 100 percent evident, I

would suggest to you, ladies and gentlemen, it is clear when

you read this letter in the context that that's what it is.

It's a made-up story, a fabric of the defendant's imagination

designed to get witnesses to lie on his behalf to obstruct

justice and to escape responsibility.

1      He goes on.  He accuses her, at the top of page 2,

2  of snitching on him.  Again, what do you understand the word

3  "snitching" to be?  Not audio recording of you making up a

4  story of evidence of me committing this horrible crime of you

5  snitching on me.  He continues.  "As of right now, bae" -- in

6  the middle of the page -- "we all have to get our stories the

7  same.  That way when I get this attorney, everything looks the

8  same and sounds the same."

9      Ladies and gentlemen, the words of an innocent man?

10  I would suggest to you not at all.  "So everything looks the

11  same and sounds the same.  So my whole game plan is that you

12  say when we got into an argument that night was because you

13  were tired of keeping your mouth shut" and about Kollin.  It's

14  a made-up story that it was Kollin, not the defendant.

15  Someone who is in jail for a murder that they did not commit

16  and they're referring to the truth as their game plan?  Ladies

17  and gentlemen, that does not make any sense.

18      And then the story that gets told here that he's

19  telling Laila to get on the same page with this, that it was

20  Kollin, it was really Kollin's marijuana, I was just selling

21  for him, everything that you heard from the defendant on the

22  witness stand.  You can see him making it up right here in

23  this letter, Exhibit 34.  And there's other suggestions in

24  here, ladies and gentlemen, that makes this point absolutely

25  clear.  Bottom middle of the page, "Also, when we went to" --

uses the term "Forf," I'll say "that guy's." "Also, when we went to that guy's crib, we were with Jason, unless he had already told the police he was somewhere else during the shoot-out." Okay. So there is only one truth, either Jason was there or he wasn't there, and it doesn't matter what he told the police. He was there or wasn't there. Here, he is saying, "He was there unless he already told the police he was somewhere else." The words of an innocent, ladies and gentlemen, or the word for someone trying to circle the wagons?

Why does he want Jason to come in and say he was there? Because that way you have another witness that can confirm your story.

Next page, 4. "The only bad thing, bae, was that in your statement you said so much incriminating evidence." Again, would it be described as incriminating evidence if she was making up a story that included him being guilty of a murder that he didn't commit? Or is it incriminating evidence because it's evidence that tends to prove his guilt of the crime of which he is accused?

The only bad thing was that in your -- in your statement you said so much incriminating evidence. The words of an innocent man, ladies and gentlemen? The only way you can reverse that is saying, like, Detective Wallace threatened you.

1          And you heard from Detective Wallace, you heard from

2    Ms. Sheehy.  You are the judges of the credibility of the

3    witnesses.  I would suggest to you none of this makes sense.

4    None of this version makes sense.  It is evident that it is

5    just a ploy to get out of responsibility for this murder that

6    the defendant committed.

7          Also, next page, 5.  "What I was thinking was you

8    and Jason go to my friend, Bryant's house, and tell him this

9    guy has not been involved.  Tell him that Kollin did it, but

10   that he put the blame on me because one time when Bryant was

11   at the mall, he seen Kollin."  Yada, yada.  So maybe Bryant

12   can come in now and be one of those other witnesses that cause

13   some confusion.  Bryant has got nothing to do with this, and

14   the defendant is asking Laila to go put this story in Bryant's

15   head so he can come into court to tell it to you to create

16   confusion.

17         "That way" -- bottom of the page -- "the more people

18   we have on our side, the better because that way the Feds do

19   not even see it coming."  And that's it, ladies and gentlemen.

20   That's why the letter was smuggled out.  That's why the letter

21   was smuggled out.  Because if the Feds had time to investigate

22   this, it's going to be evident that it's all made up.  Well,

23   guess what?  We didn't hear from Bryant; we didn't hear from

24   Jason.  The defendant has no burden of proof in this matter.

25   The burden of proof stays on the government the entire time

1    and not suggesting otherwise.  But the circling of the wagons

2    did not work, ladies and gentlemen.  And I trust and I would

3    employ you to read this letter carefully and think through

4    whether these are the words of an innocent man.  "Tell Bryant

5    this version of the events so he can spit it back out in

6    court."

7           "Also, since you mentioned my cousin Hector" --

8    going onto page 6 -- "you got to tell him the plan and tell

9    him if he is willing to testify, and say that I came to his

10   house not to burn clothes; I came to his house to tell him

11   everything, because" -- again back to the Kollin -- "I was

12   afraid that Kollin was going to kill me to tie up loose ends."

13   Well, that -- that changed, right?  That changed between the

14   writing in this letter and today.  Today, the defendant

15   testified he did, in fact, burn the clothes over there.

16          But the plan was if they could get Hector on board,

17   the defendant could get Laila to get Hector on board was to

18   say that he came to his house.  Again, at the time that Kollin

19   was in the car.  Melvin drove over there to tell Hector, he

20   says in this letter how scared he was of Kollin.  Does that

21   make any sense?  Words of an innocent man, ladies and

22   gentlemen?

23          Little further down.  "If you can tell Jason,

24   Hector, and Bryant to testify on my behalf, that is good

25   because that way we can cause some confusion in the court,

1  that way the jury does not find me guilty.  Because honestly,

2  the Feds do not have that much evidence against my" -- "except

3  my phone location and me lying not being there."

