UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
------------------------------x
                              :
UNITED STATES OF AMERICA,      : Criminal Action No.
                              :
          versus              : 1:20-cr-142
                              :
MELVIN PALMA FLORES,           : September 7, 2022
                              :
               Defendant. :
------------------------------x.
```

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

FOR THE GOVERNMENT:   MICHAEL BEN'ARY, AUSA
                      KATHERINE RUMBAUGH, AUSA
                      United States Attorney's Office
                      2100 Jamieson Avenue
                      Alexandria, VA 22314

FOR THE DEFENDANT:    ROBERT L. JENKINS, Jr. ESQ.
                      1010 Cameron Street
                      Alexandria, VA 22314


OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                 United States District Court
                                 401 Courthouse Square
                                 Tenth Floor
                                 Alexandria, VA 22314

1                    **P R O C E E D I N G S**

2   (Court proceedings commenced at 11:33 a.m.)

3            THE DEPUTY CLERK:  Criminal Case No. 20-142.  United

4   States of America versus Melvin Palma Flores.

5            Counsel, state your appearances for the record.

6            MR. BEN'ARY:  Good morning, Your Honor.

7   Michael Ben'Ary and Katherine Rumbaugh for the United States.

8            THE COURT:  Good morning.

9            MS. RUMBAUGH:  Good morning.

10            MR. JENKINS:  Good morning, Your Honor.  May it

11   please the Court.  Robert Jenkins on behalf of Mr. Melvin

12   Palma Flores.

13            THE COURT:  Good morning, sir.

14            THE INTERPRETER:  Does he need an interpreter?

15            MR. JENKINS:  He does not.

16            THE COURT:  Thank you, Ms. Horvath.

17            Let the record reflect that Mr. Melvin Palma Flores

18   is also present.

19            This matter comes on today for report and

20   sentencing.  Are there any corrections, deletions, or

21   modifications to the presentence report in this matter?

22            MR. JENKINS:  There is not, Your Honor, but there

23   still is a preliminary matter that I believe the Court needs

24   to resolve before advancing to sentencing.

25            THE COURT:  Sure.  This is your motion for judgment

1  of acquittal?

2        MR. JENKINS:  It is, Your Honor.

3        THE COURT:  All right.  I'll hear from you on that,

4  sir.

5        MR. JENKINS:  Your Honor, I will be brief because I

6  believe that both parties have adequately briefed the issue

7  for the Court.  I'll start where I think there's little room

8  or separation between the parties and that is, that with

9  respect to the two items that the defendant now complained

10  were not provided in discovery.  I think it is accurate to say

11  that those two items were not specifically provided.  And the

12  government does draw a slight distinction with the first item,

13  that being the medical records.  The government's position is

14  that while that particular record was not provided in a manner

15  in which the defense could employ it, that the -- essentially

16  the same information through another means was provided.  And

17  that is that Ms. Sheehy, who we continue to maintain, was the

18  most significant witness who testified on behalf of the

19  government, was impaired at the time that she gave her initial

20  account to law enforcement implicating the defendant in the

21  murder of Mr. Brown.

22        I don't think I need to remind the Court about the

23  substance of her testimony or the significance of it.  But I

24  will note for the Court that she was the first individual who

25  implicated Mr. Palma Flores in the murder of Mr. Brown.

1        We think it's critically important, Your Honor,

2  because this medical record, while the government may be

3  correct in that there were other -- at least one other piece

4  of information provided in discovery that suggested that she

5  may have been intoxicated at the time.  And when she spoke

6  with the detective initially back in December, we think

7  particularly this piece of evidence, Your Honor, which was not

8  provided, is distinguishable.  Because this is not an account

9  of her reporting to law enforcement that she was intoxicated,

10  but instead, she was making a report to a medical healthcare

11  provider, concerning the state that she was in at the time

12  that she spoke to law enforcement and she went a little bit

13  further than that in this situation, Your Honor.  She also

14  described that the law enforcement agents -- excuse me -- at

15  least the detective had pressured her to implicate Mr. Palma

16  Flores.  And, of course, Your Honor, that was --

17        THE COURT:  Let me ask you a question, Counsel, and

18  I appreciate your representations.  And I remember

19  specifically this trial and the testimony that was provided,

20  and I also remember the excellent job that you did

21  cross-examining that particular witness and using the

22  impeachment evidence that you're making reference to at this

23  time.  Essentially, the question I am asking is, with your

24  very good cross-examination and the fact that this witness's

25  credibility at least in the Court's view was undermined

1  somewhat, isn't it ultimately up to the jury to weigh the

2  evidence in light -- based upon the standard that they are

3  supposed to weigh it, they could give that testimony a lot of

4  credit, they could discredit it entirely, we don't know how

5  juries stand.  I do know that as a person who was able to hear

6  the testimony of that particular individual, that you did a

7  good job, an excellent job discrediting her, and the jury may

8  have had a different perspective, I don't know.  But at least

9  the information that you're making reference to was before the

10  fact-finder and would be something that they could actually

11  evaluate in determining whether or not what weight of evidence

12  they wanted to give to that particular evidence.

13          MR. JENKINS:  Well, Your Honor, certainly I

14  appreciate and thank the Court for your compliment concerning

15  my performance in cross-examining Ms. Sheehy.  But, however,

16  Your Honor, given the importance and the role that she played

17  in this matter, I needed all of my ammunition in order to deal

18  with her.  And to deny me even one bullet in the chamber, Your

19  Honor, to speak, it's something that is a disservice to

20  Mr. Palma Flores.  Yes, she admitted on cross-examination

21  about, you know, reluctantly providing information about

22  Mr. Palma Flores, their extended relationship, the ups and

23  downs of that relationship.  All of which the jury could have

24  concluded may have made her testimony questionable.  But, Your

25  Honor, remember the -- the government chose to put on

1  affirmative evidence by the summary agent in which the agent

2  denied ever pressuring Ms. Sheehy into making any statements,

3  and here it is we have her reporting to a healthcare provider.

4  Not someone that you would think she was making these

5  statements because she was trying to advance any interest

6  other than her own medical condition.  And she's reporting to

7  the fact that she was intoxicated.

8           Your Honor, I think if I had that available to me,

9  along with the other evidence that I did have available to me,

10 Your Honor, it certainly could have made a difference.  In my

11 view, Your Honor, it's inexcusable.  I mean, I don't think it

12 was intentional.  But the fact is that it was not provided.

13 And if Ms. Sheehy --

14           THE COURT:  How do you evaluate your position in

15 light of the chamber's factors that the Court must consider in

16 the determination of whether or not a new trial should be

17 granted?

18           MR. JENKINS:  Well, you know, certainly, Your Honor,

19 I think that the Court -- probably the toughest criteria for

20 me to overcome is the difference that it would have made in

21 light of the weight of the other evidence as well as, as the

22 Court has already identified, the cross-examination that

23 was -- that she was subjected to.  But I don't think that

24 changes the fact, Your Honor, that this is a violation of the

25 discovery order.  It is a violation of Rule 16, and I would

1  submit Giglio also.  And it's something that Mr. Palma Flores

2  was entitled to.  And for the government to breach its

3  obligation but then after the fact say, Well, it wouldn't

4  really have made a big difference, I think undercuts the

5  spirit of the discovery order and what the rules were in

6  place.  Countless times I've come before Your Honor

7  encouraging the Court to enter, you know, an order directing

8  the government to provide exculpatory evidence or some other

9  materials that, I think, is relevant and the Court generally

10  responds by saying, Well, Mr. Jenkins, they know their

11  obligation and I trust that they are going to live up to their

12  obligations, so, therefore, I understand your concerns but the

13  Court is not going act.

14          Well, here is a clear situation where whether it was

15  intentional or not, the government failed to turn over not one

16  but two pieces of -- of information that would have been

17  discoverable.  The target letter, Your Honor, is not a small

18  thing.  I did not know at the time I was cross-examining

19  Ms. Sheehy that she was the focus of the criminal

20  investigation at any point in time.

21          THE COURT:  So you're saying that you were not aware

22  that there was a target letter relating to her?

23          MR. JENKINS:  I was not aware, Your Honor.  And the

24  government does not dispute in his responsive pleading that it

25  was provided.  That's not what they say.  What they're saying

1    is to the Court that, Well, the defendant, Mr. Melvin Palma

2    Flores, he knew about it because we've got this telephone call

3    between he and Ms. Sheehy well before I represented him, in

4    which she is disclosing to him that she received some letter

5    from the government about their investigation.

6            THE COURT:  But doesn't that then come down to the

7    level of communication that should be expected between a

8    defendant and his lawyer?  And keep in mind, there are some

9    other instances where I know you were surprised about things

10   that your client didn't even tell you about which undermined

11   his defense.

12           MR. JENKINS:  Absolutely, Your Honor.  And as I

13   submitted to the Court at that time, and I will restate in

14   this situation, Mr. Palma Flores is not a lawyer.  He doesn't

15   understand what Giglio means, he doesn't understand what Brady

16   means, he certainly has never read Federal Rules of Criminal

17   Procedure 16.  He cannot be expected to understand the import

18   of a target letter.  A young lady having a telephone call with

19   him while he's detained at the Alexandria Detention Center

20   saying I got a letter from the government, something about the

21   investigation and they may be looking at me.  He doesn't know

22   the significance of that.  Six months or thereafter, he gets

23   me as his lawyer.  I never think to bring it up to him because

24   I have no clue.  And to a suspect that she may have gotten a

25   target letter.  Am I supposed to have the affirmative

1　responsibility to come to each one of my clients and say, Hey,

2　by the way, this is a potential witness.  Do you know if this

3　person has received a target letter?  I failed to do that,

4　because I had no reason to think that she was.  When she

5　contacted me the day after the jury verdict and provided the

6　letter to me, that was the first time I had ever seen it.