4         So here it is, again, ladies and gentlemen.  This is

5  the motivation behind this.

6         "That way the jury does not find me guilty because

7  they don't have that much evidence."  It's not the jury won't

8  find me guilty because I am an innocent man, ladies and

9  gentlemen.  I didn't do this.  It was Kollin, and I'm being

10 set up.  Nope.  How is he going to get off?  He's going to get

11 these folks to show up to court and cause as much confusion as

12 possible to try to get acquitted.  I would suggest to you if

13 you read that letter, it's going to be evidently 100 percent

14 clear that that's exactly what is going on, ladies and

15 gentlemen.

16         I think I will leave this to you, ladies and

17 gentlemen, to read the rest of.  The bottom line, ladies and

18 gentlemen, is that innocent people don't write letters like

19 this.  Innocent people don't smuggle letters out of the jail

20 asking witnesses to lie for them in federal court trials.

21 Guilty people do this.  People that shoot other people do

22 this.  In this case, the defendant who shot and killed another

23 person wrote this letter, not because of anything he knew that

24 is true, but because he was hoping to escape responsibility by

25 creating confusion and pulling a wool over your eyes, ladies

and gentlemen. And I would suggest to you that you not let

that happen. Ladies and gentlemen, there's one story here

that makes all of the evidence make sense. And that is the

version of that that includes this defendant getting out of

the car, walking down that hill, and firing three shots at

Qwa Brown. One going through his shoulder, and then as he

ducks down -- the medical examiner's report talks about the

direction of that second wound going into the top of his head

and backwards and down.

Now, we spent a lot of time in this case talking

about and focused on the defendant focused on Kollin Worlds,

focused on Laila Sheehy. And I want to close my closing with

a few words about Qwa Brown.

If you can pull up --

Ladies and gentlemen, Qwa Brown was 19 years old on

October 26, 2019. And evidence in this case has shown that he

made a series of choices that put him in danger. He made

choices to be involved with marijuana. He made choices to

involve -- to be involved with others that conduct marijuana

robberies. He, himself -- you heard the evidence -- was

involved in conducting marijuana robberies.

And, in fact, he made the most dangerous choice of

all which was to set up this defendant, an armed marijuana

dealer, for a marijuana robbery.

None of that stuff is a good idea, ladies and

1  gentlemen.  But Qwa Brown should have been given the

2  opportunity to grow and live better.  He had a family.  He had

3  a grandmother, Joyce Brown, that you heard from, that loved

4  him.  She didn't deserve to walk out of her apartment after

5  her grandson lay bleeding, died on the steps up to her

6  apartment.

7          Ladies and gentlemen, Qwa Brown bears some

8  responsibility for putting himself in a dangerous situation,

9  but this defendant had no right to be the judge, jury, and

10  executioner.  This defendant had no right to lure him out of

11  his home.  This defendant had no right to point a gun at him.

12  This defendant had no right to fire three shots at him.  At

13  any point, prior to those shots being fired, this defendant

14  could have walked away.  That's why it's premeditated murder.

15  He had a chance to walk away.  He had the entire evening.  He

16  had all the way to the time when he was walking down the steps

17  to that apartment.  He could have walked away at any time.  He

18  could have chose not to pull the gun.  He could have chose to

19  yell at Qwa Brown.  He could have chose to try and grab his

20  weed back and run.  He didn't.  He chose to shoot him and kill

21  him, and there's nothing anyone can do to bring Joyce Brown

22  her grandson back.  Qwa Brown paid the ultimate price for his

23  poor decisions.  He got a much more severe punishment, I would

24  suggest, than he deserved.

25          Now, it's time that you hold this defendant

1   accountable and we ask that you find him guilty of all three

2   counts.

3          THE COURT:  Thank you, sir.

4          Anybody that thinks they need to leave at this

5   point, can leave.  If some people are standing outside of the

6   door, they can come in.  Does anybody need a water?  No

7   takers.

8          Mr. Jenkins.

9          MR. JENKINS:  Thank you, Your Honor.

10                        **CLOSING ARGUMENT**

11         MR. JENKINS:  May it please the Court --

12         THE COURT:  Yes, sir.

13         MR. JENKINS:  -- Mr. Palma, government counsel.

14         Ladies and gentlemen of the jury, I want to start

15   off by thanking you for paying very close attention to the

16   evidence as it has come in here today.  I know this is a

17   difficult case.  A young man lost his life and that is tragic.

18   I join the government counsel in expressing how bad it was for

19   Ms. Brown to have to see her grandson in that condition.  And,

20   yes, I also concur that young Mr. Brown made some poor choices

21   and as a consequence of those choices, he placed himself in

22   harm's way.  I also agree that sadly he was shot and killed as

23   a consequence of those poor choices.  But as I told you in the

24   very beginning, beyond the government's theory, this case was

25   simply about she said and he said.  The judge has instructed

1   you about how you should go about applying the law to the

2   evidence in this case.