7　　　　THE COURT:  But isn't all of this sort of undermined

8　to a degree based upon the fact of your client's own actions

9　as to the way that this case has been processed, the fact that

10　he was convicted of tampering with a witness, the fact that he

11　was doing things that a jury found to be undermining the

12　entire process.  And so why should he be able to now come in

13　and say, I was undermining the entire process, but it's not my

14　fault.  It's actually a constitutional issue or a statutory

15　issue.

16　　　　MR. JENKINS:  Well, Your Honor, I would respectfully

17　submit that whatever bad acts or things that Mr. Palma Flores

18　may have done, it does not alleviate the obligations on this

19　side of the courtroom.

20　　　　Federal prosecutors have a duty.  They have a

21　responsibility to be consistent with discharging those duties

22　regardless of any bad actors that might be on the defense

23　side.  And here was a situation where other target letters

24　were provided.  This is the only one.  This is the only one

25　that was failed to be disclosed.

1    THE COURT:  Let me ask you this final question, and
2  I appreciate your presentation.  Objectively looking at all of
3  the evidence in this case, could a jury have found your client
4  guilty even if this person didn't testify?

5    MR. JENKINS:  Your Honor, as I've already conceded,
6  that's the most difficult hurdle for me to overcome.  But as I
7  said, again, and remind the Court that I don't think the
8  government takes issue with this, while there was other
9  evidence, she was the star witness.  And I think even during
10  the course of the trial, the Court may have also identified
11  her as that.

12    She's the first person that turned law enforcement
13  onto Mr. Palma Flores as committing the offense.  There are no
14  eyewitness -- witnesses.  She's the closest that can come by
15  saying she was seated in the vehicle, heard the shots, saw
16  Mr. Palma Flores get out of the vehicle, saw Mr. Palma Flores
17  return to the vehicle.  But most importantly, she's the person
18  who testified that Mr. Palma Flores made certain incriminating
19  statements directly to her.

20    And she is the one who provided the interpretation
21  of the letter that she received purportedly from Mr. Palma
22  Flores that supposedly, again, served as the factual basis for
23  the obstruction of justice conviction that he -- that was
24  sustained returned by the -- by the jury.  So she certainly is
25  way more significant than Mr. Worlds, who was, you know, kind

1   of limited.  No forensic evidence tying back to Mr. Palma

2   Flores.

3          The significance of Ms. Sheehy's testimony cannot be

4   downplayed, Your Honor.  And, therefore, the government had an

5   obligation to provide this target letter, to provide this

6   medical record, which is Exhibit Number 1.  I don't know if

7   the jury definitively would have ignored it all or found it

8   just to be ancillary or cumulative.  I don't know.  I do know

9   that Mr. Palma Flores had a right to have access to the

10  information.

11         And whether it was unintentional or not, Your Honor,

12  the fact is he was denied it.  And simply saying, Well, the

13  defendant, the uneducated high school guy, should have known

14  to tell his lawyer that this prospective witness got a target

15  letter.  Before he got charged with this case, he wasn't even

16  familiar with the term "target letter."  He doesn't even know

17  what it is.  So to expect that he would have been the one to

18  come to me and say, Hey, Attorney Jenkins, my girlfriend told

19  me she got a target letter.  I think it's unfair, Your Honor,

20  and it raises the bar where it shouldn't be placed on the

21  defendant to interpret the complicated federal statutes and

22  case law governing them and identify things that are important

23  that he's sure telling me where he was the night Mr. Brown was

24  killed, that's the fair expectation.

25         Telling me any information he may have that might

1  impeach an expected government witness, that would be fair,

2  and I believe he did those things.  But understanding the

3  import of a target letter, and that he needed to share that

4  with his attorney, Your Honor, I think that's a burden that

5  shouldn't be placed on any defendant.

6          THE COURT:  All right.  I understand your point.

7          Mr. Ben'Ary.

8          MR. BEN'ARY:  Your Honor, the star witness in the

9  trial was not Laila Sheehy.  The star witness in the trial was

10 Mr. Melvin Palma Flores.  There's not a chance that the jury

11 wouldn't have convicted after hearing his testimony in

12 connection with the letter.  So I do take issue with the

13 importance of Laila Sheehy's testimony.  She was important in

14 that she was an eyewitness to going to the scene, but you

15 remember her testimony, she was -- she was very upset during

16 her testimony, barely got out the testimony that she did get

17 out.  So I do take issue with the notion that she was the star

18 witness.

19          Briefly on the two items that the defense complains

20 about.  I note with respect to both of them while the actual

21 items that they complain about were not provided,

22 inadvertently, the information on both of them was provided.

23 And I think that the availability --

24          THE COURT:  State for the record how you believe the

25 information was provided.

1    MR. BEN'ARY:  Sure.  So with respect to the medical

2  records, Ms. Sheehy sent them in a text message to our police

3  detective, Melissa Wallace.  We provided that text message to

4  the defense but because of a glitch in the way that computers

5  work, they came through as files, but the content of the file

6  wasn't available.  We didn't realize that until we went back

7  after Mr. Jenkins said that he didn't get the medical

8  information.  Right -- and we sent this out in our responsive

9  pleading.  Right after Mr. Sheehy sent the medical records to

10  Detective Wallace, she followed up with a text in her own

11  words that says exactly what the medical records say that she

12  was high and under the influence and upset during the first --

13    THE COURT:  For taking Mr. Jenkins's point, while

14  that information may have been made available in some other

15  context, Mr. Jenkins takes issue with the fact that it was the

16  government's responsibility to provide this information and

17  that the information not be provided through some third party.

18    MR. BEN'ARY:  It wasn't provided from a third party.

19  It was provided by Ms. Sheehy -- it was -- we turned over her

20  text message where she says, "I was intoxicated during this

21  first interview with Detective Wallace."  So that would be

22  Jencks.

23    THE COURT:  Uh-huh.

24    MR. BEN'ARY:  The medical tech who took her report

25  at the hospital or wherever she went, that is not Jencks

1 because that's the statement of the person taking the notes.

2 So we provided the Jencks Act information in the form of her

3 statement.  I note that the whole theory of that first

4 interview being coerced was invented by Melvin.  It's in his

5 letter.  That was one of the ways that he was going to explain

6 how all of this was, you know, made up because of the force

7 and pressure put on by the police department.  So none -- the

8 information is not a surprise.  They had the Jencks

9 information that mirrors the information in the medical

10 records by the witness's own statement in her own text message

11 to Detective Wallace.  And on top of that, the interview

12 itself with Detective Wallace was fully recorded.  And that

13 recording was provided to the defense.  So, you know, if there

14 was any veracity to this whole notion that it was a coerced

15 interview and she was so high and intoxicated, they had plenty

16 of information that they could have used to impeach Ms. Sheehy

17 on all of that.  And the medical record itself, I would

18 submit, is actually -- does not fall under Jencks because it's

19 not her direct statement.  Her text message that was provided

20 to the defense in discovery was and that satisfies the

21 government's burden with respect to providing that impeachment

22 information in Jencks Act information.

23          With respect to the target letter, just to give a

24 little context.  As we were preparing to supersede the

25 indictment and listening to jail calls, it became very clear

1  that one of Mr. Palma's goals was to get Ms. Sheehy to change

2  her testimony.  Ms. Sheehy is another, you know, young

3  individual not from a lot of means.  And so, we believe that

4  it was in everyone's best interest for her to have the benefit

5  of an attorney.  The only way to get her an appointed attorney

6  was to go through the target letter process.

7        Now, a couple of things to keep in mind on the

8  target letter.  Number one, the target letter issued to

9  Ms. Sheehy could not have been used to show that she had some

10  kind of bias.  And the reason that I say this is she appeared

11  in front of the grand jury in this case prior to receiving the

12  target letter, and that transcript was provided to defense

13  counsel.  She testified at trial consistent with her testimony

14  in front of a grand jury.  That is after she received the

15  target letter.  So if her testimony remained the same both

16  before and after the target letter, I would submit that the

17  target letter here for this particular witness would not have

18  impeachment value because it could not have caused her to

19  change testimony based on bias.

20        We -- it was not in the sole possession of the

21  government as you heard.  It was in Ms. Sheehy's possession.

22  And again, the information was disclosed, and I get

23  Mr. Jenkins's point.  And I take his point about whether the

24  defendant is responsible for knowing the significance but --

25  but let me clarify.  We know the defendant knew about it

1  because as soon as Ms. Sheehy got the letter, she called him

2  in jail on a recorded line and told him I got this target

3  letter.

4          THE COURT:  But taking Mr. Jenkins's point to its

5  natural circumstance is that I know what the target letter

6  is --

7          MR. BEN'ARY:  Yup.

8          THE COURT:  -- you know what a target letter is,

9  Mr. Jenkins knows what the target letter is.

10          MR. BEN'ARY:  Yup.

11          THE COURT:  What is the defendant supposed to think

12  as to the significance in his defense as to a target letter?

13          MR. BEN'ARY:  Completely agree.  But here is -- here

14  is what I would ask the Court to keep in mind.  That recorded

15  call between the defendant and Ms. Sheehy was provided to

16  Mr. Jenkins in discovery.

17          THE COURT:  Okay.  So while he may not have had in

18  his possession the target letter, the substance of the target

19  letter was discussed in a telephone conversation between

20  Ms. Sheehy and Mr. Palma Flores, which outlined to a

21  significant degree the circumstances of what that target

22  letter was about.

23          MR. BEN'ARY:  Explicitly.  She said, "I got a target

24  letter."  So if you're dealing now with the defendant's

25  recorded statements and recorded statements of the person that

1  Mr. Jenkins thinks is the star witness, I think it's fair to

2  expect that defense counsel would have reviewed it.