3          And I submit to you, ladies and gentlemen, that

4   after a fair and impartial consideration of the evidence in

5   this case, and not with sympathy, passion, or prejudice for

6   anyone involved in this case, the only true verdict you can

7   return with respect to Mr. Melvin Palma Flores, specifically

8   with respect to Count 2, is not guilty.  Because, ladies and

9   gentlemen, I told you in the very beginning, this case was not

10  about whether or not Melvin Palma Flores engaged in marijuana

11  sales.  It wasn't.  It wasn't going to be about whether or not

12  young Mr. Qwa Brown engaged in marijuana sales.  What this

13  case is really about, ladies and gentlemen, is who exited that

14  vehicle, walked down that hill, took a 9-millimeter GLOCK

15  firearm, and fired three shots at Mr. Qwa Brown.

16         Ladies and gentlemen, separate out of your mind what

17  Laila Sheehy said, what Kollin Worlds said to you, what

18  Hector Flores said to you, what are you left with?  What are

19  you left with?  No eyewitnesses, no surveillance cameras, no

20  forensic evidence, no DNA, no fingerprints.  Nothing at all.

21  Government counsel will have you question, Well, why would

22  Ms. Sheehy, what was her motivation to falsely accuse her on

23  again, off again father of her child?  She told you.  This was

24  a bad relationship.  It has good points, but it also has its

25  bad points.  And what did she tell you happened in December of

1  2019?  You heard from Detective Wallace also.  They got into a

2  horrible fight, a terrible fight, a fight that led to

3  Mr. Palma Flores being charged with some

4  domestic-violence-related charges.  And she told you, she was

5  angry with him.  She wanted to get back at him.  She wanted to

6  get him in trouble.  And what did she then do?  Not in

7  October, not in November, but in December after this incident.

8  For the very first time, she calls the law enforcement and she

9  says it was Mr. Palma Flores who committed the murder.  She

10  gave you her motive.  She told you why she did it.  She even

11  admitted to me on cross-examination that she regretted doing

12  it.

13          The government would point to Kollin as the ultimate

14  cooperation.  So you don't have to -- according to government,

15  you all have to just rely on Ms. Sheehy, you can also take the

16  word of Kollin.  What do we know about Kollin?  He begins a

17  sexual relationship with one of his closest friend's

18  girlfriends.  He doesn't say anything about Mr. Palma Flores

19  having committed this offense until when?  Until Ms. Sheehy

20  sends him a copy of Government's Exhibit 34, in which

21  Mr. Palma Flores is clearly identifying him as the perpetrator

22  of the murder.  And it is at that point for the very first

23  time, after he gets his immunity agreement, that he meets with

24  law enforcement and his story now matches right up with the

25  woman who he's sleeping with.  They both are saying, Yeah, we

1   went here, we went there that night, and it was Melvin, who

2   got out of the car and committed the shooting.  What

3   corroboration do you have of that?

4           On cross-examination, government counsel tried to

5   point out, Well, the cell site data match it up.  It matches

6   up exactly what the defendant said and what he testified.

7   They went from point A, point B, point C, the shooting

8   occurred and then they went to point D.  That doesn't tell you

9   that Mr. Palma Flores is not telling the truth.  It certainly

10  doesn't prove that Ms. Sheehy is telling the truth.

11          Ms. Sheehy tells you this fantastic story of

12  Mr. Palma Flores, separating the gun, throwing it away in two

13  different waterways.  Detective Wallace said, you know,

14  Mr. Jenkins, you're right.  Corroborating that fact would have

15  been significant.  Corroborating that fact would have meant, I

16  didn't have to rely on just what Ms. Sheehy said.  So

17  Ms. Sheehy told me where I could go, where I could find the

18  weapon.  I called a dive team, they got together, we went to

19  the water, and guess what?  We couldn't find the weapon.

20          It wasn't where she said it was.

21          Well, Ms. Sheehy said, Well, the ballistic evidence

22  says the guys who collected the casing all say it was a

23  9-millimeter Ruger.  Nobody disputes it; nobody doubts it.

24  The defendant's home is raided.  It's searched.  He hasn't

25  gotten rid of all his ammunition.  He hasn't gotten rid of any

1  firearms.  He hasn't gotten rid of all the marijuana.  It's

2  all there.  And guess what?  No 9-millimeter rounds.  A .45,

3  yeah.  Ammunition to fit the AR-15, yeah.  No traces of a

4  9-millimeter.  No corroboration at all.  None at all.

5  Kollin Worlds tells you, Hey, I was in a car; I'm going with

6  Mr. Palma Flores, not exactly sure where we're going, but we

7  end up outside of Qwa Brown's apartment and Melvin takes my

8  phone and he starts communicating, going through his Snapchat.

9  Where is the corroboration for that?

10         Detective Wallace says, Look, that wouldn't really

11  be available.  I can't tell you who was actually using the

12  phone, who was using the Snapchat account to communicate with

13  Qwa Brown other than what Kollin Worlds says.  That's it.

14  They dumped Mr. Palma Flores' phone, they got the cell site

15  data for Ms. Sheehy's phone, and they dumped the phone of

16  Mr. Qwa Brown all in an attempt to collect data to corroborate

17  what she was saying and what he was saying.  Detective Wallace

18  told you despite her effort, despite her desire for that type

19  of quality corroborative evidence, she was unable to present

20  it to you.  We only have Kollin Worlds saying that it was not

21  him communicating with Qwa Brown moments before he was killed.

22  I want you to take a look at Government's Exhibit 47.  That's

23  the chat record.  You'll see, Kollin isn't just talking to Qwa

24  Brown around this time.  He's talking to two, three other

25  people and the very important one before he arrives at Mr.