3          There was a lot of discovery provided, and I think

4  if the -- if this particular target letter had more

5  significance, we would have affirmatively produced it.  I

6  think that because it was issued basically for the sole

7  purpose of getting her a lawyer so that she didn't engage in

8  obstructive conduct.  She never did engage in obstructive

9  conduct.  It's just simply when we did our review for Jencks

10 and Giglio, because it didn't have impeachment value because

11 she had never changed her testimony, we did not think to

12 provide it separately.  However, I do think the fact that it

13 was -- that information was provided in that recorded call to

14 the defense and it wasn't -- it wasn't buried.  I mean, I

15 don't think it's unfair for us to expect that defense counsel

16 would listen to the recorded statements of his client and the

17 star witness.  I think that that satisfies it because if you

18 wanted to use that to impeach her, the information that she

19 had received a target letter was in the possession of the

20 defense.

21          THE COURT:  All right.  Thank you, Counsel.

22          Mr. Jenkins, one last question.  And I'm going to

23 ask this question in the context of a Brady issue.  And I know

24 this is not a Brady issue but --

25          MR. JENKINS:  Yes, your Honor.

1          THE COURT:  -- I just want to see what your response

2     would be.

3          If the government was in possession of a certain

4     Brady material.  Say the government was in possession of

5     another person saying that they committed the crime, okay?

6     Obviously, the government would have the responsibility to

7     turn that over to you.  But what if your client had said to

8     you, Hey, Joey Jones said that he committed this crime, and

9     I'm telling you this right now, and the government, for

10    whatever reason, inadvertently failed to turn over the

11    specific statement -- specific information supporting

12    Johnny Jones involvement with the crime, would we have a Brady

13    problem?

14         MR. JENKINS:  Absolutely.

15         THE COURT:  Okay.  Explain why.

16         MR. JENKINS:  And the reason why -- and the reason

17    why we still would have a Brady problem, Your Honor, is

18    because it's -- well, it's not uncommon for defendants to

19    report to defense counsel some exculpatory theory of their

20    defense.  That's really -- I mean it happens almost every day.

21    For example, meet our client.  I didn't do it; that's not

22    uncommon.  But when a potential witness reports to law

23    enforcement --

24         THE COURT:  Uh-huh.

25         MR. JENKINS:  -- reports to the government

1  exculpatory evidence, that is Brady, they got to give it up no

2  matter what.  It puts defense counsel in a position to do

3  further investigation to fret that out, to determine now I

4  don't just have my client saying he didn't do it.  The

5  government now has a law enforcement witness, a prosecutor,

6  someone who took that statement from that individual saying my

7  client didn't do it.

8          THE COURT:  Okay.

9          MR. JENKINS:  Now, they get to call that person,

10  too.

11          THE COURT:  And let me ask you this, and I've had

12  this happened, because, you know, I did defense work --

13          MR. JENKINS:  Yes.

14          THE COURT:  -- back in the olden days.  And every

15  now and then my client would tell me something that I think

16  might be exculpatory.  And typically, what I would do is I

17  would go to the government and I would say, Look, my client

18  has suggested to me that Johnny Jones did this, do you have

19  any information on your side suggesting that Johnny Jones may

20  have accepted responsibility for that.  And actually,

21  sometimes the government would say we're going to follow up on

22  that and they would come back and say, Oh, yeah, yeah,

23  Johnny Jones told Officer Smith two years ago that he did it.

24          Does that create a Brady problem?

25          MR. JENKINS:  I think, Your Honor, while certainly

1  there are times where I've been confronted with similar

2  situations, where my client or maybe through some other source

3  of information, I became concerned that the government may

4  have something that I should follow up on.  It's not uncommon.

5  Sometimes I might reach out to who I believe to be a

6  government witness and the person might tell me something

7  inconsistent with what I read in a 302, I do the same as the

8  Court did when you stood in my shoes, that is follow up with

9  government counsel.  In this situation, I really wasn't in

10  that same position, Your Honor.  Say, for example, with the

11  first item, the medical tech who Ms. Sheehy was making this

12  report to about being intoxicated at the time she was

13  interviewed by the lead detective should have been disclosed

14  to Mr. Palma Flores.  He could have issued a subpoena for that

15  medical tech.  That medical tech may have served as a witness

16  for the defense, but because we didn't get the information.

17  Because we didn't even know it existed, Your Honor, that she

18  had made this report not to someone in law enforcement, not to

19  somebody who was a member of a medical -- excuse me -- of the

20  prosecution team, but to someone who was there for the purpose

21  of giving her medical attention.  It should have been

22  disclosed.  I haven't heard government counsel deny the fact

23  that these items should -- were covered by the discovery.

24          THE COURT:  I think you both are on the same page as

25  far as that is concerned.

1          MR. JENKINS:  In trying to, you know -- in my view,

2     you know, absolve itself from what has happened here and say,

3     Well, he had general access to the information or he had other

4     ways to get the information.  That's just not the way the

5     rules are written.  That's not the way Rule 16 is written.

6          The government, for example, in a drug case can't

7     fail to turn over a DEA6 lab report by excusing the fact that,

8     Well, Mr. Jenkins, we sent you an e-mail summarizing what the

9     drugs were.  We say, Yeah, we believe it was cocaine and it

10    was about a thousand kilograms.  The Court would still say

11    turn over the DEA6.  You can't just say, Well, we gave it to

12    you through some other fashion.  If the rule say that

13    defendant is entitled to it, turn it over.

14          I don't think the Court want to set a landscape

15    where government counsel is going to excuse not turn in over

16    reports, not turn in over what could potentially be Jencks or

17    Giglio material by saying, Well, we sent you an e-mail or it

18    was buried someplace else in the discovery; you could have

19    gotten it that way Mr. Jenkins, don't blame us.  The

20    government carries a heavy burden.  I mean, they really do.

21    Not just with the burden of proof, Your Honor, all the rules

22    that they have to comply with, the case law that they have to

23    be mindful of, but that's our system of justice.  It's with

24    them.  And in this situation, Your Honor, they failed to meet

25    that expectation.

1          THE COURT:  All right, sir.  Thank you.

2          MR. BEN'ARY:  Just finally, to wrap up.  If the

3   Court wants to find that we weren't careful enough with

4   discharging our discovery obligations in this case, I think

5   that would be one matter.  The case law on cumulative

6   impeachment evidence makes granting a new trial under these

7   circumstances not the appropriate remedy.  I don't -- I don't

8   think we violated our discovery responsibilities because the

9   defense had access to the information.  There's notion of

10  subpoenaing the medical tech and having her testimony, that

11  would be impeachment with cumulative evidence.  She never

12  would have been allowed to testify because it's inconsistent

13  with the rules of evidence.  These are -- these are --

14          THE COURT:  Just a second.  Are you okay,

15  Ms. Rumbaugh?

16          MS. RUMBAUGH:  Yes, Your Honor.

17          THE COURT:  Okay.  Just making sure.  All right.

18          MR. BEN'ARY:  These are impeachment matters on a

19  witness that was significantly impeached on related topics.

20  And out of all the government's witnesses in this case, this

21  is the one witness that the defense knew far more about than

22  the government did.

23          Child in common with the defendant, she was on the

24  phone with him for hours, even during the trial of the matter.

25  All of this stuff was better known to the defendant than it

1  was to the government.  We provided a great volume of

2  discovery information, we interviewed Ms. Sheehy about her

3  drug use, we provided it.  We went through the Fairfax County

4  police department's records on Ms. Sheehy and anything that

5  was potentially useful as impeachment material we provided.

6  We're talking about a computer glitch where files didn't come

7  through, but the information was right there along with it.

8  And we're talking about a target letter, which was used to

9  allow our access to court-appointed counsel where she never

10  changed her testimony before and after, and she discussed it

11  with the defendant just doesn't rise to the level of

12  impeachment evidence.  For this witness that would require

13  doubt in the jury's verdict.  The star witness in this case

14  was Mr. Palma largely by his attempts to subvert

15  responsibility for his crime.

16        THE COURT:  Thank you, sir.

17        While the procedural circumstances that are

18  presented in the case are obviously somewhat troubling to this

19  Court, the Court finds that, number one, there was, in the

20  Court's view, no intentional effort to not provide this

21  evidence to counsel.  The evidence in this case based upon the

22  Court's hearing of the evidence was overwhelming.  And the

23  overwhelming nature of this evidence was underscored by the

24  defendant's positions in this matter, which were shall we say

25  at least fluid, if not outright wrong and having been

1  determined by the jury fact-finder of this case to be

2  deceptive under the applicable statutes.

3          Federal Rule of Criminal Procedure 33 and Fourth

4  Circuit authority in *United States v. Bales*, it's 813

5  F.2d 1289, and *United States v. Chavis*, set out the standard

6  for the Court to consider evidence in this regard.  There are

7  certain five inquiries that need to be made.  And according to

8  *Chavis*, unless the answer to each of the five inquiries is

9  affirmative, a new trial is not appropriate.

10          Applying these factors in this case, the evidence is

11  not in the Court's view, in fact, newly discovered evidence.

12  As the defense was in possession of all relevant information

13  from Exhibit 1 to defendant's motion as well as the fact that

14  Ms. Sheehy had been served with a target letter before trial.

15          Number 2, based on the facts alleged, this Court may

16  infer due diligence on the part of the movement and this

17  factor, therefore, weighs in defendant's favor.

18          The evidence the defendant cites is merely

19  cumulative or impeaching as the Court finds that the evidence

20  would have had minimal impeachment value at trial in light of

21  the fact that Ms. Sheehy's statement during the interview were

22  consistent with her grand jury and trial testimony and the

23  evidence is cumulative based upon Sheehy's other evidence of

24  impeachment defendant used at trial, because the impeachment

25  valued Ms. Sheehy's -- evidence is based on circumstances that

1  are limited at best, evidence is not material to the issues

2  involved; and five, and then most importantly, it is highly

3  improbable that the evidence will result in defendant's

4  acquittal at a new trial based upon the overwhelming evidence

5  of his guilt the government presented.