1  Brown's apartment complex, he tells one of his friends "I'm
2  about to go re-up." "I am about to go re-up." Why is he
3  saying that? And where does he go? To the person who he told
4  you he had previously gotten marijuana from. That he had
5  previously gotten marijuana from. And it just doesn't end
6  there, ladies and gentlemen. After Mr. Brown has sustained
7  the gunshot, there is more chat information between
8  Kollin Worlds and his associates. Mr. Melvin Flores didn't
9  have access to his Snapchat account. He was in communication
10 with Qwa Brown. It was Kollin Worlds.

11         And I submit to you, ladies and gentlemen, you have
12 nothing independent of what she says or he says to say
13 Mr. Palma Flores' story is the true story or whether or not
14 Kollin Worlds and Laila Sheehy's story are the true story.
15 And that, ladies and gentlemen, in our system of justice is
16 the definition of reasonable doubt. Do you have a reasonable
17 basis to doubt what the government's charges are against this
18 man? And without any independent cooperation, ladies and
19 gentlemen, there has to be some doubt in your mind. You have
20 to be sitting here after hearing all the testimony wondering,
21 was it Palma Flores, or was it Kollin Worlds? Is Sheehy
22 credible? Is she telling the truth? Who's telling the truth?
23 God, I wish I had some physical evidence to back it up. Man,
24 if only there was a surveillance camera. If only an innocent
25 bystander was standing by and could identify who was the

1  shooter.  If only his fingerprint had been found on a casing.

2  If only the murder weapon had been found.  If only bullets

3  matching those used to end Mr. Brown's life had been found in

4  possession of anyone.  And then maybe, ladies and gentlemen,

5  you could resolve those doubts in your mind.

6           And government says put Ms. Sheehy aside, put

7  Mr. Worlds aside.  We understand -- honestly, he didn't say it

8  but I'll say it.  We got some problems with these two.  We got

9  some problems with these two.  They used drugs, one of them,

10 admitted, got some mental health issues, clearly has some

11 issues with the defendant, clearly.  I don't want -- they

12 don't want you to hang the case just on those two.  So they

13 want you to look to Hector Flores.  Well, this is his cousin;

14 why would he do that?  Why would he say that?  Mr. Flores pops

15 up on the scene approximately 19 months after the shooting and

16 killing.  He doesn't call Detective Wallace within days,

17 within weeks, within months, within a year, a year-and-a-half,

18 19 months later.  And he says at some unknown time, unknown

19 place, with no one else around, and no other way to

20 corroborate the conversation even existed, my cousin just said

21 to me, "I killed somebody."  No reason.  No motive.  What did

22 he tell you how he was feeling when he heard about his name

23 being mentioned in Government's Exhibit 34?

24           He said, "I was concerned."  "I was concerned that

25 law enforcement was going to get me involved in this.  I

1    didn't want to be involved with this.  I told them that Melvin

2    told me I killed somebody."  And once I did that, all of my

3    concerns went away.  No longer worried.  I told them that

4    Melvin did it.  I told them that Melvin told me that he killed

5    somebody, and all of my concerns were gone.

6              I'll close by spending some time on Government

7    Exhibit 34.  And I agree with Mr. Ben'Ary; you got to read it.

8    You got to start from the top of page 1 and you got to go all

9    the way to the bottom of page 8.  Mr. Ben'Ary has his

10   characterization of the portions, and I certainly have mine.

11   And we both have taken you through those segments, those bits

12   in which we believe support the government's theory and

13   supports the defense.  As the Judge says, you're the judges of

14   the fact.  And Mr. Palma Flores is not afraid of that.

15   Government counsel says, Why would an innocent person smuggle

16   a letter out, write a letter to his girlfriend, trying to

17   craft his defense, explaining what actually happened, making

18   sure that she rounds up witnesses, making sure that he has an

19   adequate defense?  He told you.

20             See, for some people in our communities, law

21   enforcement, the criminal justice system is something to be

22   trusted.  It's something that you can rely on.  Law

23   enforcement are just here to serve everyone's interest to be

24   guided by the facts and see to it that the right people are

25   held accountable.  And then there are others in our community

1  like Mr. Palma Flores told you.  That's not his view of law

2  enforcement.  No, when she first came to me, I lied.  Why did

3  you lie, Mr. Palma Flores?  I don't trust cops.  I'm a young,

4  Hispanic male, and in my view, cops aren't really here to help

5  me.  I'm concerned.  I don't want to be involved.  I lied.  My

6  sister Jasmine, she lied, too.  We both said, I was at home.

7  That wasn't true, Mr. Jenkins.  It wasn't true.  He told you

8  why.  He told you he didn't want to get involved.  He told you

9  he didn't trust them.  He told you and he says it in the

10 letter.  He doesn't trust his lawyer, who he's being

11 represented at that time.  He doesn't trust the jail phone.

12 He doesn't trust the jailers who inspect his mail.  He doesn't

13 want them to know what his defense is going to be at trial.

14 He said, They're not going to believe me.  He says it in the

15 letter.  That's why he wrote the letter.  You don't have to

16 agree with him, you don't have to share his views.  But is it

17 so unreasonable that those are his views?  And why he did what

18 he did.

19         Ladies and gentlemen, suspicion, probability,

20 likelihood, none of that is enough to find someone guilty

21 beyond a reasonable doubt in our American system of justice.