6          I agree with counsel for the government that the

7  star witness for the government, quite frankly, was Mr. Palma

8  Flores and his inconsistent and evasive way of presenting his

9  facts and circumstances of the case had nothing do with

10 Mr. Jenkins's due diligence or his inability to represent

11 Mr. Palma Flores as best he could.  The bottom line is

12 Mr. Palma Flores's positions throughout the course of the

13 litigation undermine his defense and in another context of

14 these circumstances may be suggestive of the need for the

15 Court to make further inquiry.

16         So for those reasons, the request to grant a new

17 trial or set aside the trial or give judgment of acquittal is

18 denied.  I note your exception, Mr. Jenkins.

19         MR. JENKINS:  Thank you, Your Honor.

20         THE COURT:  All right.  Moving to the issue of

21 sentencing.  Are there any corrections, deletions, or

22 modifications to the presentence report?

23         MR. JENKINS:  No, Your Honor.  May it please the

24 Court.  Mr. Palma Flores has had an opportunity to review the

25 contents of the presentence report.  In fact, a copy of it has

1  been provided to him, and we have no objections to the report,

2  Your Honor.

3         THE COURT:  Any corrections, deletions, or

4  modifications from the government?

5         MR. BEN'ARY:  No, Your Honor.

6         THE COURT:  Counsel, I'm going to say something and,

7  again, it's something that I've -- I don't like to invent

8  issues, but it is something that has at least had me take a

9  step back.  In a calculation of the guidelines, obviously,

10  individuals get credit for assisting the government in the

11  prosecution of the case.  And in this instance, because

12  Mr. Palma Flores elected to have a jury trial, he does not get

13  any consideration for that.

14         In the Court's view, it at least raises some

15  constitutional concern of the defendant's right to exercise

16  his right to a jury trial and not be, in effect, penalized for

17  not entering a plea of guilty or assisting authorities in the

18  prosecution of his case.  In this case that determination is

19  significant, because if he did get the, quote, "cooperation"

20  credits, it would reduce his guidelines taking it down

21  considerably.  I think it resulted -- excuse me -- being

22  somewhere around 360 months.

23         Again, this is a statutory consideration, the

24  legislature is entitled to make those determinations and

25  decide what is right.  But I will say for the record that it

1   is troubling to the Court that a defendant, by exercising his

2   constitutional rights -- and again, I know there's no

3   authority for this, but I'm concerned about the circumstances

4   that were presented particularly when we're dealing with a

5   young man who is facing a significant exposure on sentencing.

6          MR. BEN'ARY:  Can I briefly address this?

7          THE COURT:  Sure.

8          MR. BEN'ARY:  So I actually don't think it would

9   make a difference in this particular case --

10         THE COURT:  Uh-huh.

11         MR. BEN'ARY:  -- even if the two levels were

12  applied.  And let me just briefly run it down.  And if I'm --

13         THE COURT:  Sure.

14         MR. BEN'ARY:  -- if I'm off the mark, I don't --

15  this is a little bit unusual for a narcotics case to be

16  dealing with guidelines in this area.  But if you look at the

17  presentence report in -- hang on a second.

18         If you look at the presentence report, essentially,

19  what happens is because it ends up being a total offense level

20  45 --

21         THE COURT:  Uh-huh.

22         MR. BEN'ARY:  -- the guidelines cap it.  One of the

23  comments says it should be reduced to a 33.

24         THE COURT:  43.

25         MR. BEN'ARY:  43.  43.

1           THE COURT:  Okay.

2           MR. BEN'ARY:  So in effect, he gets two points for

3    free.  If he got the two points off of acceptance from the 45,

4    it would be down to the 43 anyway?

5           THE COURT:  And we'd be at the same point.

6           MR. BEN'ARY:  And we end up exactly at the same --

7    at the same point.

8           THE COURT:  Why is that anomaly present when you've

9    got a situation like this?  It's a 45 offense and it's

10   statutorily capped at 43, which then provides a bit of

11   confusion for the Court.

12          MR. BEN'ARY:  Yeah.  But it -- once you get to 43,

13   that's -- that's the literal top of the chart.  So if -- not

14   to use the word "literal" or "literally" too much, but if

15   you're a 44 or a 45, you're literally off the charts.  So it

16   doesn't -- if you're 45 and -- or 43, the guidelines are going

17   to come out exactly the same no matter what your criminal

18   history category.

19          THE COURT:  Does the probation department agree with

20   that analysis?

21          THE PROBATION OFFICER:  Yes, Your Honor.

22          THE COURT:  Yes.

23          THE PROBATION OFFICER:  So this is a situation

24   where -- and under Chapter 5, it does say anything above 43 is

25   treated as a level 43, and then automatically it drops it back

1   to a 43 that we use in our office.

2            THE COURT:  But you agree with Mr. Ben'Ary that if

3   this had been traditionally calculated, the defendant would

4   have come out to 45?

5            THE PROBATION OFFICER:  It still is traditionally

6   calculated if you look within, it does give you the level 45,

7   but then once it gives you the total offense level, it drops

8   it back.  But he is technically a level 45 --

9            THE COURT:  Okay.

10           THE PROBATION OFFICER:  -- but treated as a 43.

11           THE COURT:  Okay.  All right.  Thank you.

12           Mr. Jenkins, did you have a comment on this, sir?

13           MR. JENKINS:  No, Your Honor.  But I remember the

14  time when that was not the case, and you could have a

15  defendant at a level 45, and applauded (sic) as all members of

16  the defense bar when the statute came into play to limit it to

17  43.  At this point in time, Your Honor, it's really academic.

18  It is what it is.  Be as it 43.

19           THE COURT:  Okay.  I appreciate your candor on that,

20  Mr. Jenkins.

21           And, Mr. Ben'Ary, I appreciate you and the probation

22  department providing the Court some information to at least

23  address the Court's concern about situations such as this.

24  Because, you know, those people who appear before me know that

25  I take each case individually seriously, and I want to make

1   sure that the appropriate remedy is provided for each person

2   who is facing the worst day of their life when it comes to a

3   sentencing event.  So I do appreciate the representations

4   made.

5           Is there any evidence that the government wishes to

6   present at this time?

7           MR. BEN'ARY:  There's no evidence.  We do have two

8   family members of Mr. Brown in court that wanted to address

9   the Court at the appropriate time.

10          THE COURT:  Mr. Jenkins, do you have any problem

11  with them doing that now?

12          MR. JENKINS:  I do not, Your Honor.  I believe they

13  are entitled to by statute.

14          THE COURT:  All right.  And I'm not going to require

15  them to be under oath.  Do you have any problem with that,

16  sir?

17          MR. JENKINS:  I do not, Your Honor.

18          THE COURT:  All right.  You can recognize those

19  individuals, and then they can address the Court.

20          MR. BEN'ARY:  Your Honor, the two individuals are

21  Katherine Mackenzie (ph), who was Xyqwavius Brown's aunt; and

22  Erica Vinny Brown, Mr. Brown's mother.

23          THE COURT:  Okay.

24          MR. BEN'ARY:  I would propose hearing from

25  Ms. Mackenzie first and then Ms. Brown afterward.

1        THE COURT:  Ms. Mackenzie, you can come forward and

2   stand at the bar right before you come into the well.  And

3   anything you think appropriate to say to the Court, you can

4   say at this time, now.  Right there is fine.

5        MS. MACKENZIE:  Okay.

6        THE COURT:  If you're fully vaccinated and you want

7   to, you can remove your mask.

8        MS. MACKENZIE:  Oh, yeah.  Thank you, sir.

9        THE COURT:  Yes, ma'am.

10       MS. MACKENZIE:  I just wanted the Court to know

11  about my nephew, Qwa.  What kind of child he was growing up,

12  all the things he liked to do.  He liked to play basketball,

13  swimming, he used to do gaming.  He was just a loving and

14  caring young man.  And he had so much potential to do all kind

15  of wonderful things in life.

16       In fact, my son and him are the same age.  And the

17  day before this happened, he called my son and asked to come

18  play -- do you want to come play basketball?  And my son had

19  to go to work, because he was going to come over, play

20  basketball, spend the night, hang out at my house.  And I'm

21  always wondering, could something could have been different

22  that day to make this not happen.

23       THE COURT:  One of the things that we always do as

24  parents -- and I'm a parent, too.  One of the things that we

25  always get concerned about is the things that our children can

1  get caught up in because they don't have the experience of

2  wisdom, and they don't have the experience of life.  And I'm

3  sure you're aware that part of things that got your loved one

4  caught up in this was the fact that he was in a culture out

5  there that was bad and it was dangerous and it had mortal

6  consequences for him.

7          MS. MACKENZIE:  It did.  It really did.  Because

8  when you're young, you make bad decisions.  But we have to

9  learn not to do those things over and over again.  She's

10  heartbroken.

11          THE COURT:  I understand.

12          MS. MACKENZIE:  I'm trying to keep her alive.

13  Because it's hard when you lose a child before they -- they

14  are supposed to go.  And dealing with abuse and drugs,

15  alcohol, are the things that happen in this world today, but

16  you have to just pray for each other, you know.  And I do kind

17  of forgive the young man who did this, and I pray that in the

18  future, if he does ever have a future, that he will learn from

19  it and not come back in this world to do things he did or

20  forget.  But I also have to ask for justice for my nephew on

21  his behalf because he's not here.

22          Even though some of the things that he did might

23  have not been, you know, things that he shouldn't have done,

24  but nobody deserves to die just for a senseless crime when you

25  could have thought about other ways of doing things besides

1  killing someone.  When you take somebody's life, you can't

2  take it back.  You can't bring it back.  You can't take that

3  act back.

4          THE COURT:  Someone once said to me it's not a video

5  game where you can kill somebody and you can hit the reset

6  button and they get back up.