22 You don't have to approve of how Mr. Palma Flores was good in

23 his life.  You can disagree with him.  You can even think ill

24 of how he was good in his life.  But he deserves the same

25 protections of our constitution as every other citizen of whom

1  you might approve of.  I ask you, ladies and gentlemen, apply

2  the law to the facts of this case and find my client not

3  guilty of Count 2.  Thank you.

4          THE COURT:  Rebuttal from the government.

5          MR. BEN'ARY:  Thank you.

6                    **REBUTTAL CLOSING ARGUMENT**

7          MR. BEN'ARY:  Ladies and gentlemen, I'm going to be

8  brief and let you get to your deliberations here.  And again,

9  the defendant's goal as stated in the letter was to cause

10 confusion in the court and find him not guilty, and that's

11 what you're seeing in this -- at this point of the trial.

12         Mr. Jenkins asked you to separate, I think, he said

13 the testimony of Laila, Kollin, and Hector.  Okay, that's --

14 that's 3 out of 12 government witnesses.  May as well separate

15 all of the government's case and then there's no evidence at

16 all.  You can't separate and disregard, I would submit, their

17 testimony.  You got to look at it in connection with one

18 another, in connection with what you know about human nature,

19 and again, the only thing that makes everything else in the

20 case that makes sense was that it was the defendant that is

21 responsible for this shooting.

22         Mr. Jenkins -- and if I'm -- if I misheard him, you

23 guys are the ones who judge the facts and credibility so I

24 apologize.  But I think that Mr. Jenkins told you in the

25 arguments or suggested in the arguments just now that

1 Mr. Worlds came forward after Ms. Sheehy shared the letter

2 with him.  And I want to talk quickly about the chronology of

3 events here.

4          Laila makes the 911 call, according to the defendant

5 in December 2019.

6          Government's Exhibit 15, if you want to pull that

7 up, please, Ms. Lee.

8          This is the proffer letter that gives Mr. Worlds

9 immunity from us, using his statements against him if they're

10 truthful is dated January 2020.  Exhibit 34, the letter that

11 we've talked so much about, comes out months and months later

12 and later 2020 and the testimony was that Laila and Kollin

13 hook up New Year's Eve 2021, and in January 2021, she shares

14 the letter with Mr. Worlds.  Mr. Worlds, I would submit, is

15 not accurate to his statement.  He did not come forward with

16 information until after Ms. Sheehy shows him the letter.  He

17 was dealing with the U.S. Attorney's Office and law

18 enforcement more than a year in January of 2020, and the

19 letter that was shared in January of 2021.

20          Could you pull up 48B quickly, please?

21          This is the chat log that we're talking about, and I

22 think it's on the second page of that message comes in, "I'm

23 going to re-up."

24          So again, it's your interpretation that controls,

25 but I would suggest to you -- okay.  Message from Kollin

1  Worlds's Snapchat account to whoever this Marks2kj is.  "No,

2  I'm about to go re-up right now."

3       And remember, this is UTC.  One of our -- I think it

4  was Detective Wallace that told you, you got to subtract four

5  to get to Eastern Standard Time.  So this comes in at --

6  what's 21 minus 4?  It comes in 7 o'clock on 25th -- on the

7  25th.  This is during the time when Kollin is going to meet up

8  but has not yet met up with Mr. Palma.  So this isn't about

9  going to meet up with Qwa, I would suggest to you, this is

10 about Kollin going to meet up with Mr. Palma Flores, who has

11 just contacted him and said, Hey, let's go smoke.  This is --

12 this before they are together, I would suggest to you, based

13 on the evidence you've heard.  So I would suggest that it's

14 not probative of what Mr. Jenkins suggested to be probative

15 of.

16      All right.  The motivation for Ms. Sheehy to make

17 the 911 call in December of 2019, Mr. Jenkins suggests is

18 because they've been in this fight and the defendant had

19 assaulted her.  But remember back to her testimony, and she

20 was difficult to understand; she had the mask on.  It was a

21 strain to listen and hear her testimony, but what I would

22 suggest, and it's your recollection that controls, but I would

23 suggest what she said was that fight happened because he had

24 found that she had looked up how to contact Fairfax County

25 Homicide.  So it wasn't the fight that caused the motive.  It

1  was the motive that caused the fight.

2       She wanted to call the police and tell them that it

3  was Melvin and Melvin beat her up.  Not the other way around.

4       Let's see.  Oh, Mr. Jenkins wants you to focus on

5  who was using the Snapchat account to contact Qwa Brown.  And

6  I would suggest to you, ladies and gentlemen, that that is far

7  less important in your decision on this case than who used the

8  gun to shoot Qwa Brown.  That's what we're here about.  And

9  again, the evidence I would suggest to you points to one

10 person, and that is the defendant.

11      Mr. Jenkins says if only there was an innocent

12 bystander, if only there's someone who wasn't there who could

13 just tell us what happened here.  Ladies and gentlemen, Hector

14 is an innocent bystander.  Hector wasn't involved.  Hector

15 wasn't involved.  He was involved because the defendant

16 suggested that Laila go get him to lie.  And so the police go

17 talk to him, he tells them similar to what he testified, I

18 believe, the testimony was.  If Hector didn't want to be

19 involved and wanted to stay as far away as possible, wouldn't

20 Hector had told the police, I don't remember anything; I don't

21 want to talk to you; I don't want to be involved.  That would

22 have been a way to get away from this case entirely.  Hector

23 didn't want to get in trouble for providing false testimony

24 for obstructing justice, so he told -- I would suggest to

25 you -- he told the police the truth that the defendant burned

1    his clothes with his help and that some months after or some

2    weeks after he asked the defendant; the defendant admitted

3    that he did -- he conducted the shooting.