7          MS. MACKENZIE:  Yeah.  Thank you, Your Honor.

8  You're absolutely right.  It's not like that.  So you can't

9  reset your life.  But I pray for him.

10          THE COURT:  I appreciate your statement to the

11  Court, ma'am.  And I can imagine how difficult it is.  I've

12  been blessed to not have to stand up and address something

13  like this when I've lost a loved one, but I understand the

14  depth of your grief and I will pray for you, too.

15          MS. MACKENZIE:  Thank you so much.

16          THE COURT:  Yes, ma'am.

17          MS. MACKENZIE:  Please pray for his mother -- for

18  Qwa's mother because she's going through a lot right now, and

19  I want to try to keep her alive now.

20          THE COURT:  Okay.  That's going to be an awesome

21  responsibility, but that's what we do with someone that we

22  love.  We do the best we can with what we can.

23          MS. MACKENZIE:  Yeah.  Qwa wants her to stay here

24  with us, not on the other side where he is.

25          THE COURT:  Yes, ma'am.

1      MS. MACKENZIE:  We want her to stay here, and --

2      THE COURT:  What I'll do, ma'am, now is hear from

3  her.  If she would like to address the court.  You can stand

4  by her, if you would like.

5      Ms. Tinsley, if you could assist the ladies.

6      (Mother and aunt holding up a blanket.)

7      MS. BROWN:  I shouldn't have a blanket -- (crying.)

8      I should have him here with me.  He did nothing.  He

9  did nothing to you.  And you took his life and you took mines,

10 too.  I just came from PIW two days ago and I didn't --

11     MS. MACKENZIE:  PIW is a place where you go when you

12 are -- when you want to take your own life because you can't

13 live with life like this.  This is what it causes a mother to

14 do sometimes.

15     MS. BROWN:  My son, he was loved and he has little

16 brothers that don't understand why he can't see his big

17 brother no more.  They are children.  It's not a game.  And

18 you did that.  You are playing a game with my son's life.  I

19 did research, you are a gang leader.  You hosted drugs.  You

20 make more money than the judge do.  You took my son away from

21 me.  For what?  For what?  He did nothing to you.  The people

22 that did something to you are still out here in these streets,

23 but my son is not here anymore.  You know right from wrong.

24 You made a choice.  It's no justice.  It's no justice.

25     THE COURT:  Ma'am, let me say this to you, while I

1  have never had to bear the burden that you've had to bear in

2  losing a child, I have lost loved ones.

3        MS. BROWN:  Yes.

4        THE COURT:  And the closest people to me that I've

5  lost are my mother and father.

6        MS. BROWN:  They are not going to come back.

7        THE COURT:  They are not going to come back, and

8  they did not die the way that your son did.  But what gives me

9  the ability to get through those days when it's tough, when I

10  think about them not being in here, is I celebrate what I had

11  rather than dwell on what I lost.  That is the best way to get

12  through a day --

13        MS. BROWN:  And I try --

14        THE COURT:  -- just celebrate what you have.

15        MS. BROWN:  And that's -- everybody keeps saying

16  those words to me, too.  It's words.  My son said, words.  He

17  does not deserve to lose his life by saying words.

18        THE COURT:  And I agree with you, ma'am.  That is no

19  doubt.

20        MS. BROWN:  So, what, 100 years?  No.  There's no

21  life.  No life for a life.  He's not coming back.

22        THE COURT:  All right, ma'am.  Well, I will tell you

23  this.  As part of the determination that this Court is going

24  to make, I've heard and I've listened to what you had to say

25  today.  And it will be taken into consideration.

1     MS. BROWN:  Justice.

2     THE COURT:  I thank you for providing that

3  information to me.

4     MS. BROWN:  That's not justice to me.

5     MS. RUMBAUGH:  Your Honor, the victim's sister,

6  Janay Brown (ph), is here as well.  And I believe she wishes

7  to address the Court as well.

8     THE COURT:  Yes, ma'am.

9     MS. RUMBAUGH:  Very briefly, Your Honor.  Before she

10  comes up, I'll note that the victim's grandmother,

11  Joyce Brown, who testified at the trial, very much wished to

12  be here today but it would simply be too hard on her, but the

13  Court has her letter.

14     THE COURT:  Yes.  And it will be made part of the

15  record.

16     MS. RUMBAUGH:  Thank you, Your Honor.

17     THE COURT:  As will all the other sentencing

18  materials.

19     Yes, ma'am.

20     MS. J. BROWN:  Hi.  I'm Janay Brown.  And Xyqwavius

21  was my brother, my little brother.  And we were close growing

22  up.  People thought we were twins.  And Qwa taught me how to

23  tie my shoes, taught me how to ride a bike.

24     THE COURT:  Good memories.

25     MS. J. BROWN:  Yeah.  Taught me how to swim.  He

1   drowned me a couple of times -- like a lot of times.  But,

2   yeah, we had fun times and I just, like, I feel like when he

3   passed, I lost my childhood.

4           THE COURT:  Ma'am, let me suggest something to you.

5   And again, I appreciate what you're saying about how much you

6   loved your brother.  But right now, you have an even more

7   important responsibility.  And let me tell you what that

8   responsibility is is that that lady who brought you into this

9   world is grieving right now, and she's going to need you to be

10  strong, she's going to need you to be able to help her through

11  her most difficult times.  She's going to need you to be all

12  that you can be to help her get through this.  That's what

13  your responsibility is at this time.  And it's a tough

14  responsibility.

15          You know, when you get older like me, you find that

16  your children actually are a lot more than you thought they

17  were.  They actually become the parent, telling you what to

18  do.  My children would tell me where I can go, believe it or

19  not.  I'll say, I feel like I want to go to such and such a

20  place, and they'll say, Daddy, you can't go there.  And you

21  know what I do, I listen.  I listen because it's important for

22  them to understand how they can best protect me.  And that's

23  your responsibility right now is to do all you can do and be

24  the person that you can be to help your mother get through the

25  grief that she will never get over.  That's your obligation.

1  It's a tough obligation.

2         MS. J. BROWN:  Yeah.  I have been helping her, and

3  it's just not the same anymore.  At Thanksgiving, Christmas,

4  everything is different because we, like, we don't really get

5  along, right -- I mean, we get along but, like, my brother

6  was, like, the glue.  He just brought everybody together.

7         THE COURT:  That's the way families are.

8         MS. J. BROWN:  Yeah.

9         THE COURT:  And your family is no different.

10         MS. J. BROWN:  He's always, like --

11         THE COURT:  The one who was trying to get everybody

12  to be together.

13         MS. J. BROWN:  Yeah, he was always like trying to

14  keep us to stay together and stuff.  And --

15         MS. BROWN:  Y'all could have been friends.

16         MS. J. BROWN:  Well, it's not going to be the same

17  anymore.  And it changed my mom mentally.  And it changed me

18  mentally.  Like, I have a daughter now, and she never met my

19  brother, and that's really hard for me.

20         THE COURT:  Understood.

21         MS. J. BROWN:  And, like, a year after my brother

22  passed, my uncle passed away, too, to gun violence, too.

23         MS. BROWN:  Come on, baby.

24         MS. J. BROWN:  It's just --

25         THE COURT:  I appreciate your words, ma'am.  I

1  appreciate your words.  Thank you.

2        MS. BROWN:  He's going to get three meals a day,

3  every day. (Indiscernible.)

4        THE COURT:  Any other evidence from the government?

5        MR. BEN'ARY:  No, Your Honor.

6        THE COURT:  Mr. Jenkins, any evidence, sir?

7        MR. JENKINS:  No evidence, Your Honor.  Your Honor,

8  I would note for the Court because I know this is something

9  that the Court appreciates that the -- Mr. Palma's mother and

10 father, and also other family and friend members are seated in

11 the court, Your Honor, in support of him.

12        THE COURT:  Thank you, sir.  Mr. Jenkins, before I

13 hear from you on your sentencing argument, I try to take in as

14 much as I can.  And I can appreciate that your client

15 maintains his innocence as far as responsibility for this

16 particular act, but I watched him as I listened to the grief

17 that these three ladies articulated in very clear terms for

18 the Court, and he had no reaction.  Even if you are a person

19 who did not do it, how can you not have heartache listening to

20 what these ladies said?  I looked at his family members, they

21 had sympathy for him.

22        MR. JENKINS:  Yes, Your Honor.

23        THE COURT:  And they reacted.  They were sad for

24 these ladies over here.

25        MR. JENKINS:  Your Honor, I will --

1          THE COURT:  But your client was not.

2          MR. JENKINS:  Your Honor, even at the risk of maybe

3     even violating privilege, I will share with the Court that I

4     gave Mr. Palma Flores certain direction.  And he acted

5     consistent with the direction that I gave him, because I --

6     you know, my -- my preference would be, and unfortunately,

7     over the past 30 years, have had the displeasure to be in this

8     position on far too many times.  And representing a defendant

9     who has been convicted of taking the life of someone's loved

10    one.  And I've had some situations where things have turned.

11         THE COURT:  Ladies, I need to be able to listen to

12    the defense counsel, so I appreciate your patience here.

13         MR. JENKINS:  Where things have turned poorly

14    because it may be perceived by others, family members, that

15    the defendant is responding in a way that displeases them, and

16    then an eruption occurs.  There are times in which the

17    defendant may not be trusted to restrain his own emotions and

18    know how to respond.  So I gave Mr. Palma Flores some clear

19    instructions, and I believe, based on my observations, he

20    acted consistent with that.  That might not necessarily speak

21    to how he feels at this moment.