4          Ladies and gentlemen, again, read that letter

5    closely.  I would submit to you it is not the letter of

6    someone who is trying to get the truth to come out.  It is

7    someone who is trying to frustrate the legal process because

8    he understands he's in a lot of trouble.  I would suggest to

9    you the evidence that supports convictions on all three

10   counts.  Thank you.

11         THE COURT:  Thank you.

12         Ladies and gentlemen of the jury, the matter has

13   been submitted to you for your deliberations.  As I instructed

14   you earlier, your first order of business when you go back to

15   the deliberation room is to select a foreperson, and he or she

16   should make sure that the deliberations go forward in a

17   precise and orderly manner.  There will be no deliberations

18   unless all members of the jury are present to participate in

19   the process.

20         Ladies and gentlemen, it's 3:30 now.  I think that

21   after you select your foreperson, maybe if you could let us

22   know how long you want to go today and then the Court will

23   take that into consideration but again communicate through

24   Ms. Tinsley through a written note through your foreperson.

25   All right.

1        Ms. Armentrout.

2        THE DEPUTY CLERK:  Juror Number 10, Teresa Doyle;

3   and Juror Number, 9 Obed Diaz, you all were selected as

4   alternate jurors.

5        THE COURT:  Before you all leave during, let me

6   explain, during the course of the litigation, particularly

7   during the pandemic, we select a couple of people, and

8   depending on how long the trial was going to be, to be

9   alternates in the matter.  That's if someone gets sick or we

10  have a circumstance that we cannot predict, we like to make

11  sure that we have some people who are able to participate in

12  the process, who have been full participants in the trial.

13  The fact that you were an alternate is no less important than

14  the other 12 individuals who are going to actually deliberate

15  in the case.  Your time and attention was just as important,

16  but again, we had to select two alternates; they were done at

17  random, and so on behalf of the parties to the action in the

18  Eastern District of Virginia, I want to thank the two of you

19  for participating at this point.

20        Please do not discuss the case or any aspect of the

21  case with anyone because your service continues.  If we have

22  the misfortune of having a juror not able to participate, we

23  will bring you back in and you will be part of the

24  deliberative process.  So the instruction I've given you

25  continues to exist.  If, as you leave, you could give

1   Ms. Tinsley your cell number or number where we can get in

2   contact you -- contact with you, that is much appreciated.

3   But again, we thank you for your participation and please

4   adhere to the rule that the Court has imposed throughout this

5   litigation.  And once again, thank you.  I'll go ahead and

6   release the two alternates right now.

7           Ms. Tinsley, if you could walk them out.

8           Ms. Doyle and Mr. Diaz.  Thank you, ma'am.  Thank

9   you, sir.

10          (Alternate jurors excused.)

11          THE COURT:  Other than reading an hour of

12  instructions, that's the thing that I least like to do as a

13  judge in the case is dismiss people who have been attentive

14  and careful and responsible to their task as jurors, but now,

15  you are the 12 who will deliberate in this case.  We will have

16  written copies for each of you of the instructions that I read

17  to the Court.  If your first order of business could be to

18  select your foreperson, and then let us know how long you'd

19  like to stay today, that would be appreciated.

20          I would suggest that if you are intending on coming

21  back tomorrow, that a good time to be back would be 9:00 a.m.

22  I have other things on my docket that I'm going to do in

23  another courtroom, but I will be available, and you all are

24  the first priority of things that I will deal with tomorrow,

25  so just let us know what your intention is.  We'll wait for

1  Ms. Tinsley to come back, and then we'll go ahead and have you

2  escorted out and bring you the instructions.

3            (A pause in the proceedings.)

4            THE COURT:  People in the gallery, if you want to

5  leave, you may leave at this time.

6            Ladies and gentlemen, you can go with Ms. Tinsley

7  now.

8            (Jurors excused for deliberations at 3:36 p.m.)

9            THE COURT:  All right.  Thank you.  Ladies and

10  gentlemen of the gallery, you can have a seat if you like.

11            Mr. Palma Flores, I need to ask you this question

12  again.  I think I know the answer to the question.  Are you

13  completely satisfied with the services of Mr. Jenkins?

14            THE DEFENDANT:  Yes, Your Honor.

15            THE COURT:  Thank you, sir.

16            If you could, counsel, approach Mr. Golden and give

17  us your cell numbers or something that we can get in contact

18  with you.

19            Mr. Jenkins, what is your -- what is your plan, sir,

20  as far as being close, where are you going to go?

21            MR. JENKINS:  Your Honor, you know, I keep a pretty

22  ambitious schedule.  So I may have to appeal to the Court for

23  some assistance.  I do have a matter in -- before the general

24  district court for Prince William County tomorrow afternoon.

25  My intent is to contact the Court and to explain that I am

1    otherwise occupied.