22         THE COURT:  Thank you.

23         Government's argument on sentencing.

24         MR. BEN'ARY:  The taking of a human life is -- has

25    the largest impact of any crime in our system, and you heard

1  exactly why.  This defendant, when he decided to lure

2  Mr. Brown out of the apartment and shoot him, unarmed sitting

3  on the steps, sentenced him to life.  He gave him a life

4  sentence.  They are going to have to deal with their loved one

5  not being around from here until the end of time, and that's

6  not fair.  And it's not fair in a way that can't be addressed

7  by the sentence that the Court imposes here.  Nothing changes

8  that life sentence.  And that's a really tough pill to swallow

9  for someone -- or for people that are working in public

10  safety.  But there's just not an adequate sentence under the

11  law for -- for the -- to address the harm of the crime, which

12  puts the Court in a difficult position in figuring out what

13  the right thing is to do.

14       But I would suggest to you that the sentence that

15  the government recommends is closer to the mark here than the

16  lighter, lower sentence that the defense recommends.  And --

17  so a couple of reasons I say that.  Throw the guidelines out

18  the window.  You know, the guidelines recommend life but I'm

19  not sure that it matters all that much.  Because what you

20  have -- what the 3553(a) factors tell the Court to do is

21  address the nature and circumstances of the offense.  You take

22  somebody's -- you take somebody else's life, how do you

23  measure what the consequence should be?  I think when people

24  think about it -- when people outside the justice system think

25  about it, if you ask him, they probably would say, if you take

1    somebody's life, you should get a life sentence.

2            THE COURT:  And let me ask this.  And this is the

3    difficult thing that the Court needs to do is that I've got a

4    kid in front of me.

5            MR. BEN'ARY:  Yup.

6            THE COURT:  Now, he may be a grown man for purposes

7    of sentencing, but I've got a kid in front of me who has

8    ruined his life, ruined his family's life, ruined these

9    people's lives; and so, what purpose do I accomplish directly

10   by saying that he should, in essence, forfeit the rest of his

11   life?

12           MR. BEN'ARY:  I totally -- totally get it.  And I

13   think that Mr. Palma's youth is a large mitigating factor, and

14   that, frankly, is probably the -- the number one determination

15   that led the government to recommend a downward variant

16   sentence on a murder trial that went to trial and denies

17   responsibility.  So you've got that on the mitigating side of

18   the house.

19           Also, on the mitigating side of the house -- and it

20   was sort of mentioned here -- but Mr. Brown was engaged in

21   dangerous conduct.  He voluntarily engaged in dangerous

22   conduct.  Not at all to say that he deserved what he got to

23   the contrary.  I don't think anybody deserves to be shot in

24   cold blood unarmed.  But that is a mitigating factor.  So

25   when -- I think most people would say, All right, you kill

1  somebody; you get a life sentence.  Here's -- there are two

2  major factors that would leave the government to recommend

3  something less than that in this case.

4        On the aggravating side of the house, and sort of

5  what brings us back up to 50 years as opposed to something

6  lower than 50 years, there are -- well, I guess, it's a -- one

7  huge, related consideration that I know the Court sees, but

8  let me articulate it, is the notion of redemption.  Everyone

9  is capable of redemption.  Qwa Brown, Your Honor, was involved

10  in dangerous conduct, as I just said.  He deserved a chance to

11  become something more than he was when he was killed.  And

12  Mr. Palma took that from him.  He could have been redeemed.

13  But now he can't, because the defendant chose to end his life.

14        The defendant is capable of being redeemed.

15  Mr. Palma is capable.  Everyone is capable of being redeemed.

16  But redemption has to start with the acceptance of

17  responsibility.

18        I don't believe, Your Honor, that someone can be

19  redeemed and rehabilitated if they never take responsibility

20  for engaging in the bad conduct to begin with.  And I

21  understand the Court's point about having the right to go to

22  trial, certainly.  Everyone has the right to go to trial.  I

23  don't think you have the right to try and frame an innocent

24  person for the murder that you committed by tampering with

25  witnesses and perjuring yourself.  And I think that that

1   speaks directly to whether the defendant will be

2   rehabilitated.  And I know we're asking for a long time, but

3   as we sit here with the defendant having never expressed

4   remorse, never accepted responsibility, I don't believe that

5   he can be rehabilitated to a degree that would make the Court

6   feel satisfied that he would not continue to be a risk to

7   public safety if released.  I understand he was extremely

8   young when he committed this act, and it's reflected by our

9   recommendation which is less than life, but he certainly knew

10  that what he was doing was dangerous conduct and was conduct

11  that was not going to be reversible.

12          He went through several steps that night to lure

13  Xyqwavius Brown out.  He did lure him out.  He went and

14  approached him on the steps of that building with one purpose

15  and one purpose only, and that was to shoot and kill him.  He

16  never made it off the steps.  And, you know, our evidence

17  suggested that Xyqwavius Brown was struck by a bullet first to

18  the arm, then doubled forward and was struck a second time by

19  a bullet to the top of the head and that he was still alive

20  when paramedics got there.

21          Probably capable of feeling pain.  And a pain that

22  Mr. Palma would likely never have to endure.  I think the

23  Court sentence has to address all of that.  And I fully expect

24  the Court to give mitigation credit to the defendant for his

25  young age and for the fact that Mr. Brown was also involved in

1  dangerous conduct.  But you're also dealing with someone

2  that's going to continue to be a risk to the community because

3  he's never accepted responsibility for his actions, and you've

4  got to have a sentence that shows the Brown family and the

5  general public that our legal system puts a premium on the

6  value of human life, even when that human life is up to stuff

7  that puts that human life in danger.  Mr. Brown was capable of

8  redemption.

9          THE COURT:  Thank you, sir.

10         Mr. Jenkins.

11         MR. JENKINS:  Yes, Your Honor.

12         Your Honor, I'll start by stating the obvious.  And

13  that is that I certainly am pleased that it seems like the

14  government as well as the Court, no matter how difficult this

15  case is and the issues that are presented, all recognize that

16  this is not a case in which one-size-fits-all.  There's a

17  reason why Congress has afforded this Court some discretion in

18  terms of determining the appropriate sentence.  This is not a

19  case where someone who was convicted under an 1111 statute

20  offense where it's mandatory life.  That's not what the Court

21  has before it.  And that's because Congress recognizes that

22  someone convicted under Count 2 in this situation, the Court

23  should weigh a number of factors in determining what the

24  appropriate sentence is.  And, yes, as we detail in our

25  sentencing memorandum, we do believe that the fact that

1  Mr. Palma Flores was 18 years and 7 days old at the time of

2  this offense is worthy of the Court's consideration.

3  We do believe --

4  THE COURT:  Mr. Jenkins, I will never criticize a

5  person's determination to go to trial.  That's an individual

6  personal right.  A thing that a person has to do based upon

7  their own measured and guided circumstances.  A good person

8  who is in a circumstance similar to your client would listen

9  to his lawyer, except that maybe he did something that he

10  should not do.  Evaluate the circumstances that are presented.

11  Understand the weight of the evidence that is likely to be

12  presented against him after consultation with his lawyer.  And

13  instead of doing those things -- I think this is a fair

14  evaluation -- instead of doing these things, he decides to

15  chart his own course, not listen to his lawyer, tamper with a

16  witness and do things which absolutely undermines the ability

17  of the Court to do anything for him in consideration.

18  I was aware that there was a negotiated resolution

19  in this case that hindsight would say that was very, very

20  fair.  And your client chose not to do that.  Again, that's

21  his prerogative.

22  MR. JENKINS:  Yes.

23  THE COURT:  But instead of choosing not to do this

24  and helping with an adequate defense that you tried to present

25  for him, he did other things which undermined the ability for

1  this Court to have any real care or concern about him, other

2  than for his youth and other than for his family that are

3  grieving because of what he did.  And so, what kind of message

4  does the Court send?

5         MR. JENKINS:  Yes, Your Honor.

6         THE COURT:  And I hope you can help me with this.

7         MR. JENKINS:  Your Honor, that's a -- that

8  definitely is a fair point to raise.  But I'll take the Court

9  back 30 years or so ago when you and I practiced side by side

10  together in Prince William County in the juvenile domestic

11  relations court before you took the bench there.  I think you

12  would agree with me that one of the most difficult,

13  challenging circumstances that we confront in representing

14  young people is their ability to do all those things you just

15  identified, to give fair and honest evaluation to the facts

16  and the circumstances that they're confronted with.

17         THE COURT:  Uh-huh.

18         MR. JENKINS:  Their age alone, their immaturity

19  alone.  In this very courtroom, I've had the displeasure to

20  represent a 17-year-old charged with capital murder, having

21  difficult conversations with him and trying to get him to

22  understand what the facts and circumstances were that he faced

23  and get him to appreciate it.  See, it's one conversation to

24  have that with a 17-year-old or an immature 18-year-old and a

25  whole different conversation to have it with a 32-year-old

1   person who has been in and out of the system.

2           The question is whether or not Mr. Palma Flores or

3   anyone similarly situated has the capacity to do just what the

4   Court suggested it would expect.  In my almost 30 years of

5   practicing -- of representing people like Mr. Palma Flores,

6   that is 16-years-old, 15-year-old, 17-year-old, 18-year-old

7   charged with some of the most serious offenses our society

8   condemns.  That's my greatest challenge, to get them to

9   understand.  I tried to use family and friends.  People who

10  they know far longer than what Mr. Palma Flores has known me.

11  They engaged him in conversation also, Your Honor.  They tried

12  to bring some value to my representation in Mr. Palma Flores.

13  But none of that changes the fact of who he is; 18 years old

14  and 7 days.  30 days, approximately five weeks from now, he'll

15  turn 21.  He's still five weeks away from his 21st birthday.