2            THE COURT:  Mr. Jenkins, you're in a good position

3    because I have many friends and colleagues that sit on the

4    bench in the general district court of Prince William

5    County --

6            MR. JENKINS:  I imagine so.  I would imagine so.

7            THE COURT:  -- some of whom are very reluctant to

8    get in my way, so.

9            MR. JENKINS:  So if I'm at liberty to share that

10   information with them about why.

11           THE COURT:  And who is the judge?

12           MR. JENKINS:  I do not know because it's in the

13   general district court.

14           THE COURT:  Okay.

15           MR. JENKINS:  So I don't know who has been assigned

16   to.  I imagine that it's been assigned to a courtroom at this

17   point.

18           THE COURT:  Okay.

19           MR. JENKINS:  But I don't know if I'll be able to

20   find the judge's name.

21           THE COURT:  Once you are able to find the judge's

22   name, if there is an issue, just simply let me know.  I think

23   I have every single one of them in my contacts, so I call them

24   up and let them know that -- your circumstance, and I don't

25   think --

1          MR. JENKINS:  I will, Your Honor.

2          THE COURT:  -- I'll get any pushback.

3          MR. JENKINS:  Thank you, Your Honor.  I appreciate

4     that.

5          THE COURT:  Other than that, sir, where are you

6     going to be?

7          MR. JENKINS:  I'm going to stay here.

8          THE COURT:  Okay.

9          MR. JENKINS:  I may go out to my car, which is in

10    the parking lot, but I believe the clerk has my cell number.

11         THE COURT:  Okay.  Mr. Ben'Ary, if you could

12    approach with that.

13         MR. BEN'ARY:  We likely will go down to our office,

14    but cell numbers are always best in case we're wandering

15    around.

16         THE COURT:  Give that to Mr. Golden.  You may

17    approach Mr. Golden.

18              (Discussion off the record.)

19         THE COURT:  Counsel, what we're going to do next is

20    have you approach and take a look at the exhibits so we can do

21    the exhibit review.  Please be thorough as you go through that

22    to make sure.  For the record, I can maybe read in what I

23    have, and we can work from there.

24              (Discussion off the record.)

25         THE COURT:  Let me compliment both counsel on their

1    presentation of the case.  It was a vigorous and zealous

2    prosecution.  It was a vigorous and zealous defense.  And it

3    is always a pleasure for this Court to have the ability of

4    good, young lawyers who are practicing before the Court who do

5    their job and understand the significance of what they do.  So

6    on behalf of the judges of the Eastern District of Virginia, I

7    want to thank you for your presentations.  Okay.

8           Is there anything else we need to do?  Anything down

9    there?  All right.  Okay.  Very good.  Thank you.

10          THE BAILIFF:  All rise.  This court stands

11   adjourned.

12          (Recess.)

13          THE COURT:  We're back on the record of United

14   States of America versus Melvin Palma Flores.  Representatives

15   from the government are present as is Mr. Jenkins, who is

16   representing Mr. Flores.  Mr. Flores has been brought back

17   over for Court to answer two questions from the jury.

18          For the record, I'll just read in the first thing

19   that we got back and by agreement counsel have allowed this to

20   be resolved without the necessity of everyone being here.

21          Jury's first question or first suggestion was, "We

22   have decided as a group we would like to come back fresh in

23   the morning," signed by the foreperson.  The response by the

24   Court is, "That is fine.  What time are you coming back?"  And

25   the response by the foreperson is, "We will be here at

1  9 o'clock a.m."

2       All counsel have agreed that that communication was

3  appropriate to be conducted without Mr. Flores present.

4       Is that true, Mr. Jenkins?

5       MR. JENKINS:  That is correct, Your Honor.

6       THE COURT:  All right.  Mr. Flores, did you have any

7  problem with that being done without you being here?

8       (Counsel and Defendant confers.)

9       THE DEFENDANT:  That's fine.

10      THE COURT:  Do you have any difficulty with that,

11 Mr. Flores?

12      THE DEFENDANT:  No, Your Honor.

13      THE COURT:  Thank you, sir.

14      More of a substantive question that came back in the

15 next response from the jury.  "Would it be possible to have a

16 copy made of Exhibit 34 and 35 for each jury member?"  I have

17 two proposals.  Obviously, whatever you all want to do by

18 agreement is fine with me.  The concern that I have initially

19 is that it brings unnecessary attention to one exhibit over

20 the other if we're making individual copies.  And the second

21 concern that the Court has is if we make a copy of that, then

22 they are going to want individual copies of everything.  I'll

23 listen to you all as to what you decide you want to do.

24      MR. BEN'ARY:  Your Honor, the United States doesn't

25 have a problem with copies being made of those letters.  I

1  think both sides agree that they are critical.  So --

2          THE COURT:  Mr. Jenkins.

3          MR. BEN'ARY:  -- I think it would speed things along

4  and perhaps the Court could say, you know, copies --

5  individual copies won't be made of --

6          THE COURT:  Well, that's what I was going to say.

7  If that was your agreement, I was going to say we can make

8  individual copies of each of these exhibits, but generally, we

9  cannot make individual copies of each of the exhibits.