16          As we identified in our sentencing paper, Your

17  Honor, this is just unfortunately not uncommon.  An uncommon

18  experience.  It's something that we as our society grapple

19  with.  What do we do with really young people who commit

20  really serious crimes?  Once upon a time, it was permissible

21  in this country to send them to automatic life.  The Supreme

22  Court has now told us that's not appropriate.  That we have to

23  take in account their age.  Now --

24          THE COURT:  And there's also been -- you know, what

25  you talked about, us practicing together 30 years ago.  30

1  years ago if you had a person that was 17, there would

2  actually be a determination as to whether or not their case

3  should be certified to be tried as an adult.  And so we had

4  that option back in the day, and we've grown to some degree

5  where we're no longer killing children.

6          MR. JENKINS:  Children.

7          THE COURT:  Right.  But I think the legislature has

8  essentially said that the sweet spot is we're not going to

9  allow the government to take a life, but the bottom line is if

10  you meet that threshold of 18 years old, we're going to make

11  you bear the consequences of anyone else who commits a crime

12  and potentially mitigated by considering your youth.

13          MR. JENKINS:  That's right.  And I think that's

14  fair, Your Honor.  I think we're in a better place today than

15  where we were 30 years ago, Your Honor.  I think we're in a

16  better place today than where we were 15 years ago when, you

17  know, again, I was confronted with representing individuals

18  like Mr. Palma Flores where there wasn't really much I could

19  say at sentencing because the statute said life.  And that's

20  it.

21          But I think the law recognizes that if Mr. Palma

22  Flores was seated before you and he was 35 years old, that it

23  would be fair for you to look at him differently and to treat

24  him differently.  That if he was 45 years old and had six

25  prior felony adult convictions, it would be fair for you to

1   look at him and treat him differently.  And that's all what

2   we're asking you to do here today, Your Honor, is when you

3   take into account his age and as the government properly

4   identified, both of these young men -- in fact, I would

5   submit, Your Honor, every young person that testified in this

6   case was living a life that you and I and Mr. Ben'Ary and

7   Ms. Rumbaugh as parents never would want our children to be

8   engaged in.  All of them.  All of them were engaged in this

9   lifestyle.  Marijuana consumption, alcohol abuse, gunplay,

10  robberies; they all were engaged in it.  And it is so sad and

11  so unfortunate.  And Mr. Palma Flores, with respecting the

12  jury's verdict, he now has a price to pay.  The only question

13  is, Your Honor, how much of a price?

14          Mr. Ben'Ary talked about redemption.  We identified

15  in our moving papers, Your Honor.  Statistics tell us this,

16  that the Melvin Palma Flores before you today is unlikely to

17  be the same Melvin Palma Flores 20 years from now.  That's

18  true with all of us.  And statistics tell us, the Bureau of

19  Prisons statistics, the U.S. Sentencing Commission statistics

20  all tell us that 20 years from now he would be less likely to

21  engage in violent behavior than what he is today.  Statistics

22  tell us that 20 years from now, 25 years from now, he will be

23  better equipped to make better decisions than what he was two

24  years ago.

25          It all points us to the point that the Court can

1    take some solace, some comfort in knowing that if you do grant

2    him some grace and not impose a sentence consistent with the

3    guidelines or even one recommended by the government --

4    because I would suggest, Your Honor, that's functionally life.

5    Given his age, given his demographic, given what life

6    expectancy would be for a young Hispanic male in the Bureau of

7    Prisons system, 50 years is effectively life.

8            If the Court has concluded in its mind -- and I

9    don't assume that you have -- that Mr. Palma Flores should not

10   be sentenced to life in prison, then I would submit that 50

11   years is also inappropriate.  That something less than that

12   would be appropriate.

13           This young man still has a lot of life to live.  He

14   still has the opportunity, as Mr. Ben'Ary says, to redeem

15   himself.  He still has the opportunity to perhaps play a

16   meaningful role in his own son's life.  He still has the

17   ability to serve as an example to that son if not what to do,

18   what not to do.  Because regardless of whether or not

19   Mr. Palma Flores accepts responsibility for taking Mr. Brown's

20   life, I am confident of this that Mr. Palma Flores, during the

21   course of my time knowing him, regrets engaging in drug

22   dealing, using guns, and the lifestyle that he lives.  He

23   regrets that he will not be there for his own son.  He regrets

24   that, Your Honor.

25           And if he could take it all away, if he could wave a

1  magic wand and never start consuming marijuana, never turn to

2  alcohol, never get involved with firearms, I am confident he

3  would make that decision, Your Honor.  I know this is a

4  difficult decision, Your Honor, with all that you have to

5  balance.  I feel for the Brown family.  I understand that they

6  are hurting.  I do.  I really do, Your Honor.

7           But this was a young man who was 18 years old and 7

8  days.  Still shy of his 21st birthday.  We think, Your Honor,

9  that the sentence that we have recommended would certainly

10 satisfy the 3553(a) factors.  It would not bring Mr. Brown

11 back.  No, it would not.  And it would not give any of us

12 100 percent certainty that Mr. Palma Flores would not engage

13 in violent acts again.  But your job, Your Honor, isn't about

14 mathematical certainty.  It's about exercising judgment based

15 on the available evidence you have.

16           THE COURT:  And doing justice.

17           MR. JENKINS:  And doing justice.

18           THE COURT:  Thank you, sir.

19           MR. JENKINS:  Thank you, Your Honor.

20           THE COURT:  Mr. Palma Flores, you may stand, sir.

21 Is there anything you want to say before the Court sentences

22 you in this matter?

23           THE DEFENDANT:  First and foremost --

24           THE COURT:  You can remove your mask if you're fully

25 vaccinated, sir.

1          THE DEFENDANT:  I'm not vaccinated, Your Honor.

2          But first and foremost, I would like to send my

3    condolences to the Brown family.

4          THE COURT:  Just a moment, sir.

5          Ms. Rumbaugh, I'm going to ask you to sit in the

6    jury box.

7          MS. RUMBAUGH:  Yes, Your Honor.

8          THE COURT:  Thank you.

9          Thank you for that hesitation, sir.  Go ahead.

10         THE DEFENDANT:  First and foremost, I would like to

11   send my condolences to the Brown family.  Following

12   Mr. Jenkins instructions, it's a lot I would like to say, but

13   he, as my counsel, has advised me to remain silent.

14         Thank you, Your Honor.

15         THE COURT:  You're sure there is nothing else you

16   want to say?  Do you want to say something to your family?

17   They are here for you.  You at least need to let them know how

18   much you appreciate them supporting you in your worst moment.

19   So if you want to face your family and say something to them,

20   this is your time.

21         THE DEFENDANT:  Mama, I appreciate y'all for

22   everything y'all have done for me.  And I would like to

23   apologize for any hurt and pain and agony I have inflicted

24   upon you guys.

25         THE COURT:  You can say it in your native language

1  to them if you wanted to make sure they can understand.

2            THE DEFENDANT:  I can't.  I can't do this.

3            THE COURT:  All right, sir.  You can have a seat

4  beside your counsel.

5            You can remain seated as I go through the sentencing

6  disposition.

7            MR. JENKINS:  Yes, Your Honor.

8            THE COURT:  Under the sentencing guidelines, the

9  base offense level is 43.  I appreciate counsel and the

10 probation department providing information to the Court to

11 address some concerns that the Court had with regard to the

12 calculation of the sentencing guidelines.  The Court finds

13 that in this case the requirements of sentencing guidelines

14 Section 3E1.1 are not satisfied as the defendant has not

15 clearly demonstrated acceptance of responsibility for the

16 offense.  Therefore, the base level offense remains at 43.

17           The criminal history score is 3 and the criminal

18 history category is 2.  Accordingly, the sentencing guidelines

19 advise a term of life imprisonment.

20           The supervised release period is a supervised

21 release range of two to three years on Counts 1, 2; two to

22 five years on Count 2; one to three years on Count 3.  The

23 fine range is 50,000 to $250,000.

24           Pursuant to the factors under 18. -- 18 U.S.C.

25 3553(a), the Court should consider the following:  The nature

1  and circumstances of the offense, and the history and

2  characteristics of the defendant.  Two, the need for the

3  sentence imposed to, among other things, reflect the

4  seriousness of the offense and adequately deter criminal

5  conduct.  Three, the kinds of sentences available.  Four, the

6  guidelines.  Five, policy statements issued by the sentencing

7  commission.  Six, the need to avoid unwarranted sentencing

8  disparities among defendants with similar records found guilty

9  of similar conduct.  And seven, the need to provide

10  restitution to the victim of the offense.

11          Ultimately, as the Court has pointed out several

12  times, the sentence imposed must meet the standard of

13  reasonableness under *United States v. Booker*.

14          With respect to the nature and characteristics, and

15  circumstances of the offense, and the history and

16  characteristics of the defendant, the defendant was found

17  guilty of a grave offense by using a firearm in furtherance of

18  a drug trafficking crime resulting in death.

19          The jury found that he killed a young man over $200

20  worth of marijuana.  He cut short the life of Mr. Brown and in

21  so doing not only took the life of another but robbed

22  Mr. Brown's family of spending many precious years together

23  with their loved one.

24          What is more, the defendant attempted to deflect

25  responsibility, as the jury found, for his actions by blaming

1 someone else for the murder, and later undermining the

2 judicial process by tampering with a witness.  Words cannot

3 convey the grief the defendant's senseless act of gun violence

4 has caused this victim's family and the Court's sentence must

5 address this wrong.

6          The Court does, however, attempt to address this

7 tragic nature and circumstances of the defendant's crimes by

8 considering the following:  The need for the sentence to

9 reflect the seriousness of the offense, to promote respect for

10 the law, and to provide just punishment for the offense.  To

11 afford adequate deterrence of criminal conduct.  To protect

12 the public from further crimes of the defendant.  And to

13 provide the defendant with the needed educational and

14 vocational training, medical care, or other correctional

15 treatment in the manner most effective.  The Court finds the

16 defendant committed crimes justifies a significant sentence of

17 imprisonment.