10          MR. JENKINS:  Well, yeah.  And certainly, I

11  anticipated, and I think Mr. Ben'Ary did, too, that the jury

12  might have this request.  I share the Court's concern about

13  them focusing in on one versus the other.  If the Court's

14  position is going to be that they're not going to, in response

15  to any potential future request from them do likewise, that is

16  make 12 copies of everything else or any other selected

17  portions of exhibits they request, then I think the Court

18  should not honor this request.  I think the Court should be

19  consistent with whatever you're going to do.  So if they want

20  12 copies of Government Exhibit 47, the Snapchat, you know,

21  communications and the Court is not going to do that, then I

22  think the Court should not make 12 copies of this.

23          MR. BEN'ARY:  The only additional point, Your Honor,

24  I would raise is that both parties during closings asked each

25  juror to read the entirety of the -- of the letter.  So if

1  they're passing it around, it's going to take a few minutes.

2  So I think that does sort of set 34 and 35 apart from other

3  exhibits.

4          THE COURT:  Well, I think the question might not be

5  as potentially sinister as we might think.  I think that they

6  maybe just don't want to do it for health and safety

7  considerations, but that's neither here or there.  What I'm

8  going to say is you must share Exhibit 34 consistent with

9  health and safety considerations.

10          And on the question, "Can we get a copy of the

11  transcripts?"  The response I suggest is "You must use your

12  collective memories for review of the evidence."

13          MR. BEN'ARY:  That's fine, Your Honor.

14          THE COURT:  Mr. Jenkins.

15          MR. JENKINS:  Yes, Your Honor.  That's -- that's

16  acceptable.

17          THE COURT:  All right.  All right.  Ms. Tinsley, if

18  you could take this back.  And then once they read it,

19  retrieve it so that we can put it in the record and check with

20  them to make sure they don't have any more questions before --

21  just check with them and make sure they have -- they have no

22  more questions before they go for the day.  Thank you.

23          MR. JENKINS:  And, Your Honor, in the interim, is it

24  the Court's policy that counsel should be present at the time

25  in which the jury convenes in the morning?

1          THE COURT:  No.

2          MR. JENKINS:  Thank you.

3          THE COURT:  What I was going to suggest to

4    Ms. Tinsley is that tomorrow when they come we'll make sure

5    that we have all 12 of them and that she puts them to where

6    they need to deliberate and let them start the day at

7    9 o'clock as opposed to bringing them back in, unless you want

8    me to make a separate inquiry of them at the beginning of the

9    day tomorrow, whether they were able to live up to the Court's

10   instructions not discuss the case or any aspect of the case

11   with anyone.

12          MR. JENKINS:  Your Honor, I don't think that would

13   be a bad idea, but I don't think it's necessary for counsel

14   and Mr. Palma Flores to be present for that, if the Court is

15   inclined to --

16          THE COURT:  So let me make sure I understand what

17   you're saying.  You are agreeable to the Court welcoming them

18   tomorrow morning and inquiring as to whether they have lived

19   up to the Court's instruction without you or your client being

20   present.

21          MR. JENKINS:  That is correct, Your Honor.

22          THE COURT:  Do you have any problem with that,

23   Mr. Ben'Ary?

24          MR. BEN'ARY:  No, Your Honor.  I suspected one of us

25   will be here, but our office is here, so --

1        THE COURT:  Okay.

2        MR. BEN'ARY:  -- that's fine.

3        THE COURT:  That's fine.

4        Mr. Palma Flores, is that agreeable to you?

5        MR. JENKINS:  It is not.  Mr. Palma Flores would

6   like to be here if the Court is going to address the jury.  He

7   just informed me of that.

8        THE COURT:  Okay.

9        MR. JENKINS:  Yes.

10       THE COURT:  So bring him back in, and I'll question

11  him.

12       Ms. Tinsley, make sure they don't have any more

13  questions before I let people go for the day.

14       (A pause in the proceedings.)

15       THE CSO:  I want to make sure I know where they're

16  going to be.  Are they coming back here?

17       THE COURT:  They're coming back here because of the

18  request of Mr. Palma Flores.  He wants to hear me ask them the

19  question as to whether they've lived up to the Court's

20  instruction.

21       THE CSO:  Okay.  (Indiscernible) question.  So are

22  --

23       THE COURT:  Unless they've got another question.

24       THE CSO:  They don't have any more question that's

25  why I asked.

1          THE COURT:  All right.  Ladies and gentlemen, I
2    think we're done for the day, and we'll see you at 9 o'clock.
3    We've got your cell phone numbers, so that we can contact you
4    as quickly as we can.  As we've seen earlier in the day, some
5    of the jurors are not as prompt as others, so when they all
6    are available, we'll give you a buzz within 10 or 15 minutes.
7    I'll also let you know that I'm running another docket
8    tomorrow, so I'll be running back and forth between the two
9    courtrooms.  I'm going to keep everything as it is in this
10   courtroom and conduct the other docket in courtroom 601.
11          MR. JENKINS:  Thank you, Your Honor.
12          THE COURT:  All right.  Thank you.
13
14          **(Proceedings adjourned at 4:36 p.m.)**
15
16
17
18
19
20
21
22
23
24
25

1            CERTIFICATE OF REPORTER

2

3           I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus MELVIN**

8    **PALMA FLORES**, Criminal Action No.: 1:20-cr-142, in said

9    court on the 15th day of December, 2021.

10           I further certify that the foregoing 177 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this June 9, 2023.

17

18

19

20

21   _____
     Tonia M. Harris, RPR
22   Official Court Reporter

23

24

25

                                                          177