18          The guideline range for such an offense is a term of

19 life imprisonment.  The Court has three separate counts before

20 it.  Count 1, Count 2, Count 3, all having different

21 sentencing variations.  With respect to Count 1, the

22 sentence -- the Court -- is that the defendant serve 60 months

23 incarceration.

24          With respect to Count 3, the Court says that the

25 defendant shall serve a term of 240 months incarceration,

1  which will run concurrent.  And with regard to Count 2, the

2  most serious crime, obviously, of the things involved, the

3  Court sentences the defendant of 540 months incarceration.

4          These sentences fall below the advisory guideline

5  range and, of course, will not warrant any unwarranted

6  sentencing disparities and is in line with other sentences

7  that have been imposed in like cases involving Section 924(j)

8  offenses in the Eastern District of Virginia.

9          Accordingly, the Court's total sentence is 540

10 months imprisonment.

11         During this period of incarceration, the defendant

12 must comply with the standards and conditions that have been

13 adopted by this Court as well as the following special

14 conditions:  The defendant shall apply all monies received

15 from any income tax refunds, lottery winnings, inheritances,

16 judgments, and any anticipated or unexpected financial gains

17 to the outstanding court order financial obligations, or a

18 lesser amount to be determined by the Court upon

19 recommendation of the probation officer.

20         The defendant shall provide the probation officer

21 access to any requested financial information.  If the

22 defendant tests positive for controlled substances or shows

23 signs of alcohol abuse, the defendant shall participate in a

24 program approved by the United States probation officer for

25 substance abuse.  Which program may include residential

1  treatment and testing to determine whether the defendant has

2  reverted to the use of drugs or alcohol, with partial cost to

3  be paid by the defendant, all is directed by the probation

4  officer.

5         The defendant shall participate in a program

6  approved by the United States probation office for mental

7  health treatment to include anger management.  The cost of

8  this program is to be paid by the defendant as directed by the

9  probation department.

10         The defendant shall not use marijuana or cannabis in

11  any form.  Recognizing that the defendant is likely not

12  capable of paying the minimum fine prescribed by the statute,

13  the Court declines to impose a fine.  However, the Court must,

14  pursuant to statute, impose a special assessment of $300, $100

15  for each felony offense for which the defendant was convicted,

16  pursuant to 18 U.S.C. 3013.

17         The provisions of the Mandatory Victim Restitution

18  Act of 1996 apply to this offense.  Today it appears that no

19  restitution request has been filed.  I'll ask counsel for the

20  government to inquire of the victim's family as to whether or

21  not they want to pursue any remedies they may have under that

22  particular act.

23         MR. BEN'ARY:  We have, Your Honor, and have not

24  received information back on that.

25         THE COURT:  Do you want to set a close date on that?

1      MR. BEN'ARY:  Sure, that would be great.

2      THE COURT:  30 days?

3      MR. BEN'ARY:  That's more than enough.  Thank you.

4      THE COURT:  The defendant is advised that he may

5  appeal any portion of this Court's sentence and notice of

6  right to appeal form is inapplicable to this case and that the

7  defendant was convicted by a jury of his peers.

8      Mr. Jenkins, I will request that you advise the

9  defendant of any constitutional rights he has with regard to

10  appeal.  If he requires court appointed counsel, I would ask

11  that you facilitate making sure that that happens so that he

12  can properly note his appeal to any court of record.

13      MR. JENKINS:  Yes, Your Honor.

14      Your Honor, may it please the Court.  I have

15  discussed with Mr. Palma Flores his right to appeal.  He would

16  ask that the Clerk of Court, at this point in time, note his

17  appeal with the understanding that counsel will file a written

18  notice of appeal.

19      THE COURT:  Any objection to that, Mr. Ben'Ary?

20      MR. BEN'ARY:  No, Your Honor.

21      THE COURT:  The Court will recommend that the

22  defendant be designated to a Bureau of Prisons facility that

23  is located near the Washington, D.C. metropolitan area.  And

24  the Court will also recommend the defendant be evaluated for

25  participation in any substance abuse treatment program for

1  which you may qualify including the RDAP program.

2         Mr. Palma Flores, the jury has determined in your

3  circumstances that you're responsible for a lot of pain.

4  Again, you are entitled to maintain your innocence.  I'm not

5  in any way undermining your right to maintain your innocence,

6  but there's a lot of hurt in this room, and a jury has found

7  that you're responsible for a lot of this hurt.

8         You've heard the statements from Mr. Brown's family,

9  and you've seen the pain that your own family is going

10 through, recognizing that this is a terrible day for them as

11 they will not be able to fulfill their lives spending it with

12 you in the way that traditional families do.  But you do have

13 some life left.  I didn't give you life imprisonment.  I could

14 have.  And there was a temptation to do that, but I considered

15 your age, and I've considered the circumstances of this case,

16 and essentially given you some degree of grace in this case.

17 But you do have a significant price to pay, and I hope that

18 you make the best of the opportunity that you have for the

19 rest of your life.

20        Do you have any questions, sir?

21        THE DEFENDANT:  No, Your Honor.

22        THE COURT:  All right.  The supervised release

23 period of five years as to Count 2, and three years as to

24 Counts 1 and 3.  All concurrent, Mr. Jenkins.

25        MR. JENKINS:  Thank you, Your Honor.

1          THE COURT:  Very good.

2          (Discussion off the record.)

3          THE COURT:  Mr. Ben'Ary, because of the circumstance

4    with regard to providing that information under the Victim

5    Restitution Act (sic), the sentence does not become final

6    until I get everything.

7          Do you want to shorten the period of time for that,

8    sir?

9          MR. BEN'ARY:  I'm satisfied, Your Honor.  We have

10   discussed this with the Brown family, and they've had months

11   of opportunity to provide restitution information.  I'm

12   confident that we're not going to have --

13         THE COURT:  The Court, accepting the government's

14   representation that it has taken all necessary steps to ensure

15   that the parties involved are able to take advantage of the

16   ability to pursue remedy under the compensation act and having

17   been given due time to fulfill that obligation so that the

18   Court can consider that, declines to impose a restitution

19   obligation.

20         MR. JENKINS:  Your Honor, I would ask, Your Honor,

21   if the Court would consider, nevertheless, still suspending

22   the imposition or finalizing the judgment and commitment

23   order.  As the Court may recall, the Palma Flores family

24   retained our office in order to handle the trial in this

25   matter.  We have been engaged in some discussions about their

1  ability to do so on direct appeal. If the Court were to delay

2  entry of the judgment and commitment order, that would afford

3  them some additional time.

4          THE COURT: And this comes on your client's motion?

5          MR. JENKINS: Yes, Your Honor.

6          THE COURT: All right. Recognizing that this comes

7  on the defendant's motion for, in a sense, slowing down the

8  effectuation of the Court's order in this regard, I will grant

9  the defendant's motion to slow the process down.

10         How long do you think you need, Mr. Jenkins?

11         MR. JENKINS: Your Honor, I think three weeks should

12 be enough time to have some clarity. If they are unable to

13 afford counsel, then I will certainly note to the Court,

14 because Mr. Palma Flores then would be seeking court appointed

15 counsel.

16         THE COURT: All right. The Court is going to direct

17 that the information supporting that determination be provided

18 to the Court no later than Friday, September 30th, close of

19 business. Friday, September 30th, close of business.

20         Mr. Jenkins, because I want to make sure that there

21 is no confusion with regard to the Court's obligation to

22 notify your client of his right to appeal, that I am depending

23 on you to effectuate what needs to happen, so that there are

24 no glitches in the process.

25         MR. JENKINS: Absolutely. Yes, Your Honor.

1          THE COURT:  Mr. Ben'Ary, anything else we need to

2     do, sir?

3          MR. BEN'ARY:  No, Your Honor.  We'll speak to the

4     Brown family, again, about restitution.  And if we get it, we

5     will submit to chambers --

6          THE COURT:  Was there any money recovered as part of

7     the investigation of this matter?

8          MR. BEN'ARY:  Not that I recall.

9          MR. JENKINS:  I don't think so, Your Honor.

10          THE COURT:  Okay.  Well, maybe if you can speak with

11     the case agent to see if any money has been recovered.  As

12     part of that, one of the things that there was indeed some

13     money recovered, maybe that can help to pay for the expenses

14     that were caused by Mr. Brown having to be buried or cremated.

15          MR. BEN'ARY:  Understood.  Thank you, Your Honor.

16          THE COURT:  All right.

17          Anything else from the probation department?

18          THE PROBATION OFFICER:  No, Your Honor.

19          THE COURT:  All right.  Thank you.

20          Remand you to the custody of the United States

21     Marshals.

22          If he wants, he can stand there and say goodbye to

23     his family.  If he wants to.  If he wants to, he can face his

24     family and say goodbye.

25          THE MARSHAL:  Is he allowed to have contact with

1  them, or just talk to them -- just communication --

2            THE COURT:  Right there.

3            (Defendant complies.)

4            THE COURT:  I thank the United States Marshal for

5  that consideration.

6            All right.  We're done.

7            **(Proceedings adjourned at 1:01 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ROUGH DRAFT

1           CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4     the Eastern District of Virginia, do hereby certify that I

5     reported by machine shorthand, in my official capacity, the

6     proceedings had and testimony adduced upon the Sentencing

7     hearing in the case of the **UNITED STATES OF AMERICA versus**

8     **MELVIN PALMA FLORES**, Criminal Action No.: 1:20-cr-142, in

9     said court on the 7th day of September, 2022.

10          I further certify that the foregoing 65 pages

11    constitute the official transcript of said proceedings, as

12    taken from my machine shorthand notes, my computer realtime

13    display, together with the backup tape recording of said

14    proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16    name, this June 10, 2023.

17

18

19

20

21                         _____
                           Tonia M. Harris, RPR
22                         Official Court Reporter

23

24

25

                                                              65